# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN M. FRIEDBERG, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 02-CV-3193 |
| MUTUAL HOLDINGS LTD., *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

## ORDER

---

AND NOW, this _____ day of _____, 2002, upon

consideration of Defendants' Motion to Dismiss and Plaintiff's Memorandum of Law in

Opposition thereto, it is hereby ORDERED and Decreed that the Motion is DENIED in its

entirety, and the Temporary Restraining Order entered as of May 30, 2002, shall remain in place.


BY THE COURT:


_____
Yohn, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STEPHEN M. FRIEDBERG | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | NO. 02-CV-3193 |
| MUTUAL HOLDINGS LTD., *et al.*, | : | |
| Defendants. | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Stephen M. Friedberg, by and through his attorneys, hereby responds to the motion of defendants Mutual Holdings LTD., IPC Mutual Holdings LTD., Mutual Holdings (Bermuda) LTD., Mutual Indemnity LTD. and Mutual Indemnity (Bermuda) LTD. (hereinafter "Mutual") to dismiss the Complaint and dissolve the Temporary Restraining Order entered by this Court on May 30, 2002.[1] Defendants' motion should be denied because (1) they waived their right to challenge this Court's jurisdiction and venue, (2) the clause in the shareholder agreements relied upon by defendants to contest this Court's jurisdiction does not apply to plaintiff's claims, and (3) the arguments set forth in their memorandum of law fail to acknowledge well-established exceptions to the enforcement of such clauses, thus warranting denial of Mutual's motion to dismiss.

---

[1]     Defendant Morgan Stanley has not joined in Mutual's motion to dismiss.

## BACKGROUND

Friedberg is the sole successor and remaining shareholder under three (3) shareholder agreements relating to the creation of captive insurance arrangements (the "Shareholder Agreements") between Mutual Holdings Ltd. (now succeeded by IPC Mutual Holdings Ltd. and/or Mutual Holdings (Bermuda) Ltd.) on the one hand and Friedberg or his predecessors on the other hand. The Shareholder Agreements are as follows:

> (a)    Shareholder Agreement entered into as of January 1, 1992, by and between Mutual and Mark Ouimette (the "E11 Agreement"). A true and correct copy of the E11 Agreement is attached hereto as Exhibit "A."

> (b)    Shareholder Agreement entered into as of January 1, 1992, by and between Mutual and Advantage Partners (the "E14 Agreement"). A true and correct copy of the E14 Agreement, together with its four amendments, is attached hereto as Exhibit "B."

> (c)    Shareholder Agreement entered into as of March 1, 1994, by and between Mutual and Mark Ouimette (the "U21 Agreement"). A true and correct copy of the U21 Agreement, together with its amendment, is attached hereto as Exhibit "C."

*See* Affidavit of Stephen M. Friedberg, attached hereto as Exhibit "D" ¶1. Each of the Shareholder Agreements provides for the purchase by Friedberg's predecessor of a single share of Mutual preferred non-voting stock in a designated series and the agreement by Mutual to declare a dividend to the shareholder of record on a specific date each year and, at the termination of each agreement, to repurchase the preferred share. *Id.* ¶¶2-3. Under the three Shareholder Agreements, Friedberg or his predecessors purchased one such preferred share in series designated E11, E14, and U21. *Id.* ¶2.

2

The annual dividend that Mutual agreed to declare under each of the Shareholder Agreements was determined by a formula set forth in each of the individual Shareholder Agreements. The dividend could be either a positive or negative sum of money, depending upon the performance of each captive insurance program. Under the Shareholder Agreements, Friedberg was able to elect either to take possession of the dividend or, in the alternative, to leave the dividend with Mutual to continue to be invested with the other capital. *Id.* ¶4.

Each of the three Shareholder Agreements provided for a specific redemption date unless the parties agreed that Mutual would continue to hold Friedberg's funds and to pay him additional dividends as defined by the Shareholder Agreements. *Id.* ¶5. The parties so agreed with respect to the E11 Agreement and the E14 Agreement. *Id.* The redemption date for the U21 Agreement was June 1, 2002, Exhibit C (Amendment to the U21 Agreement), several days after Friedberg filed this Complaint.

Certain of the money that was declared by Mutual as dividends to Friedberg under the three Shareholder Agreements was transferred at Friedberg's direction to three accounts established at Prudential Securities Incorporated ("Prudential") in Philadelphia, Pennsylvania. Friedberg directed the establishment of the Prudential accounts to receive the dividend proceeds from each of the three Shareholder Agreements. Exhibit D ¶6. The Prudential accounts were later transferred by Friedberg to Dean Witter Reynolds Inc. ("Dean Witter") and then to Morgan Stanley Dean Witter & Co., now Morgan Stanley, in Philadelphia, Pennsylvania as the individual broker for the accounts moved from one firm to the next. *Id.* While these accounts passed from one investment firm to the next, Friedberg continued to direct certain of the money that was declared as dividends to Friedberg under the Shareholder Agreements to the three accounts. *Id.*

3

No person other than Friedberg directed the transfer of dividends from Mutual on the one hand to Prudential, Dean Witter, and Morgan Stanley on the other hand. *Id.*

Friedberg is the only person who has directed the investment of the monies on deposit at Prudential, Dean Witter, and Morgan Stanley. *Id.* ¶7. He continues to have unfettered discretion in directing the investment of these monies in the Morgan Stanley accounts. *Id.* ¶8. He had the same power and discretion while the accounts were at Prudential and Dean Witter.

When the three accounts were established at Prudential, two of the accounts were titled in the name of defendant Mutual Indemnity Ltd. ("Indemnity") and one in the name of defendant Mutual Indemnity (Bermuda) Ltd. ("Indemnity (Bermuda)"). *Id.* ¶9. That is how the accounts are titled at Morgan Stanley today.[2] *Id.* However, legal and equitable title or ownership to those monies passed from Mutual to Friedberg at the time that Friedberg became entitled to self-direct the deposit of the monies accruing under the Shareholder Agreements to Prudential, and then later to Dean Witter and to Morgan Stanley. Thus, Friedberg is the owner, or, alternatively, the beneficial owner of the funds that he has directed to be deposited at Prudential, Dean Witter, and Morgan Stanley despite the title name on the accounts. *Id.*

Upon information and belief, Mutual is being closely monitored by the Bermuda Supervisor of Insurance. *Id.* ¶12. Indeed, A.M. Best Company downgraded the rating of Indemnity and Indemnity (Bermuda) in its most recent report. *Id.*; *see also* Best's Rating and Report Updates for the I.P.C. Group, attached hereto as Exhibit "E." From the time this action was filed, defendants Mutual, Indemnity, Indemnity (Bermuda), and/or Mutual Risk

---

[2]    There was approximately $2,700,000 in the Morgan Stanley accounts when the Complaint was filed. *See id.* ¶11.

PHDATA 1058004_1

Management Ltd. (the holding company of Mutual) have been in precarious financial condition, may now be insolvent, and may soon seek protection under bankruptcy laws. Exhibit D ¶13; *see also* recent news articles relating to the defendants and Mutual Risk Management Ltd., attached hereto as Exhibit "F." Were Mutual, Indemnity, and/or Indemnity (Bermuda) to file for bankruptcy, Friedberg's money at Morgan Stanley, or, alternatively, his equitable interest to that money, would most likely disappear.[3]

On May 29, 2002, this Court held a conference and entered a TRO the following day to protect the Morgan Stanley monies from dissipation. After the entry of that TRO, the parties negotiated a resolution that would allow the monies to be protected while the merits of the ownership issue would be decided in Bermuda. Both parties agreed by late June 2002 that they would not contest the TRO in this jurisdiction while litigating the merits issue in Bermuda. But Mutual now seeks to disavow its agreement at the very time when it may declare bankruptcy.

Interestingly, on the same day this Court entered the TRO, defendant Mutual Holdings (Bermuda) Ltd. notified Friedberg that it was suspending dividend distributions for 60-90 days until such time as it could reach a commutation agreement with two insolvent Pennsylvania insurance companies. Letter from Mr. Alexander to Mr. Friedberg (May 30, 2002), attached hereto as Exhibit "G." And on October 10, 2002, defendant Mutual Holdings Ltd. or its successor(s) mailed a letter to all shareholders, including plaintiff, reiterating that the payment of dividends to shareholders remained under a "moratorium" until resolution of the

---

[3]     Before this Court entered the Temporary Restraining Order ("TRO"), Indemnity or Indemnity (Bermuda) contacted the Morgan Stanley stockbroker on May 15, 2002, and requested that he transfer $200,000 of Mr. Friedberg's money to a Bermuda bank account. At Friedberg's direction, the Morgan Stanley stockbroker delayed and did not transfer the $200,000.

5

commutation agreement with the two insolvent Pennsylvania insurance companies. Letter from Mr. Alexander to Preferred Shareholders (October 10, 2002), attached hereto as Exhibit "H." The notification by Mutual was a clear admission of its insolvency; the continued viability of Mutual depended upon such a commutation agreement. Indeed, "Pennsylvania insurance regulators, after examining the companies' books, ordered both [insolvent Pennsylvania insurance companies] into rehabilitation, which the news reports said was 'one stop short of insolvency, in the insurance industry bankruptcy process.'" Exhibit "F" (article published November 19, 2002).

On August 12, 2002, plaintiff Friedberg filed a second petition in the Bermuda courts seeking to liquidate the Mutual defendants and thus to obtain his rightful money, attached hereto as Exhibit "I." In that petition, Friedberg alleged the insolvency of certain of the Mutual defendants. In a sworn affidavit supporting their efforts to contest the liquidation petition, the Mutual defendants did not deny the allegation. *See* Exhibit "J" (August 20, 2002, affidavit of J. Patrick Reardon).

According to its October 10 letter, Mutual believed it had formalized a commutation agreement with the insolvent Pennsylvania insurance companies in July 2002. But the rehabilitator of those companies rejected the agreement in August. Without a commutation agreement, Mutual's ability to ever pay dividends again and to continue as a viable concern is in doubt.[4]

---

[4]     A Harrisburg judge is expected to decide the validity of the proposed commutation agreement shortly.

6

With this background, Mutual's effort here to grab Friedberg's money at Morgan Stanley plainly is an effort to maximize assets for its impending bankruptcy. That is why Mutual has suddenly violated the agreement reached among the parties that litigation on the merits would proceed in Bermuda so long as protection of the money was maintained in Philadelphia through the TRO.

## ARGUMENT

Defendants' motion should be denied because they waived their right to challenge this Court's jurisdiction and venue. Moreover, the clause in the Shareholder Agreements relied upon by defendants does not affect this Court's jurisdiction for two additional separate and independent reasons. First, this clause does not apply to the claims in plaintiff's Complaint. And second, enforcement of such forum preference clauses does not, and cannot, outweigh the interests of this Court in resolving the present dispute in this federal district.

### A.    Defendants Waived Their Right to Challenge This Court's Jurisdiction and Venue.

Defendants' motion to dismiss must be denied because they waived their right to object to jurisdiction and venue.

#### 1.    Defendants cannot challenge this Court's jurisdiction and venue because they agreed to leave the TRO in place under this Court's jurisdiction.

Plaintiff filed his lawsuit on May 23, 2002, and concurrently filed a Motion for Temporary Restraining Order. On May 29, 2002, this Court held a conference to discuss the TRO where Mutual's potential attorneys participated in the conference (Mutual's counsel had yet to clear client conflicts at this point). After hearing arguments, this Court entered a TRO at the

7

conclusion of the conference freezing the monies held in the Morgan Stanley accounts. *See* Exhibit "K" (the Order embodying the TRO entered the following day).

After lengthy discussions this past summer, the parties agreed to leave the TRO in place under the jurisdiction of this Court until such time as there was a full and complete resolution of a corollary lawsuit in Bermuda. The parties reached this accord after the Mutual defendants rejected plaintiff's attempt (which was originally supported by the Mutual defendants) to transfer the TRO to a Bermuda court and have a companion injunctive order entered in that court.

In particular, Friedberg's counsel informed the Court on June 14, 2002, that plaintiff proposed "to the Mutual defendants for the entry of an injunctive Order in the Bermuda action" but was awaiting a response. *See* Letter from Mr. Haussman to The Honorable William H. Yohn, Jr. (June 14, 2002), attached hereto as Exhibit "L." On June 26, 2002, defendants' Bermuda counsel responded to Friedberg's Bermuda counsel by letter stating that "*our clients prefer to leave the TRO in place for the time being*" while the Bermuda lawsuit proceeded. *See* Letter from Conyers Dill & Pearman to Mr. Kawaley (June 26, 2002) (emphasis added), attached hereto as Exhibit "M." Plainly, in their very own words, defendants elected to leave jurisdiction with this Court. More importantly, on July 3, 2002, plaintiff's counsel informed the Court that "*the Mutual defendants have agreed to keep the TRO in place*" while the parties continue to consider some type of resolution. *See* Letter from Mr. Haussman to The Honorable William H. Yohn, Jr. (July 3, 2002) (emphasis added), attached as Exhibit "N." Significantly, defendants' local counsel and Chicago counsel were copied on this letter – their election to stand by the representation that "defendants have agreed to leave the TRO in place" is quite telling.

8

Thus, defendants' election to leave the TRO in place under the jurisdiction of this Court waives any and all objections they now may have as to this Court's jurisdiction. Defendants' present motion is simply a futile attempt to put themselves in a position to grab the monies and put it beyond the reach of any court in the event that that the commutation agreement with the insolvent Pennsylvania insurance companies is ruled non-binding. Accordingly, defendants' motion to dismiss should be denied.

2. **Defendants waived their right to contest jurisdiction and venue because they failed to raise the objection with reasonable dispatch.**

The law is clear that defenses based upon personal jurisdiction and improper venue are waived if not raised in a timely fashion. *Bel Ray Co. v. Chemrite Ltd.*, 181 F.3d 435 (3d Cir. 1999); *Dias v. Bogins*, No. 94-1069, 1994 U.S. Dist. LEXIS 7447 (E.D. Pa. June 7, 1994); *see also* Fed. R. Civ. P. 12(h). Here, defendants' motion, which is based solely upon a forum preference clause in the Shareholder Agreements, is untimely because they did not raise the objection earlier.

This Court held a conference to discuss matters involving the TRO on May 29, 2002. In that conference, defendants were represented generally by Chicago counsel who mentioned the role the Bermuda courts might play in this action because of the potential effect of the forum clause. Despite that, this Court entered a TRO at the conclusion of the conference. *See* Exhibit "K" (the Order embodying the TRO entered the following day).

Just one week later, Mutual's local counsel entered his appearance on behalf of defendants. Exhibit "O." Nowhere on this entry of appearance does Mutual's counsel preserve the forum issue or object to this Court's jurisdiction. Moreover, Mutual's local counsel moved

9

for the admission *pro hac vice* that very same day of Vincent Connelly, Esquire, and Lisa A. Dunsky, Esquire, and nowhere in that motion did Mutual's counsel preserve or object to this Court's jurisdiction.[5] Exhibit "P."

Thereafter, as discussed at length earlier, defendants consented to the continuation of the TRO, affirmatively stating their preference that this case remain in this Court.

Now, five and one-half months after Mutual's attorneys first entered their appearance and participated in the conference before this Court regarding the TRO – and months after they requested this Court to retain jurisdiction over this case – Mutual seeks to reverse its field and argue a lack of jurisdiction. However, Mutual's motion to dismiss, which is based solely upon a forum selection argument, must be denied because its objections to jurisdiction and venue have been waived by its own conduct.

The law is clear – objections to jurisdiction and venue are waivable. *Bel Ray*, 181 F.3d 435; *Dias*, 1994 U.S. Dist. LEXIS 7447. Indeed, "once a defendant appears, he must proceed with reasonable dispatch to contest jurisdiction." *Dias*, 1994 U.S. Dist. LEXIS 7447, at *4. Otherwise, he is barred from raising that objection later on. Similarly, "the privilege to challenge venue must be 'seasonably asserted' or it will be waived." *Kampf v. Heinecke*, No. 94-6452, 1995 U.S. Dist. LEXIS 5592, at *1 (E.D. Pa. Apr. 28, 1995) (quoting *Commercial Casualty Ins. Co. v. Consolidated Stone Co.*, 278 U.S. 177, 179-80 (1929)). More importantly, federal courts have held that a party waives any defenses to personal jurisdiction if omitted from

---

[5]      This Court granted the *pro hac vice* motion for Mr. Connelly and Ms. Dunsky on June 10, 2002.

his first appearance. *E.g., Broadcast Music, Inc. v. M.T.S. Enterprises, Inc.*, 811 F.2d 278, 281 (5th Cir. 1987).

Significantly, the Third Circuit has previously ruled that a defendant who participates in a preliminary proceeding without preserving jurisdictional objections waives his right to challenge jurisdiction later on either by motion or pleading. In *Wyrough & Loser, Inc. v. Pelmore Laboratories, Inc.*, 376 F.2d 543 (3d Cir. 1967), Wyrough sought and obtained a preliminary injunction against Pelmore to enjoin it from misappropriating Wyrough's trade secrets. Similar to Friedberg, Wyrough filed its lawsuit and request for injunction on the same date; the court held a preliminary injunction hearing where the parties participated (whereas this Court held a TRO conference where plaintiff and the Mutual defendants participated); the court subsequently entered a preliminary injunction, thereby granting plaintiff preliminary relief; and then the defendant finally filed a motion to dismiss on jurisdictional grounds weeks later. *Id.* at 545. Of course, in the present case, defendants filed their motion to dismiss on jurisdictional grounds five and a half months later.

The Third Circuit affirmed the District Court's dismissal of the *Wyrough* defendants' argument that its participation in the preliminary proceeding cannot be deemed a waiver so long as it could file a timely motion to dismiss under Federal Rule of Civil Procedure 12(b). *Id.* at 546. The court dismissed this argument because the *Wyrough* defendants could have brought the jurisdictional issue to the trial court's attention before the preliminary proceeding but elected not to do so. Significantly, the fact that the time period for filing a motion to dismiss had not yet expired was of no relevance. The Third Circuit therefore held that "a party who participates in such a [preliminary] proceeding must be deemed to have waived the defense of lack of personal jurisdiction." *Id.* at 547.

11

Here, defendants waited five and a half months after participating in the TRO conference and entering their general appearance to raise their objections. Defendants had the opportunity to contest jurisdictional issues earlier but elected not to do so. As a result, defendants' very own conduct proves fatal to their present motion because any and all objections to jurisdiction have been waived. *Id.* at 546 ("defendant may waive the defense by action or conduct").

Accordingly, Mutual's motion to dismiss should be denied.

**B.    The Clause Relied Upon By Defendants Does Not Apply to Friedberg's Claims Because They Do Not Raise a Dispute Concerning the Shareholder Agreements.**

The clause relied upon by the Mutual defendants does not apply to the claims in Friedberg's Complaint. It provides (in each agreement), "This Agreement has been made and executed in Bermuda and shall be exclusively governed by and construed in accordance with the laws of Bermuda and any dispute concerning this Agreement shall be resolved by the courts of Bermuda." Exhibit A (E11 Agreement) ¶9; Exhibit B (E14 Agreement) ¶9; Exhibit C (U21 Agreement) ¶10. As Friedberg's Complaint does not raise a dispute concerning the Shareholder Agreements, this clause is inapplicable and defendants' motion should be denied.

Friedberg alleges in his Complaint that Mutual declared dividends to him and, as a result, permitted him to transfer money that he then owned, or, at a minimum, beneficially

12

owned, from Mutual's bank accounts in Bermuda to investment accounts that he established in Philadelphia. There is no dispute that the dividend money was so transferred.[6]

Friedberg alleges that title passed at the time Mutual allowed him to take control of the money. The Complaint further alleges that rather than withdraw the money from the captive insurance arrangements, he elected not to terminate the arrangements but to keep them going, which is why the money at Morgan Stanley is titled in the names of Mutual Indemnity Ltd. and Mutual Indemnity (Bermuda) Ltd. That is not a dispute concerning the Shareholder Agreements. Rather, the only dispute concerns who owns money that Friedberg has solely controlled for a number of years since its transference to Philadelphia.[7]

Nowhere in defendants' motion do they contend that Friedberg's Complaint is a dispute concerning the agreements. Rather, they dodge the issue and merely claim that Friedberg cannot contest the validity of that particular provision. Thus, not even Mutual contends that Friedberg's claims concern the Shareholder Agreements.

The clause in the Shareholder Agreements relied upon by defendants does not apply to Friedberg's claims. Accordingly, defendants' motion should be denied.

---

[6]    Indeed, the Shareholder Agreements provided that "MUTUAL agrees to cause a dividend to be declared to the owner of record on such dates(s) [as are specified in the appendix to agreement.]" *See*, *e.g.*, Exhibit A ¶2.

[7]    Friedberg certainly does not contest any of the terms of the Shareholder Agreements. Rather, he asserts his ownership interest in certain monies that were segregated from Mutual's operating assets and put into special investment accounts that he set up and has controlled. Friedberg's rights to exercise control and dominion over the Morgan Stanley monies are wholly independent of the Shareholder Agreements.

13

C.      **The Clause Relied Upon By Defendants Cannot Be Enforced Under
        The Circumstances Of This Case.**

Assuming *arguendo* that Mutual did not waive its objections to personal

jurisdiction and venue – which it did – the provision of the Shareholder Agreements that

defendants rely upon is nonetheless unenforceable under the present facts.

The law is clear that clauses expressing a forum preference are not always

binding.  Such a clause will be given no effect if (1) it was negotiated fraudulently, (2)

enforcement would violate a strong public policy of the forum, or (3) forcing the complaining

party to litigate in the preselected forum would "for all practical purposes [deprive him of his]

day in court." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12, 15, 18 (1972); *Cedarbrook

Associates v. Equitec Sav. Bank*, 678 F. Supp. 107, 108 (E.D. Pa. 1987).  A party need only

satisfy one of these exceptions in order to defeat a forum preference clause.  The present facts of

this case reveal that two of these exceptions are satisfied.

1.      **The harm Friedberg will suffer if this case is litigated in Bermuda
        implicates the public policy exception.**

Pennsylvania public policy mandates that this case be litigated in this Court

instead of in Bermuda.  Plaintiff is a citizen of the Commonwealth of Pennsylvania.  And

Pennsylvania has a strong public policy of protecting its citizens against wrongs committed by

foreign companies.  *See, e.g., Smith v. Dean Witter Reynolds, Inc.*, 846 F. Supp. 400, 403 (E.D.

Pa. 1994).  This reason alone deems the forum preference clause in the Shareholder Agreements

unenforceable.

Furthermore, this Court is the most appropriate court to dispose of this case

because not only does plaintiff (as well as defendant Morgan Stanley) reside in Pennsylvania but

the dividends that are in dispute are currently maintained in Morgan Stanley accounts in Philadelphia. This Court is already familiar with the facts and has entered a TRO freezing the Morgan Stanley monies.

Finally, were defendants to prevail in their motion, the money that this Court protected by the TRO and which the Mutual defendants *consented* to protect (in exchange for litigating the merits in Bermuda) would disappear. The potential harm to Friedberg, a Pennsylvania resident who invested his monies in Pennsylvania, would be great if he were forced to litigate in Bermuda without proper protection of the money. It is in the best interest of judicial economy and resources to leave the Complaint and TRO in place and not divest this Court of its jurisdiction. Accordingly, the forum provision relied upon by defendants should be given no effect and defendants' motion should be denied.

    2.    **Friedberg will not be able to effectively litigate his claim in Bermuda because defendants will likely remove the money from the Morgan Stanley accounts before the Bermuda litigation is resolved.**

For all practical purposes, Friedberg will effectively be denied his day in court if this case is litigated in Bermuda. Such consequences satisfy the *Bremen* exception to enforcement of forum selection clauses. *Bremen*, 407 U.S. at 18.

The TRO entered by this Court on May 30, 2002, froze the dividends that plaintiff directed to be invested in Philadelphia. More importantly, the TRO prevents Mutual from removing and transferring those monies to their accounts in Bermuda. Without the TRO, Mutual will surely remove the money – as evidenced by their unsuccessful efforts to do so just prior to the filing of this Complaint – and, in light of its poor A.M. Best Company rating and its recent notification to shareholders that it was suspending disbursement of dividends pending resolution

of other financial matters, use the funds to pay off its mounting debt and attempt to stave off its imminent financial downfall.

Clearly, this Court should not dismiss plaintiff's Complaint and dissolve the TRO because doing so will render pointless any lawsuit Friedberg files in Bermuda to protect his shareholder dividends in the Morgan Stanley accounts.  Specifically, there will be no money for him to protect if the TRO is dissolved and this Complaint dismissed, effectively eliminating his need for "a day in court" in Bermuda.  *Bremen*, 407 U.S. at 18.  And that is exactly what the Mutual defendants seek – to grab the money and run.

For this reason alone, this Court should deny defendants' motion.

## CONCLUSION

For all the foregoing reasons, plaintiff Stephen M. Friedberg respectfully requests that this Court deny defendants motion to dismiss, thereby leaving the May 30, 2002 TRO in place. and enter and order in the form attached hereto.

Respectfully submitted,

David Smith (I.D. No. 21480)
Theodore F. Haussman, Jr. (I.D. No. 76331)
*Attorneys for Plaintiff,*
*Stephen M. Friedberg*

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia. Pennsylvania  19103-7286
(215) 751-2000

Of Counsel.

Dated: November 27, 2002

PHDATA 1058004_1

# EXHIBIT A

RECEIVED
JAN 5 1996
LEECH & TISHMAN

<u>SHAREHOLDER AGREEMENT</u>

THIS AGREEMENT, made and entered into as of January 1, 1992 by and between MUTUAL

HOLDINGS LTD., a company organized and existing under the laws of the Islands of Bermuda

(hereinafter referred to as "MUTUAL") and MARK OUIMETTE (hereinafter referred to

individually or collectively as "SHAREHOLDER").

<u>WITNESSETH:</u>

WHEREAS, SHAREHOLDER is desirous of purchasing One (1) non-voting preferred share of

MUTUAL designated Series "E11" preferred share (hereinafter "PREFERRED SHARE") for

the purchase price hereinafter set forth; and

WHEREAS, MUTUAL is desirous of repurchasing the PREFERRED SHARE on the redemption

date set forth in Appendix I attached hereto (hereinafter referred to as the "REDEMPTION

DATE") for the purchase price hereinafter set forth; and

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein

the parties do hereby agree as follows:

1.        SHAREHOLDER agrees to purchase the PREFERRED SHARE and agrees to pay to

          MUTUAL the amount of One Thousand Dollars ($1,000.00). This amount shall be paid

          within thirty (30) days of the execution of this Agreement.

2.   On the dates shown in Appendix I (hereinafter referred to as the "DIVIDEND DATE")
MUTUAL agrees to cause a dividend to be declared to the owner of record on such date(s)
of the PREFERRED SHARE in an amount equal to the sum of the following:

The amount of investment income, if any, earned by MUTUAL during the 12 months
ending 31 December immediately preceding such DIVIDEND DATE resulting from the
investment of the cash funds received by MUTUAL as the purchase price of the
PREFERRED SHARE as set forth in paragraph (1) hereof, less the applicable
Administrative Fee as shown in Appendix I equal to a percentage per annum of the average
amount of investment funds held by MUTUAL as a result of the purchase price of the
PREFERRED SHARE.

3.   SHAREHOLDER hereby indemnifies and holds MUTUAL harmless against the
cumulative sum of paragraph 2, minus the cumulative amount of dividends paid, being less
than zero at any point in time.

On receipt of each written demand by MUTUAL, SHAREHOLDER agrees to pay
MUTUAL within 30 days, the amount by which the cumulative sum of the amounts
calculated under paragraph 2, minus the cumulative amounts of dividends paid pursuant
to this Agreement, are less than zero minus all previous payments under this paragraph.

4.  If on the REDEMPTION DATE, as defined in this Agreement, MUTUAL continues to hold funds and agrees to annually pay SHAREHOLDER on 28 February of each year as additional dividends the amount of investment income earned by MUTUAL during the preceding year resulting from the investment of such funds less an Administrative Fee as shown in Appendix I equal to a percentage per annum of the average amount of such funds until such time as the amount of funds held by MUTUAL is less than Five Thousand Dollars ($5,000) at which point liability under this paragraph shall cease.

5.  On the REDEMPTION DATE, MUTUAL agrees to repurchase from the SHAREHOLDER the PREFERRED SHARE upon presentation of the share certificate representing the PREFERRED SHARE duly endorsed for cancellation for the price of One Thousand Dollars ($1,000.00) by repaying the amount of cash paid by SHAREHOLDER as purchase price for the PREFERRED SHARE.

6.  It is agreed that the PREFERRED SHARE issued to SHAREHOLDER pursuant to this Agreement is being purchased by the SHAREHOLDER for purposes of investment only. The said PREFERRED SHARE has not been registered under the United States Securities Act of 1933, as amended. The said PREFERRED SHARE shall not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered and will bear the following legend:-

    "These securities have not been registered under the Securities Act of 1933, as amended. These Securities have been acquired for investment and may not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered."

7.    This Agreement may not be modified, amended or changed in any manner except in writing signed by all the parties hereto. It may, however, be terminated by written notice from either party to the other at least sixty (60) days prior to the proposed termination date. In such event all existing obligations from each party to the other or to third parties shall remain in force as of the time of termination.

8.    All notices, requests, demands or other communications provided for herein shall be in writing, shall be delivered by hand or by first-class mail, postage prepaid and shall be addressed to the parties hereto at their respective addresses listed below or to such other persons or addresses as the relevant party shall designate as to itself from time to time in a writing delivered in like manner:

If to MUTUAL HOLDINGS LTD., to it at:

        Barclays International Building
        44 Church Street
        P.O. Box HM 2064
        Hamilton HM HX, Bermuda.

If the SHAREHOLDER, to it at:

        4240 Greensburg Pike
        Pittsburg, PA 15221
        U.S.A.

9.    This Agreement has been made and executed in Bermuda and shall be exclusively governed by and construed in accordance with the laws of Bermuda and any dispute concerning this Agreement shall be resolved exclusively by the courts of Bermuda.

10.    All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

-4-

11.   The purchase of the PREFERRED SHARE by SHAREHOLDER and any subsequent transfers of the PREFERRED SHARE are subject to the prior consent of the Bermuda Monetary Authority (Foreign Exchange Control) which agency must approve all transfers of shares in Bermuda companies.

IN WITNESS WHEREOF, the parties have set their hand.

At _HAMILTON, BERMUDA_

on the _12_ day of _November_, 1994.

MARK OUIMETTE

_[signature]_

At _Hamilton, Bermuda_

on the _15_ day of _Nov_, 1994.

MUTUAL HOLDINGS LTD.

BY: _[signature]_

Paul Watson, President

G:SHAG-E11.GM/rss/2-94

-5-

APPENDIX NO. I

PREFERRED SHARE SERIES "E11"

REDEMPTION DATE

Close of business on the 1st day of March, 2000.

DIVIDEND DATE

Commencing on the 28th day of February, 1995 and annually thereafter on the 28th day of February of each succeeding year up to and including the 28th day of February, 2000.

