EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN M. FRIEDBERG, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 02-CV-3193 |
| | : | (Judge Yohn) |
| MUTUAL HOLDINGS, LTD., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## RULE 26(a) DISCLOSURES OF STEPHEN M. FRIEDBERG

Pursuant to Federal Rule of Civil Procedure 26(a), plaintiff Stephen M. Friedberg provides the following disclosures.

### A.   INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT FRIEDBERG MAY USE TO SUPPORT HIS CLAIMS

1.    Stephen M. Friedberg, 4204 Tamarack Lane, Murrysville, PA    15668. Mr. Friedberg has knowledge of the underlying facts supporting the allegations in the Complaint.

2.    David Alexander, 44 Church Street, PO Box HM 2064, Hamilton HM HX Bermuda.  Mr. Alexander may have knowledge of the circumstances upon which the dividends in question were declared and the agreement to transfer those dividends from the shareholder accounts to other investment accounts subject to Mr. Friedberg's direction and control.

3.    Andrew Lewis, 40 Wellesley Road, Swarthmore, PA  19081.  Mr. Lewis has personal knowledge of the circumstances upon which the dividends in question were declared and of the agreement to transfer those dividends from the shareholder accounts to other investment accounts subject to Mr. Friedberg's direction and control.

4.      Steve Gitter, Morgan Stanley, c/o Margaret Manolokis, Stradley Ronon, Great Valley Corporate Center, 30 Valley Stream Parkway, Malvern, PA 19355-1481. Mr. Gitter has knowledge of the deposit of the dividends in question, and accumulated earnings, in accounts with Morgan Stanley (formerly deposited with Legg Mason, Prudential Securities, Inc., Dean Witter Reynolds, Inc., and Morgan Stanley Dean Witter); the terms and conditions of such accounts; the direction and control of Mr. Friedberg over the funds in such accounts; and the daily management of the funds in such accounts.

5.      Gary Roche, Legion Insurance Company, c/o Charlotte E. Thomas, Wolf Block Schorr and Solis-Cohen, LLP, 1650 Arch Street, Philadelphia, PA 19103. Mr. Roche has personal knowledge of the circumstances upon which the dividends in question were declared and the agreement to transfer those dividends from the shareholder accounts to other investment accounts subject to Mr. Friedberg's direction and control.

Mr. Friedberg reserves the right to supplement this list should he identify additional individuals as his investigation continues.

B.      **DESCRIPTION BY CATEGORY AND LOCATION OF ALL DOCUMENTS, DATA COMPILATIONS AND TANGIBLE THINGS IN THE POSSESSION, CUSTODY OR CONTROL OF FRIEDBERG THAT FRIEDBERG MAY USE TO SUPPORT HIS CLAIMS**

Friedberg possesses documents concerning the investment of the dividends, and accumulated earnings, maintained and managed in the Morgan Stanley accounts, including, but not limited to, quarterly statements. Friedberg also possesses various correspondence between him and the Mutual defendants.

Friedberg reserves the right to supplement this list should he locate additional documents as his investigation continues.

**C.    ANY INSURANCE AGREEMENTS UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY PART OR ALL OF A JUDGMENT WHICH MAY BE ENTERED OR TO INDEMNIFY OR REIMBURSE FOR PAYMENTS MADE TO SATISFY THE JUDGMENT**

N/A.

**D.    ANY PERSON WHO MAY BE USED AT TRIAL TO PRESENT EVIDENCE UNDER RULES 702, 703 OR 705**

Mr. Friedberg will timely disclose any expert retained subsequently, together with the report(s) and other disclosures required pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

_____
David Smith, Esquire (ID No. 21480)
Han Nguyen, Esquire (ID No. 85860)
SCHNADER HARRISON SEGAL
& LEWIS LLP
Suite 3600, 1600 Market Street
Philadelphia, PA 19103

Attorneys for Plaintiff

Dated:  June 28, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of June 2005, a true and correct copy of the foregoing

Rule 26(a) Disclosures was served by first class mail, pre-postage paid, on the following:

Margaret Manolakis, Esquire
Stradley Ronon Stevens & Young, LLP
Great Valley Corporate Center
30 Valley Stream Parkway
Malvern, PA 19355-1481
Attorneys for Defendant Morgan Stanley


Douglas Christian, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Attorneys for the Mutual Defendants


_____
Han Nguyen

EXHIBIT 2

1  do.

2      A.   I work with insurance

3  agents and brokers with their large

4  corporate insurance buyers

5  structuring the insurance programs.

6  So it's sales, marketing,

7  underwriting, analysis.

8      Q.   When did you join Keystone?

9      A.   Approximately April of

10  2002.

11      Q.   Prior to that you were

12  employed by Commonwealth Risk

13  Services, Inc.; is that correct?

14      A.   Yes.

15      Q.   For how long were you with

16  CRS?

17      A.   Beginning approximately the

18  fall of 1989.

19      Q.   Tell me what you did

20  generally for CRS.

21      A.   I was a salesman, and I was

22  in charge of marketing the entire

23  suite of MRM products, Mutual Risk

24  Management, to agents and brokers and

1      A.   Don't know.

2      Q.   Mutual Holdings Bermuda

3  Limited?

4      A.   Don't know.

5      Q.   Mutual Indemnity Limited?

6      A.   Don't know.

7      Q.   Mutual Indemnity Bermuda

8  Limited?

9      A.   Don't know.

10      Q.   You don't know whether you

11  were employed by any of those

12  companies?

13      A.   My business card had two

14  companies.  I originally was hired by

15  Legion Insurance Company, and then I

16  was -- subsequently left Legion in an

17  inter-company move and went to

18  Commonwealth Risk Services.  As far

19  as who I was employed by, I do not

20  know.  Mutual Risk Management had a

21  corporate structure that was set up

22  for tax motivation, and I don't know

23  who I actually worked for.

24      Q.   I'm going to move to strike

1  their customers.

2      Q.   Did you have an employment

3  agreement?

4      A.   I had at least one, if not

5  two.

6      Q.   Do you still have those?

7      A.   I could not locate them.

8      Q.   Do you believe you have

9  them, but you haven't been able to

10  locate them?

11      A.   I could not locate them, so

12  I don't know where they are.

13      Q.   Do you know when the last

14  time strike that -- when did you last

15  look at either of those agreements?

16  If you recall.

17      A.   It would have been sometime

18  around the year 2000, 2001 probably.

19      Q.   Were you ever employed by

20  any of these companies, Mutual

21  Holdings Limited?

22      A.   Don't know.

23      Q.   IPC Mutual Holdings

24  Limited?

1  the answer as nonresponsive after and

2  including the word Mutual.

3           MS. SMITH:  Objection to

4  the motion to strike.  It was

5  perfectly responsive.

6  BY MR. CHRISTIAN:

7      Q.   You never received a

8  paycheck from any of those companies

9  I mentioned, did you, Mr. Lewis?

10      A.   To my knowledge, I don't

11  believe so.

12      Q.   You produced paystubs in

13  response to the subpoena; correct?

14      A.   I produced every paystub

15  that I had.

16      Q.   Did you have a chance to

17  see who the company was on your

18  paystubs?

19      A.   I did not look at every

20  paystub.  You requested every single

21  paystub since 1989.  I located a few.

22      Q.   Do you have any paystubs

23  other than what you produced pursuant

24  to the subpoena?

8/24/2005 Lewis, Andrew

1  believe I called Brooke as well to
2  ask her questions, Brooke Hertzer,
3  and she was going to ask you your
4  opinion on a couple of my questions.
5      Q.  Do you understand what
6  question I asked you, sir?  Will you
7  listen to this, please.
8          MR. CHRISTIAN:  Would you
9  read it back, please.
10         (The reporter read back the
11  following testimony:
12         "Q Did you feel it was
13  important to go over the items on the
14  subpoena with counsel for
15  Mr. Friedberg?")
16         THE WITNESS:  With
17  Mr. Friedberg's counsel?  That's your
18  question?
19  BY MR. CHRISTIAN:
20      Q.  Yes.
21      A.  I did it out of courtesy.
22      Q.  Tell me what you remember
23  about going over these items with
24  Mr. Friedberg's counsel.