ADMINISTRATIVE FEE

During the term of the Underwriting Period 1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

MARK OUIMETTE

BY: _____

MUTUAL HOLDINGS LTD.

BY: _____
Paul Watson, President

G:SHAG-E11.GM/ru/2-94

# EXHIBIT B

RECEIVED
JAN 5 1996
LEECH & TISHMAN

## SHAREHOLDER AGREEMENT

THIS AGREEMENT, made and entered into as of January 1, 1992 by and between MUTUAL HOLDINGS LTD., a company organized and existing under the laws of the Islands of Bermuda (hereinafter referred to as "MUTUAL") and ADVANTAGE PARTNERS (hereinafter referred to individually or collectively as "SHAREHOLDER").

### WITNESSETH:

WHEREAS, SHAREHOLDER is desirous of purchasing One (1) non-voting preferred share of MUTUAL designated Series "E14" preferred share (hereinafter "PREFERRED SHARE") for the purchase price hereinafter set forth; and

WHEREAS, MUTUAL is desirous of repurchasing the PREFERRED SHARE on the redemption date set forth in Appendix I attached hereto (hereinafter referred to as the "REDEMPTION DATE") for the purchase price hereinafter set forth; and

WHEREAS, a subsidiary of MUTUAL, MUTUAL INDEMNITY LTD. (hereinafter referred to as "INDEMNITY") has entered into one or more Reinsurance Agreements (hereinafter referred to individually or collectively as the "TREATY") as shown in Appendix I with the insurance company(ies) as shown in Appendix I (hereinafter referred to individually or collectively as the "INSURANCE COMPANY") pursuant to which INDEMNITY has reinsured certain of the liability of INSURANCE COMPANY on policies of insurance issued to SHAREHOLDER and its affiliates.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein the parties do hereby agree as follows:

1.     SHAREHOLDER agrees to purchase the PREFERRED SHARE and agrees to pay to MUTUAL the amount of One Thousand Dollars ($1,000.00). This amount shall be paid within thirty (30) days of the execution of this Agreement.

2.     On the dates shown in Appendix I (hereinafter referred to as the "DIVIDEND DATE") MUTUAL agrees to cause a dividend to be declared to the owner of record on such date(s) of the PREFERRED SHARE in an amount equal to the sum of the following:

(A)     The amount of investment income, if any, earned by MUTUAL during the 12 months ending 31 December immediately preceding such DIVIDEND DATE resulting from the investment of the cash funds received by MUTUAL as the purchase price of the PREFERRED SHARE as set forth in paragraph (1) hereof, less the applicable Administrative Fee as shown in Appendix I equal to a percentage per annum of the average amount of investment funds held by MUTUAL as a result of the purchase price of the PREFERRED SHARE.

(B)     Plus the amount of investment income earned by INDEMNITY during the 12 months ending 31 December preceding the DIVIDEND DATE, resulting from the investment of funds received by INDEMNITY under the TREATY with INSURANCE COMPANY less the applicable Administrative Fee as shown in

Appendix I equal to a percentage per annum of the average amount of such funds held by INDEMNITY during the preceding year. It is understood and agreed that such funds may be held by INDEMNITY as loss reserves and premium reserves and may be repaid to INSURANCE COMPANY pursuant to the terms of the TREATY.

(C)    Plus or minus the amount of underwriting gain or loss realized by INDEMNITY on the TREATY during the policy year preceding the DIVIDEND DATE. Underwriting gain shall be computed by the following formula:

Net Premium received by INDEMNITY after all deductions made by or paid to the INSURANCE COMPANY including ceding commissions, expenses and taxes (including the actual final cost of licenses, fees, assigned risk charges, guarantee funds etc.) as provided in the TREATY; minus all losses and loss expenses incurred including loss and loss expense reserves for unpaid reported losses and for losses incurred but not reported; minus the applicable Underwriting Fee as shown in Appendix I; minus the actual cost incurred by INDEMNITY in establishing and maintaining a letter of credit in favour of INSURANCE COMPANY as required by the TREATY.

3.(A)    SHAREHOLDER hereby indemnifies and holds MUTUAL and INDEMNITY harmless against the cumulative sum of paragraphs 2(A), 2(B) and 2(C) minus the cumulative amount of dividends paid, being less than zero at any point in time. On receipt of each written demand by MUTUAL or INDEMNITY, SHAREHOLDER agrees to pay MUTUAL or INDEMNITY within 30 days, the amount by which the cumulative sum of the amounts calculated under paragraphs

2(A), 2(B) and 2(C) minus the cumulative amounts of dividends paid pursuant to this Agreement, are less than zero minus all previous payments under this paragraph provided however that the definition of incurred losses and loss expenses in paragraph 2(C) shall for this purpose only include losses and loss expenses which have been paid or are likely to be paid within the following ninety (90) days.

(B)    As security for this obligation SHAREHOLDER hereby agrees to provide INDEMNITY, upon execution of this Agreement collateral (hereinafter referred to as the "SECURITY DEPOSIT") in the form of a clean irrevocable letter of credit in the amount as shown in Appendix I drawn on a bank acceptable to INDEMNITY or substitute cash collateral. Thereafter, SHAREHOLDER agrees, during the period of the Policy and for so long thereafter as INDEMNITY has any outstanding or potential liability to INSURANCE COMPANY under the terms of the TREATY to keep such letter of credit in force or to substitute cash collateral prior to the expiration of such letter of credit. If cash collateral is provided, interest earned on such collateral, less the applicable Administrative Fee as shown in Appendix I, will be included as a dividend pursuant to Sections 2 (B) and 4 hereof. The provisions of this paragraph (3) shall survive the redemption of the PREFERRED SHARE and the termination of this Agreement.

4.    If on the REDEMPTION DATE, as defined in this Agreement, INDEMNITY continues to hold funds pursuant to the TREATY with INSURANCE COMPANY, MUTUAL agrees to annually pay SHAREHOLDER on 28 February of each year as additional dividends the amount of investment income earned by INDEMNITY during the preceding year resulting from the investment of such funds less an Administrative Fee as shown in Appendix I equal to a percentage per

annum of the average amount of such funds plus or minus the amount of additional underwriting gain or loss realized by INDEMNITY on the TREATY calculated in accordance with paragraph 2(C) hereof until such time as the amount of funds held by INDEMNITY is less than Five Thousand Dollars ($5,000) at which point liability under this paragraph shall cease.

5.    On the REDEMPTION DATE, MUTUAL agrees to repurchase from the SHAREHOLDER the PREFERRED SHARE upon presentation of the share certificate representing the PREFERRED SHARE duly endorsed for cancellation for the price of One Thousand Dollars ($1,000.00) by repaying the amount of cash paid by SHAREHOLDER as purchase price for the PREFERRED SHARE.

6.    It is agreed that the PREFERRED SHARE issued to SHAREHOLDER pursuant to this Agreement is being purchased by the SHAREHOLDER for purposes of investment only. The said PREFERRED SHARE has not been registered under the United States Securities Act of 1933, as amended. The said PREFERRED SHARE shall not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered and will bear the following legend:-

"These securities have not been registered under the Securities Act of 1933, as amended.    These Securities have been acquired for investment and may not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered."

7.    This Agreement may not be modified, amended or changed in any manner except in writing signed by all the parties hereto. It may, however, be terminated by written notice from either party to the other at least sixty (60) days prior to the proposed termination date. In such event all existing obligations from each party to the other or to third parties shall remain in force as of the time of termination.

8.  All notices, requests, demands or other communications provided for herein shall be in writing, shall be delivered by hand or by first-class mail, postage prepaid and shall be addressed to the parties hereto at their respective addresses listed below or to such other persons or addresses as the relevant party shall designate as to itself from time to time in a writing delivered in like manner:

If to MUTUAL HOLDINGS LTD, to it at:

> Barclays International Building
> 44 Church Street
> P.O. Box HM 2064
> Hamilton HM HX, Bermuda.

If the SHAREHOLDER to it at:

> 4240 Greensburg Pike
> Pittsburg, PA 15221
> U.S.A.

9.  This Agreement has been made and executed in Bermuda and shall be exclusively governed by and construed in accordance with the laws of Bermuda and any dispute concerning this Agreement shall be resolved exclusively by the courts of Bermuda.

10. All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

11. The purchase of the PREFERRED SHARE by SHAREHOLDER and any subsequent transfers of the PREFERRED SHARE are subject to the prior consent of the Bermuda Monetary Authority (Foreign Exchange Control) which agency must approve all transfers of shares in Bermuda companies.

IN WITNESS WHEREOF, the parties have set their hand.

At _Hamilton Bermuda_

on the _8_ day of _November_ , 1993.

COMP ADVANTAGE PARTNERS

BY:_____
   Mr. Dallas Krapf

BY:_____
   Mr. ~~Steven Freidburg~~
     _Steven Friedberg_

BY:_____
   Mr. Mark Ouimette

BY:_____
   Mr. Dale Krapf

At: _Hamilton Bermuda_

on the _17_ day of _Nov_ , 1993.

MUTUAL HOLDINGS LTD.

BY:_____
   Paul Watson, President

G:SHAG-E14.GM/rss/3-93

APPENDIX NO. I

PREFERRED SHARE SERIES "E14"

REDEMPTION DATE

Close of business on the 1st day of March, 1998.

DIVIDEND DATE

Commencing on the 28th day of February, 1993 and annually thereafter on the 28th day of February of each succeeding year up to and including the 28th day of February, 1998.

TREATY

| Underwriting Period | Insurance Company |
|---|---|
| January 1, 1992 - December 31, 1992 | Legion Insurance Company |

UNDERWRITING FEE

| Underwriting Period | Underwriting Fee |
|---|---|
| January 1, 1992 - December 31, 1992 | 3.5% |

The Underwriting Fee is expressed as a percentage of the gross premium written under the TREATY.

ADMINISTRATIVE FEE

During the term of the Underwriting Period  1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

SECURITY DEPOSIT

Two Hundred and Sixty-six Thousand United States Dollars ($266,000).

COMP ADVANTAGE PARTNERS

BY: _____
Mr. Dallas Krapf

BY: _____
Mr. Steven Freidburg

BY: _____
Mr. Mark Ouimette

BY: _____
Mr. Dale Krapf

MUTUAL HOLDINGS LTD.

BY: _____
Paul Watson, President

G:SHAG-E14.GM/rss/3-93

-9-

AMENDMENT No. 1
TO
SHAREHOLDER AGREEMENT
PREFERRED SHARE SERIES "E14"

This is Amendment No. 1, to a certain Shareholder Agreement made and entered into as of the 1st day of January, 1992 by and between **MUTUAL HOLDINGS LTD.**, a company organised and existing under the laws of the Islands of Bermuda (hereinafter "MUTUAL") and **ADVANTAGE PARTNERS** (hereinafter "SHAREHOLDER") a corporation organised and existing under the laws of the State of Pennsylvania.

## WITNESSETH

WHEREAS, both SHAREHOLDER and MUTUAL are desirous of amending this Agreement to provide for the renewal of the PROGRAM; and

WHEREAS, this AGREEMENT, the POLICY and the TREATY together constitute a single insurance program (hereinafter the "PROGRAM") which is a uniquely negotiated single contract and no part of the PROGRAM would have been entered into without the other parts being in force.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein the parties do hereby agree as follows:

1.    The policies of insurance issued to SHAREHOLDER and affiliates by INSURANCE COMPANY shall hereinafter be referred to individually or collectively as the "POLICY".

-1-

2.      SHAREHOLDER agrees to pay all premium due to INSURANCE
        COMPANY promptly and in full.  Any failure to pay such premium to
        INSURANCE COMPANY promptly when due shall consitute a material
        breach of this Agreement.   In addition to all other remedies which
        MUTUAL and INSURANCE COMPANY may have from such
        non-payment or delay in payment, MUTUAL may, but shall not be required
        to, pay such premium to INSURANCE COMPANY on behalf of the
        SHAREHOLDER and if MUTUAL shall so elect then the full amount of
        such payment, plus interest, shall be deducted from any dividends due to
        SHAREHOLDER under this Agreement.

3.      Appendix No. I shall be deleted in its entirety and replaced with Appendix
        No. I-a attached hereto.  All references to Appendix I-a in the Agreement
        shall now refer to Appendix I-a.

4.      All other terms and conditions shall remain unchanged.

5.      The effective date of this Amendment No. 1 shall be the 1st day of January,
        1992.

IN WITNESS WHEREOF, the parties have set their hand.

AT _Hamilton Bermuda_

on the 8° day of _November_ 1993.

COMP. ADVANTAGE

BY: _Dallas Krapf_
Mr. Dallas Krapf

BY: _Steven M Freidburg_
Mr. Steven Freidburg
_Steven Friedberg_

BY: _Mark E._
Mr. Mark Ouimette

BY: _Dale N. Krapf_
Mr. Dale Krapf

AT _Hamilton, Bermuda_

on the 1 day of _Nov_, 1993.

MUTUAL HOLDINGS LTD.

BY: _Paul Watson_
Paul Watson, President

G:AMEN-E14.GM/rss/3-93

-3-

APPENDIX NO. I-a
PREFERRED SHARE SERIES "E14"

## REDEMPTION DATE

Close of business on the 1st day of March, 1999.

## DIVIDEND DATE

Commencing on the 28th day of February, 1994 and annually thereafter on the 28th day of February of each succeeding year up to and including the 28th day of February, 1999.

## TREATY

| Underwriting Period | Insurance Company |
| --- | --- |
| January 1, 1992 - December 31, 1992 | Legion Insurance Company |
| January 1, 1993 - December 31, 1993 | Legion Insurance Company |

## UNDERWRITING FEE

| Underwriting Period | Underwriting Fee |
| --- | --- |
| January 1, 1992 - December 31, 1992 | 3.5% |
| January 1, 1993 - December 31, 1993 | 3.5% |

The Underwriting Fee is expressed as a percentage of the gross premium written under the TREATY.

## ADMINISTRATIVE FEE

During the term of the Underwriting Period  1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

-4-

SECURITY DEPOSIT

Four Hundred and Ninety-five Thousand Two Hundred and Thirty-seven United States
Dollars ($495.237).

BY: _____
Mr. Dallas Krapf

BY: _____
Mr. ~~Steven Freidburg~~
STEVEN FRIEDBERG

BY: _____
Mr. Mark Ouimette

BY: _____
Mr. Dale Krapf

MUTUAL HOLDINGS LTD.

BY: _____
Paul Watson, President

-5-

AMENDMENT NO. 2

TO

SHAREHOLDER AGREEMENT

PREFERRED SHARE SERIES "E14"


This is Amendment No. 2 to a certain Shareholder Agreement made and entered into the 1st day of January 1992 by and between **MUTUAL HOLDINGS LTD**, a company organized and existing under the laws of the Islands of Bermuda (hereinafter "MUTUAL") and **ADVANTAGE PARTNERS** (hereinafter "SHAREHOLDER"), a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.


WITNESSETH:


WHEREAS, SHAREHOLDER is desirous of obtaining a Performance Bond from Legion Insurance Company (hereinafter "LEGION") in the amount of $47,487; and

WHEREAS, LEGION is desirous of reinsuring the Performance Bond to INDEMNITY; and

WHEREAS, SHAREHOLDER is desirous of using the assets accruing to Preferred Share Series "E14" to pay any losses incurred under the Performance Bond.

NOW, **THEREFORE**, in consideration of the mutual promises and undertakings set forth herein, the parties do hereby agree as follows:

1.      TREATY shall hereinafter additionally include INDEMNITY'S reinsurance of LEGION relating to the Performance Bond.

-2-

2.     All other terms and conditions shall remain unchanged.

IN WITNESS WHEREOF, the parties have set their hand at _Hamilton_

_Bermuda_ on the _8_ day of _November_____, 1993.

MUTUAL HOLDINGS LTD.

By:_____    _____

Paul Watson, President

Title:_____

AMENDMENT No. 3

TO

SHAREHOLDER AGREEMENT
PREFERRED SHARE SERIES "E14"

This is Amendment No. 3, to a certain Shareholder Agreement made and entered into as of the 1st day of January, 1992 by and between MUTUAL HOLDINGS LTD., a company organised and existing under the laws of the Islands of Bermuda (hereinafter "MUTUAL") and ADVANTAGE PARTNERS (hereinafter "SHAREHOLDER") a corporation organised and existing under the laws of the Commonwealth of Pennsylvania.

WITNESSETH

WHEREAS, both SHAREHOLDER and MUTUAL are desirous of amending this Agreement to provide for the renewal of the PROGRAM; and

WHEREAS, this AGREEMENT, the POLICY and the TREATY together constitute a single insurance program (hereinafter the "PROGRAM") which is a uniquely negotiated single contract and no part of the PROGRAM would have been entered into without the other parts being in force.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein the parties do hereby agree as follows:

1. The policies of insurance issued to SHAREHOLDER and affiliates by INSURANCE COMPANY shall hereinafter be referred to individually or collectively as the "POLICY".

2. SHAREHOLDER agrees to pay all premium due to INSURANCE COMPANY promptly and in full. Any failure to pay such premium to INSURANCE COMPANY promptly when due shall consitute a material breach of this Agreement. In addition to all other remedies which MUTUAL and INSURANCE COMPANY may have from such non-payment or delay in payment, MUTUAL may, but shall not be required to, pay such premium to INSURANCE COMPANY on behalf of the SHAREHOLDER and if MUTUAL shall so elect then the full amount of such payment, plus interest, shall be deducted from any dividends due to SHAREHOLDER under this Agreement.

3. Appendix No. I-a shall be deleted in its entirety and replaced with Appendix No. I-b attached hereto. All references to Appendix I-a in the Agreement shall now refer to Appendix I-b.

4. All other terms and conditions shall remain unchanged.

5.    The effective date of this Amendment No. 3 shall be the 1st day of January, 1992.

IN WITNESS WHEREOF, the parties have set their hand.

AT _____

on the    day of                    , 1994.

ADVANTAGE PARTNERS

BY: *Dallas E Krapf*                    At West Chester, Pennsylvania
    Mr. Dallas Krapf                    on April 14, 1995

BY: _____          At Pittsburgh, PA
    Mr. Stephen Friedberg                on April 17, 1995

BY: _____          At Pittsburgh, PA
    Mr. Mark Ouimette                   on April 17, 1995

BY: *Dale N. Krapf*                    At West Chester, Pennsylvania
    Mr. Dale Krapf                      on April 14, 1995

AT *Hamilton Bermuda*

on the *8* day of *May*                    , 1994.

MUTUAL HOLDINGS LTD.

BY: _____
    Paul Watson, President

C:\AMEND3E14.GM/ns/1.96

-3-

APPENDIX NO. I-b
PREFERRED SHARE SERIES "E14"

## REDEMPTION DATE

Close of business on the 1st day of March, 2000.

## DIVIDEND DATE

Commencing on the 28th day of February, 1995 and annually thereafter on the 28th day of February of each succeeding year up to and including the 28th day of February, 2000.

## TREATY

| Underwriting Period | Insurance Company |
|---|---|
| January 1, 1992 - December 31, 1992 | Legion Insurance Company |
| January 1, 1993 - December 31, 1993 | Legion Insurance Company |
| January 1, 1994 - December 31, 1994 | Legion Insurance Company |

## UNDERWRITING FEE

| Underwriting Period | Underwriting Fee |
|---|---|
| January 1, 1992 - December 31, 1992 | 3.5% |
| January 1, 1993 - December 31, 1993 | 3.5% |
| January 1, 1994 - December 31, 1994 | 3.5% |

The Underwriting Fee is expressed as a percentage of the gross premium written under the TREATY.

## ADMINISTRATIVE FEE

During the term of the Underwriting Period  1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

<u>SECURITY DEPOSIT</u>

No Security Deposit is currently required.

BY: _____
     Mr. Dallas Krapf

BY: _____
     Mr. Stephen Friedberg

BY: _____
     Mr. Mark Ouimette

BY: _____
     Mr. Dale Krapf

MUTUAL HOLDINGS LTD.

BY: _____
     Paul Watson, President

# MUTUAL INDEMNITY LTD.

Preferred Share Series   "E14"
Tax Statement
For the Twelve Months Ended December 31, 1993

|  | US$ |
|---|---|
| NET INCOME (LOSS) FOR THE PERIOD | 81,060.42 |
| Change in Contingency Reserve | 310,153.29 |
| Change in Deferred Acquisition Cost | .00 |
| STATUTORY NET INCOME (LOSS) | 391,213.71 |
| TAX ADJUSTMENTS: | |
| Loss Reserve Discounting | 153,056.00 |
| 20% Change in Unearned Prem Reserve | .00 |
| ADJUSTED INCOME (LOSS) | 544,269.71 |
| PRO RATA SHARE OF R.P.I.I. | 462,315.20 |



MUTUAL INDEMNITY LTD.

Tax Statement

Preferred Share Series   "E14"
(Unaudited)
For the Twelve Months Ended December 31, 1992

|  | US $ |
|---|---|
| NET INCOME FOR THE PERIOD (LOSS) | 20,414.98 |
| Change in Contingency Reserve | 281,801.97 |
| Change in Deferred Acquisition Cost | .00 |
| STATUTORY NET INCOME (LOSS) | 302,216.95 |
| TAX ADJUSTMENTS: |  |
| Loss Reserve Discounting | 94,136.00 |
| 20% Change in Unearned Prem Reserve | .00 |
| Opening Unearned Prem Res Recapture | .00 |
| ADJUSTED INCOME (LOSS) | 396,352.95 |
| PRO RATA SHARE OF R.P.I.I. | 264,929.84 |

RECEIVED

JAN 5 1996

LEECH & TISHMAN

AMENDMENT NO. 4 TO SHAREHOLDER AGREEMENT

<u>PARTIAL REDEMPTION AND RELEASE AGREEMENT</u>

This Agreement, effective as of the 1st day of January, 1992, between MUTUAL HOLDINGS LTD., a company organized under the laws of the Islands of Bermuda (hereinafter "Mutual") and DALE N. KRAPF ("DNK"), DALLAS L. KRAPF ("DLK"), STEPHEN FRIEDBERG ("SF") and MARK OUIMETTE ("MO") (hereinafter collectively referred to as the "Shareholders").

<u>BACKGROUND</u>

WHEREAS, the Shareholders, under the name Comp Advantage Partners, jointly purchased one (1) non-voting preferred share of Mutual designated preferred share Series "E14" (the "Preferred Share"), and entered into a Shareholder Agreement effective January 1, 1992 (the "Shareholder Agreement");

WHEREAS, Mutual will declare a stock split of the Preferred Share on a four-for-one basis, the result of which will be that this date each Shareholder owns one (1) Preferred Share;

WHEREAS, each of DNK and DLK are desirous of cancelling and Mutual is desirous of redeeming one (1) Preferred Share owned by DNK and one (1) Preferred Share owned by DLK effective as of January 1, 1992;

WHEREAS, Mutual has agreed to redeem each Preferred Share as set forth in this Agreement; and

WHEREAS, after the redemption of the two (2) Preferred Shares as set forth herein, SF and MO shall each own one (1) Preferred Share, and shall be the sole shareholders of Series "E14";

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows:

1.  <u>Stock Split</u>.  Mutual will declare a stock split of the Preferred Share on a four-for-one basis to be reflected on the shareholder books and records of Mutual, which will result in a distribution of three-quarters of one share to each of the Shareholders, which together with the one-quarter of the share theretofore owned, such shareholder records will reflect that each of the Shareholders owned one Preferred Share.

2.  <u>Redemption</u>.  Mutual agrees to redeem the one (1) Preferred Share of DNK and the one (1) Preferred Share of DLK (the "Redeemed Shares") as of the effective date of this Agreement in accordance with the terms and conditions hereof.

3. <u>Redemption Price</u>. The redemption price ("Redemption Price") for two (2) Redeemed Shares shall be $1,156,378, payable to as follows:

(a) $543,189 each to DNK and DLK on or before April 15, 1995; and

(b) $70,000 shall be retained as a reserve (the "Krapf Reserve") provided in Paragraph 4 of this Agreement.

The Redemption Price includes all dividends heretofore declared but unpaid to DLK AND DNK.

4. <u>Review of Reserves</u>.

(a) At each December 31 for the years 1995 through 1999, the liabilities of Series E14 shall be reviewed to determine whether the reserve for outstanding losses, the reserve for IBNR losses, and any other reserves reasonably applicable to the business of E14 are adequate with respect to the premiums theretofore written by Series E14. To the extent that Mutual from time to time determines that the reserves are not adequate, Mutual shall be entitled to apply that portion or all of the Krapf Reserve up to an amount equal to fifty percent (50%) of the reserve inadequacy.

(b) To the extent that the review of the reserves at each year end are determined to be in excess of those reasonably related to the premiums written by Series E14, an amount equal to fifty percent (50%) thereof, together with any of the Krapf Reserve previously applied by Mutual to reserves, shall be added to the Krapf Reserve.

(c) The amount of the Krapf Reserve remaining on December 31, 2000 or on any Termination Date (as hereinafter defined), plus the investment income earned thereon, shall be paid one-half to DLK and one-half to DNK. For the purposes hereof, the term "Termination Date" shall mean the date prior to December 31, 2000, if any, on which the business operations of Series E14 shall for any reason be terminated, or a date prior to December 31, 2000 when all of the Preferred Shares of Series E14 are no longer owned fifty percent (50%) by SF and fifty percent (50%) by MO.

5. <u>Amendment to Dividend Formula</u>. The parties hereto entered into a Shareholder Agreement dated as of January 1, 1992, as amended (the "Shareholder Agreement"). The dividend set forth in Paragraph 2 of the Shareholder Agreement shall be amended by adding the following provisions to Paragraph 2:

"(D) Minus $1,086,378.

(E) Minus any portion of the funds paid from the Krapf Reserve to Dale N. Krapf and Dallas L. Krapf on or about December 31, 2000 pursuant to the terms of the Redemption and Release Agreement dated January 1, 1992.

(F) Minus investment income earned on the Krapf Reserve."

— 2 —

6.  <u>Consent</u>.  SF and MO, jointly and severally, hereby consent and agree to the terms and conditions of this Agreement, including the redemption, the Redemption Price, the Krapf Reserve, and the amendment of the dividend formula.

7.  <u>Representations and Indemnity</u>.  DNK, DLS, SF and MO represent and warrant that they are the only parties holding any interest of any kind in and to Preferred Share Series E14, and that since January 1, 1992 none of DKN, DLK, SF and MO hereby agree to indemnify and hold Mutual harmless from any claim, loss, expense, damages or any cost whatsoever, including attorneys' fees, arising out of any claim by any person to any ownership interest in Preferred Share Series E14.

8.  <u>Releases</u>.

(a)  Mutual releases and agrees to defend and hold DNK and DLK harmless from any claim, expense, liability or cost of any liability under the Shareholder Agreement, except to the extent set forth herein.

(b)  DNK and DLK hereby release Mutual from any claim for dividends, redemption, or other rights arising out of the Shareholder Agreement, except as may be set forth herein.

(c)  SF and MO release Mutual from any claim for dividends, redemption or other rights arising out of the sums paid to DNK and DLK hereunder.

(d)  Except as set forth herein, DNK, DLK, SF and MO hereby release each other from all liabilities, damages, claims or demands in any manner related to the ownership of a Preferred Share or the operation of Series E14, except as set forth in this Agreement.

9.  <u>Effective Date</u>.  This Agreement shall be effective as of January 1, 1992.

10.  <u>Miscellaneous</u>.

(a)  <u>Successors and Assigns</u>.  The Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, administrators, successors and assigns.

(b)  <u>Notice</u>.  Any notices hereunder, if mailed, shall be deemed given and received 72 hours after mailing, and if sent by professional express service, notice shall be deemed given and received at the time of actual delivery.  Notices shall be sent to the parties at the addresses set forth herein, or such other addresses as the parties shall designate in writing from time to time.

(c)  <u>Records</u>.  Mutual agrees that the business records of Series E14 shall be available for inspection by the parties hereto during normal business hours and upon reasonable notice.  Further, Mutual agrees to

- 3 -

provide a copy to the parties hereto of the results of operation of Series E14 for each calendar year during which the Krapf Reserve is being maintained.

(d) <u>Shareholders' Agreement</u>. Except to the extent that the terms and conditions of this Agreement require otherwise, the Shareholder Agreement shall no longer be applicable to DNK and DLK, and neither shall have have any liability of any kind whatsoever thereunder. All other terms and conditions of the Shareholder Agreement shall remain unchanged as to the other parties.

(e) <u>Expenses</u>. Each party hereto shall pay its own expenses including, without limitation, legal and accounting fees and expenses, incident to the negotiation and preparation of this Agreement and to its performance and compliance with the provisions contained herein.

(f) <u>Entire Agreement; Amendments; and Waivers</u>. This Agreement constitutes the entire understanding and agreement among the parties hereto relative to the subject matter hereof. Any amendments to the Agreement must be in writing, signed by each party hereto. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of the provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

(g) <u>Partial Invalidity</u>. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein, unless the deletion of the provision or provisions would result in such a material change as to cause completion of the transactions contemplated herein to be unreasonable.

(h) <u>Execution in Counterparts</u>. This Agreement may be executed by the parties hereto signing the same instrument, or by each party hereto signing a separate counterpart or counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(i) <u>Titles and Headings</u>. Titles and headings to Paragraphs herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(j) <u>Assignment</u>. This Agreement shall not be assignable by any party without the prior written consent of all parties.

- 4 -

IN WITNESS WHEREOF, the parties hereto have executed this Redemption and Release Agreement as of the date set forth above.

At West Chester, Pennsylvania

on April 14, 1995

_____
Dale N. Krapf

At West Chester, Pennsylvania

on April 14, 1995

_____
Dallas L. Krapf

At Pittsburgh, Pennsylvania

on April 14, 1995

_____
Stephen Friedberg

At Pittsburgh, Pennsylvania

on April 14, 1995

_____
Mark Ouimette

At Hamilton, Bermuda

on _____8 May_____, 1995

MUTUAL HOLDINGS LTD.

By: _____
Paul Watson, President

- 5 -

# EXHIBIT C

## SHAREHOLDER AGREEMENT



THIS AGREEMENT, made and entered into as of March 1, 1994, by and between MUTUAL HOLDINGS (BERMUDA) LTD., a company organized and existing under the laws of Bermuda (hereinafter referred to as "MUTUAL") and MARK E. OUIMETTE (hereinafter referred to as "SHAREHOLDER"), of 4240 Greensburg Pike, Pittsburgh, PA, 15221.

## WITNESSETH:

WHEREAS, SHAREHOLDER is desirous of purchasing One (1) non-voting preferred share of MUTUAL designated Series "U21" preferred share (hereinafter "PREFERRED SHARE") for the purchase price hereinafter set forth; and

WHEREAS, MUTUAL is desirous of repurchasing the PREFERRED SHARE on the redemption date set forth in Appendix I attached hereto (hereinafter referred to as the "REDEMPTION DATE") for the purchase price hereinafter set forth; and

WHEREAS, a subsidiary of MUTUAL, MUTUAL INDEMNITY (BERMUDA) LTD. (hereinafter referred to as "INDEMNITY") entered into one or more Reinsurance Agreements (hereinafter referred to individually or collectively as the "TREATY") with the insurance company as shown in Appendix I (hereinafter referred to individually or collectively as the "INSURANCE COMPANY"), all as set forth in Appendix I, pursuant to which INDEMNITY has reinsured certain of the liability of INSURANCE COMPANY on policies of insurance (hereinafter referred to individually or collectively as the "POLICY") issued to SHAREHOLDER and its affiliates.