9/7/2005 9:16 AM                                    33

8/24/2005 Lewis, Andrew

1      Q.  Was that shortly after you
2  received the subpoena?
3      A.  That would have been on the
4  23rd or the 24th.
5      Q.  What was the next
6  discussion you had with Mr. Friedberg
7  and/or his counsel relating to the
8  subpoena?
9      A.  I believe I had a call with
10  Mr. Friedberg saying, and I can't
11  remember if it was before or after
12  the 22nd, but it was within that time
13  frame, that I either was going to get
14  subpoenaed, or I was -- or I received
15  the subpoena.  I did not talk about
16  the details of the subpoena with
17  Mr. Friedberg.
18      Q.  Did you express any
19  concerns in any communication you
20  ever had with Mr. Friedberg about the
21  subpoena?
22      A.  None at all.
23      Q.  Do you remember anything
24  else about this conversation with

9/7/2005 9:16 AM                                    35

8/24/2005 Lewis, Andrew

1      A.  My comment was that they
2  wanted a lot of information.  I
3  didn't have the majority of the
4  information they were looking for,
5  because that would have been at, in
6  my Commonwealth Risk files, and I
7  would begin gathering.
8          I questioned them, too,
9  about the paystubs and do you think
10  that Mutual Indemnity meant every
11  single paystub since 1989, and they
12  said you need to ask Brooke, or
13  excuse me, they said yourself.
14      Q.  What else do you remember
15  even generally about what was
16  discussed when you went over this?
17      A.  Just my comment that I
18  don't have many of the documents that
19  they're looking for.
20      Q.  You don't remember anything
21  else about what was discussed even
22  generally; is that correct?
23      A.  It wasn't a long
24  conversation, no.

9/7/2005 9:16 AM                                    34

8/24/2005 Lewis, Andrew

1  Mr. Friedberg you just testified
2  about?
3      A.  Not relevant to this case.
4      Q.  Relevant to business
5  dealings?
6      A.  No.
7      Q.  Is he a friend of yours?
8      A.  No.
9      Q.  Have you read his
10  deposition transcript?
11      A.  I have.
12      Q.  For what purpose?
13      A.  For entertainment purpose
14  mainly.  Having known him for years.
15      Q.  Mr. Lewis, this is a very
16  serious situation.
17      A.  I am being very serious.
18  Steve Friedberg sitting still for six
19  hours is an entertaining concept.
20      Q.  For what other purpose did
21  you read the deposition transcript?
22      A.  That was my purpose.
23      Q.  I just want to give you a
24  second to consider that answer.  Do

9/7/2005 9:16 AM                                    36

1  you have anything you'd like to add
2  to that?
3      A.  I guess for curiosity as
4  well.
5      Q.  Did you ask for a copy of
6  the transcript, or did someone
7  suggest that you read it?
8      A.  I was told that the
9  transcript was out.  I believe I was
10  asked if I wanted a copy.  I believe
11  I initially said I don't need one.  I
12  believe then it came up again and I
13  said fine, send it to me, because I'm
14  going to Bermuda and I will read it
15  on the airplane.
16      Q.  Someone suggested to you
17  that you read it; correct?
18      A.  Yes.
19      Q.  Who suggested that to you?
20      A.  It would have been one of
21  the three attorneys.
22      Q.  Did they lead you to
23  believe why they wanted to you read
24  it?

1      A.  I believe the quote was, I
2  think you will find it amusing.
3      Q.  Who said that to you?
4      A.  It was one of the three
5  attorneys.
6      Q.  Well, do you know who it
7  was?
8      A.  I really don't.  It may
9  have been a conference call.  The
10  reference was to you losing your
11  temper.
12      Q.  So they wanted you to read
13  it because they thought you would
14  find it amusing; that's what one of
15  them said to you?
16      A.  We think you'll find it
17  amusing.  I believe that was the
18  quote.
19      Q.  Was there any other reason
20  given or suggested for your reading
21  the transcript?
22      A.  Uh-uh.  No.
23      Q.  Did you read Mr. Gitter's
24  transcript?

1      A.  I did.
2      Q.  Why did you read
3  Mr. Gitter's transcript?  Again, for
4  its entertainment value?
5      A.  No.  It came in the same
6  package.
7      Q.  Well, did someone suggest
8  that it would be a good idea for you
9  to read Mr. Gitter's transcript?
10      A.  I don't remember if that
11  came up.  It did come mailed in a
12  package.
13      Q.  Did you take any notes of
14  your review of the transcripts?
15      A.  I did not.
16      Q.  Did you provide any
17  information to counsel for
18  Mr. Friedberg relating to your review
19  of the transcript or as a result of
20  your review of the transcripts?
21      A.  Could you repeat that
22  question, please.
23          (The reporter read back the
24  following testimony:

1          " Q   Did you provide any
2  information to counsel for
3  Mr. Friedberg relating to your review
4  of the transcript or as a result of
5  your review of the transcripts?")
6          THE WITNESS:  I do not
7  believe I did.
8  BY MR. CHRISTIAN:
9      Q.  How about to Mr. Friedberg?
10      A.  I do not believe I
11  commented to him about his
12  deposition.
13      Q.  Have you commented to him
14  about Mr. Gitter's deposition?
15      A.  I do not believe I did.
16      Q.  Have you commented to
17  anyone, including any of your
18  colleagues at work, about either
19  deposition?
20      A.  No.
21      Q.  How many times did you read
22  them?
23      A.  I read them once.
24      Q.  What did you do with them

1   I don't know what else they did.
2       Q.   What did you hear?  Did you
3   hear anything about what they did?
4       A.   From my coworkers?
5       Q.   From anybody.
6       A.   No.
7       Q.   What was the next
8   conversation you had with anybody
9   about the subpoena or the documents
10  being produced pursuant to the
11  subpoena after that person reviewed
12  the documents and left?
13      A.   The documents were in a box
14  and I would have received -- I did
15  receive a phone call from -- I'm not
16  sure if it was Mr. Rega or Ms. Smith
17  about the documents and they said
18  that certain documents were not
19  relevant, those were the accounting
20  documents that I alluded to.
21      Q.   Are those the only
22  documents they mentioned in that
23  call?
24      A.   And then there was a

1   document from December of 2004 with
2   an e-mail cover note to Mr. Rega, and
3   I cannot remember if it was a back
4   and forth or two independent ones,
5   but it was one document.
6       Q.   So accounting documents and
7   these December '04 e-mails were
8   documents.  Were they the only two
9   types of documents mentioned in this
10  phone call that weren't relevant?
11      MS. SMITH:  Objection.
12  Mischaracterizes his testimony.  He
13  indicated that the first section --
14      MR. CHRISTIAN:  I don't
15  need a speaking objection.  I'll
16  rephrase the question.
17      MS. SMITH:  Thank you.
18  BY MR. CHRISTIAN:
19      Q.   In the conversation with
20  someone from Mr. Rega's firm, whoever
21  it was indicated that certain
22  documents in the box were not
23  relevant.  Am I right so far?
24      A.   Relevant, sure.

1       Q.   I mean that's what you
2   said.  Which documents in this
3   conversation did they indicate were
4   not relevant?  You've said the
5   accounting documents; correct?
6       A.   There were accounting
7   documents on the -- with Legion
8   Insurance Company and the two
9   December of 2004 e-mail cover notes
10  with the same document behind them.
11  I do not believe there were any other
12  documents.
13      Q.   By that answer you mean you
14  don't believe you were advised that
15  any other documents were irrelevant
16  in that conversation.  Is that what
17  you meant?
18      A.   Yes.
19      Q.   What did you say in
20  response to that?
21      A.   Okay.
22      Q.   Okay, what?  Did they want
23  you to take them out of the box?
24      A.   They said those were not

1   relevant, take them out of the box.
2   I said okay.
3       Q.   Did you have any other
4   discussion during that conversation
5   about the subpoena or the documents
6   to be produced?
7       A.   Not to my recollection.
8       Q.   So you took those documents
9   out of the box and then what was the
10  next event or conversation relating
11  to the subpoena or the documents?
12      A.   I'm not sure exactly.  My
13  recollection is that I would have
14  called Brooke to arrange for the
15  service, copying service, to come
16  out.
17      Q.   Now, when you talked with
18  Ms. Hertzer, did you tell her that
19  you had removed certain documents at
20  the suggestion of Mr. Friedberg's
21  counsel?
22      A.   We talked about a -- I'm
23  trying to remember the phrase that
24  she used -- about a document that I

1  had prepared that was not to be
2  submitted, and I said I understand
3  which document she's talking about.
4     Q.   Prior to that conversation
5  you had with Ms. Hertzer regarding --
6  you're talking about the affidavit;
7  is that correct?
8     A.   I am.
9     Q.   Prior to the conversation
10  with Ms. Hertzer about the affidavit,
11  had you had a discussion with anyone
12  else regarding whether that document
13  should be produced responsive to the
14  subpoena or pursuant to the subpoena?
15     A.   You mean that document, you
16  mean the affidavit?
17     Q.   Or any drafts.
18     A.   The affidavit was
19  determined not to.  It was told to me
20  that it was not to be produced.
21     Q.   By whom?
22     A.   By one of the three, if not
23  all of the three, plaintiff
24  attorneys.