WHEREAS,    ; AGREEMENT, the POLICY and the T.   ATY together constitute a single insurance program (hereinafter the "PROGRAM") which is a uniquely negotiated single contract and no part of the PROGRAM would have been entered into without the other parts being in force.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein the parties do hereby agree as follows:

1.    SHAREHOLDER agrees to purchase the PREFERRED SHARE and agrees to pay to MUTUAL the amount of One Thousand Dollars ($1,000.00). This amount shall be paid within thirty (30) days of the execution of this Agreement.

2.    On the dates shown in Appendix I (hereinafter referred to as the "DIVIDEND DATE") MUTUAL agrees to cause a dividend to be declared to the owner of record on such date(s) of the PREFERRED SHARE in an amount equal to the sum of the following:

(A)    The amount of investment income, if any, earned by MUTUAL during the period ending March 31 immediately preceding such DIVIDEND DATE resulting from the investment of the cash funds received by MUTUAL as the purchase price of the PREFERRED SHARE as set forth in paragraph (1) hereof, less the applicable Administrative Fee as shown in Appendix I equal to a percentage per annum of the average amount of investment funds held by MUTUAL as a result of the purchase price of the PREFERRED SHARE.

(B)    Plus/(minus) the amount of investment income/(loss) earned by INDEMNITY during the period ending March 31 preceding the DIVIDEND DATE, resulting from the investment of funds received by INDEMNITY under the TREATY less the applicable Administrative Fee as shown in Appendix I equal to a percentage per annum of the average amount of such funds held by INDEMNITY during the preceding year. It is understood and agreed that such funds may be held by INDEMNITY as loss reserves and premium reserves and may be repaid to INSURANCE COMPANY pursuant to the terms of the TREATY.

(C)    Plus or min. the amount of underwriting gain or loss alized by INDEMNITY on the TREATY during the policy year preceding the DIVIDEND DATE. Underwriting gain shall be computed by the following formula:

Net Premium received by INDEMNITY after all deductions made by or paid to the INSURANCE COMPANY including ceding commissions, expenses and taxes (including the actual final cost of licenses, fees, assigned risk charges, guarantee funds etc. related to the POLICY) as provided in the TREATY; minus all losses and loss expenses incurred including loss and loss expense reserves for unpaid reported losses and for losses incurred but not reported; minus the applicable Underwriting Fee as shown in Appendix I; minus the actual cost incurred by INDEMNITY in establishing and maintaining a letter of credit in favor of INSURANCE COMPANY as required by the TREATY.


3.(A)    SHAREHOLDER hereby indemnifies and holds MUTUAL and INDEMNITY harmless against the cumulative sum of paragraphs 2(A), 2(B) and 2(C) minus the cumulative amount of dividends paid, being less than zero at any point in time.

On receipt of each written demand by MUTUAL or INDEMNITY, SHAREHOLDER agrees to pay MUTUAL or INDEMNITY within 30 days, the amount by which the cumulative sum of the amounts calculated under paragraphs 2(A), 2(B) and 2(C) minus the cumulative amounts of dividends paid pursuant to this Agreement, are less than zero minus all previous payments under this paragraph provided however that the definition of incurred losses and loss expenses in paragraph 2(C) shall for this purpose only include losses and loss expenses which have been paid or are likely to be paid within the following ninety (90) days.

(B)    As security for this obligation SHAREHOLDER hereby agrees to provide INDEMNITY, upon execution of this Agreement collateral (hereinafter referred to as the "SECURITY DEPOSIT") in the form of a clean irrevocable letter of credit in the amount as shown in Appendix I drawn on a bank acceptable to INDEMNITY or substitute cash collateral. Thereafter, SHAREHOLDER agrees, during the period of the POLICY and for so long thereafter as

INDEMNIT    .es any outstanding or potential liability .   .er the terms of the TREATY to keep such letter of credit in force or to substitute cash collateral prior to the expiration of such letter of credit. If cash collateral is provided, interest earned on such collateral, less the applicable Administrative Fee as shown in Appendix I, will be included as a dividend pursuant to Sections 2 (B) and 4 hereof.

The provisions of this paragraph (3) shall survive the redemption of the PREFERRED SHARE and the termination of this Agreement.

4.    SHAREHOLDER agrees to pay all premium due to INSURANCE COMPANY promptly and in full. Any failure to pay such premium to INSURANCE COMPANY promptly when due shall consitute a material breach of this Agreement. In addition to all other remedies which MUTUAL and INSURANCE COMPANY may have from such non-payment or delay in payment, MUTUAL may, but shall not be required to, pay such premium to INSURANCE COMPANY on behalf of the SHAREHOLDER and if MUTUAL shall so elect then the full amount of such payment, plus interest, shall be deducted from any dividends due to SHAREHOLDER under this Agreement.

5.    If on the REDEMPTION DATE, as defined in this Agreement, INDEMNITY continues to hold funds pursuant to the TREATY, MUTUAL agrees to annually pay SHAREHOLDER on May 31 of each year as additional dividends, the amount of investment income earned by INDEMNITY during the preceding year resulting from the investment of such funds, less an Administrative Fee as shown in Appendix I equal to a percentage per annum of the average amount of such funds, plus or minus the amount of additional underwriting gain or loss realized by INDEMNITY on the TREATY, calculated in accordance with paragraph 2(C) hereof, until such time as the amount of funds held by INDEMNITY is less than Five Thousand Dollars ($5,000), at which point liability under this paragraph shall cease.

6.    On the REL __PTION DATE, MUTUAL agrees to rep. __ase from the SHAREHOLDER the PREFERRED SHARE upon presentation of the share certificate representing the PREFERRED SHARE duly endorsed for cancellation for the price of One Thousand Dollars ($1,000.00) by repaying the amount of cash paid by SHAREHOLDER as purchase price for the PREFERRED SHARE.

7.    It is agreed that the PREFERRED SHARE issued to SHAREHOLDER pursuant to this Agreement is being purchased by the SHAREHOLDER for purposes of investment only. The said PREFERRED SHARE has not been registered under the United States Securities Act of 1933, as amended. The said PREFERRED SHARE shall not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered and will bear the following legend:-

> "These securities have not been registered under the Securities Act of 1933, as amended. These Securities have been acquired for investment and may not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered."

8.    This Agreement may not be modified, amended or changed in any manner except in writing signed by all the parties hereto. It may, however, be terminated by written notice from either party to the other at least sixty (60) days prior to the proposed termination date. In such event all existing obligations from each party to the other or to third parties shall remain in force as of the time of termination.

9.    All notices, requests, demands or other communications provided for herein shall be in writing, shall be delivered by hand or by first-class mail, postage prepaid and shall be addressed to the parties hereto at their respective addresses listed below or to such other persons or addresses as the relevant party shall designate as to itself from time-to-time in a writing delivered in like manner:

If to MUTU    ; to it at:

44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Attn: Paul D. Watson, President

If to SHAREHOLDER, to it at:

The Franklin Centre
4240 Greensburg Pike
Pittsburgh, PA  15221
U.S.A.

Attn: Mark E. Ouimette

10.  This Agreement has been made and executed in Bermuda and shall be exclusively governed
     by and construed in accordance with the laws of Bermuda and any dispute concerning this
     Agreement shall be resolved exclusively by the courts of Bermuda.

11.  All amounts referred to herein are expressed in United States Dollars and all payments shall
     be made in such dollars.

12.  The purchase of the PREFERRED SHARE by SHAREHOLDER and any subsequent transfers
     of the PREFERRED SHARE are subject to the prior consent of the Bermuda Monetary
     Authority (Foreign Exchange Control), which agency must approve all transfers of shares in
     Bermuda companies.

IN WITNESS WHEREOF, the parties have set their hand.

At _____4:00 pm._____

on the _12_ day of _September_ , 1994

MARK E. OUIMETTE

BY: _____

At _Hamilton, Bermuda_____

on the _20_ day of _Sept_ , 1994

MUTUAL HOLDINGS (BERMUDA) LTD.

BY: _____

Paul Watson, President

PREFERRED SHARE SERIES    21"
APPENDIX NO. I

## REDEMPTION DATE

Close of business on the 1st day of June 2001.

## DIVIDEND DATE

Commencing on the 31st day of May 1996 and annually thereafter on the 31st day of May of each succeeding year up to and including the 31st day of May 2001.

## TREATY

| Underwriting Period | InsuranceCompany |
|---|---|
| February 21, 1994 to April 1, 1995 | Credit General Insurance Company |

## UNDERWRITING FEE

| Underwriting Period | Underwriting Fee |
|---|---|
| February 21, 1994 to April 1, 1995 | 3.5% |

The Underwriting Fee is expressed as a percentage of the net ceded premium under the POLICY.

## ADMINISTRATIVE FEE

During the term of the Underwriting Period  1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

<u>SECURITY DEPOS</u>

No security deposit is currently required.

MARK E. OUIMETTE

BY:_____

MUTUAL HOLDINGS (BERMUDA) LTD.

BY: _____
Paul Watson, President

G:\SHAG-SHAG-U21.SS\ra\6-94

U21
Shareholder

RECEIVED
JAN 5 1996
LEECH & TISHMAN

AMENDMENT NO. 1
TO
SHAREHOLDER AGREEMENT
PREFERRED SHARE SERIES "U21"

This is Amendment No. 1, to a certain Shareholder Agreement made and entered into as of the 1st

day of March, 1994 by and between **MUTUAL HOLDINGS (BERMUDA) LTD.**, a company organized

and existing under the laws of the Islands of Bermuda (hereinafter "MUTUAL") and **MARK E.**

**OUIMETTE** (hereinafter "SHAREHOLDER") of 4240 Greensburg Pike, Pittsburgh, PA 15221.

<u>WITNESSETH</u>

WHEREAS, both SHAREHOLDER and MUTUAL are desirous of amending this Agreement

to provide for the renewal of the PROGRAM; and

WHEREAS, this AGREEMENT, the POLICY and the TREATY together constitute a single

insurance program (hereinafter the "PROGRAM") which is a uniquely negotiated single contract and no

part of the PROGRAM would have been entered into without the other parts being in force.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein

the parties do hereby agree as follows:

1. Appendix No. I shall be deleted in its entirety and replaced with Appendix No. I-a attached

   hereto. All references to Appendix I in the Agreement shall now refer to Appendix I-a.

2. All other terms and conditions shall remain unchanged.

3.    The effective date of this Amendment No. 1 shall be the 1st day of March, 1994.

IN WITNESS WHEREOF, the parties have set their hand.

At _Hamilton BDA_

on the 17 day of _Nov._, 1995.

BY: _____
MARK E. OUIMETTE

At _Hamilton Bermuda_

on the 17 day of _Nov_, 1995.

MUTUAL HOLDINGS (BERMUDA) LTD.

BY: _____

Paul Watson, President

APPENDIX NO. I-a
PREFERRED SHARE SERIES "U21"

REDEMPTION DATE

Close of business on the 1st day of June, 2002.

DIVIDEND DATE

Commencing on the 31st day of May, 1996 and annually thereafter on the 31st day of May of each succeeding year up to and including the 31st day of May, 2002.

TREATY

| Underwriting Period | Insurance Company |
|---|---|
| February 21, 1994 - April 1, 1995 | Credit General Insurance Company |
| April 1, 1995 - April 1, 1996 | Credit General Insurance Company |

UNDERWRITING FEE

| Underwriting Period | Underwriting Fee |
|---|---|
| February 21, 1994 - April 1, 1995 | 3.5% |
| April 1, 1995 - April 1, 1996 | 3.5% |

The Underwriting Fee is expressed as a percentage of the net ceded premium under the POLICY.

ADMINISTRATIVE FEE

During the term of the Underwriting Period 1.25% per annum

After expiration of the Underwriting Period 1.75% per annum

The administrative fee is calculated as a percentage of the average amount of funds held pursuant to Section 2 of the Agreement.

The Underwriting Period will be extended accordingly for each renewal.

<u>SECURITY DEPOSIT</u>

       No Security Deposit is presently required.


MARK E. OUIMETTE              MUTUAL HOLDINGS (BERMUDA) LTD.


BY: _____      BY: _____
                                             Paul Watson, President


G:ADD-SHAG/AMEN-U21.NC/mpw/11.95

# EXHIBIT D

# AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF WESTMORELAND

I, STEPHEN M. FRIEDBERG, being duly sworn, depose and say:

1.    I am the successor to and sole remaining shareholder under three (3) shareholder agreements relating to the creation of captive insurance arrangements with defendant Mutual Holdings Ltd. (or its successors) (collectively, "Mutual"). The agreements are as follows:

(a)    Shareholder Agreement entered into as of January 1, 1992 by and between Mutual and Mark Ouimette (the "E11 Agreement").

(b)    Shareholder Agreement entered into as of January 1, 1992 by and between Mutual and Advantage Partners (the "E14 Agreement").

(c)    Shareholder Agreement entered into as of March 1, 1994 by and between Mutual and Mark Ouimette (the "U21 Agreement").

2.    Pursuant to the terms of each of these agreements, I or my predecessors purchased a single share of Mutual preferred non-voting stock in a designated series, which were E11, E14, and U21.

3.    Also, pursuant to the terms of each of these agreements, Mutual was required to declare a dividend on a specific date each year going forward, payable to me or my predecessors as shareholder of record.

4.    The annual dividend that Mutual agreed to declare under each of the shareholder agreements was determined by a formula set forth in each of the individual

shareholder agreements. The dividend could be either a positive or negative sum of money, depending upon the performance of each captive insurance program. Under the shareholder agreements, I was able to elect either to take possession of the dividend or, in the alternative, to leave the dividend with Mutual to continue to be invested with the other capital.

5.       Each of the three shareholder agreements provided for a specific redemption date. But each of the three shareholder agreements also contemplated a continuation of the program beyond the redemption date, which I elected under the E11 Agreement and E14 Agreement by allowing Mutual to continue to hold my dividends in return for which Mutual agreed to pay me additional dividends as defined by the agreement.

6.       At my direction, I transferred certain of the money that was declared by Mutual as dividends to me under the three shareholder agreements to three separate accounts with Prudential Securities Incorporated ("Prudential") in Philadelphia, Pennsylvania. I later transferred the three Prudential accounts to Dean Witter Reynolds Inc. ("Dean Witter") and then to Morgan Stanley Dean Witter & Co. ("Morgan Stanley") in Philadelphia, Pennsylvania as the individual broker for these accounts moved from one firm to the next. No person other than me directed Mutual to transfer dividends under the shareholder agreements to Prudential, Dean Witter, and Morgan Stanley.

7.       I have directed the investment of the monies on deposit at Prudential, then at Dean Witter, and then at Morgan Stanley in Philadelphia, Pennsylvania.

8.       I continue to have unfettered discretion in directing the investment of these monies in the Morgan Stanley accounts, just as I had when the monies were at Prudential and Dean Witter. No person other than me has exercised any control over the funds and directed the

investment of those funds since after they were transferred by me from Mutual to Prudential, Dean Witter, and Morgan Stanley.

9.    When the three accounts were established at Prudential, two of the accounts were titled in the name of Indemnity and one in the name of Indemnity (Bermuda), which is also the way the accounts at Morgan Stanley are titled today.  However, I own the monies that I had transferred from Mutual to Prudential and then to Dean Witter and then later to Morgan Stanley as they are the annual dividends from my participation under the E11 Agreement, the E14 Agreement, and U21 Agreement.

11.    There is approximately $2.7 million in the Morgan Stanley accounts today

12.    Upon information and belief, Mutual is currently being closely monitored by Bermuda's Supervisor of Insurance.  Also, upon information and belief, A.M. Best Company downgraded the rating of Indemnity and Indemnity (Bermuda) on April 19, 2002.

13.    Upon information and belief, Mutual, Indemnity, Indemnity (Bermuda), and/or Mutual Risk Management Ltd. (the holding company of Mutual) are in precarious financial condition, may be insolvent, and may soon seek protection under bankruptcy laws.

14.    On May 15, 2002, the Mutual Stanley stockbroker informed me that Indemnity or Indemnity (Bermuda) had contacted him that day and had requested that he transfer $200,000 of my money to a Bermuda bank account.  At my direction, he has not yet done so.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information and belief.


Stephen M. Friedberg


Subscribed and sworn to this ____
day of _____, 2002
before me.

Notarial Seal
Christine Ireland, Notary Public
Wilkins Twp., Allegheny County
My Commission Expires Jan. 8, 2005
Member, Pennsylvania Association of Notaries

Notary Public

# EXHIBIT E

## Best's Rating and Report Updates for
## THE I.P.C. GROUP

### Best's Rating of NR-4 (Company Request)
### Financial Size Category of IX ($250 million to $500 million)

**Rating Category (Company Request):** Assigned to companies that request that their rating not be published. The **Financial Size Category** is assigned to all companies and reflects their size based on their capital, surplus and conditional reserve funds in millions of U.S. dollars.

The objective of **Best's rating system** is to provide an opinion of an insurer's financial strength and ability to meet ongoing obligations to policyholders. Our opinions are derived from the evaluation of a company's balance sheet strength, operating performance and business profile as compared to Best's quantitative and qualitative standards. While Best's Ratings reflect our **opinion** of a company's financial strength and ability to meet its ongoing obligations to policyholders, they are **not a warranty**, nor are they a recommendation of a specific policy form, contract, rate or claim practice. The rating symbols "A++", "A+", "A", "A-", "B++", and "B+" are registered certification marks of the A.M. Best Company, Inc.

*Note: The above information reflects the most recent Best's Rating for this company, which may have been released subsequent to the creation of the following Best's Company Report.

**Best's Company Reports** provide detailed business overview, extensive financial data and analytical commentary, product and geographic information, company history, as well as the rationale supporting the financial strength rating assigned by A.M. Best. These reports are updated on a regular basis based on input and analysis performed throughout the year.

### Best Company Report Revision Date - 04/19/2002 *

The **Report Revision Date** * represents the last significant material change made to this report. Other non-material changes may have been made to this report subsequent to this date, but are not reflected in the report revision date. The Best Company Report below was created based on the following dates.

| Rating and Commentary [1] | Financial [2] | General Information [3] |
|---|---|---|
| Best's Rating: 04/19/2002 | Time Period: Annual - 2000 | Corporate Structure: N/A |
| Rating Rationale: 04/19/2002 | Last Updated: 04/19/2002 | States Licensed: N/A |
| Report Commentary : 12/10/2001 | Status: Quality Cross Checked | Officers and Directors: 12/10/2001 |

*Note: The **Rating and Commentary** [1]date outlines the most recent updates to the Company's Rating, Rationale,and Report Commentary for key rating and business changes. Report commentary may include significant changes to Business Review, Financial Performance/Earnings, Capitalization, Investment/Liquidity, or Reinsurance sections of the report. The **Financial** [2] date reflects the current status of the financial tables found within the body of the Company Report, including whether the data was loaded as received or had been run through our quality control cross-check process. The **General Information** [3]date covers key areas that may have changed such as corpororate structure, states licensed or officers and directors .

### Best's Company Report for
### THE I.P.C. GROUP

Composite

**Group Affiliation: I.P.C. Group**

### 44 Church Street, P. O. Box HM 2064, Hamilton HM HX, Bermuda
**Tel:** 441-295-5688              **Fax:** 441-295-1527
**AMB#:** 85317

Report Revision Date: 04/19/2002

# RATING RATIONALE

**Rating Rationale:** The rating of NR-4 reflects management's desire not to have its rating published. A.M. Best had downgraded the financial strength rating to C (Weak) from B+ (Very Good) of the I.P.C. Group, Bermuda, and removed the rating from under review. I.P.C. includes: Mutual Indemnity (Barbados) Ltd., Barbados, Mutual Indemnity Ltd., Mutual Indemnity (Bermuda) Ltd., and Mutual Indemnity (U.S.) Ltd., all of Bermuda. Mutual Indemnity (Dublin) Ltd., Ireland has been de-coupled from the I.P.C. Group, the rating downgraded to D (Poor) and removed from under review due to the company's significant unrealizable assets associated with Legion Insurance Company. On March 29, 2002, A.M. Best downgraded the financial strength rating to E (Under Regulatory Supervision) of I.P.C.'s affiliated U.S. companies, under Legion Insurance Group: - Legion Indemnity Company, Illinois, Legion Insurance Company and Villanova Insurance Company, both of Pennsylvania. At that time, I.P.C. was placed under review with negative implications along with the downgrade of Legion Insurance Group.

The rating action reflected A.M. Best's uncertainty of the present and future realizable value of the non-liquid assets of I.P.C., making the ability of capital to support an efficient and secure run-off of the liabilities and any asset value shortfall questionable. While remote, it is unclear whether all of the assets of the I.P.C. companies are protected from the possible need to liquidate at the Mutual Risk Management (MRM) level. A.M. Best believes the value of I.P.C. is in its products and marketing distribution operation. With no policy-issuing carrier identified to replace Legion Insurance Company - placed in voluntary rehabilitation on April 1, 2002 - the operations are at a standstill. Given the material operating and financial problems, the ability of the rent-a-captive companies to continue as an ongoing concern is doubtful. Sale of the operations is similarly capricious.

Mutual Risk Management (MRM) - the ultimate parent of I.P.C. - maintains significant debt obligations - the bulk of which is now short-term bank debt. Absent restructuring, holding company debt perpetuates uncertainty and the inability to repay debt obligations may require MRM to liquidate. Therefore, instability continues for all of the MRM companies.

# CORPORATE OVERVIEW

The I.P.C. Group, the offshore arm of Mutual Risk Management, Ltd., operates as an insurer of the alternate risk transfer market through the I.P.C. (Insurance Profit Center) program. The I.P.C. program enables participating insureds to share in the profits and investment income from their own self-insurance programs. In the U.S. MRM's domestic carriers, rated by A.M. Best as the Legion Insurance Group, act as policy-issuing carriers for the I.P.C. program.

Included in the overall Mutual Risk Management organization are five other risk bearing entities: Mutual Indemnity, Ltd., Mutual Indemnity (Bermuda), Ltd., Mutual Indemnity (US) Ltd., Mutual Indemnity (Barbados), Ltd. and Mutual Indemnity (Dublin) Ltd. The five companies all serve as reinsurers for the two Legion companies and all insurance transactions are conducted solely with affiliated companies. The entire Mutual Risk Management organization consists of more than two dozen companies with various insurance operations encompassing risk management, investments, and loss control management.

Management has recently restructured MRM's operating units. One holding company owns MRM's U.S. insurance operations and managing agencies associated with its program business. The other, a Bermuda-based holding company, was formed and owns MRM's fee businesses comprised of Corporate Risk Management, Specialty Brokerages and Financial Services.

# BUSINESS REVIEW

Introduced in 1979, the I.P.C. (Insurance Profit Center) program offers the benefits of a captive insurance company without the capitalization requirements, administration costs and legal ramifications associated with establishing and operating an insurance subsidiary. Programs placed through the rent-a-captive allow insureds to assume a portion of their own risk on a loss-sensitive basis and are designed to lower the net cost of insurance by returning underwriting profits and investment income to participating insureds. The I.P.C. Group establishes a predetermined maximum limit that can be paid out on any one program, and this loss is typically indemnified by the insured client so that most, if not all, underwriting risks are held by the participant and not by an I.P.C. company.

The I.P.C. program is composed of three separate parts: insurance policy, reinsurance agreement, and shareholders agreement. At program inception, a policy is issued by a licensed insurance company, expenses are deducted, and the balance of funds are ceded to one of the I.P.C. Group companies. These ceded funds are invested in the Mutual Finance Ltd. Investment Pools, to earn interest and investment income. The insured purchases a discrete series of non-voting, redeemable preferred shares in Mutual Holdings, an upstream holding company. Dividends to shareholders consist of underwriting profits and accumulated investment income. The I.P.C. program is applicable to corporate insureds and associations. Individual corporate programs generally start at US$ 750,000 of premium, while associations usually start at US$ 2 million. Program business that is controlled by an insurance broker or agency can also be written in an I.P.C. program. The broker or agency takes ownership of the preferred shares, enabling the broker to participate in the profits from their book of business, an attractive feature for brokers who find their revenues being cut in the generally softer and more competitive commercial insurance marketplace.

Programs can be structured for virtually any coverage, particularly casualty coverages, with workers' compensation being the most prevalent. Legion issues the primary insurance policies and reinsures a portion of the liability in excess of a certain aggregate retention, which is not less than 10 % of gross premium. The Group writes primarily workers' compensation business. The other single large line of business is general/auto business and the remainder of the portfolio consists of other lines of business. The majority of business is written for accounts in the United States and produced largely for companies in heterogeneous groups, as well as homogenous groups such as transportation, contracting, employee-leasing, and healthcare. Agency business accounts for 71% of the contracts written, with single corporations producing 17% of the business and associations 12%.

The various I.P.C. Group companies are all designed to help reduce overall costs of an insurance program. Each I.P.C. company was set up for a reason and to facilitate deals that would generate more fee income. Mutual Indemnity (Barbados) Ltd. was set up to take advantage of FET exemption with the signing of the Barbados/US tax treaty many years ago. This no longer exists so I.P.C. is running off the programs in it. Mutual Indemnity (US) Ltd. has elected to be taxed as a US company and it is preferable for some clients to get the advantage of a rent-a-captive but pay US tax as they go. Mutual Indemnity (Bermuda) Ltd. is a Bermuda company owned directly by MRM. It is now I.P.C.'s flagship company, taking over from Mutual Indemnity Ltd. which was the initial facility whose ownership was through a US holding company. No new business currently goes into Mutual Indemnity Ltd.

Due to its unique regulatory, financial, and operational advantages, Dublin is an attractive domicile for certain European corporations and U.S. corporations with European parents. Mutual Indemnity (Dublin) Ltd. is approved by the Irish authorities to operate as a reinsurance company licensed for all classes of life and non-life business.

**Regulatory & Accounting Environment:** Insurance companies in Bermuda are supervised by

the Minister of Finance, through the Registrar of Companies, the Inspector of Companies, and the Insurance Advisory Committee. Companies may be local companies licensed to conduct business in Bermuda (must be at least 60% owned by Bermudians), or exempted companies incorporated in Bermuda for non-domestic business, where overseas investors may have 100% ownership. In Bermuda, there are no taxes on profits, income, dividends or capital gains. There is only a licensing fee which is dependent upon the level of authorized capital. Exempted companies are able to enter an agreement with the government whereby any such taxes imposed in the future would not be applicable until March 28, 2016.

# FINANCIAL PERFORMANCE

The I.P.C. Group's financial information is presented as the combined results of Mutual Indemnity Ltd., Mutual Indemnity (Bermuda) Ltd., Mutual Indemnity (Barbados) Ltd., Mutual Indemnity (U.S.) Ltd., and Mutual Indemnity (Dublin) Ltd., in accordance with U.S. generally accepted accounting principles.

**Overall Earnings:** The Group has generated excellent earnings, with total return on equity averaging roughly 22% for the five years ending 2000. This is the result of both solid underwriting and investment income trends, complemented by a modest level of realized capital gains. The Group has produced an underwriting profit in four out of the last five years, although underwriting profits have declined since their peak in 1998, due in large part to deterioration in the performance of the Group's workers' compensation book. However, beginning in 2000, the amount of competition for worker's compensation business declined and pricing began to improve.

**Underwriting Income:** Underwriting results within the Group declined in recent years due to the U.S. workers' compensation market. Excess capacity in both the primary and reinsurance markets have resulted in rate inadequacy and relaxed terms and conditions. Coupled with that, loss costs have risen over the last few years especially in the medical arena. During 1999, this segment resulted in the Group's highest combined ratio in five years, though its five- year average combined ratio remains favorable. In 2000, the combined ratio improved as pricing in the worker's compensation market improved. Although underwriting profits have been achieved in four out of the past five years, the Group loss and expense ratios have fluctuated widely. The Group's concentration within a single line of business subjects results to greater volatility and risk to pricing and reserving errors.

**Investment Income:** Investment earning have played an increasingly significant role in the Group's overall profitability, driven in part by the Group's sizeable invested asset base. Over the past five years, the Group's portfolio focus has consisted of longer-term securities rather than cash and shorter-term investments.

Premiums ceded to the I.P.C. Group are invested in interest bearing call accounts and the Mutual Finance Investment Pools. Funds are maintained in call accounts to meet estimated claim payments due within the following month. The majority of the ceded funds are invested in the Mutual Finance Investment Pools to earn a higher rate of return for Insurance Profit Center program participants. Currently the Mutual Finance Pool is structured to utilize five different asset allocations, ranging from cash to aggressive growth. The asset allocation is tailored to choose the most appropriate allocation for each program participant. The majority of funds are invested in the Balanced Pool, which offers 10% cash, 70% fixed income, and 20% equity allocation. Each pool is valued twice monthly and the income is distributed to the participants in proportion to their holdings and returned via a dividend.

# CAPITALIZATION

**Overall Capitalization:** The Group has demonstrated a strong capacity to consistently generate capital internally, from a combination of pre-tax operating earnings and to a lesser extent realized capital gains. Capital growth has been more than sufficient to support shareholder dividends. The Group has also received periodic infusions of capital from its parent company. Based on A.M. Best's capital model the Group maintains an excellent level of capitalization, which adequately supports its current rating level.

**Underwriting Leverage:** Leverage measures remain consistent with industry norms. Premiums to surplus ratio, on both a gross and net basis, were less than 1 to 1. The Group retains a majority of gross premiums written and gross leverage measures are, therefore, comparable with net measures.

**Reserve Quality:** When an I.P.C. program is established, the insured is required to indemnify the I.P.C. Group company up to the aggregate liability under a reinsurance agreement. This indemnification is usually supported by cash, letter of credit or a mixture of both. Tillinghast projects ultimate losses for selected programs, and I.P.C. posts reserves to the lower of Tillinghast's ultimate, or the individual I.P.C. program's aggregate attachment point.

# LIQUIDITY

The Group's liquidity position is supported by the investment in mutual funds that are centered in high investment grade bonds, equities and cash and bank deposits. Since there are several different mutual funds available for the individual participants to invest assets in, portfolio liquidity can be tailored to meet the specific requirements of each participant. Quick liquidity measures fall far short of industry norms as mutual funds, and receivables from affiliates make up a significant portion of the invested asset base, though the majority of investments within the mutual funds are in highly marketable securities.

## Source of Information: Audited Financial Statement

The audited financial statements are presented on a combined basis and include the financial data of Mutual Indemnity Ltd., Mutual Indemnity (Barbados) Ltd., Mutual Indemnity (Bermuda) Ltd., Mutual Indemnity (Dublin) Ltd. and Mutual Indemnity (U.S.) Ltd. All inter company transactions have been eliminated.