1     Q.   And that was before your
2  conversation with Ms. Hertzer about
3  it; is that correct?
4     A.   Yes.
5     Q.   All right.  So they told
6  you not to produce accounting
7  documents, they told you not to
8  produce two December '04 e-mail cover
9  notes with the accounting documents,
10  they told you not to produce the
11  affidavit.  Did they tell you not to
12  produce anything else?
13     A.   Not to my recollection.
14     Q.   Did they tell you not to
15  produce certain e-mails that went
16  back and forth among you and the
17  lawyers for Mr. Friedberg?
18     A.   No.
19     Q.   There have been e-mails
20  between you and lawyers for
21  Mr. Friedberg over the last couple of
22  years; correct?
23     A.   Yes.
24     Q.   Some of them relating to

1  this lawsuit; correct?
2     A.   Yes.
3     Q.   Why did you not produce
4  those?
5     A.   I don't have them.  It's
6  not our corporate philosophy to keep
7  e-mails that are nonrevenue
8  generating.  We have a small company
9  with limited server space; we delete
10  everything.
11     Q.   Did you delete any e-mails
12  relating to this lawsuit after you
13  received the subpoena?
14     A.   I do not believe so.
15     Q.   Did you ever have a
16  discussion with counsel for
17  Mr. Friedberg or with Mr. Friedberg
18  regarding deletion of any e-mails
19  either generally or specifically?
20     A.   Yes.  I told them that we
21  delete our e-mails at our company.
22     Q.   How did that come up?
23     A.   I said I don't have very
24  many e-mails.

1     Q.   So they asked you about
2  e-mails and you said you don't have
3  very many?
4     A.   I'm not sure if they asked
5  me or I initiated it, but that came
6  up and I said I don't keep e-mails.
7     Q.   After that conversation did
8  you delete any e-mails relating to
9  this matter?
10     A.   I do not believe so.
11     Q.   When did you have that
12  conversation?  Was it before or after
13  you got the subpoena?
14     A.   After.
15     Q.   Do you have any e-mails
16  relating to this lawsuit that you did
17  not produce?
18     A.   There would have been
19  extensive e-mails at MRM, so my -- so
20  I did not produce any of these.
21     Q.   But you don't work at MRM.
22     A.   I do not.
23     Q.   I'm asking for e-mails you
24  have access to at work or at home.

1  a draft of the attachment?

2      A.   This?

3,     Q.   Yes.  The privilege law.

4      A.   No.

5      Q.   You see on the first page

6  of Exhibit 35, the first line is

7  quote, In response to your letter

8  earlier today regarding documents

9  from Mr. Lewis' files not produced,

10  please see the documents listed

11  below, and then there's a list of

12  documents.  Do you see that?

13      A.   Uh-huh.

14      Q.   Counsel for Mr. Friedberg

15  determined what documents would not

16  be produced from your files.  Is that

17  true?

18      A.   Yes.

19      Q.   I think you've talked about

20  most of these already.  The

21  spreadsheets, are they the accounting

22  documents you referred to?

23      A.   Yes.

24      Q.   Were they prepared in

1  connection with the suit that was

2  brought by Legion in the Commonwealth

3  Court?

4      A.   I'm not sure how to answer

5  that in connection with.  They were

6  part of.  I don't, I don't know who

7  prepared them.

8      Q.   Do they relate in any way

9  to any aspect of this lawsuit?

10      A.   My understanding is that

11  this lawsuit is E-11, E-14 and U-21.

12      Q.   Yes.

13      A.   So these were involved with

14  other share series, so no.

15      Q.   So these are unrelated to

16  any aspect of this lawsuit; is that

17  correct?

18      A.   I believe they are.

19           Now, I'm sorry.  Your

20  question was on the accounting.

21      Q.   Yes.  The spreadsheets.

22      A.   Okay.

23      Q.   Now, a couple of documents

24  I don't think we talked about in your

1  testimony were e-mails from Kristy

2  Ireland.  Do you see that?

3      A.   Yes.

4      Q.   Who is Kristy Ireland?

5      A.   She works at Research

6  Underwriters.

7      Q.   Do you know what e-mails

8  are referred to there?

9      A.   I believe that was the

10  e-mail and the attachments associated

11  with those e-mails are listed below.

12  That's my recollection.

13      Q.   I am done with 35.

14           Let's talk about your

15  preparation for this deposition.  I

16  think you testified a little earlier

17  that you set aside yesterday.  Was

18  that to meet with counsel for

19  Mr. Friedberg?

20      A.   Yes.

21      Q.   With whom did you meet?

22      A.   With the three attorneys.

23      Q.   Mr. Nguyen, Ms. Smith and

24  Mr. Rega?

1      A.   Yes.

2      Q.   Where did you meet?

3      A.   At Schnader's office.

4      Q.   For how long did you meet?

5      A.   The meeting went from

6  approximately 2:00 until

7  approximately 5:15.

8      Q.   Then did you have dinner or

9  drinks or did you head home, or do

10  something else?

11      A.   And then I tried to shed a

12  little culture on Mr. Rega, showing

13  him the Liberty Bell, Independence

14  Mall, and Society Hill, and Queen

15  Village, and then we had dinner at

16  Rittenhouse Square.

17      Q.   So you met with him, met

18  with the lawyers until about 5:15,

19  you gave Mr. Rega a tour of

20  Philadelphia, and then you had dinner

21  with Mr. Rega; correct?

22      A.   Uh-huh.  Yes.

23      Q.   Did you meet with any

24  counsel for Mr. Friedberg this

1   please give me all the discussions
2   including meetings.
3       A.   It is probable and likely
4   that we had numerous discussions all
5   through the years.  I'm not sure I
6   would remember any specific other
7   than the Mutual Indemnity meeting in
8   2002.  I believe there was another
9   meeting in Bermuda at Mutual
10  Indemnity preceding that, and there
11  may have been yet another preceding
12  that.
13          In advance of those
14  meetings there would have been
15  numerous phone calls from discussing
16  hotel arrangements, travel
17  arrangements, meeting arrangements,
18  information to bring.  There was a
19  financial transaction between MRM and
20  Research Underwriters, and I believe
21  Mr. Rega represented Research
22  Underwriters on that.  I'm not sure
23  of that time frame.  I believe that
24  was '96 or '97.

1       Q.   What generally was that
2   financial transaction?
3       A.   There was a New York City
4   livery program that Research
5   Underwriters acted as the, I'll call
6   it MGA for, and Mutual Risk
7   Management bought out their interest
8   in that program and the servicing
9   responsibilities.
10      Q.   Okay.  I've heard enough.
11  Why don't you continue with your
12  chronology.  Thank you for explaining
13  that to me.
14      A.   So that is about up to
15  2002.  I do not believe I had any
16  face-to-face meetings with Mr. Rega
17  after that until maybe December of
18  2004, plus or minus.
19      Q.   What were the circumstances
20  regarding that meeting?
21      A.   Mr. Rega was asking me
22  detailed questions of the MRM
23  structure and particular reference to
24  Mutual Indemnity.

1       Q.   Did he tell you why he
2   wanted that information?
3       A.   My recollection is that
4   there were lawsuits at the time with
5   Mutual Indemnity, and he wanted to
6   get a better understanding of the
7   components of the programs.
8       Q.   Where did you meet with
9   him?
10      A.   I believe it was in my
11  office.
12      Q.   Was anyone else there?
13      A.   No.
14      Q.   How long did it last?  Do
15  you know?
16      A.   I think it was the better
17  part of the day.  I believe he came
18  in the morning and I believe he left
19  late afternoon.
20      Q.   So he asked detailed
21  questions regarding MRM's structure
22  and Mutual Indemnity.  Did you
23  discuss anything else?
24      A.   That's pretty broad.