## Summarized Accounts as of December 31, 2000

# STATEMENT OF INCOME

|  | 12/31/2000 USD(000) | 12/31/1999 US$(000) |
| --- | --- | --- |
| Combined technical account: |  |  |
| Direct premiums | 39,957 | 23,344 |
| Reinsurance premiums assumed | 220,330 | 131,278 |
| Gross premiums written | 260,287 | 154,622 |
| Reinsurance ceded | 11,705 | 4,153 |
| Net premiums written | 248,582 | 150,469 |
| Increase/(decrease) in gross unearned premiums | 23,487 | 302 |
| Net premiums earned | 225,095 | 150,167 |
| Net investment income | 43,060 | 40,889 |
| Realised capital gains/(losses) | -3,195 | 5,708 |
| Other technical income | 13,343 | 17,074 |
| Total revenue | 278,303 | 213,838 |

| | | |
|---|---:|---:|
| Net claims paid | 125,315 | 101,996 |
| Net claims incurred | 125,315 | 101,996 |
| Other technical expenses | 106,259 | 58,168 |
| Total expenses | 231,574 | 160,164 |
| Balance on combined technical account | 46,729 | 53,674 |

Non-technical account:

| | | |
|---|---:|---:|
| Profit/(loss) before tax | 46,729 | 53,674 |
| Taxation | 120 | 98 |
| Profit/(loss) after tax | 46,609 | 53,576 |
| Retained Profit/(loss) for the financial year | 46,609 | 53,576 |
| Retained Profit/(loss) carried forward | 46,609 | 53,576 |

# MOVEMENT IN CAPITAL & SURPLUS

| | 12/31/2000 US$(000) | 12/31/1999 US$(000) |
|---|---:|---:|
| Capital & surplus brought forward | 392,205 | 286,675 |
| Change in share capital | -99,897 | 109,978 |
| Change in distributable shares | 222 | -28,951 |
| Profit or loss for the year | 46,609 | 53,576 |
| Dividend to shareholders | -47,823 | -29,073 |
| Total change in capital & surplus | -100,889 | 105,530 |
| Capital & surplus carried forward | 291,316 | 392,205 |

# ASSETS

| | 12/31/2000 US$(000) | 12/31/2000 % of total | 12/31/1999 US$(000) |
|---|---:|---:|---:|
| Cash & deposits with credit institutions | 30,056 | 3.6 | 17,970 |
| Shares & other variable interest instruments | 9,598 | 1.1 | 10,084 |
| Liquid assets | 39,654 | 4.7 | 28,054 |
| Mortgages & loans | 34,188 | 4.1 | 150,466 |
| Inter-company investments | 181,457 | 21.6 | 130,469 |
| Other investments | 340,010 | 40.4 | 384,160 |
| Total investments | 595,309 | 70.7 | 693,149 |
| Deposits with ceding companies | 177,534 | 21.1 | 157,869 |
| Insurance/reinsurance debtors | 24,950 | 3.0 | 15,277 |
| Inter-company debtors | 7,009 | 0.8 | 2,512 |
| Other debtors | 5,124 | 0.6 | 4,474 |
| Total debtors | 37,083 | 4.4 | 22,263 |
| Prepayments & accrued income | 31,740 | 3.8 | 6,672 |
| Other assets | 213 | 0.0 | 1,637 |
| Total assets | 841,879 | 100.0 | 881,590 |

Shown at fair value.

Shown at estimated fair market value.

# LIABILITIES

|  | 12/31/2000 US$(000) | 12/31/2000 % of total | 12/31/1999 US$(000) |
|---|---|---|---|
| Capital | 132,845 | 15.8 | 228,745 |
| Paid-up capital | 132,845 | 15.8 | 228,745 |
| | | | |
| Distributable reserves | ... | ... | 4,000 |
| Other reserves | 67,539 | 8.0 | 72,152 |
| Retained earnings | 90,932 | 10.8 | 87,308 |
| Capital & surplus | 291,316 | 34.6 | 392,205 |
| | | | |
| Gross provision for other technical reserves | 398,741 | 47.4 | 414,054 |
| Total gross technical reserves | 398,741 | 47.4 | 414,054 |
| | | | |
| Short term borrowings | 841 | 0.1 | ... |
| External borrowings | 841 | 0.1 | ... |
| | | | |
| Insurance/reinsurance creditors | 130,286 | 15.5 | 61,230 |
| Inter-company creditors | 2,607 | 0.3 | 2,121 |
| Other creditors | 3,872 | 0.5 | 3,447 |
| Total creditors | 136,765 | 16.2 | 66,798 |
| | | | |
| Accruals & deferred income | 368 | 0.0 | 441 |
| Other liabilities | 13,848 | 1.6 | 8,092 |
| Total liabilities | 841,879 | 100.0 | 881,590 |

# HISTORY

The I.P.C. Group is led by Mutual Indemnity Ltd., which was incorporated under the laws of Bermuda on May 4, 1979 and commenced operations on January 1, 1980. Mutual Indemnity (Barbados) Ltd. was incorporated under the laws of Barbados (Exempt Insurance Act 1983-1989) on August 18, 1986. Mutual Indemnity (U.S.) Ltd. was incorporated under the laws of Bermuda on January 3, 1989. Mutual Indemnity (Dublin) Ltd. was incorporated under the laws of Ireland on November 25, 1991. Mutual Indemnity (Bermuda) Ltd. was incorporated under the laws of Bermuda on May 25, 1993.

# MANAGEMENT

All of the common shares of each company are held indirectly by Mutual Risk Management Ltd. (M.R.M.), a Bermuda company listed on the New York Stock Exchange, and engaged, through its subsidiaries, in providing various insurance and risk management services in Bermuda, the United States, Cayman Islands, Barbados and Europe.

The affairs of the group are under the direction of David Alexander, president.

**Officers:** Chairman, John Kessock, Jr.; president, David Alexander; executive vice president and financial controller, Paul D. Watson; vice presidents, David J. Doyle, James C. Kelly, Woon Jung Cho, Cathryn Towlson, Neville Bilimoria; manager, Caroline Kemp; secretary, Elizabeth Price; assistant secretary, I.S. Outerbridge; treasurer, Paul Sinnott.

**Directors:** John Kessock, Jr., David Alexander, David J. Doyle, Arthur E. Engel, James C. Kelly, Peter MacKay, Hamish G. McClurg, Gary McCoy, James M. Macdonald, Robert A. Mulderig, Howard Parker, Greg Pickert, Paul Sinnott, Richard G. Turner, Paul D. Watson, Mark Rattner.

# REINSURANCE

On large deductible programs, I.P.C. utilizes reinsurance to the extent of $5 million per program, per year. This $5 million is in excess of an amount taken by each individual program when it participates in its own risk. Where the program pierces the aggregate by actual incurred losses or by an actuarial loss pick (mainly IBNR), then this is reported as a reinsurance recovery. These recoveries are due from Legion through their treaty on any particular underwriting year. Additionally, Mutual Indemnity (U.S.) Ltd. retrocedes all risk to certain Cayman captives. To protect itself, Mutual Indemnity (U.S.) receives letters of credit or bonds from these captives, to cover its maximum liability under the reinsurance agreement.

# *COMPARATIVE FINANCIAL AND OPERATING EXHIBIT

|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| Gross premiums written | 260,287 | 154,622 | 158,079 | 158,544 | 161,756 |
| Net premiums written | 248,582 | 150,469 | 151,911 | 148,934 | 148,484 |
| Net investment income | 43,060 | 40,889 | 50,315 | 42,482 | 25,855 |
| Profit or (loss) before tax | 46,729 | 53,674 | 79,999 | 59,476 | 43,959 |
| Total assets | 841,879 | 881,590 | 834,474 | 792,278 | 707,343 |
| Total adjusted assets | 841,879 | 881,590 | 834,474 | 792,278 | 707,343 |
| Total gross technical reserves | 398,741 | 414,054 | 455,743 | 448,158 | 424,136 |
| Capital & surplus | 291,316 | 392,205 | 286,675 | 221,145 | 189,370 |

* Currency: USD thousands.

# *UNDERWRITING EXPERIENCE

|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| Gross premiums written | 260,287 | 154,622 | 158,079 | 158,544 | 161,756 |
| Net premiums written | 248,582 | 150,469 | 151,911 | 148,934 | 148,484 |
| Net premiums earned | 225,095 | 150,167 | 148,709 | 144,337 | 148,923 |
| Net claims incurred | 125,315 | 101,996 | 82,561 | 87,374 | 83,018 |
| Balance on technical account(s) | 46,729 | 53,674 | 79,999 | 59,476 | 43,959 |
| Profit or (loss) after tax | 46,609 | 53,576 | 77,459 | 57,106 | 41,965 |

* Currency: USD thousands.

# PROFITABILITY TESTS (%)

|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| Return on adjusted assets | 5.4 | 6.2 | 9.5 | 7.6 | 6.3 |
| Return on equity | 13.6 | 15.8 | 30.5 | 27.8 | 24.8 |

# LEVERAGE TESTS (%)

|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|
| Total liabilities to surplus | 189.0 | 124.8 | 191.1 | 258.3 | 273.5 |
| External borrowings to surplus | 0.3 | ... | ... | ... | ... |
| Inter-company investments to surplus | 62.3 | 33.3 | 51.2 | 64.2 | 9.5 |
| Liquid assets to surplus | 13.6 | 7.2 | 8.5 | 9.3 | 235.6 |

# LIQUIDITY TESTS (%)

|                                     | 2000  | 1999  | 1998  | 1997  | 1996  |
|-------------------------------------|-------|-------|-------|-------|-------|
| Current liquidity ratio             | 108.1 | 141.6 | 114.0 | 107.8 | 90.0  |
| Liquid assets to net technical reserves | 9.9   | 6.8   | 5.4   | 4.6   | 105.2 |
| Insurance balances to adjusted assets   | 24.1  | 19.6  | 22.9  | 21.0  | 21.3  |

© Copyright 2002 by A.M. Best Company, Inc.  ALL RIGHTS RESERVED.
No part of this report may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the A.M. Best Company.
BCR04192002

# EXHIBIT F

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Nov 19, 2002

# MRM woes could hit N. Carolina residents

The financial troubles of Mutual Risk Management's US insurance companies – Legion and Villanova – could mean some North Carolina residents are left short on workers compensation payments they are due.

News reports yesterday said North Carolina regulators were scrambling to pay up to $25 million in 1,500 workers' compensation claims after the state's insurance industry was left to pick up the workers' comp tab – or the difference between claims and the $14 million on deposit from the failed companies. The Mutual Risk (MRM) US-based subsidiaries were taken over by state regulators earlier this year and put into state regulated run-off. MRM, as the parent company, has been fighting to bring the companies out of rehabilitation, claiming that the companies are solvent.

But, because of the way the Legion and Villanova cases have proceeded in Pennsylvania courts, some North Carolina residents could see an interruption in their weekly workers' comp claims payments and the payment gap could run from two to four weeks. Meanwhile State insurance regulators said Legion and Villanova's failure could be attributed to stiff competition in the workers' comp market that led to rate-cutting to the point that premiums were not keeping pace with claims.

Pennsylvania insurance regulators, after examining the companies' books, ordered both Legion and Villanova into rehabilitation, which the news report said was "one step short of insolvency in the insurance industry bankruptcy process".

A Pennsylvania judge recently delayed action on declaring the two companies insolvent, however, after MRM objected. The judge also ruled that Legion and Villanova could stop paying workers comp claims in states where the two companies had posted deposits. Without a formal declaration of insolvency North Carolina reportedly could not use the $14 million on deposit to pay claims and neither could it get the case files on whom to pay. To get around these difficulties, officials from the Guaranty Association, the Department of Insurance and the North Carolina Industrial Commission asked the General Assembly to pass a hastily-crafted bill allowing them to use the $14 million and to begin cleaning up after the two firms, even though they haven't been declared insolvent in Pennsylvania.

The General Assembly rushed the bill through in a single day, passing it only hours before it adjourned. And on November 1, North Caroline Insurance Commissioner Jim Long won a Wake County court order declaring the two firms insolvent in that state.

The Guaranty Association, which is still waiting for the case files from the two companies, will asses its 700 insurance company members for the amount of unpaid claims exceeding the $14 million deposit.

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Nov 6, 2002

# Boardroom clearout will save jobs - Ezekiel

The recent resignation by the board of Bermuda insurance and financial services company Mutual Risk Management could be seen as a further blow to the troubled company but it could also be another step in the company's attempt to preserve value and jobs in the company's still successful service units, according to the company's new head David Ezekiel.

In the long run, the future of certain MRM insurance units, including its US subsidiaries, may still not be secure but the continuation of its service units could be preserved under restructuring into MRM Services that could become a privately-held company under the new name of IAS Park.

The company's 8-K filing with the US Securities and Exchange Commission (SEC) last month revealed that its entire board and its long-time chairman and CEO Robert Mulderig were all stepping aside after the company was unable to secure directors' and officers' (D&O) liability insurance.

To replace the board, two men were nominated with David Ezekiel, president and managing director of MRM subsidiary International Advisory Services (IAS) as well as CEO of the newly structured services unit MRM Services, becoming chairman and CEO. Joining Mr. Ezekiel on the board was Paul Scope, who was already chairman and chief executive officer of MRM's insurance brokerage subsidiary, Park Group Limited.

The company's inability to secure D&O coverage was another hit for the company after it posted close to $100 million in losses last year which led to a string of woes including rating downgrades, its US insurance companies being put into state regulated rehabilitation, its share price plummeting (it was trading yesterday at below four cents) and a wave of lawsuits.

Speaking of the situation, Mr. Ezekiel said: "Given the state of the insurance market (with significant price increases across many lines including D&O) and of course, given what had happened to MRM made the quotes (for D&O coverage) many multiples of what we had seen previously – and not something we thought was realistic or affordable. Ultimately, we could not get coverage at an acceptable price."

He added that the company's troubled financial circumstances were also a factor in seeking D&O insurance: "Obviously these events had already occurred but people are afraid of what might still come and that made any extension of the D&O for the old board very difficult."

But he added that as a result of the resignations, the company has now secured D&O coverage: "We have D&O in place for the new board and for all officers of our subsidiaries going forward."

And yesterday Mr. Ezekiel, speaking from his soon to be vacated IAS office – the group's 160 Bermuda staff will all move into the MRM building at 44 Church Street by the end of the week – revealed that although MRM continued to face its share of troubles, the company's restructuring of its service units was nearing completion with a scheme of arrangement being filed in Bermuda court this week: "This development does not change our planned restructuring at all," he said.

The restructuring, which was announced earlier this year, intends to see senior debt holders – with a principle debt of $235 million comprised of some $131 million owing under MRM's

credit facility and $104 million owing to debenture holders – exchange debt for 80 percent stock of the new company. MRM is expected to retain 20 percent holding in the new company.

Mr. Ezekiel continued: "The scheme will be filed at the court this week and then there will be time for the voting process. It has to be mailed to all creditors and then the creditors have to be given time to look at the documentation and then vote at the final scheme meeting. It is being done under the Bermuda Scheme of Arrangement and we expect the next meeting, under the current schedule, to take place on January 8."

He added the matter could be wrapped up as early as the first of the year: "Assuming a positive vote – and we think there will be because the scheme is in the interest of all classes of creditors with the whole point of the restructuring being to bring value to creditors going forward – we expect the scheme meeting to be held on January 8. After that we expect the Supreme Court sanction the scheme a week to ten days later."

Speaking further of what the approval of the scheme of arrangement would achieve, Mr. Ezekiel said: "And then what we will have is a new company – IAS Park – going forward. In effect this will be a privately held company and the shareholder group will be what were the creditors and debenture holders of MRM. MRM itself will have a 20 percent interest, but it is important to mention that that will only have value after the creditors are re-paid in full."

Looking at MRM's future, Mr. Ezekiel said it was still clouded by uncertainty: "MRM is now, in essence, effectively in a box. The end result of MRM depends on what happens with the US subsidiaries, and there will be continuing issues with MRM obviously, with lawsuits and negotiations. These will continue to be managed. But our focus is primarily on taking IAS Park forward..."

He continued: "The MRM shares are standing now at 3.6 cents so clearly the world does not put any value in these shares and for the current MRM shareholders to see value would need a positive resolution for the US insurance subsidiary, Legion. And the outcome for Legion, whether or not it will come out of state regulation, is impossible to predict."

But Mr. Ezekiel added: "We clearly believe that Legion is a candidate for rehabilitation and can have some value going forward but there are too many moving parts to say for sure and it is important to stress that."

To underscore the uncertainty, Mr. Ezekiel pointed out: "At the last financial statements of MRM, Legion was written down to zero."

Despite this, Mr. Ezekiel said negotiations to wrest Legion back control from state regulators was still being pursued: "There have been negotiations between Legion and the IPC Companies, which are part of the Mutual Group, to commute contracts.

"There are something in the order of 500 to 600 separate contracts between the two and it was thought to be in the interest of both companies to enter into a commutation agreement with about 120 of those contracts and hand them back to Legion together with the funds to support any remaining liabilities under those contracts."

Mr. Ezekiel said further of the negotiations: "It would put Legion in a positive cash flow position.

"When it went into rehabilitation it had a surplus in excess of $400 million but a severe cash flow problem brought about by its inability to collect from its reinsurers.

" So if the commutation is successfully completed it will do two things: It will make the evaluation of the IPC companies in Bermuda a lot more certain as we would have got a number of liabilities off our books and paid.

"And it will provide Legion with the liquidity to meet claims payments and keep the company going. We think it is important for both companies and we are working with rehabilitators."

But pragmatically Mr. Ezekiel said: "Until the certainty is got rid of we could face (further)

legal action as people have money tied up in the IPC companies, and IPC cannot make payments until they have some certainty to their financial position ... of the 500 to 600 cell members in IPC you have got a small number taking action to try and extradite their own funds.

"And these actions have nothing to do with negotiations between IPC and Legion."

Another obstacle for MRM are the half a dozen class action lawsuits launched in recent months by disgruntled shareholders, but Mr. Ezekiel said yesterday the actions should not bear on the new company, IAS Park: "All of the class actions relate to events that have already happened – at this stage the company is where it is.

"Any decisions that were made relating to where it is right now is history.

"So what we have going forward in IAS Park as a completely new company, new team, new board, and 300 employees of which some 160 are in Bermuda, and as of Friday, all under one roof..."

---

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Nov 6, 2002

# Mulderig: There is no role for me now

After 23 years Bermuda insurance and financial services company Mutual Risk Management is undergoing a changing of the guard with its now former chairman and CEO Robert Mulderig stepping down from the troubled venture.

The company's 8-K filing with the US Securities and Exchange Commission (SEC) on October 18 revealed that Mr. Mulderig was retiring from Mutual Risk (MRM) – which was set up by his father, the late insurance veteran Francis Mulderig, as a subsidiary of then Aneco Re – after the company was unable to secure an extension of its directors' and officers' (D&O) liability insurance.

The company's future has been under threat since it reported close to $100 million in losses last year after its US insurance companies – Legion and Villanova – ran into troubled financial waters because of an inability to recover reinsurance it claimed to be owed. The loss prompted rating downgrades and put MRM in violation of certain debenture agreements, in default on its bank credit facility and its letter of credit facility.

The company's woes continued when it was delisted after a decade – and as one of the first Bermuda insurers to list on a US exchange – on the New York Stock Exchange as its stock dropped to mere pennies in value. In addition, Legion and Villanova were put into "rehabilitation" by state regulators, or essentially put into run-off.

In the interim months the company has also been hit by a wave of class action lawsuits from disgruntled investors and additional legal actions by clients trying to secure money that had been paid to the company's subsidiary group, the IPC Companies.

Last month's filing also reported that other board members, including Roger Dailey, Arthur Engel, Jerry Rosenbloom, Norman Rosenthal, Joseph Sargent and Richard Turner were also quitting as a result of the company's difficulties in securing D&O coverage.

Yesterday however both Mr. Mulderig and the man taking up the company's reins, David Ezekiel, said Mr. Mulderig's retirement was by choice and took exception to a report in Tuesday's *Royal Gazette* that he had been "axed".

*Mr. Ezekiel, the long-time CEO of captive management company International Advisory Services – a company that was set up more than 20 years ago and bought out by MRM in 1998 – became CEO of the group's operating companies after it said earlier in the year that it would undergo restructuring.*

*The move, which stripped out the group's service units from the insurance ventures, was set up as MRM Services (now to be named IAS Park) as a means of wiping out the company's debt and to preserve value in the company's services units.*

*Mr. Ezekiel is now to be CEO and chairman of MRM as well as the services group, IAS Park.*

*Although Mr. Ezekiel said retirement had been Mr. Mulderig's choice, he conceded that it was the result of the company's troubled circumstances: ""His retirement was prompted by the changing nature of the situation we have (within the company).*

"The filing stated that we were unable to obtain D&O coverage, and at this stage, that led to his (Mr. Mulderig's) decision to retire. He was acting in the best interest of the company. But it was Rob (Mulderig), by himself, and given the various factors that he had to take into account, that came to this decision."

Case 1:02-cv-02198    Document 13    Filed 11/27/2002    Page 90 of 186

*Although the SEC filing said Mr. Mulderig's retirement would become effective from November 1, Mr. Ezekiel said Mr. Mulderig would stay on for an unspecified period to help with the transition. After that, he said he expected Mr. Mulderig to find "some new avenue in the local business community".*

*Yesterday Mr. Mulderig told* The Royal Gazette the report that he had been axed was "unfair" and claimed that there had not been any attempts by the paper to contact him on the matter ahead of going to print on Monday.

But he added that news of his stepping aside should not come as a surprise: "It was clear that I would step down once the scheme of arrangement (restructuring) had taken place. "The operating companies (MRM Services) had been under the management of David Ezekiel for some time – and he has done a good job – and they don't need me," he said.

Although his resignation had already become effective, Mr. Mulderig spoke with *The Royal Gazette yesterday from Pennsylvania where he was attending hearings into the matter of MRM's US insurance companies. He added that he would stay with the company on as long as he could "help in any way" especially in negotiations to bring Legion and Villanova out of rehabilitation.*

*Mr. Mulderig continued: "It was my interest to get the company reorganised and ensure there was as little disruption to jobs (some 160) in Bermuda as possible. And we have done that – now there is not a role for me..."*

*As for his future, Mr. Mulderig said he had no immediate plans but said he expected to eventually take on a "challenging and exciting" position within the local insurance sector: "I am a Bermudian insurance executive with a lot of experience," he concluded.*

---

Case 2:02-cv-03193   Document 13   Filed 11/27/2002   Page 91 of 186

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Nov 5, 2002

# Mulderig axed in MRM boardroom shake-up

According to a report filed with the US Securities and Exchange Commission, troubled Bermuda insurer Mutual Risk Management (MRM) has undergone a series of sea changes at board level. Robert Mulderig, the public face of MRM for many years, has been axed.

In, to the board of directors on October 18, came Bermudian David Ezekiel, the president and managing director of International Advisory Services Ltd., a subsidiary of MRM, and also a director of MRM Services Ltd.

Out, from the board of the directors on October 19, went Roger E. Dailey, Arthur E. Engel, Jerry S. Rosenbloom, Norman L. Rosenthal, Joseph D. Sargent and Richard G. Turner. The reason? "Due to the company's inability to secure an extension of its current directors' and officers' insurance policy or to obtain acceptable replacement coverage," chief financial officer Angus Ayliffe reported.

Directors' and officers' insurance protects company officials from being sued personally for the economic consequences of acts they take in their company capacities. Following the rash of corporate scandals that have occurred or become public this year, the D&O sector is experiencing difficulties that have seen premiums raised significantly and several issuers stop writing coverage altogether.

The changes at MRM continued. In to the board of directors on October 31, came Paul Scope, chairman and chief executive officer of the Park Group Limited, MRM's insurance brokerage subsidiary. Out, from the board of directors, and the posts of chairman and chief executive officer, on November 1, went Bermudian Robert Mulderig. In, to the offices of chairman and chief executive officer of the company, on November 1, came Mr. Ezekiel.

The net effect of all these changes is that the MRM board now comprises just two men: Mr. Ezekiel and Mr. Scope. Neither man was on the board prior to October 18. Although neither Mr. Ezekiel nor Mr. Mulderig could be reached for comment by press time last night, some things are clear from the order in which the changes took place: the board resignations en masse mean that all the actions of the previous board members would have been covered by the D&O policy that could not be renewed. Unable to renew the coverage, the directors had a choice: to continue without coverage, or to resign. They resigned.

The wording of the company's 8-K report to the SEC does not make plain whether such coverage could not be arranged, or whether it could not be arranged at a price that the company deemed acceptable.

MRM had been experiencing financial problems since earlier this year. In March, the company sold its fund administration business, Hemisphere Management Ltd., to repay indebtedness. That month, it also announced that it had retained Greenhill & Co., LLC, an independent global merchant banking firm, to assist in developing a restructuring of its balance sheet. Later in March, MRM announced that two of its US insurance companies, Legion Insurance Company and Villanova Insurance Company ("the Legion Companies"), had been placed into voluntary rehabilitation as a result of an order issued by the Commonwealth Court of Pennsylvania.

The order of rehabilitation, which was effective on April 1, 2002, was filed with the consent of the boards of directors of the Legion Companies.

Beginning on April 1, 2002, the Legion Companies operated in run-off under the control of

the Insurance Commissioner of the Commonwealth of Pennsylvania as Rehabilitator. No new policies were to be bound and the Legion Companies were to begin a process to non-renew their in-force policies in accordance with applicable state regulations.

In May, MRM restructured its debt. On September 13, Pennsylvania insurance regulators sought to place Legion Insurance Company in liquidation. During the year, MRM's stock has plummeted; it has delisted from the New York Stock Exchange, suffered numerous rating downgrades and seen the launch of several class action lawsuits by disgruntled investors. The company's stock closed last night at four cents on the Bermuda Stock Exchange, in contrast to its 52-week high in October of $23.56. Mutual Risk Management Ltd. provides risk management services to clients in the United States, Canada and Europe seeking alternatives to traditional commercial insurance for certain of their risk exposures, as well as financial services to individuals and other companies.

---

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Sep 13, 2002

# MRM subsidiary faces possible liquidation

Pennsylvania insurance regulators are seeking to place troubled Mutual Risk Management Ltd. subsidiary Legion Insurance Company in liquidation.

The news follows Legion being taken over by state insurance regulators earlier this year and is one more piece of bad news for the flailing insurance and financial services company.

During the year Mutual (MRM) has seen its stock plummet to pennies, its delisting from the New York Stock Exchange, numerous rating downgrades and the launch of several class action lawsuits by disgruntled investors. The company's stock closed at three cents on the Over the Counter market Tuesday in contrast to its 52-week high in October of $23.56. The class action suits, which are in addition to other legal actions facing MRM and its subsidiaries, followed the stock's performance and target Mutual Risk Management, with shareholders contending the company's officers issued misleading financial statements that overstated the company's revenue and net income.

The Milwaukee Journal Sentinel reported this week that, Legion, which was placed in "rehabilitation" last April, has not written any new policies since then. Roseanne T. Placey, spokeswoman for the Pennsylvania Insurance Department's Office of Policy, Enforcement and Administration in Harrisburg, Pennsylvania, confirmed that regulators are seeking to place the insurance firm in liquidation, the newspaper said.

She said officials could not comment on details of the case until a judge signs the liquidation order. But general guidelines for the Pennsylvania Insurance Department state that "an order of liquidation normally terminates the company's existence."

Legion sells commercial insurance, such as workers' compensation, medical malpractice, general liability and group accident and health coverage. No new policies have been issued since the Pennsylvania insurance commissioner took control of the company. The Pennsylvania Insurance Department indicated they took over the companies in April when Legion and Villanova ran into trouble after the insurance-rating firm AM Best Co. had concerns about losses posted by Mutual Risk Management's US insurance subsidiaries and lowered its ratings on them.

Mutual Risk Management reported a loss of $99.2 million in 2001. That came after a loss of $5.6 million in 2000. After the ratings downgrade, the flow of new business to Legion and Villanova dried up and helped to create a liquidity problem, a department spokeswoman said last spring. A number of other ratings agencies also lowered their ranking of MRM and its insurance subsidiaries. In addition, the company was hurt by lagging payments to insurance subsidiaries by reinsurers hit by September 11 terrorist claims, the department said.

A printer friendly article from the Royal Gazette

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published May 31, 2002

# More MRM legal woes

Bermuda-based Mutual Risk Management has been hit with further legal action against its rent-a-captive subsidiaries.

*The Royal Gazette has learned that the action was launched by Stephen Friedberg and is against MRM companies Mutual Indemnity Ltd., IPC Mutual Holding Ltd. and Mutual Indemnity (BDA) Ltd.*

*Yesterday Mutual Risk's CEO Robert Mulderig said the action from Mr. Friedberg – a rent-a-captive client – resulted from a dispute between the two parties.*

*The discrepancy, he said, was over the amount of a dividend payment, or the balance remaining in the rent-a-captive account from income including investment returns less claims and reserves.*

*Mr. Mulderig said the dispute was "straightforward" and at this point, it appeared it would go forward to the courts.*

*Several calls were made this week by* The Royal Gazette to law firm Milligan, Whyte & Smith, which is representing Mr. Friedberg in the action but calls had not been returned by Press time yesterday.

This latest legal action followed a suit earlier in the year against the IPC companies from US truck leasing company Franklin Logistics Inc. which resulted in a $3 million asset freeze.

The Franklin group is understood to have resorted to legal action after it was unable to transfer its workers' compensation programme with the MRM group.

Although the financially troubled firm – MRM posted close to $100 million in losses for 2001 which has ultimately resulted in rating downgrades and loss of business, its US insurance arm being put into state-regulated run-off, its delisting from the New York Stock Exchange and being put under review by the Bermuda Monetary Authority – announced a restructuring earlier this month, some of its insurance units may still face an uncertain future.

The plan to restructure Mutual Risk Management in effect wiped out debt at the parent company level in exchange for securities to senior debt holders – which are a group of banks and MRM debenture holders, including XL Capital after it led a $112.5 million investment in the company last year. The plan also broke off the company's fee-based service units into MRM Services which included the company's Global Captive Group, comprised of International Advisory Services (IAS), Shoreline Mutual Management, and MRM Speciality Brokers Ltd.

In addition, the restructuring gave senior debt holders preferred shares, 80 percent of the common stock in MRM Services and management say in the company and warrants for 15 percent of MRM's common shares.

But other company units – including its US insurance companies the Legion Group – remain in troubled financial waters despite a reported $2.6 billion in reinsurance recoverables.

Mr. Mulderig said earlier this month that there was value in the companies and it was hoped that the US insurance companies would come out of state-regulated rehabilitation, but they may not.

Meanwhile, the Wall Street Journal has tied the medical communities' difficulty in finding medical-malpractice coverage to financially troubled insurers such as the Legion Group.