1       Q.   My question is, did you
2   discuss anything else?
3       A.   Relevant to this case,
4   probably not.  We both like our
5   respective football teams and
6   baseball teams and we have a rivalry,
7   but it was limited to the MRM, Mutual
8   Indemnity, and we would have --
9   within the MRM structure would have
10  been Legion as well.
11      Q.   Did he tell you why he was
12  asking these questions?
13      A.   He wanted a better
14  understanding of how everything
15  worked.  The MRM program structures
16  were very complicated.
17      Q.   So you spent a day talking
18  with Mr. Rega about this?
19      A.   Yes.
20      Q.   Did you receive any
21  compensation?
22      A.   I don't believe he even
23  bought me lunch.
24      Q.   Why did you spend a day

1   talking to Mr. Rega about this?

2     A.  Because I felt it was

3   necessary.  I have spent an

4   incredible amount of time with

5   customers and their attorneys on

6   Legion issues, Mutual Indemnity

7   issues, and MRM issues.

8     Q.  There were confidentiality

9   provisions in your employment

10  agreement; is that correct?

11    A.  I don't have any

12  recollection of confidentiality

13  agreement within my employment

14  provision.

15    Q.  Did you tell anyone from

16  any of the MRM-related companies that

17  you were going to or had met with

18  Mr. Rega?

19    A.  I had numerous discussions

20  with Mr. Pickering.  I had

21  discussions with Mr. Watson, I had

22  discussions with Mr. Alexander.  They

23  know that I was trying to get both

24  sides to agree.

1   what he believes, Ms. Smith.

2     MS. SMITH:  Asked and

3   answered.

4     MR. CHRISTIAN:  I'm not

5   asking what someone told him.

6     MS. SMITH:  Same

7   objection.  Asked and answered.

8     THE WITNESS:  Can I answer

9   it at all?

10  BY MR. CHRISTIAN:

11    Q.  Please do.

12    A.  No.

13    Q.  What do you think your

14  shares are worth right now,

15  Mr. Lewis?

16    A.  I could sell my shares

17  certificate on eBay for greater value

18  than I could realize from selling my

19  shares.  So that would be a nominal

20  number.

21    Q.  De minimus; correct?

22    A.  Yes.  Latin was not my

23  strength.

24    Q.  They're not worth anything,

1     Q.  Do you have any financial

2   interest in the outcome of this case?

3    A.  I'm a shareholder of MRM.

4   So to the extent MRM does well, my

5   shares will go up or down in value.

6    Q.  Do you have any other

7   financial interest in the outcome of

8   this case?

9    A.  No.

10    Q.  Do you honestly expect the

11  resolution of this case to have any

12  effect whatsoever on the value of the

13  MRM shares you hold?

14    A.  Mr. Pickering told me that

15  if Mr. Friedberg wins, it has the

16  possibility of jeopardizing all of

17  the remaining MRM assets.

18    Q.  Do you honestly believe

19  that the outcome of this case has any

20  effect on the value of the MRM shares

21  you hold?

22    MS. SMITH:  Asked and

23  answered.

24    MR. CHRISTIAN:  I'm asking

1   are they?

2    A.  No.  Actually I think they

3   are trading for cents on the dollar.

4    Q.  And you have no other

5   financial interest in the outcome of

6   this lawsuit; is that correct?

7    A.  That's correct.

8    Q.  Have you ever had a

9   financial interest in the outcome of

10  this lawsuit since you left CRS?

11    A.  No.

12    Q.  So is it your testimony

13  that Mr. Pickering or Mr. Watson or

14  Mr. Alexander knew that you were

15  going to spend a day with Mr. Rega

16  answering detailed questions about

17  MRM?

18    A.  No.  They know that I was

19  working with Mr. Friedberg to try to

20  get a resolution to the

21  circumstances.

22    Q.  Why was it in your

23  financial interest for that to happen

24  or succeed?

8/24/2005 Lewis, Andrew

1   commented just that these structures
2   were a true win for all parties
3   involved, meaning the insurance
4   companies made out, the reinsurance
5   companies made out, the agents and
6   the brokers made out, and the
7   shareholders made out, and how unique
8   that was in the business world that
9   everybody makes out.
10      Q.   And included in those
11  entities was Mr. Friedberg's company;
12  correct?
13      A.   Yes.
14      Q.   Do you remember anything
15  else about that day-long meeting?
16      A.   Just discussions on my
17  opinion on the current status of
18  Legion liquidation and current status
19  of Mutual Indemnity and the Mutual
20  Indemnity companies, what was
21  happening to the various different
22  people, who was running it, running
23  Mutual Risk Management.
24      Q.   Have you ever met with

8/24/2005 Lewis, Andrew

1   Mr. Rega came to Philadelphia to meet
2   with Ron Williams at Legion.
3       Q.   When was that?  Do you
4   know?
5       A.   It was either late spring,
6   early summer.
7       Q.   2005?
8       A.   In 2005, yes.
9       Q.   Did you discuss any aspect
10  of this lawsuit when you met with
11  Mr. Rega that day?
12      A.   I don't believe so.
13      Q.   Or on any of those days?
14      A.   No.  It was really the
15  Legion issue.
16      Q.   When was the next face-to-
17  face meeting you had with Mr. Rega?
18      A.   I believe it was when he
19  was in town, in Philadelphia, excuse
20  me, for Mr. Friedberg's deposition.
21  I don't know the date of that.  You
22  have it in your records somewhere.
23          MR. CHRISTIAN:  Let's go
24  off the record.

8/24/2005 Lewis, Andrew

1   Mr. Gentile?
2       A.   I do not believe I've ever
3   had a face-to-face meeting with him.
4       Q.   Have you ever had telephone
5   conversations with him?
6       A.   I had conversations with
7   him.
8       Q.   Telephone conversations?
9       A.   Telephone conversations.
10  Excuse me.
11      Q.   And was Mr. Rega involved
12  in any of those?
13      A.   Meaning a three-way
14  conversation?
15      Q.   Yes.
16      A.   I do not remember that.  He
17  may or may not have been.  I have no
18  recollection.
19      Q.   Let's get back to your
20  meetings with Mr. Rega.  You talked
21  about the December '04 meeting.  When
22  was the next face-to-face meeting you
23  had with Mr. Rega?
24      A.   My recollection was when

8/24/2005 Lewis, Andrew

1                RECESS
2   BY MR. CHRISTIAN:
3       Q.   We were beginning to talk
4   about the meeting you had with
5   Mr. Rega when he was in town for
6   Mr. Friedberg's deposition.  So I'd
7   like to ask you a few questions about
8   that.
9           Who attended that meeting?
10      A.   My recollection was that it
11  was the three attorneys,
12  Mr. Friedberg, were there, and then I
13  came in, I believe I came in right at
14  lunchtime and then left shortly
15  thereafter.  So I don't think there
16  was anybody else.
17      Q.   Was that the day of
18  Mr. Friedberg's deposition?
19      A.   I don't, I don't believe
20  so.  I think it was in advance.  I
21  think it was the day before.
22      Q.   I see.  What was the
23  purpose, as you understood it, of
24  your attending that meeting?

1    . A.   They had asked if I would
2  come to the meeting in case they had
3  questions.
4    Q.   So you were there for how
5  long?
6    A.   I would say between two and
7  three hours.
8    Q.   Discussing various issues
9  with Mr. Friedberg and his lawyers in
10  preparation for Mr. Friedberg's
11  deposition; is that correct?
12    A.   I believe that to be
13  accurate.
14    Q.   And the lawyers or
15  Mr. Friedberg asked you to come to
16  that meeting.  Is that true?
17    A.   I believe that to be the
18  case.
19    Q.   Did they tell you why they
20  wanted you to be at that meeting?
21    A.   I believe they said in case
22  they had questions.
23    Q.   Where did that occur?
24  Schnader's offices?