Case 2:02-cv-03193    Document 13    Filed 11/27/2002    Page 95 of 186

This is a printer friendly version of an article from www.theroyalgazette.com

Back

Article published May 8, 2002

# Shareholders at the mercy of MRM restructuring



Robert Mulderig

A proposed restructuring of long-time Bermuda insurance and financial services firm Mutual Risk Management may forge the way for its service entities to carry on business, but the fate of its US insurance subsidiaries remains in question and value for common shareholders could be tied to that outcome.

Mutual Risk (MRM) earlier in the year reported close to $100 million in losses for 2001 which put it in violation of certain debt agreements. As a result, the company and several subsidiaries were hit with rating downgrades and its US insurance companies - the Legion group - were put in to rehabilitation by state regulators.

In addition, a lack of investor confidence sent the company's market value in to tailspin as shares fell to below $1. After trading at that level for a period of weeks, MRM was delisted after more than a decade on the New York Stock Exchange.

The company is currently trading on the Over the Counter (OTC) Bulletin Board where trading has been below 10 cents per share during recent weeks.

Following MRM's restructuring announcement the stock price saw a marginal gain, closing at 16 cents on Monday and reaching a high of 17 cents yesterday before dipping down to 12 cents.

In comparison to its market value just over three years ago - $682.89 million - the company, despite a marginal gain on its share value this week, is left with market capitalisation of below $5 million.

Speaking with The Royal Gazette this week, MRM CEO Robert Mulderig said of the restructuring and how it may bear on shareholders: "What that (restructuring) does is eliminate all the debt of the parent company and takes away the debenture defaults. And the realisation of value for the MRM (common) shareholders will largely come about by virtue of whether we see a recovery out of the rehabilitation and the substantial realisation of value that is there in the Legion Companies."

CEO of MRM Services David Ezekiel, which will as part of the restructuring hold the MRM fee-based units including the Global Captive Group, as International Advisory Services (IAS) and Shoreline Mutual Management, and MRM Speciality Brokers Ltd, added that in the long-term the company does hope for recovery of the US insurance companies: "The hope is that we can, by working with the department (of insurance regulators), assist in retaining the value in the insurance companies.

"Clearly the best possible outcome would be to have the situation be stabilised enough for them to come out of rehabilitation, Mr. Ezekiel said.

In terms of the companies coming out of rehabilitation, Mr. Ezekiel said: "One could expect to unlock the value in Legion, for shareholders, if they came out of rehab. But it is a long process."

He added: "For there to be value to the common shareholders, it is clear that there needs to

A printed copy from the Royal Gazette

be a combination of continued success on the service side (from MRM Services), which we know will happen, and the creation of some substantial residual value in the Legion companies."

But Mr. Mulderig said that whether or not the MRM US insurance subsidiaries would carry on writing business after coming out of rehabilitation would have to be determined: "We are working towards getting the company out of rehabilitation and preserving the value that is in the company and then make the determination of what if any business we should write going forward. But there is a large amount of value that is there. And that, in the best case scenario, would be preserved for MRM shareholders."

In terms of the value in the companies, Mr. Mulderig said: "The US insurance companies at year end had about $400 million of capital, and about $2.6 billion of reinsurance recoverables. That is because in a very soft market they ceded to reinsurers all of the liability on the business that they wrote. The problem was that produced a very highly leveraged situation. And then a small number of disputes that arose caused insurers to pay late, or not pay at all," he said.

Mr. Mulderig said the difficulty in claiming reinsurance recoverables was the root of the firm's problems.

Mr. Ezekiel added: "On that large of a reinsurance recoverable, even a small delay can cause serious problems in meeting obligations on the outgoing side."

When asked if there is hope of recovering the $2.6 billion in reinsurance, Mr. Mulderig said: "Sure," and added that the reinsurance amounts in dispute were a little more than $50 million of the total $2.6 billion in reinsurance balances at the end of 2001.

Mr. Mulderig continued: "The receivables are from perfectly solvent companies and over time hopefully all of it will be received by the Legion Companies."

Mr. Ezekiel said of the reinsurance disputes: "It would be fair to say that in insurance business what happens is that if you have one, two, three disputes, a lot of other people that owe you money start dragging their feet a bit.

"The (Legion) companies, when they went in to rehab, had one of the largest surpluses it had had in its entire history. But there clearly was uncertainty about some of the collections. "People take a look at what is clearly a small number of disputes and extrapolate it, And start saying if that is an expression of the whole, oh my goodness," Mr. Ezekiel said.

He also pointed out that Mr. Mulderig is in advanced discussions with those involved in the reinsurance disputes.

Mr. Mulderig added that those discussions have been "difficult to resolve but we are hopeful that we will get those resolved and get the reinsurance collected. But you are right that (reinsurance recovery) is the major problem for all of MRM."

When asked if MRM stands to return to its glory days - in years past it was heralded as one of Bermuda's strongest international companies, and within the last three years its stock was trading on the New York Stock Exchange at above $40 per share - Mr. Mulderig said: "With the restructuring, there will be separate companies. This separates MRM Services from Mutual Risk Management so the answer is probably no.

"The best case outcome to hope for - and what we are all working for - is to end up with a very successful service company in MRM Services and that MRM shareholders receive some value going forward, both from their shares in MRM Services (which will be 20 percent after restructuring) and more particularly, from the successful outcome of the rehabilitation of the Legion companies."

But, both Mr. Mulderig and Mr. Ezekiel stressed that obligations to senior debt holders must be met first: "Any value (from MRM or MRM Services) will first used to pay the creditors, to repay senior debt and to accrue to the preferred shares and then remaining value will go to

(common) shareholders," they said.

Meanwhile, Mr. Mulderig said the shares will continue to trade on the Over the Counter (OTC) bulletin board.

In terms of an eventual relisting on the NYSE, Mr. Mulderig said: "I would say that it is unlikely. It would only happen after the Legion Companies came out of rehabilitation." And Mr. Mulderig added that there are no guarantees that the companies will come out of rehabilitation.

Mr. Ezekiel added: "It needs to said, even though we believe there is value (in the Legion Companies), the record of companies going in to rehab and coming out is not great. We believe that by actively managing the process with the department (of insurance), which we are committed to doing, we substantially improve the chances of that happening."

And Mr. Ezekiel said the company could still face adverse business developments such as the recent legal action against the company's rent-a-captive company IPC, in which $3 million of MRM assets were frozen, and as reported in *The Royal Gazette* on Monday He said: "That sort of thing is going to happen going forward in the normal course of business. Because until such time as we clarify the obligations of the rent-a-captive operations, until such time as we determine that it meets solvency tests and so forth there is little movement we can make in terms of paying cash, declaring dividends and in that period you are going to get certain clients of these companies trying to protect their own interests. "So you are going to get what looks like a lot of different things but they are all going to be pretty much emanating from the same issue which is that until we are totally clear as to where we stand it is going to be difficult for us to take any actions," he concluded.

This is a printer friendly version of an article from www.theroyalgazette.com

Back

Article published May 6, 2002

# MRM assets frozen in legal challenge

Legal action facing troubled Bermuda insurance services firm Mutual Risk Management has resulted in a $3 million asset freeze.

The freeze on company assets resulted from legal action reported on by The Royal Gazette last month when two of Mutual Risk's (MRM) Bermuda-based subsidiaries – IPC Mutual Holdings Ltd. and Mutual Indemnity Ltd. – faced legal proceedings by Franklin Logistics Inc.

At that time, little was known about the action or the plaintiff and legal firm Wakefield Quin declined to speak further on the case but did indicate that the matter was filed before the Bermuda court in April.

More information on the action came to light after a report in the latest issue of InsideBermuda, a monthly web-based newsletter, which reported that Franklin "resorted to legal proceedings after spending approximately six months unsuccessfully trying to novate (or transfer) its workers' compensation programme with the MRM group," it said.

Franklin, which was said to be the driver leasing arm of Pennsylvania-based Smith Transport, reportedly wishes to transfer its programme to a Marsh-managed captive facility, according to Mark Gordon, the plaintiff's US lawyer, who was quoted by InsideBermuda.

Meanwhile, ailing MRM may also be faced with other legal action in the US.

Inside Bermuda reported: "Another disgruntled client of MRM's rent-a-captive program claims to have been been duped in to paying $1 million for a 'phantom liability'."

In that case, the plaintiffs – which are reportedly American Patriot Insurance Agency and Diane and Kenneth Hendricks – are seeking treble and punitive damages, an accounting of funds relating to their account and an order setting aside "fraudulently induced contracts", according to InsideBermuda.

The legal actions follow a string of hits to the long-time Bermuda company, including numerous rating downgrades on the parent company and its subsidiaries after it posted losses nearing $100 million in 2001, its US insurance arms being put in to state-regulated run-off, the appointment of an ongoing review by the Bermuda Monetary Authority, several resignations from board directors and management and its delisting from the New York Stock Exchange after more than a decade of trading.

Although MRM CEO Robert Mulderig, earlier in the year, said he would not rule out being taken over by a "more stable" company, the fate of the firm still hangs in the balance.

The company has a reported $2.6 billion in reinsurance recoverables on its books but has faced difficulties in securing payment. Industry experts have said the situation with reinsurance recoverables could be attributing in large part to the company's woes.

The company, after its delisting from the NYSE, moved to trading on the Over-the-counter (OTC) bulletin board, where its stock has traded in recent weeks at below ten cents per share.

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 26, 2002

# MRM in legal battle

Troubled Bermuda company Mutual Risk Management is now facing legal action in Bermuda's court.

*The Royal Gazette* has learned that two of Mutual Risk's (MRM) Bermuda-based subsidiaries – IPC Mutual Holdings Ltd. and Mutual Indemnity Ltd. – are the subject of legal action from Franklin Logistics Inc.

Little is known about the action or the plaintiff and Franklin's lawyer, Richard Horseman of Wakefield Quin, declined to speak further on the matter but did indicate that the matter was to be filed before the courts yesterday.

The news follows rating downgrades from AM Best earlier in the month for both IPC and Mutual Indemnity.

At the time rating agency AM Best announced it had placed the financial strength rating of MRM's Bermuda based Insurance Profit Center (IPC) rent-a-captive facility at C (weak) from B+ (Very Good).

The downgrade came after AM Best placed the B+ (Very Good) rating of IPC Group (Bermuda) under review with negative implications last month pending discussions with management on the collateralised nature of its loss reserves and strategic alternatives including finding another quality fronting carrier and other related issues.

AM Best reported that with no policy-issuing carrier identified to replace MRM's US-based Legion Insurance Company – which has been put in to state regulated run-off - the operations of IPC are at a standstill.

AM Best said. "Given the material operating and financial problems, the ability of the rent-a-captive companies to continue as an ongoing concern is doubtful.

"The rating action reflects the uncertainty of the present and future realisable value of the non-liquid assets of IPC, making the ability of capital to support an efficient and secure run-off of the liabilities and any asset value shortfall questionable.

"While remote, it is unclear whether all of the assets of the IPC companies are protected from the possible need to liquidate at the MRM level."

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 15, 2002

# S&P downgrades MRM's credit rating

Mutual Risk Management has been hit by yet another rating downgrade, with Standard & Poors (S&P) announcing on Friday it had lowered Mutual Risk's (MRM) counterparty credit rating to double C, which it said reflected "the highly vulnerable status of existing obligations to nonpayment".

The S&P had already put the company on credit watch at the end of last year, and last week announced the company remained on credit watch with "negative implications".

The negative credit watch is said to imply that the company's creditworthiness is under review and that further rating downgrades could follow.

MRM, which is a longstanding Bermuda-based insurance and financial services firm, posted close to $100 million in losses last year.

The firm has been plagued by a string of lawsuits in recent years, and financial difficulties that seem to stem in part from difficulty in reinsurance recovery. MRM is reported to have $2.6 billion in reinsurance recoverables on its books.

After reporting hefty losses for the last year the company has been hit by rating downgrades, a slump in business, and in recent weeks its Pennsylvania-based insurers have been put in to state regulated run-off. The company was also thrown off the New York Stock Exchange – where it had been listed since 1991 – after its stock fell to below $1.

In addition, the Bermuda Monetary Authority has appointed a review team to monitor Mutual Risk's business on an ongoing basis because the company is in default under the terms of its convertible exchangeable debentures and its bank credit facilities.

The S&P in announcing the latest rating downgrade said: "It is not clear whether further sales of assets will yield sufficient proceeds to satisfy indebtedness. Its shares have been delisted from the NYSE, and it is highly likely that Legion Indemnity Co., Mutual Risk's triple C (currently vulnerable) rated US insurance subsidiary, which is not yet under regulatory control, will fall under regulatory control prospectively.

"Management is trying to negotiate a restructuring plan with existing creditors. If the company cannot restructure its debt or reach some accommodation, it may be forced to liquidate through proceedings in Bermuda and in the United States," the S&P concluded.

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 12, 2002

# Troubled insurer hit with top-level resignation



In years past: MRM president John Kessock stands behind MRM CEO Robert Mulderig. After 23 years with the company, Mr. Kessock yesterday announced his resignation from the troubled firm.

Beleaguered Mutual Risk Management was yesterday hit with another blow: the resignation of its long-time employee and president John Kessock.

The move is the latest in a spell of bad news for the Bermuda insurer, which posted close to $100 million in losses last year, has seen multiple rating downgrades, its US subsidiaries being put in to run-off, its share price tumbling to well below one dollar, and delisting from the New York Stock Exchange.

Mr. Kessock, 52, had been with the company for 23 years and was instrumental in setting up MRM's Insurance Profit Center (IPC) rent-a-captive facility in the early 1980s. He had been president of the company for more than a decade, since 1991.

Rating agency AM Best last month placed the B+ (Very Good) rating of IPC Group (Bermuda) under review with negative implications pending discussions with management on the collateralised nature of its loss reserves and strategic alternatives including finding another quality fronting carrier and other related issues.

The concern over finding another fronting carrier follows the MRM US insurers - Legion and Villanova - being put in to regulatory run off last month. The companies, along with MRM's Illinois insurer Legion indemnity, have operated under an intercompany reinsurance pooling arrangement since 1996. Additionally, they have operated as the fronting carriers for most of the Bermuda-based IPC Group rent-a-captive programmes.

Mr. Kessock's surprise departure was said to be "in order to pursue personal interests".

MRM CEO Robert Mulderig said: "John played a key role in building the company over the years, particularly the sales and marketing of the IPC product. We wish him all the best in his future endeavours."

As of 2001, records filed with the US Securities and Exchange Commission (SEC) indicated that Mr. Kessock held about two percent ownership or nearly 864,000 shares.

The announcement that Mr. Kessock was stepping down follows the resignation of CFO Andrew Cook. Meanwhile, interim CFO James Kelly was replaced recently by Angus Ayliffe.

MRM also saw the resignation of five of its directors in recent weeks. They were: XL Executives Fiona Luck, Michael Esposito and Bruce Connell and directors Welford Tabor and William Galtney. John Kessock, as company president, also sat on the board of directors.

This is a printer friendly version of an article from www.theroyalgazette.com

Back

Article published Apr 11, 2002

# MRM to foot bill for review

Troubled financial and insurance services firm Mutual Risk Management will foot the bill for a review of its operation launched by the Bermuda Monetary Authority.
A filing with the US Securities and Exchange Commission (SEC) earlier this month advised of the company being put under BMA watch.
The review has been launched after Mutual Risk (MRM) posted close to $100 million in losses for 2001.
In addition the company has seen its US subsidiaries Legion and Villanova Insurance put under state regulated run-off, and both AM Best and Standard & Poors have downgraded the rating of several MRM companies.

The firm has also seen its market value take a drastic dive, and after extended trading below $1 it saw its shares taken off the New York Stock Exchange. It is now trading on the over-the-counter bulletin board for pennies.
As part of its review of the company, the BMA have appointed an independent agent – identified as Richard Lightowler of KPMG.
And a letter to MRM CEO Robert Mulderig on March 12, from Bermuda Monetary Authority chair Cheryl-Ann Lister, and on behalf of the Supervisor of Insurance, advised the company of the particulars of the review.
The letter identified the Review Team's MRM contact as CFO Angus Ayliffe, who took over the company's financial reins in recent weeks after the resignation of Andrew Cook and then James Kelly, who held the post of interim CFO for less than three months.
Under the terms of the review, MRM has been required to pay an up front retainer fee of $150,000.
Invoices for work performed will be submitted to MRM and if not paid within seven days KPMG is entitled to draw down the amount of the outstanding balance from the retainer fee.
In addition MRM has been required to set aside office space at MRM for the Review Team and to provide "full and free access" to Mr. Ayliffe and to all company information. The purpose of the review is not however intended to interfere with MRM's running of its operation.
Mrs. Lister's letter states: "MRM will continue to operate its business in the normal course, including but not limited to any steps it is advised or believes it should take with respect to the reorganisation or sale of any or all parts of its business or assets."

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 10, 2002

# 'Nothing definite' on the fate of MRM



Uncertain times: Mutual Risk Management's CEO, Robert Mulderig, says 'nothing is definite' for the future of the company, headquartered on Church Street, in Hamilton.

By Lilla Zuill

Troubled financial and insurance services firm Mutual Risk Management may be working to restructure its operations in a bid to stem its financial deterioration. MRM CEO, Robert Mulderig, yesterday told The Royal Gazette that it continues to evaluate strategic alternatives – including possible restructuring – with its financial advisor, recently retained company Greenhill & Co., LLC.

But Mr. Mulderig cautioned: "I don't think anything is definite. The company's preference would be to complete restructuring but nothing is firm."

Mutual Risk (MRM) is currently under review by the Bermuda Monetary Authority insurance division, with the BMA revealing they have put the company under watch on an "ongoing basis".

An officer with the insurance division said the BMA felt it "prudent" to take action after MRM's financial situation showed increasing deterioration.

The company has seen its value on the stock market – it was listed on the New York Stock Exchange (NYSE) until its delisting earlier in the month – plummet to below a dollar with reported losses for 2001 of $99.2 million. And the company's Pennsylvania insurers were also put in to run off by state regulators and a string of rating agency downgrades has plagued the company, as its financial condition – despite a reported $2.6 billion in reinsurance recoverables on its books – has crumbled.

In filings with the US Securities and Exchange Commission (SEC), MRM has hinted at the possibility of selling off its assets and even the possibility of liquidation.

The filing states: "We are currently in default under the agreements governing our debt facilities... Therefore, if these defaults are not waived or if our debt is not restructured, there is substantial doubt as to the company's ability to continue as a going concern."

The company also reported in an SEC filing that as part of its analysis of "strategies going forward", it might consider "strategic asset sales".

Sources close to the matter indicated that could include the sale of MRM-owned captive manager International Advisory Services (IAS), but management this week said that was unlikely.

IAS president David Ezekiel dispelled rumours that IAS was about to go on the sales block and told The Royal Gazette: "That is absolutely not the case. The (MRM) group is looking at the restructuring of its profitable units."

Mr. Ezekiel conceded that MRM SEC filings have indicated the possible sales of assets. And he added: "One can never say never in terms of a sale," but Mr. Ezekiel said the company does plan to restructure: "A number of the profitable service units in the MRM group – of which IAS is one – are looking at restructuring so that we can move forward together."

IAS was bought by MRM in 1998. Although owned by MRM, IAS has been largely autonomous and run by Mr. Ezekiel.

Mr. Ezekiel said that despite MRM woes, IAS is doing well: "IAS is growing and profitable. We had our best ever year in 2001 and we are expecting again to have our best ever year in 2002."

Mr. Ezekiel added that the company has also maintained 100 percent client retention in spite of MRM's financial deterioration.

Mr. Ezekiel said MRM's situation has sparked calls from concerned clients, but he said the enquiries have been "after our own (IAS) well-being."

Meanwhile, XL Capital indicated in a recent SEC filing that its investment in MRM is not under threat.

A year ago XL led a $112.5 million investment in the firm, along with First Union Capital Partners, High Ridge Capital and Century Capital Partners with a newly created class of debentures.

In its SEC10-k filing XL Capital said it continuously reviews the performance of its investments.

The filing stated further: "Included in the company's other investments at December 31, 2001 is a convertible debenture issued by Mutual Risk Management carried at $63.2 million. Although the market value of MRM has declined significantly, the company has assessed the value of the debenture, and due to underlying security features, believes there is no impairment."

Three XL executives sat on the MRM board until last month but resigned following concerns over possible conflicts of interest. Michael Esposito, chairman XL Capital, Fiona Luck, executive vice-president, group operations, and Bruce Connell, executive vice-president, group underwriting officer stepped down.

A spokesman from XL said: "The XL representatives on the MRM board stepped down after it became clear that MRM's changed circumstances would require liquidation (of assets) to satisfy creditors."

The spokesman added that as the board would be called to vote on actions taken by the firm to satisfy creditors – and with XL being a creditor – the XL executives could have faced a conflict of interest.

---

A printer friendly version of an article from The Royal Gazette

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 9, 2002

# Kast takes over MRM's share of BIIF

The Bermuda Insurance Index Fund (BIIF) has undergone substantial changes reflecting the new risk landscape formed on the Island following September 11.

Troubled Mutual Risk Management (MRM) which was one of the constituent companies has been axed, as well as Stirling Cooke Brown and PXRE.

Speaking with *The Royal Gazette yesterday, fund administrator Anne Kast said a whole host of changes had been made to the fund that will take effect from April 30.*

*These include the purchase by Kast Investment Management Ltd. (Kast) of MRM's 6000 founder shares of the company, as the fund was co-managed by MRM and Kast. Kast Investment is now the sole manager of BIIF.*

*Ms Kast said president and CEO of MRM, Robert Mulderig's three year contribution to the fund will be missed, but said MRM will remain as the fund's sponsoring broker for listing on the Bermuda Stock Exchange (BSX).*

*Also new, the Fund's administrator has been changed from Hemisphere Management to Meridian Corporate Services Ltd.*

*The directors have also been changed, with Tom Healy of Hemisphere Management replaced by Sean Davis of Meridian Corporate Services Ltd.*

*Auditors Ernst & Young have also been replaced by Mazars Neville Russell in an effort to reduce fees.*

*Ms Kast also said that in order to lower costs to the investors, they are "unbundling fees" so that the management fee is reduced from two percent to one percent and all other costs are debited to the fund rather than being taken from the higher management fee.*

*Also new is the withdrawing of income shares, and only accumulation shares will now be offered which is expected to lead to a reduction in annual listing charges.*

*Several of the constituent companies no longer meet the inclusion criteria due to the decline in their market price, and these companies, which include MRM, Stirling Cooke Brown and PXRE, will be temporarily suspended from the index list until such time their market capitalisation recovers to at least $100 million or one percent of the index. These removals are expected to help reduce brokerage fees said Ms Kast.*

*No companies will be added to the Index however as Ms Kast says she does not know of any other company's meeting the criteria to be listed in the index, namely that the company has global headquarters and senior management in Bermuda, that the company trade on the BSX and a major overseas Stock Exchange such as the New York Stock Exchange or Nasdaq.*

*"For the time being we will be operating with fewer companies," said Ms Kast who added: "We have been working very hard to reduce the fees on this fund."*

*However, the new companies formed in Bermuda following September 11 provide exciting prospects says Ms Kast who said that in future, it was hoped to add new and exciting attractive companys to the list.*

*As far as existing shareholders, Ms Kast said: "Hopefully efforts to reduce cost will go right to them, the primary beneficiaries. If we reduce costs, the performance goes up, this is the primary driver behind many of the changes, to reduce costs.*

*"This is a fast changing world, so this is an opportunity for investors as we are reducing*

costs under the full management of Kast we hope to continue with efforts to introduce shareholder value whenever possible."

Starting at $10 in 1998, the fund currently trades at $12.629 which is a 26.30 percent increase net of all fees compared to a 25.48 percent return for the S&P 500.

"It's been a very good investment especially in a bear market," said Ms Kast. She also said that the bear market lasted through 1999, while the market improved in 2000 and 2001, and that 2002 was shaping up to be a good year for insurers.

Ms Kast is still bullish on the sector: "A lot of factors blend together well that are creating good outlooks for these companys."

Minimum investment in the fund is $2,500.

A printer friendly version of an article from the Royal Gazette
Case 2:02-cv-03193   Document 13   Filed 11/27/2002   Page 108 of 186
Page 1 of 2

This is a printer friendly version of an article from www.theroyalgazette.com

Back

Article published Apr 5, 2002

# MRM placed under review by the BMA



Under review: Robert Mulderig's Mutual Risk Management.

Beleaguered Bermuda company Mutual Risk Management (MRM) is now the subject of a review by the Bermuda Monetary Authority (BMA).

In a filing with the US Securities and Exchange Commission (SEC) on April 1, MRM advised of the company being put under BMA watch: "The company has entered in to an agreement with the BMA under which the authority has appointed a review team to monitor the company's business on an ongoing basis."

The filing also indicated that notice of this action, taken by the BMA's supervisor of insurance, Jeremy Cox, may have taken place in early March.

An officer in the Insurance division said the BMA felt it "prudent" to take action after MRM's financial situation showed increasing deterioration. He would not elaborate on what actions the BMA review team are taking.

The company has seen its value on the stock market - it was listed on the New York Stock Exchange (NYSE) until its delisting earlier this week - plummet to below a dollar after the announcement in February that it was reporting close to $100 million in fourth quarter losses. And this week MRM reported that loss had widened to a loss for 2001 of $99.2 million or nearly $113 million for the fourth quarter.

The company's Pennsylvania insurers were also put in to run off by state regulators in recent days and a string of rating agency downgrades has plagued the company in recent weeks, as its financial condition - despite a reported $2.6 billion in reinsurance recoverables on its books - has crumbled.

Meanwhile, the troubled company saw its market capitalisation drop by more than $20 million this week following the company being ousted from the NYSE.

Mutual Risk reportedly had 41.6 million shares outstanding, which were trading on Monday for 60 cents. On Tuesday the Exchange (NYSE) did not open trading in the company's common stock, and moved to delist the company's listing on Wednesday.

MRM subsequently moved to list its stock on the over-the-counter (OTC) bulletin board, where trading has moved between four and nine cents per share - leaving a market capitalisation of between $2 and $3 million.

The company's CEO Robert Mulderig, according to a filing with the SEC earlier this year indicated that he held more than one million MRM shares.

Those shares, within the last year would have been worth more than $12 million, would now be worth a little more than $100,000.

Mr. Mulderig's annual income, according to 2000 records, was about seven times that amount at $697,000.

The ultimate fate of the company could be its liquidation, according to the latest SEC filing. The filing states: "We are currently in default under the agreements governing our debt facilities...Therefore, if these defaults are not waived or if our debt is not restructured, there is substantial doubt as to the company's ability to continue as a going concern."

The filing states further that shareholders would unlikely recoup any of their investment if the company were to pursue liquidation: "It is unlikely that any proceeds of the liquidation would remain after the claims of the general creditors were satisfied."

A clause in the SEC filing also indicates the adverse conditions facing MRM's US subsidiaries could affect the company's executive performance: "Defending against such actions may distract our directors and management from their duties, which may negatively affect our operations," the filing reads.

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

Article published Apr 4, 2002

# NYSE delists MRM



Mutual Risk Management chairman Robert Mulderig

Beleaguered Mutual Risk Management's troubles were compounded yesterday by the delisting of the company's stock from the New York Stock Exchange. In addition, MRM's secondary listing on the Bermuda Stock Exchange (BSX) suspended trading of the company's shares.

The BSX said their decision was based on the action taken by the NYSE.

The company's stock value – which was trading as high as $12.30 in the last year – plummeted to below a dollar after the announcement in February that it was reporting close to $100 million in fourth quarter losses and this week MRM reported that loss had widened to a loss for 2001 of $99.2 million or nearly $113 million for the fourth quarter.

The company's US-based insurers were also put in to run off by state regulators in recent days and a string of rating agency downgrades has plagued the company in recent weeks, as its financial condition – despite a reported $2.5 billion in reinsurance recoverables on its books – has deteriorated.

The Exchange (NYSE) reported on Tuesday that the company had not opened for trading as its continued listing was under review. Yesterday the NYSE said it had determined that the MRM common stock should be suspended immediately.

The Exchange said: "As previously announced, the NYSE did not open trading on Tuesday due to our review of the company's April 2, 2002 regulatory filings (with the Securities and Exchange Commission) which included a partial Form 10-K submission for the fiscal year ended December 31, 2001 and a related Form 12b-25 extension request delaying the filing of the company's finalised Form 10-K."

The NYSE said its delisting decision followed an attempt to resume trading the stock, which was listed as ticker symbol MM.

"Upon attempting to resume trading procedures, the NYSE subsequently decided to suspend trading because price indications reflect an abnormally low selling price for the common stock." the Exchange reported.

In the face of its shares being removed from the NYSE, MRM released a press statement which said it has its shares quoted on the over-the-counter (OTC) Bulletin Board, which is commonly referred to as the Pink Sheets.

MRM said its shares would be listed under a new ticker symbol, MLRM.

The company's shares – which had closed on the NYSE on Monday at 60 cents – were trading on the OTC late yesterday at six cents.

MRM did not respond to questions from The Royal Gazette on the company's possible liquidation, which its SEC filing indicated was a possibility.

The filing said: "It is unlikely that any proceeds of the liquidation would remain after the claims of the general creditors were satisfied."

MRM did however indicate in a press statement that management continues to evaluate

strategic alternatives with its financial advisor, Greenhill & Co., LLC.

Its SEC filing reports the company is trying to cover its creditor obligations which could result in the sell off of its remaining assets. The company sold off its Bermuda-based fund administrator, Hemisphere Management, last month. And questions remain over the fate of another MRM-owned company, Bermuda captive manager International Advisory Services (IAS), which although owned by the company has operated autonomously.

Meanwhile word has emerged that the company is to be dogged by yet another legal suit – it has been the subject of several legal actions in recent years – from its US subsidiary Legion Insurance chief underwriting officer Doug Boyce.

David Marchand, in a monthly web-based newsletter on Bermuda business, said a civil suit was filed by Mr. Boyce, who is now effectively out of a job as the company has gone in to run-off, on March 27.

Mr. Boyce was hired last September and is seeking damages in relation to relocation costs, promised bonus payments, and claims his contract calls for compensation equal to three times his annual salary of $450,000 should his employment be terminated by the company other than for cause before October 1, 2002.

This is a printer friendly version of an article from **www.theroyalgazette.com**

Back

___

Article published Apr 3, 2002

# Doubts over MRM future

Troubled Bermuda-based insurer Mutual Risk Management may now be considering liquidation.

The company's future has been under threat since it reported in February close to $100 million in fourth quarter losses. And its woes were magnified yesterday with reports of further losses, additional rating downgrades and its listing on the New York Stock Exchange being put under review.

The company, in an SEC filing, yesterday revealed that its 2001 loss had widened by $13 million to a net loss of $99.2 million. The company, in February, reported a fourth quarter net loss of $99.7 million and net loss for the year of $86.1 million.

The company's losses have put it in violation of certain debenture agreements, and the the SEC filing indicates the company is also in default on its bank credit facility and its letter of credit facility.

In addition the filing reports the company is working to satisfy creditors, including XL Capital, which may lead to the sale of additional assets - the company sold off its Bermuda-based fund administrator Hemisphere Management last month - and could result in MRM's liquidation.