1    A.   Schnader's office.
2    Q.   Tell me what you recall
3  being discussed at that meeting.
4    A.   My recollection is they
5  were asking about Mutual Indemnity
6  employees, Paul Watson, David
7  Alexander, Neville Billimoria, Ellen
8  Charley, Gary Roche, Dale Gawley, and
9  the remainder were the Mutual
10  Indemnity account executives.  Do you
11  want me to -- my recollection, keep
12  going through that list?
13    Q.   If you wouldn't mind, yes.
14    A.   Jason Flaxbeard, Lisah -- I
15  can't remember Lisah's last name.
16  Lisah with an H.  Gran Mollineau.  As
17  an aside, I'll spell these; they're
18  hard.  Ian Kolowski, Angela
19  Rawcliffe, another Ian whose name
20  escapes me right now, but the basic
21  questions were who were these people
22  and what did they do for Mutual
23  Indemnity, and that was the fair
24  amount of the back and forth, trying

1  to answer those questions.
2    Q.   During the two or three
3  hours that you were there, there were
4  conversations other than answering
5  questions relating to these people
6  are and what they did.  Is that fair?
7    A.   Yes.
8    Q.   Did you talk about any
9  aspect of what Mr. Friedberg might
10  expect at his deposition, issues or
11  questions, anything along those
12  lines?
13    A.   No.  They were mainly
14  asking me questions personnel
15  related, personnel related to Mutual
16  Indemnity.
17    Q.   When you say "mainly," what
18  I'm trying to understand is what else
19  you discussed.  Do you remember?
20    A.   Yes.  There were a series
21  of, I guess, interactions between
22  Mr. Friedberg and the senior MRM
23  executives.  Mr. Mulderig our
24  chairman, bought a Porsche from

1  Mr. Friedberg and Mr. Friedberg, when
2  Mr. Mulderig drove from Pittsburgh to
3  Rhode Island, did not give him the
4  proper papers, and Mr. Mulderig was
5  very upset with that.  We discussed
6  that at length.
7    Q.   What else did you discuss?
8    A.   Mr. Friedberg was -- the
9  president of MRM, John Keesock, John
10  Keesock -- Mr. Friedberg bought John
11  Keesock a Porsche 911, we talked
12  about that, and the difference
13  between those two individuals and
14  cars.
15    Q.   What else did you discuss?
16    A.   We talked about the timing
17  of the original Legg Mason account
18  with Mr. Fischetti.  They asked did I
19  remember exactly when that happened,
20  when that account was put on.  I
21  don't know the definitive date of
22  that.  We discussed my relationship
23  with Mr. Gitter, and actually I guess
24  my relationship with Mr. Fischetti as

1    well. I'm not sure what else was, if
2    anything else, was discussed.
3    Q.   Do you know whether
4    Mr. Friedberg was at the meeting
5    before you attended or after you
6    left? In other words, were you there
7    for just part of the meeting, to your
8    knowledge?
9    A.   Oh, the meeting was in
10   process when I arrived, and I don't
11   know what happened after I left.
12   Q.   Did you discuss any of the
13   positions of the parties in the
14   lawsuit or the status of the lawsuit?
15   A.   Can you -- positions?
16   Q.   Arguments Friedberg was
17   making. Arguments the defendants
18   were making. Any allegations or
19   defenses. Anything along those
20   lines.
21   A.   No. It was really directed
22   questions at the Mutual Indemnity
23   employees, questions asking me about
24   Fischetti and Gitter. I don't

1    believe there was any positioning
2    discussed -- I'm sorry. The second
3    part of your question was stature?
4    Q.   Status of the lawsuit.
5    A.   Status. I did make the
6    inquiry like, why don't you guys just
7    shut up and get together and fix it.
8    Q.   Fix what, the dispute?
9    A.   No. Just fix the -- stop
10   yelling at each other. Mutual
11   Indemnity and Steve were friends
12   forever.
13   Q.   Do you understand that
14   there's a dispute between
15   Mr. Friedberg and the defendants?
16   A.   I'm not sure how I would
17   categorize it. It's just a --
18   Q.   It's a lawsuit, right?
19   A.   I understand there's a
20   lawsuit.
21   Q.   And that's a dispute;
22   wouldn't you agree with that?
23   A.   I would call a lawsuit.
24   Q.   There's a disagreement with

1    regard to the parties' rights and
2    obligations. Do you agree with that?
3    A.   I'm not sure I'd say that.
4    I'd say there's a lawsuit that
5    shouldn't have been filed.
6    Q.   By Mr. Friedberg, correct?
7    A.   Actually I don't know if
8    there's a lawsuit from Mutual
9    Indemnity so...
10   Q.   Do you remember anything
11   else being discussed at that meeting
12   the day before Mr. Friedberg's
13   deposition other than what you've
14   told us about?
15   A.   I don't believe so.
16   Q.   When was the next face-to-
17   face discussion with Mr. Rega?
18   A.   I believe it was yesterday.
19   Q.   All right. And yesterday
20   was a deposition preparation
21   session. Let's talk about that.
22   A.   Yes.
23   Q.   Did you review any
24   documents in preparation for your

1    deposition?
2    A.   There were two documents.
3    One was the Mutual Holdings -- I may
4    have this wrong -- Mutual Holdings
5    articles of incorporation, and the
6    second document was a letter that I
7    received from an attorney in New
8    Mexico and I asked Ms. Smith to tell
9    me what it means.
10   Q.   Attorney in New Mexico?
11   A.   Yes.
12   Q.   All right. You reviewed
13   both of those in preparation for the
14   deposition?
15   A.   Those are the two documents
16   that we went over.
17   Q.   The only two; is that
18   correct?
19   A.   I don't have any
20   recollection of any -- those were the
21   only two documents.
22   Q.   You looked at those
23   documents yesterday; correct?
24   A.   I did.

**[Page 129]**

1    Q.  What else did he tell you?
2    I'm talking about what Mr. Rega told
3    you last night about Gentile, U-21,
4    or this inquiry we had made regarding
5    a letter.
6    A.  He said that that letter
7    was apparently used -- I'm trying to
8    remember exactly how he said that.
9    There was an issue with Mr. Ouimette
10   and Mr. Friedberg upon Mr. Ouimette's
11   divorcing his wife, which was
12   Mr. Friedberg's sister, and he was a
13   partner in Mr. Friedberg's business,
14   and as part of the separation they
15   had to determine, I guess, the share
16   of all of the assets at hand, and
17   that letter was used in the
18   determination of the allocation of
19   those assets.
20   Q.  What did he tell you about
21   how the letter was used?
22   A.  It was used -- I'm trying
23   to remember exact words -- it was
24   used to, it was used to reduce

**[Page 130]**

1    Mr. Ouimette's share of the
2    allocation.
3    Q.  Used by whom?
4    A.  I don't think he said by
5    whom.
6    Q.  Did you have an
7    understanding of who used it?
8    A.  I had assumed it was
9    Mr. Friedberg.
10   Q.  What other conversation did
11   you have with Mr. Rega last night
12   about Mr. Gentile or the letter or
13   U-21 or our inquiry?
14   A.  He asked was this a
15   surprise and a common kind of
16   occurrence, and I said no, it was not
17   a surprise and no, it's not a common
18   occurrence.  Mark and Steve had,
19   within the U-21 structure, offered me
20   ownership in that, they had offered
21   me ownership in other things, and a
22   number of other clients had offered
23   me ownership as well.
24   My comment to Mr. Rega was

**[Page 131]**

1    that that was something that I had
2    routinely said no, thank you, but it
3    was also evidence of the job that I
4    did as a salesman for -- on their
5    programs and for MRM.
6    Q.  What else was discussed
7    last night with Mr. Rega or anyone
8    else involving Mr. Gentile or the
9    letter or U-21 or our inquiries
10   regarding the letter?
11   MS. SMITH:  Objection as to
12   form.
13   THE WITNESS:  What was that
14   last part of that question?
15   BY MR. CHRISTIAN:
16   Q.  Our inquiry regarding the
17   letter.
18   A.  There was nothing mentioned
19   on the inquiry.  I'm not sure I
20   understand that aspect of it.
21   With the U-21 program, and
22   the offer of the ownership, it was
23   believed by Mr. Friedberg and
24   Mr. Ouimette that during the course

**[Page 132]**

1    of our relationship that -- that they
2    had a disproportionate benefit of our
3    relationship; that I did a lot of
4    work and did not get compensated
5    fairly.
6    And my comment to them and
7    to Mr. Rega last night was that that
8    was just evidence of a good sales job
9    and that's how we were trained to do
10   it.  So I told him that I had no
11   ownership; it was repeatedly offered;
12   I had been offered a number of things
13   from Mr. Friedberg and Mr. Ouimette
14   over the years, from vacations, from
15   a Ferrari, numerous other types of
16   gifts, vacations, wines.
17   I have not accepted
18   anything from Mr. Friedberg except
19   for a hundred dollar bill once in
20   Bermuda, which went to a bar tab, and
21   then a pair of I'll say Head skis
22   without bindings, which I gave to my
23   sister.
24   Q.  What other conversation did