"It is unlikely that any proceeds of the liquidation would remain after the claims of the general creditors were satisfied," the filing said.

These latest developments follow Monday's announcement that the companies Pennsylvania-based US insurers - Legion and Villanova - had been taken over by state regulators and put in to run off.

MRM's CEO Robert Mulderig was contacted by *The Royal Gazette* but he declined to speak with the paper. Mr. Mulderig's office said: "He is sorry but he cannot give an interview but when the situation changes and he can give you an interview he will be happy to give you one." *The Royal Gazette* asked if there was a reason that Mr. Mulderig would not answer questions but no reason was given.

Legion and Villanova received rating downgrades from AM Best earlier in the week, and yesterday Standard & Poor's (S&P) downgraded its ratings for the companies to R as a result of the news that the Pennsylvania-based companies had been placed under "regulatory control". S&P credit analyst Karole Dill Barkley indicated that Pennsylvania regulators were exploring whether the companies could be "rehabilitated" or should be put in to liquidation. There was also word that there could be staff cuts for the two companies as no more business was being written.

A third subsidiary, Illinois-based Legion Indemnity Co. also saw its rating fall to triple C as the S&P anticipated the company could also be taken over by state regulators.

MRM also remains on the S&P's CreditWatch negative list. And AM Best has put MRM's Bermuda-based IPC Group on negative watch.

Meanwhile, the New York Stock Exchange (NYSE) said it has put the company's listing under review. The NYSE did not open trading in MRM common stock yesterday citing its review of the company's filing of a partial Securities and Exchange Commission (SEC) Form 10-K submission for the fiscal year ended December 31, 2001 and a related Form 12b-25 extension request delaying the filing of the Company's finalised Form 10-K.

Robin Verhose, in the NYSE Press office, told *The Royal Gazette* that MRM stock would resume trading but it did not trade yesterday. It closed on Monday at 60 cents. The company, which was trading as high as $23 18 months ago, has a 52-week low of 43 cents while its high was $12.30.

The NYSE action also followed the announcement that MRM is assessing the financial impact of its US subsidiaries being put in to "rehabilitation". The Exchange reported that continued listing standards require maintenance of a minimum share price of $1 over a 30 trading day period. The NYSE said it had recently notified MRM of its non-compliance with this standard and that demonstration of compliance within six months from the date of the NYSE's notification is mandatory.

---

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2002, I caused to be served the foregoing Motion for Temporary Restraining Order and for Preliminary Injunction and accompanying papers by Fedex Next Day addressed as follows:

Mutual Holdings Ltd.
Barclays International Building
44 Church Street
P.O. Box HM 2064
Bermuda

IPC Mutual Holdings Ltd.
Barclays International Building
44 Church Street
P.O. Box HM 2064
Bermuda

Mutual Holdings (Bermuda) Ltd.
Barclays International Building
44 Church Street
P.O. Box HM 2064
Bermuda

Mutual Indemnity Ltd.
44 Church Street, Hamilton HM 12
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Mutual Indemnity Ltd.
44 Church Street, Hamilton HM 12
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Morgan Stanley
1585 Broadway
New York, New York  10036



Theodore F. Haussman, Jr.

**EXHIBIT G**

# MUTUAL HOLDINGS (BERMUDA) LTD.

44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

tel 441.295.5688
fax 441.295.1527

May 30, 2002

Transportation Group
c/o Steve Friedberg
Research Underwriters
The Franklin Center
4240 Greensburg Pike
Pittsburgh, PA 15221
U.S.A.

**Post-it® Fax Note  7871**

To: Steve Friedberg
Fax # 412-351-1810

Re:  **Financial Statements for the 3 Months Ended March 31, 2002
Preferred Share Series "U21"**

Dear Mr. Friedberg:

I would like to begin by thanking you for the understanding and support offered the staff of the Mutual Holdings Ltd. ("Holdings") and Mutual Indemnity Ltd. ("Indemnity") during the past six weeks. These have been trying times for us all as we try to work through the effects of the Legion Companies rehabilitation. I would like to summarize the events that transpired, the immediate effects on Holdings and Indemnity and what we see happening in the near term.

On April 1, 2002 Legion Insurance Company and Villanova Insurance Company were placed in voluntary rehabilitation with the Pennsylvania Insurance Department. The effect of this measure is that the Pennsylvania Insurance Department now effectively controls both companies. Legion Indemnity Company has also been placed into a conservation proceeding by the Illinois Insurance Department. These actions were taken due to concerns about liquidity at the insurance companies following the lowering of the A. M. Best Company ratings.

Indemnity and our other IPC Companies have written the vast majority of their business over the years with the Legion Companies, so the impact of the rehabilitation is significant and has created some uncertainty as to how Indemnity will move forward. Indemnity has hired U.S. and Bermuda counsel to advise it and will be working with them and the rehabilitator to determine and define its relationship with the Legion Companies in the future. Everyone is working hard to ensure that Indemnity meets its obligations to the Legion Companies and the other insurance companies that they reinsure, as well as each of our preferred shareholder clients. As part of this process, the IPC Companies, including Indemnity, have presented a commutation proposal to the rehabilitator for their consideration. This commutation proposal, if accepted, would fix the liability of Indemnity and the other IPC Companies to Legion on about 80 programs and would clarify certain other obligations to the Legion Companies for the future. If this proposal is accepted, we hope that a great deal of uncertainty will be removed, and we then could address the dividend rights of our preferred shareholders.

An **MRM** Company

# MUTUAL HOLDINGS (BERMUDA) LTD.

44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

tel 441.293.5688
fax 441 295.1927

- 2 -

In the meantime, the Board of Directors of Holdings has determined that, until such time as the position with the Legion Companies has been clarified (which we anticipate will be within the next 60 to 90 days), Holdings will not make any dividend distributions to our preferred shareholders. Indemnity will continue to reimburse the Legion Companies for claims payments, plus settle those claims with other insurance companies and claims on direct policies. Collateral will only be released where the relevant contract clearly obligates Holdings and/or Indemnity to do so. We will not be in a position to entertain exchanges of existing collateral or amendments to the terms of our programs.

The Board feels that this is a prudent and necessary position to take, given the extent of the effects of the rehabilitation on Indemnity, protecting the interests of all preferred shareholders while giving management time to work through the issues, confer with the rehabilitator, Bermuda and US Counsel and establish a plan for taking the companies forward that will be in the best interests of all our shareholders.

We will update you on any matters arising as soon as we can. If you have any questions on the contents of this letter please do not hesitate to call me. Again, thank you for your patience and understanding as we put our efforts into the tasks at hand.

Respectfully,

David Alexander,
President

cc:    Bruce Lawrence
       Andrew Lewis

An MRM Company

**EXHIBIT H**



Mutual Indemnity (Bermuda) Ltd.
. 44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Tel: 441.295.5688
Fax: 441.295.1527

October 10, 2002

Dear Preferred Shareholder:

I would like to take this opportunity to update you on the status of the IPC Companies.

Our intended course of action, as outlined in my letter to you of May 30, was for us to negotiate a commutation agreement covering a number of programs with the Pennsylvania Insurance Commissioner who is acting as Rehabilitator of Legion and Villanova Insurance Companies. As well as fixing the liabilities on a number of programs, this commutation was necessary to establish formal understandings with the Rehabilitator regarding premium and reinsurance set offs and other procedures that would be adhered to by both parties on a going forward basis. The formalization of these procedures would provide additional certainty to the IPC Companies but until this was established, the Boards of the IPC Companies had put a moratorium on dividend payments and the return of collateral.

An agreement was reached in July with the Rehabilitator on the terms of a proposed commutation and a summary letter agreement was executed by both sides. On July 3, 2002, the date the letter agreement was executed, we anticipated signing off on the formal commutation documentation within a few weeks at most.

By early August, the Rehabilitator indicated that she would not go forward with the commutation, unless a legal opinion providing certain guarantees was provided by Bermuda counsel. We believe this legal opinion was not contemplated by the July 3 letter agreement and, moreover, could not be provided by any law firm in good conscience. Later in August, the Rehabilitator abandoned the commutation. The only reason the Rehabilitator has given for abandoning the commutation was the failure to provide the legal opinion that was not contemplated by the letter agreement. We believe the abandonment of the commutation on these grounds is in violation of the agreement that was reached in July.

On August 30 we received notification that the Rehabilitator had petitioned the Pennsylvania court to place both Legion and Villanova in liquidation. Mutual Risk Management Ltd., ultimate parent of Legion and Villanova (plus the IPC Companies), filed a petition objecting to the proposed liquidation order with the Pennsylvania Court.

.../...

Letter to Preferred Shareholders
October 10, 2002
Page 2

The IPC Companies in their own right filed a motion for a hearing on the commutation in an effort to enforce a binding agreement. We were successful in obtaining a hearing on both counts. A hearing for the commutation has been set for October 15, to allow us a limited discovery period, and a preliminary hearing for MRM on the liquidation was held on October 4. Limited discovery has also been permitted relating to the request for a liquidation order, and a hearing on that request is tentatively scheduled for October 31 and November 1.

Until the hearing is held on the commutation and the judge renders her decision, the IPC Companies will still be under the dividend and collateral moratorium. It is hoped by the Boards of the IPC Companies that the Judge will make the commutation binding with no changes to format. If that occurs we will address the possibility of payment of dividends and collateral, albeit on a very conservative basis and under the control of a dividend committee.

I hope this brings you up to date with what has happened since May. Our September statements are in the process of being compiled so we anticipate that we will send you another communication with that mailing. In the meantime please continue to call us with your questions and looking for any updates.

Thanking you again for your patience as we work for you during these difficult times.

Yours sincerely

David Alexander
President

DA/rjh

# EXHIBIT I

# MILLIGAN-WHYTE & SMITH

### BARRISTERS & ATTORNEYS

Mintflower Place • 2nd Floor
5 Par-la-Ville Road
Hamilton HM 08, Bermuda

Telephone: (441) 295-4294
Fax: (441) 295-1348
E-mail: mws@mws.bm
Website: www.milligan-whyteandsmith.bm

P.O. Box HM 1223
Hamilton HM FX
Bermuda

August 12, 2002

By Hand
The Registrar
Supreme Court Registry
Old Fire Building
113 Front Street
Hamilton HM 12

Dear Madam,

Re:    In the Supreme Court of Bermuda
Companies (Winding-Up) No  of 2002
In the Matter of IPC Mutual Holdings Ltd
In the Matter of the Petition of Stephen Friedberg,
And in the Matter of the Companies Act 1981
In the Supreme Court of Bermuda
Companies (Winding-Up) No  of 2002
In the Matter of Mutual Holdings (Bermuda) Ltd
In the Matter of the Petition of Stephen Friedberg, Dale Krapf and
Dalls Krapf
And in the Matter of the Companies Act 1981

Please find enclosed for filing two Petitions, one for each of the above two
matters (originals plus three copies of each).

Yours faithfully
MILLIGAN-WHYTE & SMITH

Ian Kawaley

Encs

IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:    OF  2002

IN THE MATTER OF IPC MUTUAL HOLDINGS  LTD.

IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

PETITION

---

THE HUMBLE PETITION of Stephen Friedberg  of  4240 Greensburg Pike,  Pittsburg, PA, USA , a Creditor and Contributory of Mutual Holdings  Ltd. ("the Company), SHOWETH as follows:

## BACKGROUND

1.  The Petitioner  is a preferred shareholder of the Company, which was incorporated in Bermuda as an exempted company on  August 10, 1985 under the name of  Mutual Holdings Ltd, in Series E14 . On June 23, 1994 the Company changed its name to IPC Mutual Holdings Ltd.

2.  The Company's registered office is at Clarendon House, Church Street, Hamilton HM 11.

3.  The Company's authorized capital is US$5,000,000 and CDN$100,000.

4.   The Company's principal objects are:

"As set forth in paragraphs (b) to (n) and (p) to (u) inclusive of the second Schedule to the Companies Act 1981",

and such other objects as are set out in the Memorandum of Association.

## THE PETITIONERS' LOCUS AS CREDITORS

5       The Petitioner is owed US$790, 832.00 according to the Company's own accounts for the period ending March 31, 2002 under a dividend formula set out in their respective preference shareholders agreement.

6.      This sum is due according to a dividend calculation which requires the Respondent to "declare" a dividend on an annual basis depending on the profitability of the related insurance programmes after appropriate reserves are set aside for known and estimated losses. According to the course of dealing between the parties, the dividend amounts are indicated by the Respondent in accounts prepared by Mutual Indemnity Ltd. ("Indemnity") under the heading "Shareholder Account". Dividends "declared" in this manner would be payable or retained by Indemnity for investment depending on the wishes of the preferred shareholder concerned. The terms of the shareholder agreements clearly anticipate the payment of dividends in each year when investment income and/or underwriting profit is generated and the Petitioners agreed to repay any dividends overpaid if losses were subsequently proved to have been under-estimated. These "dividends" were not company dividends requiring board approval under section 54 of the Companies Act 1981, but individual contractual payment obligations owed by the Company to its preferred shareholders.

7.      Occasionally, but not invariably, the Company before declaring or paying a dividend would furnish to the Petitioners a dividend calculation table explaining in further detail how it arrived at the figure payable to preferred shareholders as set out in Indemnity's periodic accounts for each programme under the "shareholder account" heading.

8.      The Company has disputed that it presently owes the Petitioner, inter alia, the said sum of US$790,832.00 by a letter dated May 23, 2002 from their attorneys, Messrs. Conyers Dill & Pearman, ("CDP") to the Petitioners' attorneys, Messrs. Milligan-Whyte & Smith ("MWS"). The May 23, 2002 letter attached a spreadsheet which admits that a "potential dividend" exists of US$83,013 as at May 31, 2002. On July 10, 2002 CDP wrote MWS asserting:

"1.     No dividend has been declared in favour of your client, accordingly there is no debt due to your client.

2.      The current state of accounting between our respective clients is set out in the spreadsheet

attached to our letter of 23 May, 2002 and shows clearly that your client has no entitlement to any payment of $4,695,921 [the total sum claimed under a statutory demand]".

9.    The Company's assertion that "no dividend has been declared" is inconsistent with the terms of the relevant shareholder agreements and the course of dealing between the parties according to which sums credited to the "shareholder account" of preferred shareholders generally reflect dividends which have been declared applying the formula set out in the relevant shareholder agreement. The Company cannot dispute bona fide or on substantial grounds that a sum sufficient to support the present Petition is presently due to the Petitioner under the Shareholder Agreement for the reasons set out in MWS's letter dated June 25, 2002 to CDP in this regard. It is also inconsistent in the manner in which the "insurance profit center" programmes were initially marketed to the Petitioners and other preferred shareholders, who were told by the Company and/or to affiliates that dividends would be paid annually provided the dividend formula set out in the Shareholder Agreement, to be applied commencing approximately 18 months from inception, yielded a profit. According to an August 1991 "IPC Case Study" (at page 5):

> "*Funds held under an Insurance Profit-Center Program earn investment income, which can be returned annually or allowed to compound..... The program commences January 1st and funds begin to flow. Arrangements are made for a dividend calculation to take place in June of the following year. The association purchases the preferred shares of stock and is designated as the Shareholder. As outlined in the Shareholders Agreement, Mutual Holdings Ltd will pay dividends (investment income)* __annually__ *[emphasis added] to the association. The association, in turn, will pass along as underwriting profit dividends to the participants, based on a formula to be agreed by its [i.e. the preferred shareholders] Board of Directors"*[in fact, the shareholders agreements all provide a formula for dividends comprising investment income AND underwriting profits to be declared annually].

10.   Further and alternatively, all sums attributable to the Series E14 programme held by Morgan Stanley in an account set up at the request of the Petitioner after dividends were declared by the Company and the First Petitioner agreed not to accept payment at that time, constitute an indisputable debt presently owing to the Petitioner by the Company.

## THE COMPANY'S INSOLVENCY

11.   In or about late November, 2001, the Petitioner became concerned about the Company's solvency based on news reports about the MRM Group of Companies to which the

Company belongs and market intelligence, combined with the Company's persistent refusal to pay its debts as they fall due.

12. The Company has refused to pay the Morgan Stanley monies to the Petitioner, having admitted over a year ago that those monies were held to the order of the Petitioner and payable to him on demand.

13. The Company has also raised obviously bogus excuses for not paying sums properly due, including, inter alia, the assertion that the monies due to the Petitioner should be reduced by the amount of a potential claim of US$1.8 million on the part of the primary insurer, Legion Insurance Company ("Legion") against Research Underwriters Inc, a wholly distinct legal entity of which the First Petitioner is merely a shareholder. Legion has never asserted a claim for this amount or any amount against Research Underwriters , Inc. or the Petitioner.

14. This pattern of refusing to pay debts as they fall due appears to be part of a wider corporate strategy involving other members of the MRM group controlled by the same management as that in control of the Company. This is illustrated by the fact that IPC Mutual Holdings Ltd. failed to pay some US$2 million it agreed to pay to, inter alia, the Petitioner, within four days after execution of a redemption agreement in respect of Preferred Shares Series E11 until served with a Statutory Demand. The Petitioner has been advised of similar behaviour towards other preferred shareholders of part of the Company and its affiliates.

15. This failure to pay debts as they fall due has occurred against the background of two related United States primary insurers (Legion and Villanova Insurance Company ("Villanova")) entering voluntary rehabilitation in Pennsylvania on April 1, 2002. Legion has also been placed into rehabilitation in Illinois.

16. The Company wrote the Petitioner by letter dated May 30, 2002 advising him that due to uncertainty relating to the Legion and Villanova rehabilitations (which it was hoped would be resolved by a commutation agreement within "60-90 days"):

> "*In the meantime, the Board of Holdings has determined that...... Holdings will not make any dividend distributions to our Preferred Shareholders.....*"

17. The Company is, accordingly, admittedly unable to pay its debts as they fall due and it has admitted it will not be paying dividends which would otherwise be payable until further notice.

## THE NEED FOR INDEPENDENT MANAGEMENT

18. In or about May 2002, the Petitioner commenced in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 02-CV-3193 against, inter alia, the Company and Indemnity. On May 29, 2002, the Pennsylvania Court entered a

Temporary Restraining Order ("TRO")freezing the $2,700,000 in the Morgan Stanley Account which the First Petitioner contends are held by Indemnity on trust for him. These proceedings were commenced so that, in the event of the Company's or Indemnity's Liquidation in Bermuda, the First Petitioner could establish, if necessary, his proprietary claim to the relevant dividend proceeds. Similar proceedings were commenced against Indemnity, whom are believed to legally hold all dividend monies, in The Supreme Court of Bermuda, Civil Jurisdiction 2002: No. 195. By letter dated June 26, 2002 from CDP to MWS, the Company indicated that it was content to let the TRO remain in place.

19.    It is unsatisfactory that the Company, in light of its admitted insolvency and the fact that related companies in the United States are properly under independent management, should continue to remain in the hands of its current management. This is particularly the case as serious allegations have been made against the Company's and/or its affiliates' present management in proceedings abroad, eg.:

19.1    in American Patriot Insurance Company, Inc –v- Mutual Risk Management Ltd. and others, United States District Court for the Northern District of Illinois, the Complaint alleges that the President of the Company, David Alexander, acting on behalf of affiliates of the Company, fraudulently misrepresented the manner in which similar "rent a captive programmes" to those participated in by the Petitioners operated with a view to obtaining security from an insured/preferred shareholder which was not genuinely required for the programme in order to settle losses which should properly have been borne by Legion under the relevant Reinsurance Agreement. These allegations provide some independent support for the Petitioner's assertions that the Company, acting through the same David Alexander, has acted in bad faith in its dividend calculations and contentions as to the amount of security is required for the Petitioners' programmes. Indeed, the Petitioners consider that their programmes, like those which form the basis of the American Patriot litigation, provide a definitive cap on liabilities which Indemnity is exposed to, thus rendering wholly artificial the arguments being advanced on behalf of the Company as an excuse for grossly excessive over-reserving in respect of liabilities whose limits (from the Indemnity/Company/Petitioners perspective)are clearly ascertainable;

19.2    on June 18, 2002, the Royal Gazette reported on page 26-27 a California Law suit against, inter alia, Mutual Risk Management Ltd. alleging, inter alia, false accounting;

19.3    meanwhile in Bermuda, an injunction was granted against an affiliate of the Company, IBC Mutual Holdings Ltd. freezing its assets as reported in the Royal Gazette, May 6, 2002 at page 17;

19.4    the said legal proceedings are relevant to the need for independent management of the Company because, as set out in paragraph D of page 9 of the Memorandum of Law in support of the American Patriot Complaint:

*"As noted above, and as should be self-evident from the manner in which the Rent-a-Captive programs operate, The Mutual Entities effectively operate as one. Thus, any financial impact on one has serious repercussions for the others........"*

## PETITIONER'S LOCUS AS CONTRIBUTORY

20.    In his capacity as a contributory of the Company, the Petitioner contends that it is just and equitable that the Company be wound-up for the reasons hereinbefore averred.

21.    In light of the fact that Legion and Villanova are in rehabilitation, it seems inevitable that none of the insurance programmes in which the Company and Indemnity are, together with various preferred shareholders, involved will be renewed. The relevant programmes will all be run-off and it is in the best interest of all of the Company's Preferred Shareholders (who are also likely to be its principal creditors) that independent management supervise this run-off process.

22.    The Petitioner and, he believes, other preferred shareholders doubt the ability of the existing management, in light of their past conduct to fairly manage the run-off process.

23.    As it is not inevitable that the Company be wound-off in any event after the run-off of the relevant insurance programmes is complete, the winding-up petition can be adjourned on the first return date and a provisional liquidator appointed specifically to supervise the run-off process.

## CONCLUSION

24.    In the premises it is just and equitable that the Company be wound-up.

## AND THE PETITIONER THEREFORE HUMBLY PRAYS:-

1.    That this Petition be adjourned *sine die*.

2.    That, at such time as this Petition is relisted for hearing, if so moved by the Petitioners, the Company be wound up by the Court under the provisions of the Companies Act 1981.

3    That a Provisional Liquidator of the Company be appointed with the power to appoint agents and attorneys and to pay for same out of the assets of the Company at the normal hourly rates charged by such agents and attorneys.

4.    That the costs occasioned by this Petition be paid out of the assets of the Company.

5.    That such other Order may be made in the premises as may to this Honourable Court seem just.

DATED this /2 day of August, 2002

Milligan-Whyte & Smith
Mintflower Place, 2nd Floor
8 Par-la-Ville Road
Hamilton HM 08
Bermuda
Attorneys for the Petitioners

It is intended to serve this Petition on the Company.
The above Petition, having been presented to this Court on the          day of   August, 2002 , it
is ordered that this Petition shall be heard before the Court sitting on the          day of
, 2002 at     o'clock in the          noon.

Dated this          day of          , 2002

REGISTRAR

IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:   OF  2002

IN THE MATTER OF IPC MUTUAL
HOLDINGS LTD.

IN THE MATTER OF THE PETITION OF
STEPHEN FRIEDBERG

AND IN THE MATTER OF THE COMPANIES
ACT 1981

---

### PETITION

---

Milligan-Whyte & Smith
Mintflower Place
8 Par-la-Ville Road
Hamitlon HM 08
Attorneys for the Petitioner











IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:   OF   2002


IN THE MATTER OF MUTUAL HOLDINGS (BERMUDA) LTD.


IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG, DALE KRAPF
AND DALLAS KRAPF


AND IN THE MATTER OF THE COMPANIES ACT 1981


---

### PETITION

---


THE HUMBLE PETITION of Stephen Friedberg and Dale and Dallas Krapf of 4240
Greensburg Pike,  Pittsburg, PA, USA , Creditors and Contributories of Mutual Holdings
(Bermuda) Ltd. ("the Company), SHOWETH as follows:


### BACKGROUND

1.    The Petitioners are preferred shareholders of the Company, which was incorporated in
      Bermuda as an exempted company on May 25, 1993, in Series   U21 (First Petitioner
      only) and M23 (Second and Third Petitioners only) and N23 (all Petitioners).

2.    The Company's registered office is at Clarendon House, Church Street, Hamilton HM 11.

3.    The Company's authorized capital is US$11,840,000 and UKP 100,000.

4.     The Company's principal objects are:

"As set forth in paragraphs (b) to (n) and (p) to (u) inclusive of the second Schedule to the Companies Act 1981",

and such other objects are set out in the Memorandum of Association.

## THE PETITIONERS' LOCUS AS CREDITORS

5.    The Petitioners are owed US$4,643,291.00 according to the Company's own accounts for the period ending March 31, 2002 under a dividend formula set out in their respective preference shareholders agreement. This sum is made up as follows:

| - | Series U21 | (Friedberg only) | : | $3,234,391 |
| - | Series M23 | (Krapfs only) | : | $  149,015 |
| - | Series N23 | (All Petitioners) | : | $1,259,895 |

**TOTAL:    $  4,643,291**

6.    This sum is due according to a dividend calculation which requires the Respondent to declare a dividend on an annual basis depending on the profitability of the related insurance programmes after appropriate reserves are set aside for known and estimated losses. According to the course of dealing between the parties, the dividend amounts are indicated by the Respondent in accounts prepared by Mutual Indemnity Ltd. ("Indemnity") under the heading "Shareholder Account". Dividends "declared" in this manner would be payable or retained by Indemnity for investment depending on the wishes of the preferred shareholder concerned. The terms of the shareholder agreements clearly anticipate the payment of dividends in each year when investment income and/or underwriting profit is generated and the Petitioners agreed to repay any dividends overpaid if losses were subsequently proved to have been under-estimated. These "dividends" were not company dividends requiring board approval under section 54 of the Companies Act 1981, but individual contractual payment obligations owed by the Company to its preferred shareholders.

7.    Occasionally, but not invariably, the Company before declaring or paying a dividend would furnish to the Petitioners a dividend calculation table explaining in further detail how it arrived at the figure payable to preferred shareholders as set out in Indemnity's periodic accounts for each programme under the "shareholder account" heading.

8.    The Company has disputed that it presently owes the Petitioners, inter alia, the said sum US$4,643,291 by a letter dated May 23, 2002 from their attorneys, Messrs. Conyers Dill & Pearman, ("CDP") to the Petitioners' attorneys, Messrs. Milligan-Whyte & Smith ("MWS"). The May 23, 2002 letter attached a spreadsheet which admits that a "potential dividend" exists of US$83,013 as at May 31, 2002. On July 10, 2002 CDP wrote MWS asserting:

"1.    No dividend has been declared in favour of your client, accordingly there is no debt due to your client.

2.    The current state of accounting between our respective clients is set out in the spreadsheet attached to our letter of 23 May, 2002 and shows clearly that your client has no entitlement to any payment of $4,695,921".

9.    The Company's assertions that "no dividend has been declared" is inconsistent with the terms of the relevant shareholder agreements and the course of dealing between the parties according to which sums credited to the "shareholder account" of preferred shareholders generally reflect dividends which have been declared applying the formula set out in the relevant shareholder agreement. The Company cannot dispute bona fide or on substantial grounds that a sum sufficient to support the present Petition is presently due to the Petitioners under the Shareholder Agreement for the reasons set out in MWS's letter dated June 25, 2002 to CDP in this regard. It is also inconsistent in the manner in which the 'insurance profit center" programmes were initially marketed to the Petitioners and other preferred shareholders, who were told by the Company and/or to affiliates that dividends would be paid annually provided the dividend formula set out in the Shareholder Agreement applied commencing approximately 18 months from inception yielded a profit. According to an August 1991 "IPC Case Study" (at page 5):

> "Funds held under an Insurance Profit-Center Program earn investment income, which can be returned annually or allowed to compound..... The program commences January 1ˢᵗ and funds begin to flow. Arrangements are made for a dividend calculation to take place in June of the following year. The association purchases the preferred shares of stock and is designated as the Shareholder. As outlined in the Shareholders Agreement, Mutual Holdings Ltd will pay dividends (investment income) annually [emphasis added] to the association. The association, in turn, will pass along as underwriting profit dividends to the participants, based on a formula to be agreed by its [i.e. the preferred shareholders] Board of Directors"[in fact, the shareholders agreements all provide a formula for dividends comprising investment income AND underwriting profits to be declared annually].

10.    Further and alternatively, all sums held by Morgan Stanley in respect of the U21 programme in an account set up at the request of the First Petitioner after dividends were declared by the Company and the First Petitioner agreed not to accept payment at that time, constitute an indisputable debt presently owing to the First Petitioner by the Company.

## THE COMPANY'S INSOLVENCY

11.  In or about late November, 2001, the Petitioners' became concerned about the Company's solvency based on news reports about the MRM Group of Companies to which the Company belongs and market intelligence, combined with the Company's persistent refusal to pay its debts as they fall due.

12.  The Company has refused to pay the Morgan Stanley monies to the First Petitioner, having admitted over a year ago that those monies were held to the order of the First Petitioner and payable to him on demand.

13.  The Company has also raised obviously bogus excuses for not paying sums properly due, including, inter alia, the assertion that the monies due to the First Petitioner should be reduced by the amount of a potential claim of US$1.8 million on the part of the primary insurer, Legion Insurance Company ("Legion") against Research Underwriters Inc, a wholly distinct legal entity of which the First Petitioner is merely a shareholder. Legion has never asserted a claim for this amount or any amount against Research Underwriters, Inc. or the Petitioners.

14.  This pattern of refusing to pay debts as they fall due appears to be part of a wider corporate strategy involving other members of the MRM group controlled by the same management as that in control of the Company. This is illustrated by the fact that IPC Mutual Holdings Ltd. failed to pay some US$2 million it agreed to pay to, inter alia, the First Petitioner, within four days after execution of a redemption agreement in respect of Preferred Shares Series E11 until served with a Statutory Demand. The Petitioners have been advised of similar behaviour towards other preferred shareholders of part of the Company and its affiliates.

15.  This failure to pay debts as they fall due has occurred against the background of two related United States primary insurers (Legion and Villanova Insurance Company ("Villanova")) entering voluntary rehabilitation in Pennsylvania on April 1, 2002. Legion has also been placed into rehabilitation in Illinois.

16.  The Company wrote the Petitioners by letter dated May 30, 2002 advising them that due to uncertainty relating to the Legion and Villanova rehabilitations (which it was hoped would be resolved by a commutation agreement within "60-90 days"):

> *"In the meantime, the Board of Holdings has determined that...... Holdings will not make any dividend distributions to our Preferred Shareholders....."*

17.  The Company is, accordingly, admittedly unable to pay its debts as they fall due and it has admitted it will not be paying dividends which would otherwise be payable until further notice.

## THE NEED FOR INDEPENDENT MANAGEMENT

18.    In or about May 2002, the First Petitioner commenced in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 02-CV-3193 against, inter alia, the Company and Indemnity. On May 29, 2002, the Pennsylvania Court entered a Temporary Restraining Order ("TRO")freezing the $2,700,000 in the Morgan Stanley Account which the First Petitioner contends are held by Indemnity on trust for him. These proceedings were commenced so that, in the event of the Company's or Indemnity's Liquidation in Bermuda, the First Petitioner could establish, if necessary, his proprietary claim to the relevant dividend proceeds. Similar proceedings were commenced against Indemnity, whom are believed to legally hold all dividend monies, in The Supreme Court of Bermuda, Civil Jurisdiction 2002: No. 195. By letter dated June 26, 2002 from CDP to MWS, the Company indicated that it was content to let the TRO remain in place.