8/24/2005 Lewis, Andrew

```
1        Now, we are here to depose
2    Mr. Lewis.  This is clearly relevant
3    to the issue of the credibility of
4    Mr. Lewis; I don't think there's any
5    question about that.
6        Do you know, as you sit
7    here today, whether your office has
8    any of these attachments?
9        MS. SMITH:  First of all,
10   let me note what the letter says.
11   The letter says, and I quote, I
12   reviewed the forms along with the
13   balance sheet.  I offer the following
14   comments:  I note that the attached
15   account statements still reflect
16   Mr. Lewis' alleged one million plus
17   interest, see U-21, period.
18       Now, that sentence, I
19   think, if you read it fairly refers
20   to attachments to the forms that were
21   reviewed, and I note again that
22   there's no indication on this letter
23   of any enclosure.
24       MR. CHRISTIAN:  All right.
```

9/7/2005 9:16 AM                                    141

8/24/2005 Lewis, Andrew

```
1    I'll make the request again.  Will
2    you please provide me with the
3    documents referenced in this letter?
4        MS. SMITH:  We will
5    endeavor to be sure that we have
6    produced all of the responsive
7    documents that are available to us.
8    We think we've already done it.  As a
9    courtesy, we will double-check.
10       MR. CHRISTIAN:  Well, I
11   don't think it's to be done as a
12   courtesy.  We don't have much time
13   left, so let me say that I'd like to
14   hear from you by the close of
15   business Friday; I'd like to see
16   these documents.  If you're not going
17   to produce them, then we will include
18   a reference in the motion to compel
19   we're filing relating to this.  So
20   that should give you plenty of time
21   to provide these documents to me.
22       And I will state for the
23   record, Ms. Smith, I have no idea why
24   this document was not produced
```

9/7/2005 9:16 AM                                    142

8/24/2005 Lewis, Andrew

```
1    initially by Mr. Friedberg.  It is
2    clearly relevant.  It goes right to
3    the heart of this witness's
4    credibility, and it was like pulling
5    teeth to get this document.  I don't
6    know why it was not produced
7    initially.  Do you?
8        MS. SMITH:  I believe in
9    discussions with Mr. Nguyen that he
10   indicated it was an oversight, and I
11   believe as soon as he discovered it
12   it was produced.
13       Let me note for the record
14   that there is no indication yet that
15   there are any documents relating to
16   this letter which have not already
17   been produced to you that are within
18   our client's possession, custody or
19   control.  As a courtesy, we will look
20   again.
21       MR. CHRISTIAN:  Please do
22   so.  I will get the witness.
23       (Mr. Lewis came back into
24   the room.)
```

9/7/2005 9:16 AM                                    143

8/24/2005 Lewis, Andrew

```
1    BY MR. CHRISTIAN:
2        Q.  Mr. Lewis, have you ever
3    had a conversation with Mr. Gentile
4    about any aspect of this letter or
5    the subject matter of this letter?
6        A.  I have no recollection of
7    having conversations on that.  I've
8    talked to him about their divorce.
9        Q.  Well, what do you remember
10   discussing with Mr. Gentile about the
11   divorce?
12       A.  That it was messy.
13       Q.  What else?
14       A.  I don't have any direct
15   recollections other than he said some
16   comments about Mr. Ouimette, that he
17   was a tough customer, tough client I
18   guess.
19       Q.  Now, Mr. Lewis, have you
20   ever seen any document that stated or
21   suggested that you had an interest or
22   a potential interest in the proceeds
23   in U-21?
24       A.  Other than what is in front
```

9/7/2005 9:16 AM                                    144

```
1    Q.   So you did not talk with
2  them about any of the testimony you
3  have given today; is that correct?
4    A.   I asked them generally with
5  a deposition who sees it, and they
6  told me that -- I can't remember what
7  they told me.  They said that the
8  judge could see it, other people
9  could see it, but it may not even be
10 looked at.
11   Q.   Why did you wonder who
12 would see it?
13   A.   Just never actually knew.
14   Q.   You've already said that
15 you have set aside the 12th to
16 testify; is that correct?
17   A.   I have the 12th blocked
18 out.
19   Q.   So you've had some
20 discussion with Mr. Friedberg's
21 lawyers regarding at least the
22 general areas of your testimony; is
23 that correct?
24   A.   Really, no.  Just that I
```

```
1  they want you to testify about?
2    A.   My understanding of the
3  Mutual Indemnity programs, my role at
4  MRM.
5    Q.   Anything else?
6    A.   That's pretty broad.
7    Q.   Yeah, it is.  Anything
8  else?
9    A.   No.
10   Q.   What's the basis of your
11 understanding as to what they want
12 you to testify about if they haven't
13 told you?
14   A.   I guess it was my
15 assumption, based upon several years
16 of hearing this, these discussions,
17 and so I guess from your discussion
18 with me, when you came out to my
19 office.
20   Q.   Mr. Friedberg has asked you
21 to be available for testimony on the
22 12th, correct, or his lawyers have?
23   A.   His lawyers, yes.
24   Q.   Getting back real quickly
```

```
1  would be available to testify.
2    Q.   Have you had any discussion
3  with Mr. Friedberg or his lawyers,
4  even in general terms, regarding what
5  they would like you to testify about
6  in the hearing?
7    A.   They have said numerous
8  times that they would like me to
9  testify and tell everything to the
10 best of my knowledge, and tell the
11 truth, and that would be it.
12   Q.   But they haven't given you
13 any indication at all as to even the
14 general areas of your expected
15 testimony; is that correct?
16   A.   I don't believe they have.
17   Q.   So as you sit here today,
18 you have no idea what they want you
19 to testify about at the hearing.  Is
20 that fair?
21   A.   Did not say that.  I have a
22 fairly good idea of what they want me
23 to testify about.
24   Q.   Well, what do you think
```

```
1  to the question-and-answer document
2  that you testified about before we
3  took the lunch break, was that ever
4  revised into an affidavit, to your
5  knowledge?
6    A.   Was that --
7    Q.   Have you signed an
8  affidavit in this case?
9    A.   I have signed an affidavit.
10   Q.   Do you have a copy of the
11 affidavit?
12   A.   I have a copy of the
13 affidavit.
14   Q.   Signed affidavit?
15   A.   Yes.
16   Q.   What did you do with the
17 signed affidavit?  Did you send it to
18 one of Mr. Friedberg's lawyers or
19 give it to one of Mr. Friedberg's
20 lawyers?
21   A.   It was given to Han.
22   Q.   Did you give it to Han?
23   A.   I did.
24   Q.   For what purpose did you
```

1  worked for Commonwealth Risk.
2      Q.   Describe the business
3  relationship between Keystone Risk
4  and Mr. Friedberg or any of his
5  companies.
6      A.   The only company that
7  Keystone Risk has involvement with
8  Mr. Friedberg is Research
9  Underwriters, his insurance agency.
10  We have an active common customer,
11  Krapf Coaches, out in Exton, that we
12  are actually the agent of record on
13  the policy.  We took the underwriting
14  information and negotiated a Workers'
15  Compensation insurance contract.
16      Q.   And that was obviously
17  sometime after you started at
18  Keystone Risk; is that correct?
19      A.   Yes.
20      Q.   Do you or does Keystone
21  Risk have any other business
22  relationship with Mr. Friedberg or
23  any of his companies?
24      A.   Presently, no.

1      Q.   Do you hope to?
2      A.   No.
3      Q.   You said presently.  You
4  were drawing a distinction between --
5      A.   I was.
6      Q.   -- now in the future or now
7  in the past?
8      A.   In the past.
9      Q.   What was the business in
10  the past?
11      A.   In the past we facilitated
12  the acceptance of his comp advantage
13  program after it left Legion
14  Insurance Company with one of the
15  Royal & SunAlliance insurance
16  carriers.
17      Q.   Why do you not hope to have
18  additional business with
19  Mr. Friedberg or his companies in the
20  future?
21      A.   I'm not sure if that's --
22  if that was your original question,
23  then I did not answer that.  I
24  thought your question was additional

1  companies of Mr. Friedberg.
2      I am very happy having a
3  relationship with the insurance
4  agency of Mr. Friedberg.  I have no
5  desire to have a relationship with
6  the other companies that I know
7  about.
8      Q.   Why is that?
9      A.   They would provide very
10  little value to my company.
11      Q.   And the companies you're
12  talking about are?
13      A.   I believe Steve owns a --
14  Mr. Friedberg owns an insurance
15  company called Freedom Advantage.  I
16  believe he has a premium finance
17  company.  I believe he has real
18  estate and other ventures.  None of
19  those I would care to do business
20  with.
21      Q.   You have had a role in
22  attempting to work out a settlement
23  of a dispute between Legion and/or
24  the liquidator of Legion and