19.    It is unsatisfactory that the Company, in light of its admitted insolvency and the fact that related companies in the United States are properly under independent management, should continue to remain in the hands of its current management. This is particularly the case as serious allegations have been made against the Company's and/or its affiliates' present management in proceedings abroad, eg.:

19.1    in American Patriot Insurance Company, Inc –v- Mutual Risk Management Ltd. and others, United States District Court for the Northern District of Illinois, the Complaint alleges that the President of the Company, David Alexander, acting on behalf of affiliates of the Company, fraudulently misrepresented the manner in which similar "rent a captive programmes" to those participated in by the Petitioners operated with a view to obtaining security from an insured/preferred shareholder which was not genuinely required for the programme in order to settle losses which should properly have been borne by Legion under the relevant Reinsurance Agreement. These allegations provide some independent support for the Petitioners' assertions that the Company, acting through the same David Alexander, has acted in bad faith in its dividend calculations and contentions as to the amount of security is required for the Petitioners' programmes. Indeed, the Petitioners consider that their programmes, like those which form the basis of the American Patriot litigation, provide a definitive cap on liabilities which Indemnity is exposed to, thus rendering wholly artificial the arguments being advanced on behalf of the Company as an excuse for grossly excessive over-reserving in respect of liabilities whose limits (from the Indemnity/Company/Petitioners perspective)are clearly ascertainable;

19.2    on June 18, 2002, the Royal Gazette reported on page 26-27 a California Law suit against, inter alia, Mutual Risk Management Ltd. alleging, inter alia, false accounting;

19.3    meanwhile in Bermuda, an injunction was granted against an affiliate of the Company, IBC Mutual Holdings Ltd. freezing its assets as reported in the Royal Gazette, May 6, 2002 at page 17;

19.4    the said legal proceedings are relevant to the need for independent management of the Company because, as set out in paragraph D of page 9 of the Memorandum of Law in support of the American Patriot Complaint:

> *"As noted above, and as should be self-evident from the manner in which the Rent-a-Captive programs operate, The Mutual Entities effectively operate as one. Thus, any financial impact on one has serious repercussions for the others........"*

## PETITIONERS' LOCUS AS CONTRIBUTORIES

20.    In their capacity of contributories of the Company, the Petitioners contend that it is just and equitable that the Company be wound-up for the reasons hereinbefore averred.

21.    In light of the fact that Legion and Villanova are in rehabilitation, it seems inevitable that none of the insurance programmes in which the Company and Indemnity are, together with various preferred shareholders, involved will be renewed. The relevant programmes will all be run-off and it is in the best interest of all of the Company's preferred shareholders (who are also likely to be its principal creditors) that independent management supervise this run-off process.

22.    The Petitioners and, they believe, other preferred shareholders doubt the ability of the existing management, in light of their past conduct to fairly manage the run-off process.

23.    As it is not inevitable that the Company be wound-off in any event after the run-off of the relevant insurance programmes is complete, the winding-up petition can be adjourned on the first return date and a provisional liquidator appointed specifically to supervise the run-off process.

## CONCLUSION

24.    In the premises it is just and equitable that the Company be wound-up.

## AND THE PETITIONER THEREFORE HUMBLY PRAYS:-

1.    That this Petition be adjourned *sine die*.

2.     That, at such time as this Petition is relisted for hearing, if so moved by the Petitioners, the Company be wound up by the Court under the provisions of the Companies Act 1981.

3     That a Provisional Liquidator of the Company be appointed with the power to appoint agents and attorneys and to pay for same out of the assets of the Company at the normal hourly rates charged by such agents and attorneys.

4.     That the costs occasioned by this Petition be paid out of the assets of the Company.

5.     That such other Order may be made in the premises as may to this Honourable Court seem just.

DATED this /2th day of August, 2002

Milligan-Whyte & Smith
Mintflower Place, 2nd Floor
8 Par-la-Ville Road
Hamilton HM 08
Bermuda
Attorneys for the Petitioners

It is intended to serve this Petition on the Company.

The above Petition, having been presented to this Court on the      day of August, 2002 , it is ordered that this Petition shall be heard before the Court sitting on the      day of      , 2002 at      o'clock in the      noon.

Dated this      day of      , 2002

REGISTRAR

IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:    OF  2002

IN THE MATTER OF MUTUAL HOLDINGS
(BERMUDA) LTD.

IN THE MATTER OF THE PETITION OF
STEPHEN FRIEDBERG, DALE KRAPF AND
DALLAS KRAPF

AND IN THE MATTER OF THE COMPANIES
ACT 1981





PETITION

Milligan-Whyte & Smith
Barristers & Attorneys
Mintflower Place
8 Par-la-Ville Road
Hamilton HM 08
Attorneys for the Petitioner

IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:   OF  2002

IN THE MATTER OF MUTUAL HOLDINGS (BERMUDA) LTD.

IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG, DALE KRAPF AND DALLAS KRAPF

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

### PETITION

---

THE HUMBLE PETITION of Stephen Friedberg and Dale and Dallas Krapf. of 4240 Greensburg Pike,  Pittsburg, PA, USA , Creditors and Contributories of Mutual Holdings (Bermuda) Ltd. ("the Company), SHOWETH as follows:

### BACKGROUND

1.     The Petitioners are preferred shareholders of the Company, which was incorporated in Bermuda as an exempted company on May 25, 1993, in Series   U21 (First Petitioner only) and M23 (Second and Third Petitioners only) and N23 (all Petitioners).

2.     The Company's registered office is at Clarendon House, Church Street, Hamilton HM 11.

3.     The Company's authorized capital is US$11,840,000 and UKP 100,000.

4.       The Company's principal objects are:

"As set forth in paragraphs (b) to (n) and (p) to (u) inclusive of the second Schedule to the Companies Act 1981",

and such other objects are set out in the Memorandum of Association.

## THE PETITIONERS' LOCUS AS CREDITORS

5.    The Petitioners are owed US$4,643,291.00 according to the Company's own accounts for the period ending March 31, 2002 under a dividend formula set out in their respective preference shareholders agreement. This sum is made up as follows:

|  |  |  |  |  |
|---|---|---|---|---|
| - | Series U21 | (Friedberg only) | : | $3,234,391 |
| - | Series M23 | (Krapfs only) | : | $ 149,015 |
| - | Series N23 | (All Petitioners) | : | $1,259,895 |
|  |  | **TOTAL:** |  | **$ 4,643,291** |

6.    This sum is due according to a dividend calculation which requires the Respondent to declare a dividend on an annual basis depending on the profitability of the related insurance programmes after appropriate reserves are set aside for known and estimated losses. According to the course of dealing between the parties, the dividend amounts are indicated by the Respondent in accounts prepared by Mutual Indemnity Ltd. ("Indemnity") under the heading "Shareholder Account". Dividends "declared" in this manner would be payable or retained by Indemnity for investment depending on the wishes of the preferred shareholder concerned. The terms of the shareholder agreements clearly anticipate the payment of dividends in each year when investment income and/or underwriting profit is generated and the Petitioners agreed to repay any dividends overpaid if losses were subsequently proved to have been under-estimated. These "dividends" were not company dividends requiring board approval under section 54 of the Companies Act 1981, but individual contractual payment obligations owed by the Company to its preferred shareholders.

7.    Occasionally, but not invariably, the Company before declaring or paying a dividend would furnish to the Petitioners a dividend calculation table explaining in further detail how it arrived at the figure payable to preferred shareholders as set out in Indemnity's periodic accounts for each programme under the "shareholder account" heading.

8.    The Company has disputed that it presently owes the Petitioners, inter alia, the said sum US$4,643,291 by a letter dated May 23, 2002 from their attorneys, Messrs. Conyers Dill & Pearman, ("CDP") to the Petitioners' attorneys, Messrs. Milligan-Whyte & Smith ("MWS"). The May 23, 2002 letter attached a spreadsheet which admits that a "potential dividend" exists of US$83,013 as at May 31, 2002. On July 10, 2002 CDP wrote MWS asserting:

"1.    No dividend has been declared in favour of your client, accordingly there is no debt due to your client.

2.    The current state of accounting between our respective clients is set out in the spreadsheet attached to our letter of 23 May, 2002 and shows clearly that your client has no entitlement to any payment of $4,695,921".

9.    The Company's assertions that "no dividend has been declared" is inconsistent with the terms of the relevant shareholder agreements and the course of dealing between the parties according to which sums credited to the "shareholder account" of preferred shareholders generally reflect dividends which have been declared applying the formula set out in the relevant shareholder agreement. The Company cannot dispute bona fide or on substantial grounds that a sum sufficient to support the present Petition is presently due to the Petitioners under the Shareholder Agreement for the reasons set out in MWS's letter dated June 25, 2002 to CDP in this regard. It is also inconsistent in the manner in which the 'insurance profit center" programmes were initially marketed to the Petitioners and other preferred shareholders, who were told by the Company and/or to affiliates that dividends would be paid annually provided the dividend formula set out in the Shareholder Agreement applied commencing approximately 18 months from inception yielded a profit. According to an August 1991 "IPC Case Study" (at page 5):

*"Funds held under an Insurance Profit-Center Program earn investment income, which can be returned annually or allowed to compound..... The program commences January 1ˢᵗ and funds begin to flow. Arrangements are made for a dividend calculation to take place in June of the following year. The association purchases the preferred shares of stock and is designated as the Shareholder. As outlined in the Shareholders Agreement, Mutual Holdings Ltd will pay dividends (investment income) annually [emphasis added] to the association. The association, in turn, will pass along as underwriting profit dividends to the participants, based on a formula to be agreed by its [i.e. the preferred shareholders] Board of Directors"* [in fact, the shareholders agreements all provide a formula for dividends comprising investment income AND underwriting profits to be declared annually].

10.    Further and alternatively, all sums held by Morgan Stanley in respect of the U21 programme in an account set up at the request of the First Petitioner after dividends were declared by the Company and the First Petitioner agreed not to accept payment at that time, constitute an indisputable debt presently owing to the First Petitioner by the Company.

## THE COMPANY'S INSOLVENCY

11.    In or about late November, 2001, the Petitioners' became concerned about the Company's solvency based on news reports about the MRM Group of Companies to which the Company belongs and market intelligence, combined with the Company's persistent refusal to pay its debts as they fall due.

12.    The Company has refused to pay the Morgan Stanley monies to the First Petitioner, having admitted over a year ago that those monies were held to the order of the First Petitioner and payable to him on demand.

13.    The Company has also raised obviously bogus excuses for not paying sums properly due, including, inter alia, the assertion that the monies due to the First Petitioner should be reduced by the amount of a potential claim of US$1.8 million on the part of the primary insurer, Legion Insurance Company ("Legion") against Research Underwriters Inc, a wholly distinct legal entity of which the First Petitioner is merely a shareholder. Legion has never asserted a claim for this amount or any amount against Research Underwriters , Inc. or the Petitioners.

14.    This pattern of refusing to pay debts as they fall due appears to be part of a wider corporate strategy involving other members of the MRM group controlled by the same management as that in control of the Company.  This is illustrated by the fact that IPC Mutual Holdings Ltd. failed to pay some US$2 million it agreed to pay to, inter alia, the First Petitioner, within four days after execution of a redemption agreement in respect of Preferred Shares Series E11 until served with a Statutory Demand.  The Petitioners have been advised of similar behaviour towards other preferred shareholders of part of the Company and its affiliates.

15.    This failure to pay debts as they fall due has occurred against the background of two related United States primary insurers (Legion and Villanova Insurance Company ("Villanova")) entering voluntary rehabilitation in Pennsylvania on April 1, 2002. Legion has also been placed into rehabilitation in Illinois.

16.    The Company wrote the Petitioners by letter dated May 30, 2002 advising them that due to uncertainty relating to the Legion and Villanova rehabilitations (which it was hoped would be resolved by a commutation agreement within "60-90 days"):

> "In the meantime, the Board of Holdings has determined
> that...... Holdings will not make any dividend distributions
> to our Preferred Shareholders....."

17.    The Company is, accordingly, admittedly unable to pay its debts as they fall due and it has admitted it will not be paying dividends which would otherwise be payable until further notice.

## THE NEED FOR INDEPENDENT MANAGEMENT

18.   In or about May 2002, the First Petitioner commenced in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 02-CV-3193 against, inter alia, the Company and Indemnity.  On May 29, 2002, the Pennsylvania Court entered a Temporary Restraining Order ("TRO")freezing the $2,700,000 in the Morgan Stanley Account which the First Petitioner contends are held by Indemnity on trust for him.  These proceedings were commenced so that, in the event of the Company's or Indemnity's Liquidation in Bermuda, the First Petitioner could establish, if necessary, his proprietary claim to the relevant dividend proceeds.  Similar proceedings were commenced against Indemnity, whom are believed to legally hold all dividend monies, in The Supreme Court of Bermuda, Civil Jurisdiction 2002: No. 195.  By letter dated June 26, 2002 from CDP to MWS, the Company indicated that it was content to let the TRO remain in place.

19.   It is unsatisfactory that the Company, in light of its admitted insolvency and the fact that related companies in the United States are properly under independent management, should continue to remain in the hands of its current management.  This is particularly the case as serious allegations have been made against the Company's and/or its affiliates' present management in proceedings abroad, eg.:

19.1   in American Patriot Insurance Company, Inc –v– Mutual Risk Management Ltd. and others, United States District Court for the Northern District of Illinois, the Complaint alleges that the President of the Company, David Alexander, acting on behalf of affiliates of the Company, fraudulently misrepresented the manner in which similar "rent a captive programmes" to those participated in by the Petitioners operated with a view to obtaining security from an insured/preferred shareholder which was not genuinely required for the programme in order to settle losses which should properly have been borne by Legion under the relevant Reinsurance Agreement.  These allegations provide some independent support for the Petitioners' assertions that the Company, acting through the same David Alexander, has acted in bad faith in its dividend calculations and contentions as to the amount of security is required for the Petitioners' programmes.  Indeed, the Petitioners consider that their programmes, like those which form the basis of the American Patriot litigation, provide a definitive cap on liabilities which Indemnity is exposed to, thus rendering wholly artificial the arguments being advanced on behalf of the Company as an excuse for grossly excessive over-reserving in respect of liabilities whose limits (from the Indemnity/Company/Petitioners perspective)are clearly ascertainable;

19.2   on June 18, 2002, the Royal Gazette reported on page 26-27 a California Law suit against, inter alia, Mutual Risk Management Ltd. alleging, inter alia, false accounting;

19.3    meanwhile in Bermuda, an injunction was granted against an affiliate of the Company, IBC Mutual Holdings Ltd. freezing its assets as reported in the Royal Gazette, May 6, 2002 at page 17;

19.4    the said legal proceedings are relevant to the need for independent management of the Company because, as set out in paragraph D of page 9 of the Memorandum of Law in support of the American Patriot Complaint:

> "As noted above, and as should be self-evident from the manner in which the Rent-a-Captive programs operate, The Mutual Entities effectively operate as one. Thus, any financial impact on one has serious repercussions for the others........."

## PETITIONERS' LOCUS AS CONTRIBUTORIES

20.    In their capacity of contributories of the Company, the Petitioners contend that it is just and equitable that the Company be wound-up for the reasons hereinbefore averred.

21.    In light of the fact that Legion and Villanova are in rehabilitation, it seems inevitable that none of the insurance programmes in which the Company and Indemnity are, together with various preferred shareholders, involved will be renewed. The relevant programmes will all be run-off and it is in the best interest of all of the Company's preferred shareholders (who are also likely to be its principal creditors) that independent management supervise this run-off process.

22.    The Petitioners and, they believe, other preferred shareholders doubt the ability of the existing management, in light of their past conduct to fairly manage the run-off process.

23.    As it is not inevitable that the Company be wound-off in any event after the run-off of the relevant insurance programmes is complete, the winding-up petition can be adjourned on the first return date and a provisional liquidator appointed specifically to supervise the run-off process.

## CONCLUSION

24.    In the premises it is just and equitable that the Company be wound-up.

## AND THE PETITIONER THEREFORE HUMBLY PRAYS:-

1.    That this Petition be adjourned *sine die.*

2.    That, at such time as this Petition is relisted for hearing, if so moved by the Petitioners, the Company be wound up by the Court under the provisions of the Companies Act 1981.

3    That a Provisional Liquidator of the Company be appointed with the power to appoint agents and attorneys and to pay for same out of the assets of the Company at the normal hourly rates charged by such agents and attorneys.

4.    That the costs occasioned by this Petition be paid out of the assets of the Company.

5.    That such other Order may be made in the premises as may to this Honourable Court seem just.

DATED this 12th day of August, 2002

Milligan-Whyte & Smith
Mintflower Place, 2nd Floor
8 Par-la-Ville Road
Hamilton HM 08
Bermuda
Attorneys for the Petitioners

It is intended to serve this Petition on the Company.
The above Petition, having been presented to this Court on the         day of August, 2002 , it is ordered that this Petition shall be heard before the Court sitting on the         day of         , 2002 at         o'clock in the         noon.

Dated this         day of         , 2002

REGISTRAR

IN THE SUPREME COURT OF BERMUDA

COMPANIES (WINDING UP)

NO:   OF  2002


IN THE MATTER OF MUTUAL HOLDINGS
(BERMUDA) LTD.

IN THE MATTER OF THE PETITION OF
STEPHEN FRIEDBERG, DALE KRAPF AND
DALLAS KRAPF

AND IN THE MATTER OF THE COMPANIES
ACT 1981

---

### PETITION

---

Milligan-Whyte & Smith
Barristers & Attorneys
Mintflower Place
8 Par-la-Ville Road
Hamilton HM 08
Attorneys for the Petitioner

# EXHIBIT J

Filed on behalf of IPC Mutual Holdings Ltd
and Mutual Holdings (Bermuda) Ltd
2nd Affidavit of J Patrick Reardon
Sworn 20 August 2002

litdocs.7578

## IN THE SUPREME COURT OF BERMUDA

## COMPANIES (WINDING UP)

### 2002 : NOS.299 & 300

COMPANIES WINDING UP 2002 NO. 299
IN THE MATTER OF IPC MUTUAL HOLDINGS LTD
AND IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES ACT 1981

COMPANIES WINDING UP 2002 NO.300
IN THE MATTER OF MUTUAL HOLDINGS (BERMUDA) LTD
IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG, DALE
KRAPF AND DALLAS KRAPF
AND IN THE MATTER OF THE COMPANIES ACT 1981

-----------

## AFFIDAVIT OF J. PATRICK REARDON

-----------

I, J. Patrick Reardon of 44 Church Street, Hamilton, Bermuda MAKE OATH AND SAY AS
FOLLOWS:

1. I am an attorney qualified to practice law in the State of New Jersey and the
   Commonwealth of Pennsylvania in the United States of America and I am employed by
   the Mutual Risk Management Ltd. group of companies (the "MRM Group") as in-house
   legal counsel.  I am authorized by IPC Mutual Holdings Limited ("IPC") and Mutual
   Holdings (Bermuda) Limited ("Mutual") (together the "Companies") to swear this
   affidavit in support of their application to strike out the petitions filed in these
   proceedings seeking to wind up the Companies and appoint provisional liquidators.

2. Save where is otherwise indicated, the facts and matters deposed to in this affidavit are
   known to me personally through my employment by the MRM Group, of which IPC and
   Mutual are subsidiaries.

3. There are now produced and shown to me marked "PR1" copy documents which relate to this matter. Also now produced and shown to me marked "PR2" is the Affidavit of David Alexander sworn by him on 11 July 2002 in connection with the Statutory Demand dated 25 June 2002 and issued by Petitioners to Mutual. David Alexander is currently on holiday in Scotland and it is for this reason that I exhibit his affidavit to my own affidavit.

4. The ground for seeking this striking out is that the issue of the petitions is an abuse of the process of this Court in that:

    (a)    The Petitioners have acted in bad faith in that they are using the petitions for an improper purpose, namely to bring pressure to bear on the Companies to meet their claims for dividends which the Companies contend have not been declared, and are therefore not presently due and owing.;

    (b)    The Petitioners, through their counsel, gave an undertaking, having issued a Statutory Demand as more particularly set out below, that they would not present petitions based on the Statutory Demand without giving notice to Mutual's counsel. Whilst these petitions are not strictly speaking based upon the Statutory Demand, they are at least in part, based upon the same claims as formed the basis of the Statutory Demand; and

    (c)    There are proceedings before this court (Civil Jurisdiction 2002 No.195) and in the United States federal court in Pennsylvania commenced by Petitioner Freidberg in respect of substantially the same, or similar claims as form the basis of these petitions.

**Background**

5. In this affidavit I seek to set out the history of the relationship between the Companies and the Petitioners and to provide this Court with the factual position regarding the claims which form the basis for the disputes between the parties.

6. The disputes arise out of shareholder agreements between the Companies and the Petitioners relating to various programmes run for the Petitioners by the Companies and other companies in the MRM Group. The shareholder agreements provide that the shareholders, sometimes referred to as clients, such as the Petitioners, participate in the underwriting profits or losses of the reinsurance of the insureds' risks. The aim is that if profits are realised those profits are paid out by way of dividends to the clients; whereas if no profits are realised and instead losses result those losses are covered by reinsurance premiums, less expenses and fees, from the insurance carrier, collateral (either cash or letters of credit) provided by the client and held by the relevant MRM Group company, and any investment income gained on such reinsurance premiums, less expenses and fees, and cash collateral, if so posted.

7. I should emphasise that under clause 2 of the shareholder agreements, the Petitioners may receive a dividend in respect of the investment income, plus or minus underwriting gain or loss realised, on the particular programme during the year preceding the dividend date. Clause 2 of the shareholder agreement, as amended, contains a detailed mechanism for calculating this dividend. Profits are not debts due to the client; there is an entitlement to a dividend if it is declared on an appropriate dividend date. The arrangement between the Petitioners and the Companies is a shareholders arrangement, not a debtor/creditor arrangement.

**The Mutual Petition (Matter No. 300)**

8. At page 2 of the exhibit to the affidavit of David Alexander, there is to be found a copy of a Statutory Demand dated 25 June 2002 issued by Stephen Friedberg, Dale Krapf and Dallas Krapf which I believe relates in part to the amount claimed due by the Petitioners in the Mutual Petition (the "Mutual Petitioners"). The parties who issued the Statutory Demand are the same parties as the Mutual Petitioners. It is not clear to me precisely when the Statutory Demand was in fact served at Mutual's registered office, but I first saw it on 27 June 2002.

9. I was somewhat surprised that the Mutual Petitioners chose to serve a Statutory Demand on Mutual. The Mutual Petitioners well knew that their claim was disputed. By letter dated 23rd May 2002, Mutual's attorneys, Messrs Conyers Dill & Pearman, wrote to the Defendants' attorneys, Messrs Milligan Whyte & Smith, and addressed the state of accounting between Mutual and the Mutual Petitioners. A spreadsheet was attached to the letter, showing that little money was available in the Mutual Petitioners' programmes which possibly could be dividended to the Mutual Petitioners. A copy of the letter of 23rd May 2002 is at pages 7 to 9 of the exhibit to David Alexander's affidavit.

10. On 25 June 2002, Messrs Milligan-Whyte & Smith replied to the letter from Conyers Dill & Pearman, taking issue with the figures shown in the spreadsheet attached to the letter of 23 May 2002, and stating that the Statutory Demand was being issued. A copy of the letter of 25 June is to be found at pages 4 to 6 of the exhibit to David Alexander's affidavit

11. By letter dated 10 July 2002 Conyers Dill & Pearman sought an undertaking from Milligan Whyte & Smith not to proceed to present a winding up petition based on the Statutory Demand. By letter of 17 July 2002 Milligan Whyte & Smith gave an undertaking that their clients would "not present a winding up petition based on their June 25 2002 Statutory Demand save on not less than fourteen (14) days notice to you". Copies of these letters are to be found in exhibit PR1

12. While the Mutual Petition is not strictly based on the Statutory Demand dated 25 June 2002, it relates to the same alleged "debt". The fact that Milligan Whyte & Smith gave the undertaking by letter dated 17 July 2002 would appear to indicate their acceptance that the so called "debt" is disputed.

13. There is a clear dispute between the parties about the state of accounting between them and I am advised by Mutual's attorneys that in such circumstances it was inappropriate to proceed to serve a statutory demand. In the circumstances it was even more surprising that the Mutual Petitioners then chose to issue the Mutual Petition.

14. The Statutory Demand related to programmes for preferred share series E11, E14, U21, M23 and N23. The Petitioner Stephen Friedberg (one of the Mutual Petitioners and the sole IPC Petitioner, as hereinafter defined) participated in all these programmes. Dale Krapf and Dallas Krapf (the other two Mutual Petitioners) participated in programmes M23 and N23. The shareholder agreements in question, together with various amendments to them, are to be found at pages 27 to 127 of the exhibit to David Alexander's affidavit.

15. I am advised by the Mutual's attorneys and believe that since no dividends have been declared in accordance with clause 2 of the shareholder agreements, the Mutual Petitioners have no debt claim against Mutual. I am advised that this makes the Mutual Petitioner's use of a statutory demand and petition based upon non-payment of debts inappropriate.

16. Moreover, Mutual was not party to the shareholder agreements for programmes E11 and E14. The Statutory Demand was incorrect in this respect. I refer to the relevant shareholder agreements at pages 27, 31, 33 and 39 of the exhibit to David Alexander's affidavit. Mutual Holdings Limited (now known as IPC Mutual Holdings Limited) is the MRM Group company party to shareholder agreements for programmes E11 and E14. The Mutual Petitioners have no claim against Mutual in respect of these two shareholder agreements.

17. I refer the court to exhibit PR2, the Affidavit of David Alexander that was prepared and sworn by him in response to the various allegations made in the Milligan-Whyte & Smith letter of 25th June 2002.

**The IPC Petition (Matter No 299)**

18. The IPC Petition relates to programme E14. The liability of IPC in respect of the money allegedly due to Friedberg ($790,832) (the "IPC Petitioner") is again disputed. Once

more, there is no debt due to the IPC Petitioner; the IPC Petitioner's claim is for a dividend which has not been declared.

19. The documentation at pages 7-9 of the exhibit to David Alexander's affidavit shows that the figure $790,832 is not even available as surplus on programme E14 such as would enable a dividend to be declared. The Petitioner asserts that the $790,832 is lodged (with other money) in an account at Morgan Stanley Gitter in Philadelphia, Pennsylvania. It is certainly the case that money in connection with programme E14 was deposited in an account at Morgan Stanley Gitter in Philadelphia at the request of the IPC Petitioner, but this money was deposited in the name of Mutual Indemnity Ltd., a wholly-owned subsidiary of IPC, and is part of the general assets of the MRM Group. It is not money held on behalf of or on trust for the IPC Petitioner.

20. On 27 May 2002 the IPC Petitioner commenced proceedings in this Honourable Court (Civil Jurisdiction 2002 No 195) seeking a declaration that a minimum of $4.7m in respect of dividends was held on constructive trust for him. It is alleged in these proceedings that the money is held in the accounts of Morgan Stanley Gitter. This, I believe, is the same money as forms the subject matter of the IPC Petition. So far, although a Memorandum of Appearance was filed, the IPC Petitioner has not served a Statement of Claim in this action. The money claimed in the IPC Petition is already the subject matter of proceedings before this Honourable Court; yet despite this the IPC Petitioner has chosen to launch a winding up petition to compel payment of these monies.

21. In addition, the IPC Petitioner has commenced proceedings before the US District Court for the Eastern District of Pennsylvania seeking to recover the money held in the accounts of Morgan Stanley Gitter. A Temporary Restraining Order has been obtained by the IPC Petitioner in these proceedings.

22. The IPC Petitioner, having commenced proceedings in US District court and before this Honourable Court, which was contested and in respect of which the IPC Petitioner knows that the liability to pay money to him is disputed, now brings a winding up petition in Bermuda to compel payment of the same monies.

**Conclusion**

23. I do not believe that any of the Petitioners are entitled to dividends under the shareholder agreements as alleged by the Petitions. There may be potential dividends available on programmes E11, E14, U21, M23 and N23 on the next appropriate dividend date and calculations as to such potential dividends have been communicated to the Petitioners. However, adverse developments in respect of the losses on these programmes could diminish the potential dividends or, conversely, positive developments as to losses could enhance the potential dividends, before dividends may be declared on the next

appropriate dividend date.  I do not believe that dividends are due and payable at the present time; they have not been declared.

24. The presentation of these winding up petitions is potentially extremely damaging and detrimental to the Mutual, IPC and the MRM Group as a whole.  Quite apart from the damage which the petitions could cause to the  business of the Companies and other MRM Group companies,  very sensitive negotiations are underway to agree and to finalise a Commutation Agreement with the Rehabilitator of Legion Insurance Company and Villanova Insurance Company.  Moreover, the MRM Group parent company, Mutual Risk Management Ltd., is in the midst of pursuing a restructuring proposal with its creditors.  In this respect I refer to my previous Affidavit sworn and filed herein on 15th August 2002.

SWORN BY the said            )
[                            ]  )
in the City of Hamilton      )
in the Islands of Bermuda    )

This 2[th] day of August 2002

BEFORE ME:

_Joann M. Lynd_
A COMMISSIONER FOR OATHS

IN THE SUPREME COURT OF BERMUDA

COMPANIES WINDING UP

2002 : NO. 299 and 300

COMPANIES WINDING UP 2002 NO. 299
IN THE MATTER OF IPC MUTUAL
HOLDINGS LTD
AND IN THE MATTER OF THE PETITION
OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES
ACT 1981

COMPANIES WINDING UP 2002 NO.300
IN THE MATTER OF MUTUAL HOLDINGS
(BERMUDA) LTD
AND IN THE MATTER OF THE PETITION
OF STEPHEN FRIEDBERG, DALE KRAPF
AND DALLAS KRAPF
AND IN THE MATTER OF THE COMPANIES
ACT 1981

---

AFFIDAVIT

---





Conyers Dill & Pearman
Clarendon House, 2 Church Street
Hamilton, Bermuda
Attorneys for the Plaintiff
Ref: PAS/sct/litdocs.7578

litdocs.7578

IN THE SUPREME COURT OF BERMUDA

COMPANIES WINDING UP

2002 : NO. 299 and 300

COMPANIES WINDING UP 2002 NO. 299
IN THE MATTER OF IPC MUTUAL HOLDINGS LTD
AND IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES ACT 1981

COMPANIES WINDING UP 2002 NO.300
IN THE MATTER OF MUTUAL HOLDINGS (BERMUDA) LTD
AND IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG, DALE
KRAPF AND DALLAS KRAPF
AND IN THE MATTER OF THE COMPANIES ACT 1981

---

EXHIBIT "PR2"

---

This is the paper writing referred to as "PR2" in the Affidavit of J. Patrick Reardon sworn

THIS 20ᵗʰ day of August 2002

BEFORE ME

Joan M. Lynch

COMMISSIONER OF OATHS

litdocs.6724

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION 2002 : NO.