1  Mr. Friedberg or some of his
2  companies; is that correct?
3      A.   Yes.
4      Q.   And that has involved your
5  meeting with lawyers and meeting with
6  Mr. Friedberg and at least attempting
7  to meet with representatives of the
8  liquidator; is that correct?
9      A.   Yes.
10      Q.   Has that involved travel to
11  Bermuda?
12      A.   I can't say if any of the
13  travels to Bermuda were specifically
14  related to the Legion portion of the
15  business, but the Legion portion and
16  the Mutual Indemnity business are
17  very intertwined.
18      Q.   You have performed certain
19  analyses to assist Mr. Friedberg in
20  working things out with a
21  liquidator.  Would that be a fair
22  statement?
23      A.   I don't think that would be
24  a fair statement.  I think I have

1  reviewed, or actually been given
2  spreadsheets and analyses on Research
3. Underwriters' position with the
4  liquidator.
5      Q.  Is it your testimony, sir,
6  that you have not performed any
7  analyses whatsoever in the context of
8  attempting to work out the dispute
9  between the liquidator and Research
10  Underwriters?
11     A.  My definition of analyses
12  would be the person who actually sat
13  down with all the information and put
14  a fair degree of effort into a
15  spreadsheet.  I have received
16  spreadsheets.  I have offered
17  comments.  I have reviewed it.  I
18  would not call that analyses.  It was
19  I have made efforts to help.
20     Q.  And what benefit do you
21  get?  What benefit do you get from
22  spending your time and presumably
23  expenses helping that matter get
24  settled?

1  in any way benefit you financially;
2  is that correct?
3      A.  That is correct.
4      Q.  You have also worked on
5  behalf of Mr. Friedberg with regard
6  to his prosecution of this claim; is
7  that correct?
8          MS. SMITH:  Objection as to
9  form.
10          THE WITNESS:  That is
11  correct.
12  BY MR. CHRISTIAN:
13     Q.  You have many documents in
14  your files provided to you by counsel
15  for Mr. Friedberg, correct, relating
16  to this litigation?
17     A.  That is correct.
18     Q.  You have documents in your
19  files relating to the litigation
20  Mr. Friedberg commenced in Bermuda
21  relating to the Mutual companies; is
22  that correct?
23     A.  That is correct.
24     Q.  You have assisted

1          MS. SMITH:  Objection as to
2  form.
3  BY MR. CHRISTIAN:
4      Q.  In other words, why do you
5  do it?
6      A.  Because I believe it's the
7  right thing to do.  I have assisted
8  Legion Insurance Company when they've
9  had questions.  I've assisted Mutual
10  Indemnity.  I have assisted my
11  customers.  I have assisted the
12  underwriting insurance buyers and
13  their agents.
14     Q.  As a principal at Keystone
15  Risk, you have spent time on
16  Mr. Friedberg's behalf trying to get
17  the matter with the liquidators
18  settled.  Is that fair?
19          MS. SMITH:  Objection as to
20  form.
21          THE WITNESS:  Yes.  That's
22  fair.
23  BY MR. CHRISTIAN:
24     Q.  Even though that does not

1  Mr. Friedberg and/or his counsel in
2  the prosecution of the claim in
3  Bermuda; is that correct?
4      A.  That is correct.
5      Q.  Have you been paid for any
6  of that?
7      A.  For the very first time
8  last night I got a dinner, and that
9  is the extent to which I've been
10  paid.
11     Q.  You have flown to Bermuda
12  on Mr. Friedberg's behalf with regard
13  to this litigation; is that correct?
14     A.  I have flown to Bermuda and
15  met on behalf of Mr. Friedberg while
16  I was doing other business down
17  there.  I did not make a specific
18  trip for the sole purpose of that.
19     Q.  Well, did you make any
20  trips to Bermuda for the primary
21  purpose of helping Mr. Friedberg in
22  this matter?
23     A.  After what date?
24     Q.  After you started at

EXHIBIT 3

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

186

1  I have a substantial amount of money
2  there. I'd like to know if they're
3  going to go under.
4      Q.  Where did you meet?
5      A.  I'm sorry?
6      Q.  Where did you meet?
7      A.  Meet who?
8      Q.  Pardon me?
9      A.  Meet who?
10     Q.  We've been talking about
11  Andy Lewis, sir.
12     A.  Okay.
13     Q.  Do you need to take a
14  break?
15     A.  No.
16     Q.  Okay.  Where did you meet
17  Andy Lewis?
18     A.  In Philadelphia.
19     Q.  Did you come to
20  Philadelphia for that purpose?
21     A.  No.
22     Q.  When did you meet with him?
23     A.  I am in Philadelphia a lot.
24     Q.  Good.  When did you meet

187

1  with him?
2      A.  I don't recall a date.
3      Q.  Was anyone else at the
4  meeting?
5      A.  Andy and I spent a few
6  afternoons talking about this.
7      Q.  Okay.  Was anyone else at
8  the meeting?
9      A.  I don't recall.
10     Q.  Were any notes taken?
11     A.  No.
12     Q.  Have you hired him as a
13  consultant with regard to this
14  dispute?
15     A.  No.
16     Q.  Didn't he go to Bermuda on
17  your behalf, perhaps with you, to try
18  to work something out?
19     A.  Andy did go to Bermuda to
20  try to -- to try to resolve a
21  compromise.
22     Q.  Who paid for that?
23     A.  Andy did.
24     Q.  Andy did.

188

1      A.  Uh-huh.
2      Q.  Andy spent his money to fly
3  down and try to work out this -- work
4  out a compromise?
5      A.  Andy does a lot of
6  rent-a-captive business and is a
7  regular in Bermuda, and as a favor to
8  me he said he would have a
9  conversation with these guys.
10     Q.  Now, you tried to settle
11  with the liquidator in the
12  Commonwealth Court as well; correct?
13     A.  That's correct.
14     Q.  And did Mr. Friedberg --
15  I'm sorry.
16         Did Mr. Lewis show up with
17  you at that time as well?
18     A.  He did.
19     Q.  And did -- did he charge
20  you for that?
21     A.  No.
22     Q.  So he's just doing you a
23  favor?
24     A.  Uh-huh.  Yes.

189

1      Q.  A couple favors, actually.
2  One in Bermuda, one in the
3  Commonwealth Court situation; right?
4      A.  Perhaps.
5      Q.  What's your relationship
6  with Mr. Lewis?  Do you do business
7  with him?
8      A.  Uh-huh.
9      Q.  You have to answer with a
10  word.
11     A.  Yes.
12     Q.  Generally tell me what that
13  business is.
14     A.  We insure a client
15  together, the Krapfs, Krapf Bus
16  Company.
17     Q.  You say you insure it
18  together.  One of your companies
19  insures that bus company?
20     A.  Uh-huh.
21     Q.  Is that a yes?
22     A.  Yes.
23     Q.  And what's Mr. Lewis's
24  role?  He's not an insurer, is he?



**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

190

1     A.  Mr. Lewis is a -- is a --
2   functions as an intermediary, so he
3   puts programs together.  And we
4   brought the Krapfs to Mr. Lewis and
5   Mr. Lewis constructed a Workers'
6   Comp. program for them.
7     Q.  Do you have any other
8   business dealings with Mr. Lewis?
9     A.  No.
10    Q.  Are you a friend of his?
11    A.  No.
12    Q.  Is he a friend of yours?
13    A.  No.
14    Q.  Have you talked with
15  Mr. Lewis about any testimony he may
16  have given in this case?
17    A.  Yes.
18    Q.  Tell me what you discussed
19  in that regard.
20    A.  Testimony, I -- no details.
21    Q.  Tell me what you remember.
22    A.  I -- I've been focused on
23  this for me, so I really don't
24  remember.

191

1     Q.  Did you talk with Mr. Lewis
2   about how he might be able to help
3   you in this litigation?
4     A.  No.
5     Q.  So you don't remember any
6   aspect of any discussion regarding
7   possible testimony of Mr. Lewis?
8     A.  We talked about it.
9     Q.  Okay.  But you don't
10  remember even generally what you
11  talked about?
12    A.  I have -- I have spent the
13  last month and a half going through
14  13 years' worth of documents and
15  boxes and boxes of financial
16  statements.  I have been most
17  concerned about me representing the
18  facts as best as I can remember them
19  for today.  And that has been my
20  focus.
21    Q.  But my question was, do you
22  remember even generally what you
23  discussed with Mr. Lewis about
24  testimony, what the testimony he

192

1   might give in this case?
2     A.  Not really.
3     Q.  Did you understand that
4   Andy Lewis worked for Commonwealth
5   Risk Services?
6     A.  Andy Lewis presented
7   himself to me as a senior vice-
8   president and as the man who would
9   get things done.
10    Q.  Do you understand that Andy
11  Lewis worked -- was employed --
12  strike that.
13        Do you understand that Andy
14  Lewis was employed by Commonwealth
15  Risk Services?
16    A.  Andy Lewis was also
17  employed by Legion Insurance Company.
18    Q.  He was not employed by any
19  of the defendants in this case, would
20  you agree with that?
21    A.  I don't know that.  We
22  perceived the MRM Group in all --
23    Q.  Sir, you've answered my
24  question.