B E T W E E N :-

MUTUAL HOLDINGS (BERMUDA) LIMITED

Plaintiff

- and –

STEPHEN FRIEDBERG
DALE KRAPF
DALLAS KRAPF

Defendants

---

AFFIDAVIT OF DAVID ALEXANDER

---

I, DAVID ALEXANDER, of 8D Landmark Drive, Southampton, SN04, Bermuda MAKE
OATH AND SAY AS FOLLOWS:

1.  I am the President of the Plaintiff, Mutual Holdings (Bermuda) Limited. I am authorised
    by the Plaintiff to make this Affidavit in support of its application for (1) an injunction
    restraining the Defendants from proceeding to present any petition for the winding-up of
    the Plaintiff based upon a Statutory Demand served by the Defendants in the sum of
    $4,695,921 dated 25th June 2002 and (2) for leave to serve these proceedings on the
    Defendants outside Bermuda.

2.  There are now produced and shown to me marked "DA1" copy documents which relate
    to this matter. I will refer to documents in exhibit "DA1" by reference to their page
    numbers: thus "page 1" is a reference to page 1 of exhibit "DA1".

3.  At page 2, there is to be found a copy of the Statutory Demand dated 25 June 2002 issued
    by the Defendants. It is not clear to me precisely when the Statutory Demand was in fact
    served at the Plaintiff's registered office, but I first saw it on 27 June 2002.

4.  I am somewhat surprised that the Defendants have chosen to serve a Statutory Demand
    on the Plaintiff. The Defendants well know that their claim is disputed. By letter dated
    23rd May 2002, the Plaintiff's attorneys, Messrs Conyers Dill & Pearman, wrote to the
    Defendants' attorneys, Messrs Milligan Whyte & Smith, dealing with the state of

accounting between the Plaintiff and the Defendants. A spreadsheet was attached to the letter, showing that little money was available in the Defendants' programmes which possibly could be dividended to the Defendants. A copy of the letter of 23rd May 2002 is at pages 7 to 9.

5.    On 25 June 2002, the Defendants' attorneys, Messrs Milligan-Whyte & Smith replied to the letter from Conyers Dill & Pearman, taking issue with the figures shown in the spreadsheet attached to the letter of 23 May 2002, and stating that a Statutory Demand was being issued. A copy of the letter of 25 June is to be found at pages 4 to 6.

6.    There is a clear dispute between the parties about the state of accounting between them and I am advised by the Plaintiff's attorneys that in such circumstances it is inappropriate to proceed to serve a Statutory Demand.

7.    I should explain that this dispute arises out of shareholder agreements between the Plaintiff and the Defendants relating to various programmes run for the Defendants by companies in the MRM Group (the IPC programmes). The shareholder agreements provide that the shareholders, sometimes referred to as clients, such as the Defendants, participate in the underwriting profits or losses of the reinsurance of the insureds' risks. The aim is that if profits are realised those profits are paid out by way of dividends to the clients; whereas if no profits are realised and instead losses result those losses are covered by reinsurance premiums, less expenses and fees, from the insurance carrier, collateral (either cash or letters of credit) provided by the client and held by the relevant MRM Group company, and any investment income gained on such reinsurance premiums, less expenses and fees, and cash collateral, if so posted.

8.    The Statutory Demand relates to programmes series E11, E14, U21, M23 and N23. The Defendant Stephen Friedberg participated in all these programmes. The Defendants Dale Krapf and Dallas Krapf participated in programmes M23 and N23. The shareholder agreements in question, together with various amendments to them, are to be found at pages 27 to 127

9.    I should emphasise that under clause 2 of the shareholder agreements, the Defendants may receive a dividend in respect of the investment income, plus or minus underwriting gain or loss realised, on the particular treaty during the year preceding the dividend date. Clause 2 of the shareholder agreement, as amended, contains a detailed mechanism for calculating this dividend. Profits are not debts due to the Defendants; there is an entitlement to a dividend if it is declared on an appropriate dividend date. The arrangement is a shareholders' arrangement, not a debtor/creditor arrangement.

10.   I am advised by the Plaintiff's attorneys and believe that since no dividends have been declared in accordance with clause 2, the Defendants have no debt claim against the

Plaintiff. I am advised that this makes the Defendants' use of a Statutory Demand inappropriate.

11.   Moreover, the Plaintiff was not party to the shareholder agreements E11 and E14. The Statutory Demand is incorrect in this respect. I refer to the relevant shareholder agreements at pages 27, 31, 33 and 39. Mutual Holdings Limited (now known as IPC Mutual Holdings Limited) is the MRM company party to shareholder agreements E11 and E14. The Defendants have no claim against the Plaintiff in respect of these two shareholder agreements.

12.   I now turn to deal with the various allegations made in the Milligan-Whyte & Smith letter of 25th June 2002.

Programme U21

a.   The IBNR $381,004.93 (see page 4) is based upon figures produced by the Plaintiff's independent actuary, Tillinghast Towers Perrin. I refer to the Tillinghast loss reserve analysis as at year end 2001 and the Plaintiff's Collateral Review (pages 10 and 11). As can be seen on page 10, the "Booked to expected ultimate" (BEU) total is $5,306,050.33; the "Paid Losses" total $4,596,077.55 and the "OSLR" (outstanding loss reserves) total $328,967.92. The difference between the sum of the Paid Losses and the OSLR and the BEU figure is $381,004.86. This $381,004.46 is the IBNR. Again, this is not a figure produced by the Plaintiff, but by its independent consulting actuary, Tillinghast. The Plaintiff is entitled to rely upon the figures produced by Tillinghast.

b.   There was a letter of credit posted by the Plaintiff in favour of Credit General, the fronting carrier on programme U21, in the amount of $1,591,789.89, of which $1,445,174 was in respect of liabilities on programme U21. (This letter of credit also covered liabilities of another unrelated programme in the amount of $146,614.) Credit General is in liquidation. The Plaintiff requested that Credit General permit the substitution of what is known as a "Section 114 Reinsurance Trust" to collateralise their obligations to Credit General in place of the letter of credit. By letter of 27th June 2002 (page 13) Paragon, who are handling the reinsurance administration in the liquidation of Credit General, in conjunction with the Ohio State Regulators responsible for Credit General's liquidation, refused to permit the Plaintiff to substitute a Section 114 Reinsurance Trust for the letter of credit. Subsequently and as a result, Credit General drew down on the letter of credit so that the "reserve for potential increase in Credit General liability" shown on the 23rd May 2002 spreadsheet has now been realised. Credit General now holds $1,445,174 of collateral for programme U21. The spreadsheet (page 9) shows loss reserves covered by the outgoing letter of credit on U21 of

$709,973, together with a "reserve for potential increase in Credit General liability" of $744,364. Following the drawdown by Credit General of the letter of credit, Credit General now holds cash collateral of $1,445,174 in respect of programme U21 and there can be no question that the Plaintiff was therefore entitled to debit the Defendants account with the $744,364.

c.  At page 14 there is an e-mail dated 1st July 2002 from Bank of America, informing the Plaintiff of the draw-down of the Credit General letter of credit.

### $1.8 million potential claim against Friedberg

d.  At pages 16 to 17 there is a draft release and assignment agreement between Legion Insurance Company, Stephen Friedberg and Research Underwriters Inc (of which Stephen Friedberg is President). This agreement was drafted, by Legion and never executed by the parties to it. The parties to this agreement had discussions in March 2002 regarding payment of $1.8 million by Friedberg to Legion by way of any potential dividends declared on programmes U21 and B14. This request that the Plaintiff and IPC Mutual Holdings Limited should pay $1.8 million from potential dividends declared on these programmes to Legion forms the basis of the Plaintiff's reserve on these programmes for this amount. The Plaintiff is protecting itself from any claim by the rehabilitator of Legion by reserving in the amount of $1.8 million; the rehabilitator may potentially make a claim against the Plaintiff to pay this sum to Legion.

### Cross Collateralisation of Programme C39 with Programme N23

e.  At page 18 there is a letter dated 22nd March 2002 between Stephen Friedberg and the Krapfs. The letter requests that Stephen Friedberg and the Krapfs authorise cross collateralisation between programmes M23, N23 and C39. The letter states that

*"underwriting profits, investment income and collateral on one programme cannot be used to fund a deficit position that may arise in the other programme"*

and hence requests authorisation of cross collateralisation. The letter of 22nd March 2002 was not countersigned by either Stephen Friedberg or the Krapfs. However, at a meeting held in Bermuda on 30th January 2002 (attended by myself, Nathan Kowalski, Patrick Reardon on behalf of the Plaintiff and MRM companies, and Steven Friedberg and his attorney), I asked Stephen Friedberg to cross collateralise these three programmes and he agreed to do so on his own behalf and on behalf of the Krapfs. I believe that we have the verbal authorisation of Stephen Friedberg to effect cross collateralisation, although I have to accept

that the written documentation in respect of the agreement was not completed. It is not correct that there was no agreement to cross collateralisation between programmes, as alleged by Milligan Whyte & Smith.

f.  Had Steven Friedberg not agreed to cross collateralisation in respect of programme C39, the Plaintiff would not have been willing to take on the programme, or would have asked for Steven Friedberg to provide substantial security. The C39 programme has "uncapped" liability for Plaintiff to Legion and ultimately for Defendants to Plaintiff. Given that Defendants had sufficient funds for its obligations on their other programmes Plaintiff did not initially require Defendants to post sufficient collateral for programme C39.

Overstating of Legitimate Reserves

g.  Loss reserves are set by third party claims administrators, who have contractual relations with the relevant fronting carrier, be it Legion, Credit General or otherwise. The third party claims administrators set reserves on claims notifications, based upon relevant known factors which the third party claims administrator considers, in its expertise, to be indicative of the exposure to the carrier under the insurance policies issued by the carrier. The Plaintiff does not control or influence the setting of these reserves, and has no contractual relationship with the third party claims administrators. Any issues which there may be about "overstating" of reserves is not the responsibility of the Plaintiff. The Plaintiff, as reinsurers of the fronting carriers, simply accepts the reserves posted by the third party claims administrators and applies them to the relevant programmes.

13.  I do not believe that the Defendants are entitled to dividends under the shareholder agreements in a minimum admitted sum of $4,695,291 as alleged in the Milligan-Whyte & Smith letter of 25th June 2002 and the Statutory Demand. There may be potential dividends available on programmes E11, E14 U21, M23 and N23 on the next appropriate dividend date and calculations as to such potential dividends has been communicated to Defendants in the 23rd May 2002 letter as found at pages 7 to 9. However, adverse developments in respect of the losses on these programmes could diminish the potential dividends or, conversely, positive developments as to losses could enhance the potential dividends, before dividends may be declared on the next appropriate dividend date. I do not believe that dividends are due and payable at the present time as alleged in the Statutory Demand; they have not been declared and, as indicated above, the state of the Defendants' accounts is not such that dividends can be declared.

14.  The presentation of a Winding Up petition based upon the Statutory Demand would be extremely damaging and detrimental to the Plaintiff. Quite apart from the damage which

such a Petition would cause to the Plaintiff's business, the Plaintiff and its affiliated companies are currently attempting to agree a Commutation Agreement with the rehabilitator of Legion. Moreover, the parent of the Plaintiff is in the midst of pursuing a restructuring proposal with its creditors. The presentation of a Winding Up petition would be extremely damaging to these endeavours and might prevent them coming to fruition.

15.     Finally, I deal with the question of service out of the jurisdiction:

(1)   Stephen Friedberg has already commenced proceedings in Bermuda (Civil Jurisdiction 2002 No 195) against companies in the MRM group associated with the Plaintiff.   But the Plaintiff is not party to those proceedings.

(2)   The Shareholder Agreements are all expressly governed by Bermuda law and contain a Bermuda jurisdiction clause (see pages 25, 30, 38, 64, 84 and 116).   I am advised by the Plaintiff's legal advisors that the Court has power to grant leave for service out of the jurisdiction in these circumstances under RSC Order 11, Rule 1 (1)(f)(iii) and Rule 2.

(3)   I believe that the Plaintiff has a good cause of action for the injunction claimed.

(4)   The Plaintiff has corresponded with the Defendants in Pennsylvania. The address of the Defendants stated in the Shareholder Agreements is 4240 Greenberg Pike, Pittsburg, PA 15221. I believe that the Defendants are located and can be served in Pennsylvania or elsewhere in the USA.

SWORN BY the said                    )
DAVID ALEXANDER                      )
in the City of Hamilton              )
in the Islands of Bermuda            )

This 11th day of July 2002

BEFORE ME:

A COMMISSIONER FOR OATHS

litdocs.6724

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION 2002 : NO.

B E T W E E N :-

MUTUAL HOLDINGS (BERMUDA) LIMITED

Plaintiff

- and –

STEPHEN FRIEDBERG
DALE KRAPF
DALLAS KRAPF

Defendants

---

EXHIBIT "DA1"

---

This is the paper writing referred to as DA1 in the Affidavit of David Alexander sworn

THIS 11ᵗʰ day of July 2002

BEFORE ME

*Joann M Lynch*

COMMISSIONER OF OATHS

CIVIL JURISDICTION 2002 : NO.

BETWEEN:-

MUTUAL HOLDINGS (BERMUDA) LIMITED

<u>Plaintiff</u>

– and –

STEPHEN FRIEDBERG
DALE KRAPF
DALLAS KRAPF

<u>Defendants</u>

---

**EXHIBIT "DA1"**

---

Conyers Dill & Pearman
Clarendon House, 2 Church Street
Hamilton, Bermuda
Attorneys for the Plaintiff
Ref: PAS/nms/litdocs.6724

litdocs.7578

### IN THE SUPREME COURT OF BERMUDA

### COMPANIES WINDING UP

### 2002 : NO. 299 and 300

COMPANIES WINDING UP 2002 NO. 299
IN THE MATTER OF IPC MUTUAL HOLDINGS LTD
AND IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES ACT 1981

COMPANIES WINDING UP 2002 NO.300
IN THE MATTER OF MUTUAL HOLDINGS (BERMUDA) LTD
AND IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG, DALE
KRAPF AND DALLAS KRAPF
AND IN THE MATTER OF THE COMPANIES ACT 1981

### EXHIBIT "PR1"

This is the paper writing referred to as "PR1" in the Affidavit of J. Patrick Reardon sworn

THIS 20ᵗʰ day of August 2002

BEFORE ME

_Joann M Lynch_

COMMISSIONER OF OATHS

# EXHIBIT K



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN M. FRIEDBERG,                          :

            Plaintiff,                   :

       v.                                        :      CIVIL ACTION NO. *02-CV-319*,

MUTUAL HOLDINGS LTD., IPC MUTUAL     :
HOLDINGS LTD., MUTUAL HOLDINGS        :
(BERMUDA) LTD., MUTUAL INDEMNITY      :
LTD., MUTUAL INDEMNITY (BERMUDA)      :
LTD., and MORGAN STANLEY,             :

            Defendants.                  :

**FILED MAY 3 0 2002**

## TEMPORARY RESTRAINING ORDER

AND NOW, this _29_ day of _May_, 2002, upon consideration

of Plaintiff's Complaint, Plaintiff's Motion for Temporary Restraining Order and for Preliminary

Injunction, and the accompanying papers in support thereof and having determined that: *and after telephone conference with counsel for the parties*

    1.    Plaintiff will suffer irreparable harm and injury if Defendants Mutual

Holdings Ltd., IPC Mutual Holdings Ltd., Mutual Holdings (Bermuda) Ltd., Mutual Indemnity

Ltd., Mutual Indemnity (Bermuda) Ltd. and Morgan Stanley are not restrained and enjoined from

wasting, transferring, selling, concealing, disbursing, assigning, encumbering or otherwise

disposing of the approximately $2,700,000 plus accrued interest held by Morgan Stanley

    2.    Greater injury would be inflicted on the Plaintiff by the denial of

injunctive relief than would be inflicted on the Defendants by the granting of such relief; **ENTERED**

    3.    Plaintiff is entitled by equity to the relief he seeks.

**MAY 3 1 2002**

**CLERK OF COURT**

4.    Issuance of this Order will preserve the status quo.

5.    Plaintiff would not have an adequate remedy at law if this Court denied him the injunctive relief he seeks.  It is therefore ORDERED, ADJUDGED, and DECREED as follows:

a.    Stephen Friedberg's Motion is GRANTED;

b.    Defendants are restrained and enjoined from wasting, transferring, selling, concealing, disbursing, assigning, encumbering or otherwise disposing of the approximately $2,700,000 plus accrued interest held by Morgan Stanley.

c.    Plaintiff shall post with the Court a bond in the amount of $~~1.00~~ *50,000* on or before *May 30, 2002*

6.This Order shall be in effect until further Order of this Court; and

*7. A further conference on this continuation or dissolution of this TRO is scheduled for June 7, 2002 at 1:30*

~~7.    A hearing on Plaintiff's Motion for Preliminary Injunction continuing the aforesaid relief shall be held before the Court on the _____ of _____, 2002, at _____, .~~

BY THE COURT:

_____
                        J.

# EXHIBIT L



**SCHNADER HARRISON SEGAL & LEWIS** LLP

ATTORNEYS AT LAW

SUITE 3600 ▪ 1600 MARKET STREET ▪ PHILADELPHIA, PENNSYLVANIA 19103-7286

215-751-2000 ▪ FAX: 215-751-2205

http://www.schnader.com

Theodore F. Haussman, Jr.
Direct Dial: 215-751-2255
Internet Address: thaussman@schnader.com

June 14, 2002

**VIA FAX**

Honorable William H. Yohn, Jr.
United States District Court for the
 Eastern District of Pennsylvania
Room 14613
601 Market Street
Philadelphia, Pennsylvania 19106

       Re:   Friedberg v. Mutual Holdings Ltd. et al.
              <u>Civil Action No. 02-CV-3193 (E.D. Pa.)</u>

Dear Judge Yohn:

       I called your chambers near the end of the day to provide a status report on the negotiations among the parties. I was asked to send Your Honor a short letter summarizing what I reported yesterday.

       Plaintiff, through its Bermuda counsel, has made a proposal to the Mutual defendants for the entry of an injunctive Order in the Bermuda action. As of yesterday, we were awaiting the response of the Mutual defendants. Although the information comes secondhand, I understand that the Mutual defendants' client was traveling yesterday and that they were unable to reach him to be able to respond to us.

       We will report back to the Court as soon as we have had a response from the Mutual defendants.

                      Respectfully,

                      Theodore F. Haussman, Jr.
          For SCHNADER HARRISON SEGAL & LEWIS LLP

cc   Vincent J. Connelly, Esquire (via facsimile)
      John E. Quinn, Esquire (via facsimile)
      Margaret Manolakis, Esquire (via facsimile)

# EXHIBIT M

# Conyers Dill & Pearman
### BARRISTERS & ATTORNEYS

CLARENDON HOUSE, 2 CHURCH STREET, P.O. BOX HM 666, HAMILTON HM CX, BERMUDA
TELEPHONE: (441) 295 1422  FACSIMILE: (441) 292 4720  E-MAIL: INFO@CDP.BM
INTERNET: WWW.CDP.BM

26 June 2002

Ian Kawaley
Milligan Whyte & Smith
Mintflower Place
8 Par-la-Ville Road
Hamilton
Bermuda HM08

| | |
|---|---|
| DIRECT LINE: | 295 7635 |
| E-MAIL: | |
| OUR REF: | |
| YOUR REF: | FAB:scp:369139:docs 375578 |

**BY HAND AND BY FAX – 295 1348**

Dear Sirs

**Re Friedberg - Preferred Share series E11, E14 and U21**

We refer to your e-mail of 12 June with attached draft Order for removal of the Pennslyvania TRO to Bermuda.

We have now been able to obtain instructions from our clients in relation to the draft Order and have to tell you that our clients decline to consent to an order in such terms. Our clients prefer to leave the TRO in place for the time being.

We shall be replying separately to your letter of 25 June 2002 after taking instructions.

Yours faithfully

*Conyers Dill & Pearman*

CONYERS DILL & PEARMAN

# EXHIBIT N



**SCHNADER HARRISON SEGAL & LEWIS** LLP

ATTORNEYS AT LAW

Suite 3600 ▪ 1600 Market Street ▪ Philadelphia, Pennsylvania 19103-7286

215-751-2000 ▪ Fax: 215-751-2205

http://www.schnader.com

Theodore F. Haussman, Jr.
Direct Dial: 215-751-2255
Internet Address: thaussman@schnader.com

July 3, 2002

**VIA FAX**

Honorable William H. Yohn, Jr.
United States District Court for the
  Eastern District of Pennsylvania
Room 14613
601 Market Street
Philadelphia, Pennsylvania 19106

> Re:   Friedberg v. Mutual Holdings Ltd. et al.
>        <u>Civil Action No. 02-CV-3193 (E.D. Pa.)</u>

Dear Judge Yohn:

As I promised I would in my June 14, 2002 letter to Your Honor, I wanted to report on the status of discussions between our client and the Mutual defendants.

The parties continue to consider some type of resolution. During the interim, the Mutual defendants have agreed to keep the TRO in place. That is acceptable to our client for the time being.

We will report to Your Honor immediately upon the parties reaching a lasting resolution or in the event impasse is reached and a hearing may be necessary. If the Court prefers I would be happy to report on specific dates as directed by Your Honor.

Respectfully,

Theodore F. Haussman, Jr.
For SCHNADER HARRISON SEGAL & LEWIS LLP

cc:    Vincent J. Connelly, Esquire (via facsimile)
       John E. Quinn, Esquire (via facsimile)
       Margaret Manolakis, Esquire (via facsimile)

# EXHIBIT O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN M. FRIEDBERG                       :
4204 Tamarack Lane                         :
Murrysville, PA  15668                     :
                                           :
                        Plaintiff          :
                                           :        Case No. 02-CV-3193
                                           :
            v.                             :
                                           :
MUTUAL HOLDINGS LTD.                       :
Barclays International Building            :
44 Church Street                           :
P.O. Box HM 2064                           :
Hamilton HM HX, Bermuda                    :
            and                            :
IPC MUTUAL HOLDINGS LTD.                   :
Barclays International Building            :
44 Church Street                           :
P.O. Box HM 2064                           :
Hamilton HM HX, Bermuda                    :
            and                            :
MUTUAL HOLDINGS (BERMUDA) LTD.             :
Barclays International Building            :
44 Church Street                           :
P.O. Box HM 2064                           :
Hamilton HM HX, Bermuda                    :
            and                            :
MUTUAL INDEMNITY LTD.                      :
44 Church Street, Hamilton HM 12           :
P.O. Box HM 2064                           :
Hamilton HM HX, Bermuda                    :
            and                            :
MUTUAL INDEMNITY (BERMUDA) LTD             :
44 Church Street                           :
P.O. Box HM 2064                           :
Hamilton HM HX, Bermuda                    :
            and                            :
MORGAN STANLEY                             :
1585 Broadway                              :
New York, New York  10036                  :
                                           :
                        Defendants         :

## ENTRY OF APPEARANCE

Kindly enter my appearance on behalf of Defendants, Mutual Holdings Ltd., IPC Mutual Holdings Ltd., Mutual Holdings (Bermuda) Ltd., Mutual Indemnity Ltd. and Mutual Indemnity (Bermuda) Ltd., with regard to the above captioned action.

Respectfully submitted,

John E. Quinn
Identification No. 19312
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Attorney for Defendants,
Mutual Holdings Ltd., IPC Mutual Holdings Ltd.,
Mutual Holdings (Bermuda) Ltd.,
Mutual Indemnity Ltd. and Mutual Indemnity
(Bermuda) Ltd.

Dated:  June 6, 2002

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies he served a copy of the foregoing Entry

of Appearance upon the following counsel of record via United States, first class mail, postage

prepaid, this 6th day of June, 2002:

> Theodore Haussman, Jr., Esquire
> Schnader Harrison Segal & Lewis LLP
> 1600 Market Street, Suite 3600
> Philadelphia, PA 19103
> Attorney for Plaintiff

> Margaret Manolakis, Esquire
> Stradley Ronon Stevens & Young, LLP
> 2600 One Commerce Square
> Philadelphia, PA 19103
> Attorney for Defendant
> Morgan Stanley

_____
John E. Quinn

# EXHIBIT P

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN M. FRIEDBERG        :
4204 Tamarack Lane         :
Murrysville, PA 15668        :
                :
        Plaintiff     :
                :    Case No. 02-CV-3193
    v.             :
                :
MUTUAL HOLDINGS LTD.       :
Barclays International Building      :
44 Church Street         :
P.O. Box HM 2064         :
Hamilton HM HX, Bermuda       :
     and           :
IPC MUTUAL HOLDINGS LTD.      :
Barclays International Building      :
44 Church Street         :
P.O. Box HM 2064         :
Hamilton HM HX, Bermuda       :
     and           :
MUTUAL HOLDINGS (BERMUDA) LTD.   :
Barclays International Building      :
44 Church Street         :
P.O. Box HM 2064         :
Hamilton HM HX, Bermuda       :
     and           :
MUTUAL INDEMNITY LTD.       :
44 Church Street, Hamilton HM 12     :
P.O. Box HM 2064         :
Hamilton HM HX, Bermuda       :
     and           :
MUTUAL INDEMNITY (BERMUDA) LTD   :
44 Church Street         :
P.O. Box HM 2064         :
Hamilton HM HX, Bermuda       :
     and           :
MORGAN STANLEY         :
1585 Broadway          :
New York, New York 10036       :
                :
        Defendants    :

## **ORDER**

AND NOW, this _____ day of _____, 2002, upon consideration of the

Motion for Admission Pro Hac Vice of Vincent J. Connelly and Lisa A. Dunsky, and good cause

appearing, IT IS ORDERED that said Motion for Admission Pro Hac Vice of Vincent J.

Connelly and Lisa A. Dunsky is GRANTED and that said attorneys are granted leave to appear

pro hac vice on behalf of Defendant, , in the case at Bar.

BY THE COURT:

_____

U.S. District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN M. FRIEDBERG                          :
4204 Tamarack Lane                            :
Murrysville, PA  15668                        :
                                              :
                Plaintiff          :
                                              :       Case No. 02-CV-3193
                                              :
        v                            :
                                              :
MUTUAL HOLDINGS LTD.                          :
Barclays International Building               :
44 Church Street                              :
P.O. Box HM 2064                              :
Hamilton HM HX, Bermuda                       :
        and                        :
IPC MUTUAL HOLDINGS LTD.                      :
Barclays International Building               :
44 Church Street                              :
P.O. Box HM 2064                              :
Hamilton HM HX, Bermuda                       :
        and                        :
MUTUAL HOLDINGS (BERMUDA) LTD.                :
Barclays International Building               :
44 Church Street                              :
P.O. Box HM 2064                              :
Hamilton HM HX, Bermuda                       :
        and                        :
MUTUAL INDEMNITY LTD.                         :
44 Church Street, Hamilton HM 12              :
P.O. Box HM 2064                              :
Hamilton HM HX, Bermuda                       :
        and                        :
MUTUAL INDEMNITY (BERMUDA) LTD                :
44 Church Street                              :
P.O. Box HM 2064                              :
Hamilton HM HX, Bermuda                       :
        and                        :
MORGAN STANLEY                                :
1585 Broadway                                 :
New York, New York  10036                     :
                                              :
               Defendants         :

## MOTION FOR ADMISSION PRO HAC VICE OF
## VINCENT J. CONNELLY AND LISA A. DUNSKY

Defendants, Mutual Holdings Ltd., IPC Mutual Holdings Ltd., Mutual Holdings (Bermuda) Ltd., Mutual Indemnity Ltd. and Mutual Indemnity (Bermuda) Ltd. ("Defendants"), in the matter presently before this Honorable Court, by and through its attorneys, Reed Smith, LLP, respectfully move for the admission pro hac vice of Vincent J. Connelly and Lisa A. Dunsky, and in support thereof aver as follows:

1.      Mr. Connelly is a partner in the law firm of Mayer, Brown, Rowe & Maw in Chicago, Illinois. He is a member in good standing of the Bar of the State of Illinois, having been admitted thereto in 1975. His Illinois attorney identification number is 0501557. He is also a member in good standing in the U.S. District Court for the Northern District of Illinois and the U.S. Court of Appeals for the Seventh Circuit. Mr. Connelly has never been disciplined or censured by any court before which he has appeared.

2.      Ms. Dunsky is an associate in the law firm of Mayer, Brown, Rowe & Maw in Chicago, Illinois. She is a member in good standing of the Bar of the State of Illinois, having been admitted thereto in 1993. Her Illinois attorney identification number is 6215999. She is also a member in good standing in the U.S. District Court for the Northern District of Illinois and the U.S. District Court for the Northern District of Indiana. Ms. Dunsky has never been disciplined or censured by any court before which she has appeared.

3.      Good cause exists for the admission of Mr. Connelly and Ms. Dunsky herein because Defendants have requested that they represent them in the above-captioned matter.

4.      This application for admission is made on the motion of John E. Quinn of Reed Smith, LLP, associate counsel to Defendants and a member in good standing of the Bar of

this Court, upon whom all pleadings, motions, notices and other papers may be served in conformance with Local Rule 83.5.2.

        5.    Margaret Manolakis, Esquire, counsel for Morgan Stanley, as well as Theodore Haussman, Jr., Esquire, Plaintiff's counsel, have represented to Mr. Quinn that they do not oppose this Motion.

        WHEREFORE, for all of the foregoing reasons, Defendants respectfully requests that this Court admit Vincent J. Connelly and Lisa A. Dunsky to represent them pro hac vice.

Respectfully submitted,

_____
John E. Quinn
Identification No. 19312
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Attorney for Defendants,
Mutual Holdings Ltd., IPC Mutual Holdings Ltd.,
Mutual Holdings (Bermuda) Ltd.,
Mutual Indemnity Ltd. and Mutual Indemnity
(Bermuda) Ltd.

Dated:  June 6, 2002

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies he served a copy of the foregoing Motion For Admission Pro Hac Vice of Vincent J. Connelly and Lisa A. Dunsky upon the following counsel of record via United States, first class mail, postage prepaid, this 6th day of June, 2002:

Theodore Haussman, Jr., Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Attorney for Plaintiff

Margaret Manolakis, Esquire
Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103
Attorney for Defendant
Morgan Stanley

John E. Quinn

## CERTIFICATE OF SERVICE

I, Theodore F. Haussman, Jr., hereby certify that a copy of the foregoing

Memorandum of Law in Opposition to Defendants' Motion to Dismiss was served by United

States mail, first-class, postage prepaid upon the following on November 27, 2002.


John E. Quinn, Esq.
Reed Smith
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Margaret Manolakis, Esq.
Stradley Ronon Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103

Vincent J. Connelly, Esq.
Mayer Brown Rowe & Maw
190 South La Salle Street
Chicago, IL 60603


Theodore F. Haussman, Jr.