193

1        MR. NGUYEN:  Well, hold
2   on.  If what you're about to say is
3   relevant to your last answer, he has
4   a right to say so on the record.
5        MR. CHRISTIAN:  Well, Han,
6   honestly, I asked a question and he
7   said I don't know.  Now, what --
8   what -- what can he add that's going
9   to clarify that?
10        THE WITNESS:  Andy Lewis --
11  Andy --
12        MR. NGUYEN:  I don't know.
13  Why don't you ask?
14        THE WITNESS:  Andy Lewis
15  conducted, coordinated and set up all
16  the meetings that we had in Bermuda
17  and Andy Lewis was present at every
18  meeting that we had in Bermuda.
19  BY MR. CHRISTIAN:
20    Q.  You're testifying under
21  oath that Andy Lewis was present at
22  every meeting you had in Bermuda?
23    A.  If not every meeting, 98
24  percent of them.  When we wanted to



**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

EXHIBIT 4

# GOLDBERG, GRUENER, GENTILE
# HOROHO & AVALLI, P.C.

MARK J. GOLDBERG
HARRY J. GRUENER
GARY G. GENTILE
KENNETH J. HOROHO, JR.
CHARLES J. AVALLI
VELMA B. HIRSCH
KERRI L. CAPPELLA
SERÉNA M. WILLIAMS
MARK R. ALBERTS

ATTORNEYS AT LAW
SUITE 230 GRANT BUILDING
310 GRANT STREET
PITTSBURGH, PENNSYLVANIA 15219-2200

TELEPHONE (412) 261-9900
FACSIMILE (412) 261-7100

March 23, 2001

Patrick J. Rega, Esquire
AMATANGELO, BAISLEY & REGA
100 Fourth Street
Donora, PA  15033

RE:    OUIMETTE v. OUIMETTE

Dear Pat:

I reviewed the forms, along with the balance sheet. I offer the following comments: I note that the attached account statements still reflect Mr. Lewis's alleged $1,000,000+ interest (See U21). If he intends to hold back his full amount, contrary to what we discussed on the phone, then we may have a problem. As you will recall, it was our intention to make him participate proportionally in the $1.8 million claim of Mutual's. I believe his number would be something like 20% even without whatever adjustment Mark and Steve deemed appropriate. I propose distributing payments on an incremental basis to Mr. Lewis as the funds are released, assuming the funds will be released in installments and not in one lump sum. It is my understanding that $1,000,000 incremental distributions will "stay under the radar" and be less controversial. In such a case, we would segregate portions of Mr. Lewis's "interest" in a separate account and release his share once all funds were repatriated.

Very truly yours,

Gary G. Gentile

GGG/7676/jep

EXHIBIT 5

MUTUAL

## Dividend Calculation

| Shareholders<br>Side agreement<br>Split | E11<br>MO<br>MO & SF<br>50% | E14<br>MO & SF<br>MO & SF<br>50% | U21<br>MO<br>MO & SF<br>33% | M23<br>DK & DK<br>MO & SF<br>25% | N23<br>DK & DK & SF & MO<br>MO & SF<br>25% | Total |
|---|---|---|---|---|---|---|
| Cash balance 31st December 2000 | 1,281,568 | 1,338,161 | 4,202,693 | 454,681 | 2,669,880 | 9,946,983 |
| Cash balance 31st March 2001 | 1,167,498 | 1,153,607 | 4,153,124 | 334,280 | 2,653,513 | 9,462,023 |
| Cash Movement | (114,070) | (184,554) | (49,569) | (120,401) | (16,367) | (484,960) |
| | | | | | | |
| Potential surplus as at 12/31/00 | 1,289,033 | 1,188,494 | 3,140,122 | 113,550 | 1,489,048 | 7,220,247 |
| Potential surplus as at 3/31/01 | 1,167,498 | 1,027,169 | 3,144,076 | 79,071 | 898,039 | 6,315,853 |
| | (121,535) | (161,325) | 3,954 | (34,479) | (591,009) | (904,394) |

| All Shareholders | | | | | | |
|---|---|---|---|---|---|---|
| Potential Dividend Available | 1,167,498 | 1,027,169 | 3,144,076 | 79,071 | 898,039 | 6,315,853 |
| | | | | | | |
| **MO & SF Share Only** | | | | | | |
| Potential Dividend Available<br>SF & MO | 1,167,498 | 1,027,169 | 2,093,955 | 39,536 | 449,019.50 | 4,777,177 |
| Potential due to MRM Group | | | | | | (1,800,000) |
| | 1,167,498 | 1,027,169 | 2,093,955 | 39,536 | 449,020 | 2,977,177 |

**Notes**

$1.8m due to Mutual in connection with Premium Risk Group.
The value of these programs varies substantially as they have a high proportion of their funds based in equity investments.

EXHIBIT 6

The Warner Centre
332 Fifth Avenue – Suite 610
Pittsburgh, PA 15222
Phone: (412) 281-7724
Fax:    (412) 281-6153

**HERGENROEDER, REGA & SOMMER, LLC**

# FACSIMILE

**To:**  Gary Gentile, Esq.

**From:** Patrick J. Rega, Esq.

**Date:** October 29, 2001

**Re:**

**Fax No.:** 412-261-7100

**No. Pgs. (Incl. Cover):** 2

**COMMENTS:**  Here's the lates numbers.  I'll call you.

The pages comprising this fax transmission contains confidential information from Hergenroeder, Rega & Sommer, L.L.C. This information is intended solely for use by the individual or entity named as the recipient herein.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited.  If you have received this transmission in error, please notify us by telephone so that we may arrange to retrieve this message.

GG 039

MUTUAL

### Dividend Calculation

| Shareholders<br>Side agreement<br>Split | E11<br>MO<br>MO & SF<br>50% | E14<br>MO & SF<br><br>50% | U21<br>MO<br>MO & SF<br>33% | M23<br>DK & DK<br>MO & SF<br>25% | N23<br>DK & DK & SF & MO<br>MO & SF<br>25% | Total |
|---|---|---|---|---|---|---|
| Cash balance 30th June 2001 | 1,259,560 | 1,160,038 | 4,269,694 | 337,883 | 2,194,127 | 9,241,302 |
| Cash balance 30th Sept 2001 | 1,252,416 | 1,064,277 | 4,079,527 | 334,292 | 2,198,886 | 8,929,398 |
| Cash Movement | (7,144) | (95,761) | (210,167) | (3,591) | 4,759 | (311,904) |
| | | | | | | |
| Potential surplus as at 6/30/01 | 1,259,560 | 994,705 | 3,177,932 | 82,817 | 952,693 | 6,467,707 |
| Potential surplus as at 9/30/01 | 1,252,416 | 984,827 | 2,971,810 | 79,218 | 957,158 | 6,245,429 |
| | (7,144) | (9,878) | (206,122) | (3,599) | 4,465 | (222,278) |

| | E11 | E14 | U21 | M23 | N23 | Total |
|---|---|---|---|---|---|---|
| **All Shareholders** | | | | | | |
| Potential Dividend Available | 1,252,416 | 984,827 | 2,971,810 | 79,218 | 957,158 | 6,245,429 |
| | | | | | | |
| **MO & SF Share Only** | | | | | | |
| Potential Dividend Available SF & MO | 1,252,416 | 984,827 | 1,979,225 | 39,609 | 478,579.00 | 4,734,656 |
| Potential due to MRM Group | | | | | | (1,800,000) |
| | 1,252,416 | 984,827 | 1,979,225 | 39,609 | 478,579 | 2,934,656 |

Notes

$1.8m due to Mutual in connection with Premium Risk Group.
The value of these programs varies substantially as they have a high proportion of their funds based in equity investments.

GG 040

# EXHIBIT 7

new share series    ( 1 or 2 )
— life

Andy    U - 21

Dale Gawley    —    441 - 295 -    5-688
                                          5-688
                                       ext 267

⅓ partner — U - 21

Corporated cert

Friedberg000234