EXHIBIT A

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    called one of the three attorneys; I

2    don't remember which one.

3        Q.    You did call one of the

4    three attorneys; correct?

5        A.    I did call one of the three

6    attorneys.

7        Q.    Okay.  For what purpose?

8        A.    To say that I have the

9    subpoena, and my recollection is that

10   they either said they had a copy or

11   they would be receiving a copy.

12       Q.    What else was discussed in

13   that conversation?

14       A.    Went through the items of

15   the subpoena, and I'm not sure if

16   that was on that conversation or a

17   followup conversation.  But it was,

18   it was either at that or shortly

19   thereafter.

20       Q.    Did you feel it was

21   important to go over the items on the

22   subpoena with counsel for

23   Mr. Friedberg?

24       A.    After I called them, I

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    believe I called Brooke as well to

2    ask her questions, Brooke Hertzer,

3    and she was going to ask you your

4    opinion on a couple of my questions.

5        Q.    Do you understand what

6    question I asked you, sir?  Will you

7    listen to this, please.

8            MR. CHRISTIAN:  Would you

9    read it back, please.

10           (The reporter read back the

11   following testimony:

12           "Q Did you feel it was

13   important to go over the items on the

14   subpoena with counsel for

15   Mr. Friedberg?")

16           THE WITNESS:  With

17   Mr. Friedberg's counsel?  That's your

18   question?

19   BY MR. CHRISTIAN:

20       Q.    Yes.

21       A.    I did it out of courtesy.

22       Q.    Tell me what you remember

23   about going over these items with

24   Mr. Friedberg's counsel.

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    my chronology, do you remember what

2    day you came into my office?

3          Q.    I don't.

4          A.    Okay.

5          Q.    With regard to

6    conversations with Mr. Friedberg's

7    counsel, you testified that you went

8    over the subpoena with them.  Do you

9    remember that?

10         A.    I either told them I had

11   the subpoena on the first call or

12   told them I was getting subpoenaed.

13   I don't remember when I talked to

14   them.  But I did talk with them in a

15   phone call about the subpoena, and

16   I'm not sure of the chronology.

17         Q.    What was the next

18   conversation you had with

19   Mr. Friedberg or his counsel

20   regarding the subpoena?

21         A.    It probably was after

22   Brooke got back to me with answers to

23   the questions.

24         Q.    What were your questions?

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Do you remember?

2        A.    I can only remember one,

3    which was the paystubs, that she

4    needed every single biweekly paystub

5    since 1989.

6        Q.    I'm sorry.  Go ahead.

7        A.    And that you couldn't just

8    live with the beginning and the

9    ending paystub for each year.

10       Q.    That's the only issue you

11   raised with Ms. Hertzer; correct?

12       A.    I don't remember.

13       Q.    You don't remember raising

14   any other issue; correct?

15       A.    In conversations we talked

16   about the floor of the meeting, the

17   time of the meeting.  Oh, the other

18   issue was a copy service.  I don't

19   remember if that was the first

20   discussion.  She got back to me with

21   a copy service time.

22       Q.    So when was your next

23   discussion with counsel for

24   Mr. Friedberg or Mr. Friedberg about

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    relevant, take them out of the box.

2    I said okay.

3        Q.    Did you have any other

4    discussion during that conversation

5    about the subpoena or the documents

6    to be produced?

7        A.    Not to my recollection.

8        Q.    So you took those documents

9    out of the box and then what was the

10    next event or conversation relating

11    to the subpoena or the documents?

12        A.    I'm not sure exactly.  My

13    recollection is that I would have

14    called Brooke to arrange for the

15    service, copying service, to come

16    out.

17        Q.    Now, when you talked with

18    Ms. Hertzer, did you tell her that

19    you had removed certain documents at

20    the suggestion of Mr. Friedberg's

21    counsel?

22        A.    We talked about a -- I'm

23    trying to remember the phrase that

24    she used -- about a document that I

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    had prepared that was not to be

2    submitted, and I said I understand

3    which document she's talking about.

4         Q.    Prior to that conversation

5    you had with Ms. Hertzer regarding --

6    you're talking about the affidavit;

7    is that correct?

8         A.    I am.

9         Q.    Prior to the conversation

10   with Ms. Hertzer about the affidavit,

11   had you had a discussion with anyone

12   else regarding whether that document

13   should be produced responsive to the

14   subpoena or pursuant to the subpoena?

15        A.    You mean that document, you

16   mean the affidavit?

17        Q.    Or any drafts.

18        A.    The affidavit was

19   determined not to.  It was told to me

20   that it was not to be produced.

21        Q.    By whom?

22        A.    By one of the three, if not

23   all of the three, plaintiff

24   attorneys.

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1          A.    Until you phrased the

2    question just like that.   I'm not

3    certain it was ever represented that

4    it would be handed to the judge.   My

5    understanding was that it -- is that

6    it was going to be.

7          Q.    Okay.   But you don't know

8    what representations were made by

9    Mr. Friedberg's counsel with regard

10   to whether it would be presented; is

11   that correct?

12         A.    To whom?

13         Q.    To you.

14         A.    Yes.   But I can't recall if

15   they specifically said that it would

16   be handed to the judge.   That was my

17   understanding and assumption, but as

18   you asked the question, I'm not sure

19   they actually said that.   They may

20   have.

21         Q.    Well, we've asked for it

22   and they're not giving it to us.   So

23   I need to ask you.   If you can't tell

24   me, just say you can't tell me.   Tell

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    me what was in the affidavit.

2         A.    It was -- it started with

3    my name.

4         Q.    That's a good start.

5         A.    I had been employed by

6    Mutual Risk Management from 1989

7    until 2001.  Talked about my job

8    description.

9         Q.    I want you to tell me with

10   as much specificity as you can what

11   this affidavit said.

12        A.    Just that was --

13        Q.    Mr. Lewis, I know you're

14   struggling with this.  I am as well.

15   But we're not getting this affidavit

16   from these guys.  So the only way for

17   me to get this information is for me

18   to ask you, and I'm going to ask you

19   to tell me what was in the affidavit

20   with as much specificity as you can.

21   That's my question.

22        A.    That's fine.  And my smile

23   was after my first sentence I was

24   going to recite my address, but

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    was -- I withheld.

2            It talked about my

3    employment at MRM and my job at --

4    excuse me -- my original employment I

5    think with Legion, and then it was

6    with Commonwealth Risk, my duty as a

7    salesman, my understanding of -- I'm

8    trying to remember at that point --

9        Q.    If you can't remember, just

10   tell me.  I don't want you to guess.

11   Only what you remember.

12       A.    I would be guessing.  I

13   cannot give specifics.  Can I talk --

14   do you want general?

15       Q.    Yes, please.  You can tell

16   me the topics if you can't remember

17   what was specifically said about each

18   topic.  You can just identify the

19   topics to the extent you remember

20   them.

21       A.    It talked about the E-11,

22   E-14 and U-21 programs, the opening

23   of the Legg Mason accounts, the

24   Prudential accounts, and then the

James DeCrescenzo Reporting, LLC

215.564.3905            InnovatingLitigation            FAX 215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1     Morgan Stanley accounts.  I guess

2     the --

3          Q.    I don't want you to guess.

4          A.    Then I'm done.

5          Q.    To the best of your

6     knowledge, as you sit here today,

7     you've identified the general areas

8     referenced in your affidavit; is that

9     correct?

10         A.    Yes.

11         Q.    Was there any reference in

12    the affidavit to dividends?

13         A.    Yes.

14              MR. CHRISTIAN:  Let's mark

15    as Exhibit 37 an e-mail that you sent

16    to Steve Friedberg.

17              (Exhibit Lewis 37 was

18    marked for identification.)

19    BY MR. CHRISTIAN:

20         Q.    Would you read that to

21    yourself, please, and tell me when

22    you are ready to be questioned about

23    it.

24         A.    Okay.

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    did you not?

2         A.    It would suggest that I

3    did.

4         Q.    It's from your e-mail

5    address at Keystone Risk; is that

6    right?

7         A.    Yes.

8         Q.    It's got your name on it,

9    right?

10        A.    Yes.

11        Q.    Is it accurate?  Is the

12   e-mail accurate, not your name.

13        A.    Thank you.  I am -- I

14   believe it's accurate.

15        Q.    Now, in this e-mail you are

16   telling Steve Friedberg that the

17   moneys in the Morgan Stanley account

18   were something other than a

19   dividend.  Would you agree with that

20   characterization?

21        A.    Yes.

22        Q.    Now, tell me what you said

23   in the affidavit, if you remember,

24   about the concept of dividends.

JDR

James DeCrescenzo Reporting, LLC

215.564.3905        Innovating Litigation        FAX 215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1        A.    The kind of general comment

2    was that dividends were used

3    interchangeably -- the term dividends

4    were used interchangeably with excess

5    funds, redundant funds, unnecessary

6    collateral, excess collateral.  And

7    that from my perspective after long,

8    hard thought I couldn't come up with

9    an actual scenario where I saw a

10   dividend being present.  Since there

11   was no formal committees or

12   processes, that we've generally

13   relied on the collateral review,

14   which was an internal MRM accounting

15   and the collateral review determined

16   the excess funds to be released.  Did

17   I answer you?

18       Q.    What is collateral review?

19       A.    Collateral review is a

20   spreadsheet showing the funds in

21   Mutual Indemnity outlining the claims

22   that had been paid, the loss reserves

23   that were posted, and the incurred

24   but not reported development

James DeCrescenzo Reporting, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

200

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Q.    What did you understand
2  Mr. Friedberg's reason to be relating
3  to why the accounts were opened in
4  Mutual's name and not his name?
5    A.    If they were not in his
6  name, he would continue to have the
7  similar argument from a tax deferral
8  position that he had consistent with
9  the assets held in the Mutual pool.
10   Q.    In other words, there would
11 not be a taxable event if he did not
12 get the money; is that right?
13   A.    There should not be a
14 taxable event.
15   Q.    Were you in the business of
16 providing tax advice to
17 Mr. Friedberg?
18   A.    With our programs, whether
19 it was Mr. Friedberg or anybody, we
20 talked about tax constantly.  We were
21 warned not to give tax advice, but we
22 talked about tax.  So we talked at
23 length, ad nauseam tax.
24   Q.    But did you ever tell

James DeCrescenzo Reporting, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Mr. Friedberg when you were talking
2    about any tax situation that he needs
3    to consult a tax expert?
4        A.    There were repeated
5    warnings to that effect, that this is
6    what we think, we meaning MRM, is the
7    tax position that somebody in this
8    position should take, and everything
9    we portrayed was relative.  So
10   relative to someone else or relative
11   to a black or a white situation,
12   that's how we did it, and we always
13   said you should talk to your tax
14   adviser.
15       Q.    Do you know whether
16   Mr. Friedberg ever indicated that he
17   did speak with a tax advisor?
18       A.    I believe that he did, and
19   I believe that I had conversations
20   with one of his outside accountants.
21       Q.    About the tax treatment
22   relating to the funds staying in an
23   account in Mutual's name?
24       A.    I believe that to be

**James DeCrescenzo Reporting**, LLC
215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    correct.

2        Q.    What was the name of that

3    person?  Do you know?

4        A.    I want to say his name was

5    Chuck, and this was quite some time

6    ago.  I'm sorry, I can't remember the

7    last name.

8        Q.    Did Mr. Alexander have any

9    approval function regarding the

10   transfer of funds initially to the

11   Legg Mason account?

12       A.    I don't believe

13   Mr. Alexander with the Legg Mason

14   funds was in a senior enough

15   position.  I believe it was

16   Mr. Watson and then his team

17   underneath him, which I want to say

18   was Gary Roche, R-O-C-H-E.

19       Q.    Do you remember

20   Mr. Friedberg wanting to be a

21   signatory on these accounts?  Do you

22   understand my question?

23       A.    No.

24       Q.    Let me ask it differently

James DeCrescenzo Reporting, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
               1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    then, because I'm not sure I do.

2    There were authorized signatures on

3    the accounts at the various

4    investment houses; correct?

5         A.    On the new account opening

6    statements?

7         Q.    Yes, sir.

8         A.    I remember that, yes.

9         Q.    You were not one of them;

10   correct?

11        A.    No.

12        Q.    Mr. Friedberg was not one

13   of them; correct?

14        A.    No.

15        Q.    No one affiliated with

16   Mr. Friedberg had signature authority

17   on those accounts; is that right?

18        A.    Correct.

19        Q.    Did Mr. Friedberg or anyone

20   on his behalf ever request that he

21   have signature authority on these

22   accounts?

23        A.    My recollection is that he

24   talked about it.  I'm not sure he

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Stanley.

2        Q.    It will be so much easier

3    if we had the affidavit.

4        A.    I appreciate that.

5        Q.    But I can't get it yet.

6    Does the affidavit indicate anywhere

7    how it might be used?  Do you say, I

8    submit this affidavit for a certain

9    purpose or for use in a certain way,

10    anything along those lines?

11        A.    Don't believe so.

12        Q.    Did anyone tell you why it

13    had to be notarized?

14        A.    I'm trying to remember.  I

15    don't believe so.  There was a notary

16    seal and I said this needs to be

17    notarized and yes, it needs to be

18    notarized.  So I'm not sure I

19    inquired or it was offered why it had

20    to be notarized.

21        Q.    Some affidavits say

22    something to the effect that the name

23    of the affiant, the name of the

24    person giving the affidavit states

**James DeCrescenzo Reporting**, LLC

215.564.3905            Innovating Litigation            FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    under oath as follows. Is there any

2    language such as that in this

3    affidavit?

4        A.    I can't remember.

5        Q.    Did you say anything in the

6    affidavit about the opening of any of

7    these accounts other than what you've

8    told us about already today?

9        A.    I believe I said -- I

10    discussed the accounts opening with

11    Mr. Friedberg and he instructed me to

12    go back to Mutual Indemnity as I was

13    his liaison or point person to open

14    them, to get them opened, to have

15    them.

16        Q.    Was there a reference in

17    the affidavit to tax considerations

18    or tax discussions?

19        A.    Yes. There we routinely

20    discussed -- "we" being employees of

21    Mutual Risk Management routinely

22    discussed tax. I believe I said but

23    we did not give tax advice.

24        Q.    Anything else about tax

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1           THE WITNESS:   No.

2   BY MR. CHRISTIAN:

3       Q.     Do you have an expectation

4   that you'll be paid or reimbursed?

5       A.     No.

6       Q.     Have you had any discussion

7   with Mr. Friedberg or any of his

8   lawyers with regard to whether you

9   would be paid or reimbursed?

10      A.     No.

11             Yes, actually.   There was

12  discussions and I said that I have

13  not been paid.   I do not intend to be

14  paid and I do this for all of my

15  existing customers, agents, brokers

16  as well as Legion and Mutual.

17      Q.     You're not assisting any of

18  the defendants in their defense of

19  this case, are you, sir?

20             MS. SMITH:   Objection as to

21  form.

22             THE WITNESS:   I made an

23  offer to them that I will help them

24  in any way, shape or form and they

James DeCrescenzo Reporting, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    have elected to not take me up on

2    that offer.

3    BY MR. CHRISTIAN:

4        Q.    Who did you make that offer

5    to?

6        A.    To Mr. Pickering,

7    Mr. Alexander, Mr. Reardon.

8        Q.    I'm going to show you

9    Exhibit 18, previously marked.  It's

10   a shareholders agreement, and I'm

11   going to refer you to Page 7.  You

12   can look at the agreement if you

13   want, but I'm just going to ask you

14   about that last page.

15       A.    Okay.

16       Q.    There are some signatures

17   on that page.

18       A.    Yes.

19       Q.    Do you see where it says it

20   was signed in Hamilton, Bermuda?

21       A.    Yes.

22       Q.    Is it your recollection

23   that those gentlemen were in Bermuda

24   when that agreement was signed?

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

EXHIBIT B

44 Church Street      tel 809.295.5688
P.O. Box HM 2064      : 909.292.1867
Hamilton HM HX
Bermuda



# MUTUAL INDEMNITY LTD.

### Receipt

I confirm that I have received the sum of $6,000 as a distribution from the Mutual Indemnity Ltd. Preferred Share Series "E14".  I understand that to the extent the distribution is not used as reimbursement for travelling expenses, it will be treated as a return of profits from the program.

Signed: _____         Date: _____11/16/95_____

Steve Friedberg

An **MRM** Company



EXHIBIT NO. 6
RL  7/19/05



# MUTUAL INDEMNITY LTD.

## RECEIPT

I confirm that I have received the sum of $ 10,000 as a distribution from the Mutual Indemnity Limited Preferred Share Series "E14". It is understood that to the extent that the distribution is not used as a reimbursement for traveling expenses, it will be treated as a return of income from the IPC Program.

Signed: _____

Steve Friedberg

Date: 11/13/97



EXHIBIT NO. 9
RC 7/19/05



...ual Indemnity Ltd.
44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Tel: 441.295.5688
Fax: 441.295.1527

# CONFIRMATION OF RECEIPT

I confirm that I have received the sum of US$20,000 as a distribution from the Mutual Indemnity Ltd.'s Preferred Share Series "E14". I understand that to the extent that the distribution is not used as a reimbursement for travelling expenses, it will be treated as a return of profits from the IPC Program.

Signed: _Stan Friedberg_         Date: _5/29/2000_
Stan Friedberg



EXHIBIT NO. D
RC 7/19/05

**IPC GROUP**
*an MRM Company*

Mutual Indemnity (Bermuda) Ltd.
44 Church Street
P.O. Box HM 2064
Hamilton HM HX, Bermuda

Tel: 441.295.5688
Fax: 441.295.1527

## CONFIRMATION OF RECEIPT

    I confirm that I have received the sum of US$10,000 as a distribution from the Mutual Indemnity (Bermuda) Ltd.'s Preferred Share Series "E11". I understand that to the extent that the distribution is not used as a reimbursement for travelling expenses, it will be treated as a return of profits from the IPC Program.

Signed: _____        Date: _11/16/00_____
    Steve Friedberg

EXHIBIT NO. 11
RC  7/19/05

EXHIBIT C

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

1    A.    Yes, I can.

2    Q.    I'll help you.

3    A.    I don't have --

4    Q.    No.  You have them.

5    A.    Up here (indicating).

6    Q.    No.  That's not it.

7    A.    Okay.  Here's 11.  Here's

8  10.  There's 9.  And there's 8.

9    Q.    All right.  Can you read

10  into the record what Exhibit 8 says

11  after the heading Receipt.

12    A.    I confirm that I've

13  received the sum of $6,000 as a

14  distribution from Mutual Indemnity,

15  Limited, Preferred Share Series

16  E-14.  I understand that to the

17  extent of the distribution is not

18  used as reimbursement for traveling

19  expenses, it will be treated as

20  returned profits from the program.

21    Q.    Sitting here today, do you

22  remember how much of that $6,000 was

23  devoted to reimbursement of traveling

24  expenses?

332

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

1          A.     I do not.

2          Q.     Sitting here today, do you

3    recall how much of that $6,000 was

4    for a return of profits from the

5    program?

6          A.     I do not.

7          Q.     Please turn to Exhibit 9.

8    Can you read into the record what it

9    says after the word "Receipt."

10         A.     I confirm that I have

11   received the sum of $10,000 as a

12   distribution from Mutual Indemnity

13   Limited, Preferred Share Series

14   E-14.  It is understood that to the

15   extent that the distribution is not

16   used as a reimbursement for traveling

17   expenses, it will be treated as a

18   return of income from the IPC

19   program.

20         Q.     Sitting here today, do you

21   recall how much of that $10,000 was

22   for a reimbursement of traveling

23   expenses?

24         A.     I do not.

333

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

1      Q.      Sitting here today, do you

2   recall how much of that $10,000 was

3   treated as a return of income?

4      A.      I do not.

5      Q.      Please turn to Exhibit 10.

6   Can you please read into the record

7   the statement underneath the heading,

8   Confirmation of Receipt.

9      A.      I confirm that I have

10   received the sum of $20,000 as a

11   distribution from Mutual Indemnity,

12   Limited's Preferred Share Series

13   E-14.  I understand that to the

14   extent the distribution is not used

15   as a reimbursement for traveling

16   expenses, it will be treated as a

17   return of profits from the IPC

18   program.

19      Q.      Recognizing that that is

20   signed by Stan Friedberg, do you

21   know, sitting here today, do you

22   recall, how much of that $20,000 was

23   devoted to a reimbursement of

24   traveling expenses?

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

334

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

1    A.    I do not.

2    Q.    Sitting here today,

3  recognizing that this document is

4  signed by Stan Friedberg, do you

5  recall how much of that $20,000 is

6  devoted to a return of profits from

7  the IPC program?

8    A.    I don't.

9    Q.    Please turn to Exhibit 11.

10  Can you please read into the record

11  the statement after the heading,

12  Confirmation of Receipt.

13    A.    I confirm that I have

14  received the sum of $10,000 as a

15  distribution from the Mutual

16  Indemnity, Limited's Preferred Share

17  Series E-11.  I understand that to

18  the extent that the distributions are

19  used as a reimbursement for traveling

20  expenses, it will be treated as a

21  return of profits from the IPC

22  program.

23    Q.    Sitting here today, do you

24  know or do you recall how much of

VIDEO DEPOSITION OF STEPHEN M. FRIEDBERG, 7/19/05

1    that $10,000 was treated as a

2    reimbursement of traveling expenses?

3        A.    I do not know.

4        Q.    Sitting here today, do you

5    know or do you recall how much of

6    that $10,000 was treated as a return

7    of profits from the IPC program?

8        A.    I do not know.

9        MR. NGUYEN:  I have no

10   further questions at this time.

11                    EXAMINATION

12   BY MR. CHRISTIAN:

13       Q.    Now, Mr. Friedberg, just in

14   follow up to some of the questions

15   your lawyer asked, and let's start

16   with these receipts you just

17   testified about, do you have any

18   documents that would help you explain

19   how much of that related to a travel

20   expense and how much was income?

21       A.    Not anymore.

22       Q.    Would you ever take some of

23   that money and -- and pay the -- for

24   the hotel expenses or other expenses

LEXSEE 1999 U.S. DIST. LEXIS 19105

**PEERLESS HEATER COMPANY and, PEERLESS INDUSTRIES, INC., Plaintiffs VS. MESTEK, INC., JOHN E. REED, and R. BRUCE DEWEY, Defendants**

CIVIL ACTION NO. 98–6532

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**1999 U.S. Dist. LEXIS 19105**

**December 3, 1999, Decided**
**December 6, 1999, Filed**

DISPOSITION: [*1] Motion to compel denied.

**LexisNexis(R) Headnotes**

COUNSEL: For PEERLESS HEATER COMPANY, PEERLESS INDUSTRIES, INC., PLAINTIFFS: CARL W. HITTINGER, NEIL C. SCHUR, STEVENS & LEE, P.C., PHILADELPHIA, PA USA.

For MESTEK, INC., JOHN E. REED, R. BRUCE DEWEY, DEFENDANTS: LARRY H. SPECTOR, MANN, UNGAR, SPECTOR, LABOVITZ, P.C., PHILA, PA USA.

JUDGES: CHARLES B. SMITH, UNITED STATES MAGISTRATE JUDGE.

OPINIONBY: CHARLES B. SMITH

OPINION:

### MEMORANDUM AND ORDER

The discovery dispute pending in the above–reference action surrounds the privileged nature of several affidavits drafted by attorneys for defendants, Mestek, Inc., John E. Reed and R. Bruce Dewey ("Mestek") under the work product doctrine. While Mestek argues that the sought–after information carries work product immunity, plaintiffs, Peerless Heater Company and Peerless Industries, Inc. ("Peerless"), contend both that the immunity has been waived and that Peerless has a substantial need for the information. For the reasons which follow, I will deny the motion to compel, but will mandate that Mestek prepare a privilege log for the withheld documents.

### I. FACTUAL HISTORY

In the process of preparing his client's case, counsel for Mestek conducted interviews [*2] with various third–parties, consisting of customers and potential customers of Peerless. Defense counsel then drafted third–party affidavits, based on the information received from the interviews, and sent them to the interviewees for signature. One of the third–parties to whom the affidavits were sent forwarded the draft to Peerless's counsel, thereby alerting plaintiff to defense counsel's interviews. Thereafter, one other third–party did likewise.

Peerless's counsel subsequently contacted Mestek's counsel to request copies of all draft affidavits sent to third–parties, as they were covered by one of Peerless's discovery requests. Despite repeated requests, counsel for Mestek refused to produce them, ultimately arguing that they were protected the attorney work product doctrine. Peerless then brought the dispute to this Court's attention claiming that (1) Mestek waived the protection of the doctrine by disclosing the documents to the third–party affiants and (2) Peerless has substantial need for these documents and cannot, without undue hardship, obtain their substantial equivalent by other means prior to the January 17, 2000 discovery deadline. I now address each of these arguments [*3] in turn.

### II. DISCUSSION

Federal Rule of Civil Procedure 26(b)(3) codifies the work product doctrine and states that "a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." This doctrine "promotes the adversary system directly

  

by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991). Relying on this privilege, attorneys are free to prepare their cases without fear that their own work product will used against their client. Id. Traditionally, witness statements have been accorded work product protection because they reflect the attorney's thoughts and impressions from witness interviews. [*4] Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947); 8 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIV. 2D, § 2028 (1994).

As noted above, the requested information consists of affidavits, drafted by Mestek's counsel following his telephone interviews of various customers and potential customers of plaintiffs, and then sent to these third-parties for signature. Without contesting the inherent work product nature of these documents, Peerless now seeks disclosure on the grounds of both waiver and substantial need/undue hardship.

### A. Waiver

Waiver can remove preexisting work product protection. 8 Wright & Miller, supra § 2024. Because, however, the doctrine targets the protection of an attorney's work product from the eyes of his/her adversary, the waiver principle in the work product context differs somewhat from waiver in an attorney-client privilege context. The purpose of the work product rule "is not to protect the evidence from disclosure to the outside world but rather to protect it only from the knowledge of opposing counsel and his client, thereby preventing its use against the lawyer gathering material." 8 Wright & Miller, [*5] supra § 2024. Thus, disclosure to a third-party or non-adversary does not necessarily waive the protection. Westinghouse, 951 F.2d at 1429. Instead, a waiver occurs only if "a voluntary disclosure enables an adversary to gain access to the information." Vanguard Savings & Loan Assoc. v. Banks, 1995 U.S. Dist. LEXIS 13712, No. Civ. A. 93-CV-4627, 1995 WL 555871, *4 (E.D. Pa. Sept. 18, 1995)(citing Westinghouse, 951 F.2d at 1428); see also Wright & Miller, supra § 2024 (documents otherwise protected by the work-product rule must be disclosed to others with an actual intention that an opposing party may see the documents). Moreover, disclosure of some of the documents does not destroy work-product protection for other documents of the same character. Id. "[A] party who discloses documents protected by the work-product doctrine may continue to assert the doctrine's protection only when the disclosure furthers the doctrine's underlying goal." Westinghouse, 951 F.2d at 1429.

The particular issue, in this case, queries whether witness statements prepared by an attorney in the course of litigation and sent to the witness for review [*6] and/or signature can still maintain work product protection. In Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947), the Supreme Court held that both witness statements that have not been adopted by the interviewed witness and those that have were not discoverable absent a showing of either necessity or undue prejudice. Id. at 509. That proclamation was subsequently adopted into Rule 26(b)(3), which notes that, while a non-party witness can obtain a copy of his/her statement concerning the action, a party to the litigation has no right to the document without the usual showing required for work product. 8 Wright and Miller, supra § 2028.

Although instructive, these doctrines do not provide a definitive answer on the particular waiver question at bar. While no case from this Court pinpoints the exact issue before us, we find guidance from courts outside this Circuit. The case of In re Convergent Technologies, 122 F.R.D. 555 (N.D. Cal. 1988), addressed a factual scenario analogous to the case at bar. In that matter, plaintiff's attorney interviewed two former employees of the defendant company, prepared statements [*7] and then gave those statements to the former employees so that they could correct any errors. Id. at 556. One of the employees signed his statement; the other was not asked to sign his. Id. Sometime after learning of these interviews, defense counsel attempted to obtain discovery of the written statements arguing that, by having the witnesses adopt their statements, plaintiffs' counsel took a step which substantially increased the likelihood that defense counsel would come into possession of them, either by subpoenaing them or by persuading the witnesses, with whom defendant may be on friendly terms, to voluntarily share the statements with defense counsel. Id. at 565. Defense counsel, therefore, claimed waiver of whatever work product protection otherwise attached to the statements. Id.

The court rejected this argument, noting first that plaintiff's attorney could not foresee the successful use of a subpoena to acquire a copy of the non-party's statement, as no court had authorized such a tactic in a published opinion. Id. Moreover, the court found that defendants "failed to prove that plaintiff's counsel should have foreseen a substantial [*8] risk . . . that [the witnesses] would demand their statements and then give copies to defendants." Id. Elaborating on this finding, the court further explained that "waiver requires a knowing and voluntary relinquishment of a right" and, as such, "a mere abstract possibility" that the witnesses might supply their statements to a defendant was insuf-

  

ficient. Id. Indeed, "to support a finding of waiver, defendants would have to adduce persuasive evidence that plaintiffs' counsel knew or should have known specific facts that substantially increased the likelihood that [either witness] would acquire his statement and then give a copy to defendants . . . defendants have failed to prove that plaintiffs' counsel took steps that they should have known would cost them their work product rights." Id.; see also High Tech Communications, Inc. v. Panasonic Co., 1995 U.S. Dist. LEXIS 2547, at *8, Civ. A. No. 94–1477, 1995 WL 83614, *5 (E.D. La. Feb. 24, 1995) (citing Convergent with approval); Butler Mfg. Co., Inc. v. Americold Corp., 148 F.R.D. 275, 277 (D. Kan. 1993) (sending witness's lawyer a copy of his statement under Rule 26(b)(3) does not waive work product immunity); 8 Wright [*9] & Miller, *supra* § 2028 (delivery of a nonparty witness statement to that witness does not waive work product privilege).

While not binding, I find the reasoning of these cases quite persuasive. In the matter at hand, Mestek's lawyer conducted telephone interviews of a significant number of witnesses, consisting of customers or potential customers of Peerless, and, based on those interviews, prepared statements or affidavits which were subsequently sent to the interviewed witnesses for signature, *i.e.* adoption. Two of those witnesses voluntarily produced copies to Peerless, who now contends that, having disclosed these statements to third-party affiants, Mestek's lawyer has waived all work product protection which originally adhered to the statements.

I disagree. Both parties concede — and the prevailing law clearly holds — that statements taken by attorneys from third-parties in anticipation of litigation maintain work product protection. Recognizing the purpose behind this privilege, the Supreme Court, the Federal Rules of Civil Procedure and several district courts have held that privilege intact even when those statements were "adopted" by the witness. In this case, [*10] Peerless bears the burden of proving that Mestek should have known of the specific facts that substantially increased the likelihood that Peerless would gain access to the statements. It has not done so. Some companies maintain particularly friendly relationships with their customers, while others keep arms-length, strictly business relationships. To support a finding of waiver, Peerless needs to show that Mestek's counsel knew or should of known of the specific facts creating a substantial risk that the interviewed customers would be on friendly terms with Peerless and turn over the statements. n1 No such proof has been adduced, and the mere fact that two of the customers did provide copies to plaintiffs cannot allow this Court to act in hindsight and find that Mestek's counsel, at the time of sending the papers, should have

known of the risk. Notably, it is telling that only two of the nonparties have given Peerless anything and Peerless does not even know the identity of the remaining affiants. In short, to hold that any disclosure of witness statements to the witnesses themselves constituted waiver of work product immunity would violate the purpose of the privilege and the [*11] spirit of Federal Rule 26(b)(3). n2

> n1 While defendants' counsel would have been wise to mark the statements confidential or tell the recipients not to disclose their contents to plaintiffs, his failure to do so is not inconsistent with his continued assertion of the privilege.

> n2 Plaintiffs claim that because defendants only addressed signed affidavits in its letter brief, they apparently conceded that they must produce the unsigned affidavits. This logic is fault, as the above analysis also applies to any unsigned affidavits sent to third-parties. Moreover, any unsigned affidavits that were not sent to third-parties certainly have not lost their work product protection.

The cases relied on by Peerless offer no reprieve from this conclusion, as they are clearly distinguishable. Peerless first incorrectly cites Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414 (3d Cir. 1991) and Cooper Hosp./University Med. Ctr. v. Sullivan, 183 F.R.D. 119 (D.N.J. 1998) [*12] for the principle that any disclosure to a third-party of work product documents that enables an adversary to obtain those documents constitutes a waiver. To the contrary, though, both cases recognize that mere disclosure to a third-party does not necessarily constitute waiver as to all adversaries. In Westinghouse, the party asserting privilege had disclosed the witness statements to the Securities and Exchange Commission and the Department of Justice, both of which were conducting investigations of that party regarding the same events which triggered the lawsuit. As such, the Third Circuit found that the two government agencies were adversaries of that party. Westinghouse, 951 F.2d at 1428. The court went on to hold that, because continued assertion of the privilege would not further the underlying goal of work product immunity, the disclosure to one adversary waived the work product doctrine as against all other adversaries. Id. at 1429.

Similarly, in Cooper, the United States District Court for the District of New Jersey reiterated the rule that "disclosures to non-adversaries do not waive the privilege, while a disclosure to only [*13] one adver-

 LexisNexis™      LexisNexis™      LexisNexis™

sary 'waive[s] the work–product doctrine as against all other adversaries.'" Cooper, 183 F.R.D. at 128 (citing Westinghouse, 951 F.2d at 1429). It found that, because the government agencies to which the documents were disclosed were adversaries of the parties asserting the privilege, work product protection was lost.

Peerless is hard–pressed to establish that the customers and potential customers interviewed by Mestek and to whom copies of the statements were sent are adversaries of Mestek. Indeed, its brief in support of their motion for leave to compel notes that many of the customers do business with both Peerless and Mestek. See Plaintiffs' Memorandum of Law in Support of Their Motion for Leave Expedited Discovery from Defendants and for Leave to Disclose Confidential Information and Documents to Select Officers of Plaintiffs at p. 24. As the various individuals and their representative companies interviewed by Mestek's counsel cannot be deemed "adversaries" of Mestek, both Westinghouse and Cooper are inapposite.

Nor does the decision in Behnia v. Shapiro, 176 F.R.D. 277 (N.D. Ill. 1997), instruct us in [*14] any meaningful fashion, due to the difference in the nature of the document sought to be protected. In that case, a three–page memorandum prepared by one party's attorney was sent to his clients and third–party fact witnesses for the explicit purpose of preparing them for their depositions. Id. at 278. Unlike a third–party receiving a copy of his/her own statement, however, the third–party witness in this case had no interest in — nor any entitlement to — the disclosed document. Indeed, disclosure in that matter was at odds with the purposes behind the work product rule, whereas disclosure in the case at bar was in full harmony with Fed. R. Civ. P. 26(b)(3). n3

> n3 Plaintiffs' letter brief argues that the witness affidavits here serve to prepare the witnesses for their depositions. That conclusion is belied by the facts as set forth by plaintiffs. The statements were sent to the customers and potential customers for their signatures. In fact, plaintiffs contend, in support of their second argument, that not all of these customers have been scheduled for depositions, nor will they be prior to the discovery cut-off.

[*15]

In sum, despite their forceful allegations, Peerless has failed to establish that Mestek's counsel was aware, or should have been aware, of some substantially increased risk that the third–parties would turn over the affidavits to Peerless. As to the two affidavits obtained by Peerless, the work product privilege is waived, since it would be frivolous for Mestek to continue asserting immunity. However, with respect to the remaining affidavits, both signed and unsigned, they remain protected by the work product doctrine and need not be produced absent some finding of substantial need or prejudice.

## B. Substantial Need

Peerless's second attempt to obtain discovery of these nonparty affidavits turns on the substantial need/undue hardship exception of Fed. R. Civ. P. 26(b)(3). As noted above, Federal Rule of Civil Procedure 26(b)(3) states that work product information is discoverable "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." When dissected, this rule enumerates three [*16] separate, required factors: "(1) the party must show 'substantial need,' seemingly something more than relevancy sufficient to satisfy Rule 26(b)(1), (2) the party would suffer 'undue' hardship, and not merely some expense or inconvenience, to obtain (3) the 'substantial equivalent.'" 8 Wright and Miller, FEDERAL PRACTICE AND PROCEDURE § 2025 (1994). The party seeking discovery has the burden of proving each of these factors. See Newark Ins. Co. v. ADT Security Systems, Inc., 1997 U.S. Dist. LEXIS 11336, Civ. A. No. 96–3469, 1997 WL 438458, *2 (E.D. Pa. July 29, 1997) (citing 6 Moore's FEDERAL PRACTICE § 26.70(5)(b) (3d ed. 1997).

Considering the first requirement, the party seeking the documents must demonstrate "substantial need for the materials in the preparation of the party's case." "Substantial need is clearly shown when the materials sought are essential to prove the discovering party's case, or where without the information a distinct advantage would accrue to the party having it." Georgine v. Amchem Products, Inc., 1994 U.S. Dist. LEXIS 12996, Civ. A. No. 930215, 1994 WL 502475, *2 (E.D. Pa. Sept. 2, 1994). However, mere need for information contained in work product does not establish substantial [*17] need for the work product itself. Delco Wire & Cable Co. v. Weinberger, 109 F.R.D. 680, 689–690 (E.D. Pa. 1986). Additionally, "the desire to impeach or corroborate a witness's testimony, by itself, [cannot] overcome the protection afforded the interview memoranda." In re Grand Jury Investigation, 599 F.2d 1224, 1232 (3d Cir. 1979).

The latter two criteria of Rule 26(b)(3) impose an equally strict burden of proof. In general, discovery of work product material will be denied if the party seeking discovery can obtain the desired information by taking

  

the deposition of witnesses. 8 Wright and Miller, *supra* § 2025; Eoppolo v. National R.R. Passenger Corp. 108 F.R.D. 292 (E.D. Pa. 1985). Courts have generally required a showing that the witness is no longer available, In re Grand Jury Investigation, 599 F.2d at 1231-1232, or that the witness can no longer remember the facts. Raso v. CMC Equipment Rental, Inc., 154 F.R.D. 126, 129 (E.D. Pa. 1994).

Peerless has failed to make the requisite showing sufficient to overcome the attorney work–product privilege. It contends that the affidavits are discoverable [*18] because they memorialize the witness' statements as to whether they received false or misleading information from Mestek — the heart of plaintiffs' case — and what the witnesses did as a result of that information. Moreover, it claims that it cannot contact and potentially depose the list of 77 possible affiants prior to the discovery deadline of January 17, 2000.

These allegations do not suffice to overcome the privileged nature of these documents. Mestek's counsel, having expended significant amounts of time in interviewing the third–parties and preparing statements reflecting his thoughts, should not have to now simply turn over his recollection of the interviews. That is not the function of discovery. Peerless may have a substantial need for the information, but it does not need the actual work product. It has already scheduled depositions of five of the third–party affiants and may, without undue hardship, schedule additional discovery. At these depositions, Peerless will have the opportunity to delve into any of the subject areas covered by the witness statements, thereby obtaining the needed information, without invading the thoughts and impressions of defendants' attorney. [*19] n4

> n4 Notably, if Mestek attempts to admit any of these affidavits at trial or in a submission to this Court, all work product immunity will be waived. See United States v. Nobles, 422 U.S. 225, 239 n. 14, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975) ("Where ... counsel attempts to make testimonial use of these materials the normal rules of evidence come into play with respect to cross–examination and production of documents.").

In light, however, of the impending discovery deadline and this Court's desire to avoid subjecting numerous third–parties, who have had no contact with Mestek, to unnecessary depositions, it would not be unreasonable for Mestek to provide a privilege log listing the names of all of the third–parties whom counsel interviewed, their affiliate companies and whether he sent them witness statements. Indeed Federal Rule of Civil Procedure 26(b)(5) specifically notes that "when a party withholds information otherwise discoverable under these rules by claiming that it is privileged [*20] or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." The names of the third–party witnesses cannot be deemed work product, especially in light of the fact that they came from Peerless's own discovery responses or self-executing disclosure statement. Consequently, while I will not require production of the affidavits themselves, I will order that Mestek produce a privilege log, as described above, to Peerless within ten days of this Order.

An appropriate order follows.

### ORDER

AND NOW, to wit, this 3RD day of December, 1999, upon consideration of the letter briefs of both parties concerning the privileged nature of several third–party witness affidavits, it is hereby ORDERED that plaintiffs' motion to compel production of these affidavits is hereby DENIED and that defendants are ordered to produce a privilege log listing the names of all third–parties interviewed by [*21] defendants' counsel, their affiliate companies and whether they received an affidavit.

It is so ORDERED.

BY THE COURT

CHARLES B. SMITH

UNITED STATES MAGISTRATE JUDGE

  

LEXSEE 2004 U.S. DIST. LEXIS 1983

EQUAL OPPORTUNITY EMPLOYMENT COMMISSION v. ROSE CASUAL DINING,
L.P., d/b/a APPLEBEE'S NEIGHBORHOOD GRILL & BAR DANIELLE RIELLI v.
ROSE CASUAL DINING, L.P., JAMIE RUCKLE, SUSAN PURCELL, STACEY
BARTHOLOMEW, DEXTER VOLPE, and BRIAN MARKS

CIVIL ACTION NO. 02-7485

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

2004 U.S. Dist. LEXIS 1983

January 23, 2004, Filed

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by EEOC v. Rose Casual Dining, L.P., 2004 U.S. Dist. LEXIS 4335 (E.D. Pa., Mar. 5, 2004)

**DISPOSITION:** Plaintiffs' motion to compel answers to interrogatories and document requests granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For STACEY BARTHOLOMEW, ThirdParty Defendant: THOMAS B. LEWIS, PRINCETON, NJ.

For EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff: DAWN M. EDGE, JACQUELINE H. MCNAIR, JUDITH A. O'BOYLE, OPPORTUNITY COMMISSION, PHILADELPHIA, PA.

For BRIAN MARKS, SUSAN PURCELL, ThirdParty Defendant: THOMAS B. LEWIS, PRINCETON, NJ.

For DANIELLE RIELLI, ThirdParty Plaintiff: CHARLES V. CURLEY, HALBERSTADT CURLEY, LLC, CONSHOHOCKEN, PA. SHANNON REILLY, POWELL TRACHTMAN, KING OF PRUSSIA, PA.

For DANIELLE RIELLI, Movant: CHARLES V. CURLEY, HALBERTSTADT CURLEY, LLC, CONSHOHOCKEN, PA.

For ROSE CASUAL DINING, INC., ThirdParty Defendant: THOMAS B. LEWIS, STARK & STARK P.C., PRINCETON, NJ.

For ROSE CASUAL DINING, INC., ROSE CASUAL DINING, L.P., Defendants: BRIAN A. CARLIS, THOMAS B. LEWIS, STARK & STARK P.C., PRINCETON, NJ.

For JANIE RUCKLE, DEXTER VOLPE, ThirdParty Defendant: THOMAS B. LEWIS, STARK & STARK P.C., PRINCETON, NJ.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINIONBY:** R. Barclay Surrick

**OPINION:** SURRICK, J.

**MEMORANDUM & ORDER**

Presently before the Court is the Equal Employment Opportunity Commission's (the "EEOC") and Danielle Rielli's Motion to Compel Answers to [*2] Interrogatories and Document Requests. For the following reasons Plaintiffs' Motion will be granted in part and denied in part.

**Background n1**

n1 We recite only those allegations in Rielli's Third Party Complaint that are necessary to decide this motion. The EEOC also filed a complaint making substantially the same allegations.

On or about October 25, 2001, Plaintiff Danielle Rielli was hired as a manager-trainee by Defendant Rose Casual Dining, L.P. ("Rose Causal"), at their Bloomsburg, Pennsylvania facility. ( Doc. No. 12 P 10.) Rielli alleges that almost immediately after she was hired, she was subjected to a sexually hostile work environment by the management and other employees

  

of Rose Casual. ( *Id.* P 11.) When Rielli complained to the assistant general manager, Susan Purcell, about the sexually hostile work environment at the Bloomsburg facility, she responded that Rielli would have to deal with it. ( *Id.* P 12.) When Rielli complained to the general manager, [*3] Stacey Bartholomew, she laughed and questioned Rielli's sexual orientation. ( *Id.* P 13.)

Determined to become a restaurant manager, Rielli continued to endure the sexual harassment until she finished the kitchen training and transferred to Rose Casual's Audubon facility to begin "front of the house" training. ( *Id.* P 15.) On or about November 23, 2001, at the Audubon orientation meeting, Rielli explained the difficulties she encountered at the Bloomsburg facility and that she did not feel fully prepared to be a restaurant manager. ( *Id.* P 16.) Rielli promised the general manager, Scott Larsen, that she would do anything to make up for the deficiencies in her training in Bloomsburg and was assured by Larsen that she would be successful. ( *Id.* P 17.) On November 27, 2001, Rielli met with the manager and training coordinator, Dexter Volpe, and informed him of the sexual harassment that she endured at the Bloomsburg facility. ( *Id.* P 18.) Volpe expressed concern and told Rielli that he was going to refer the matter to the human resources department and make them aware of her allegations. ( *Id.* P 19.) [*4] On November 29, 2001, Rielli met with two human resources employees, Paul Rockelmann and Paul Trzaska, to discuss the sexual harassment Rielli endured at the Bloomsburg facility. ( *Id.* P 20.) Trzaska told her that he was aware of complaints at the Bloomsburg facility and that she was not the first one to make such a complaint. (*Id.*)

On December 3, 2001, Rielli attended Rose Casual's holiday party. ( *Id.* P 23.) Upon entering the party, the Bloomsburg manager, Jamie Ruckle, immediately approached Rielli and grabbed her posterior while commenting on how good she looked. Ruckle then removed Rielli's name tag and dropped it down her cleavage. Ruckle continued to pursue Rielli throughout the night, grabbing her and making repeated sexual comments towards her. (*Id.*) On December 4, 2001, Rielli returned to work and again complained to Volpe about Ruckle's sexually harassing behavior. ( *Id.* P 25.) Volpe commented that Ruckle "was doing that to everyone," not just Rielli. ( *Id.* P 26.) Less than three hours later, Rielli was informed that she was being terminated because she did not fit in. ( *Id.* P 27–29.) [*5]

Rielli alleges that Defendants subjected her to a sexually hostile work environment and retaliated against her when she complained about the sexual harassment. She seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and

the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. § 951, et seq. ("PHRA"), and raises other state law claims.

## Plaintiffs' Motion to Compel

Plaintiffs move to compel the production of two groups of documents. First, Plaintiffs request certain witness statements that were written at the request of Defendants' counsel, but without assistance from or communication with counsel. The witness statements were allegedly produced in connection with Defendants' investigation of Rielli's claims of sexual harassment. Second, Plaintiffs seek the Manager in Training ("MIT") workbooks, and the General Manager Weekly Reports ("GM Reports") of manager-trainees who were similarly situated with Rielli. Defendants maintain that Rielli was terminated because she was behind in her MIT workbook. Plaintiffs wish to examine MIT workbooks from other similarly situated employees [*6] to show that Defendants' proffered reason for terminating Rielli was pretextual. Plaintiffs also wish to examine the GM Reports, which were weekly evaluations used in connection with the manager training program. Defendants have refused to produce these documents and/or denied that such documents exist. n2

> n2 Plaintiffs also moved to compel a third group of documents, namely, all e-mail correspondence between and among management employees involved in the decision to terminate Rielli and the post-termination investigation. The parties have since resolved their dispute with respect to the requested e-mails. Counsel for Defendants agreed to give Plaintiffs an affidavit stating that Defendants have searched for the requested e-mails and that no such e-mails exist.

## Witness Statements

Plaintiffs claim that Defendants conducted an investigation after Rielli complained about sexual harassment at the Bloomsburg facility in late November, 2001. Defendants admit that they investigated Rielli's claims prior [*7] to her termination, having affirmatively pled that they "properly investigated the allegations made by" Rielli, (Doc. No. 14, Tenth Affirmative Defense), "took immediate and effective remedial action upon notice of discriminatory conduct against" Rielli (*Id.* Fourteenth Affirmative Defense), and "exercised reasonable care to prevent and promptly correct any alleged harassing or discriminatory behavior" (*Id.* Sixteenth Affirmative

  

Defense). Accordingly, Plaintiffs seek any witness statements generated during this investigation. In response, Defendants claim that the witness statements Plaintiffs seek were not generated during the investigation prior to Rielli's termination, but rather during a second investigation commenced after Rielli was terminated. This second investigation, which was led by Rose Casual's outside counsel, began after Rose Casual received a letter from Rielli's attorney on December 10, 2001, threatening it with litigation. Defendants claim that any witness statements generated during this second investigation are protected from discovery by the attorney–client privilege and the work–product doctrine.

With respect to witness statements that were generated after [*8] Rielli was fired and at the direction of counsel in preparation for litigation, we agree that such statements are protected from discovery by the work–product doctrine. n3 *See* FED. R. CIV. P. 26(b)(3). The purpose of the work–product doctrine is to "promote[] the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation." *Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). "The work product doctrine found in Fed. R. Civ. P 26(b)(3) is somewhat broader than the attorney-client privilege and extends to documents prepared by either the client, his attorney or another representative." *Advanced Tech. Assocs. v. Herley Indus.*, 1996 U.S. Dist. LEXIS 17931, C.A. No. 96–0132, 1996 WL 711018, at *6 (E.D. Pa. Dec. 5, 1996). Witness statements prepared at the direction of counsel in anticipation of litigation, such as the documents Plaintiffs seek, are classic examples of attorney work–product, and are immune from discovery absent a showing of substantial need by the party seeking such [*9] documents.

> n3 Because we conclude that the witness statements are protected by the work–product doctrine, we need not discuss whether the statements are protected by the attorney–client privilege.

Plaintiffs do not dispute that the witness statements they seek are potentially attorney work–product. They argue, however, that Rose Casual waived the protection of the work–product doctrine by placing the reasonableness of its investigation at issue in this litigation. n4 Plaintiffs cite *Brownell v. Roadway Package Sys., Inc.*, 185 F.R.D. 19 (N.D.N.Y. 1999), wherein a Title VII plaintiff moved to compel witness statements generated during an investigation by the defendant employer of the plaintiff's claims of sexual harassment. In *Brownell*, the employer asserted the adequacy of its investigation as an affirmative defense to the plaintiff's claims. As in this case, the employer claimed that it had conducted two separate investigations and that witness statements generated during the investigation [*10] led by its outside counsel as opposed to its human resources department were protected by the work–product doctrine. The court disagreed, finding that the company had conducted only one investigation and had waived the protection of the work–product doctrine by placing the adequacy of that investigation "in issue." *Brownell*, 185 F.R.D. at 25–26.

> n4 In the context of a hostile work environment claim under Title VII, in certain circumstances employers may raise an affirmative defense to liability if they can show that they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Suders v. Easton*, 325 F.3d 432, 435 (3d Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)). Rose Casual does assert the reasonableness of its response to Rielli's complaints as an affirmative defense.

[*11]

While we agree with the result reached in *Brownell*, we think that case is distinguishable. In *Brownell*, the outside counsel for the company began investigating the plaintiff's allegations of sexual harassment before the plaintiff was terminated. Thus, the investigation conducted by the company's outside counsel overlapped the company's internal investigation. Furthermore, the court pointed to several statements by the outside counsel and company employees that indicated that the company was conducting a single investigation. By asserting the adequacy of that investigation as an affirmative defense, the company waived the protections of the work–product doctrine.

In this case we conclude that Rose Casual conducted two separate investigations, one that began prior to Rielli's termination, and a second that began when Rose Casual received a letter from Rielli's attorney threatening it with litigation. We reach this conclusion for several reasons. First, Rose Casual's outside counsel began investigating Rielli's allegations only after Rose Casual received the letter from Rielli's attorney and after Rielli had been terminated. When Rose Casual's human resource director Rockelmann [*12] was asked whether or not any witness statements were generated during the company's internal investigation, he responded that he

 LexisNexis™     LexisNexis™     LexisNexis™

did not believe witness statements were taken "until there was an investigation later on with the — while our attorneys were involved after we got the letter." (Rockelmann Dep. at 125.) On the other hand, the company's internal investigation began when Rockelmann met with Rielli on November 29, 2001, to discuss her allegations. ( *Id.* at 110.) After that meeting Rockelmann asked Sharon Baldwick to do an investigation. (*Id.* at 125.) When Baldwick finished her investigation, she reported back to Rockelmann. (*Id.* at 126.) Again, however, no witness statements were generated during Baldwick's investigation. Witness statements were generated only after Rose Casual's outside counsel became involved and after Rielli was terminated. (*Id.* at 125.)

It is apparent that Rose Casual has raised the reasonableness of its internal investigation as an affirmative defense to Plaintiff's allegations. Therefore, Plaintiff is entitled to any witness statements or other documents related to the internal investigation. As best we can determine from the record, this [*13] internal investigation ended when Baldwick reported back to Rockelemann and generated no witness statements. A second investigation began when Rielli's attorney sent a letter to Rose Casual threatening it with litigation. This second investigation was led by Rose Casual's outside counsel and generated witness statements prepared in anticipation of litigation. These statements are protected from discovery by the work–product doctrine. Accordingly, Plaintiffs' motion to compel the production of these witness statements must be denied.

**MIT Workbooks/GM Reports**

Plaintiffs want to examine the MIT workbooks and GM Reports to evaluate Rose Casual's claim that Rielli was terminated for reasons related to her job performance. The MIT workbooks and GM Reports may show how other similarly situated manager trainees were performing, and may ultimately demonstrate that Rose Casual's proffered reason for terminating Rielli was pre-

textual. If Rielli can show that the reasons Rose Casual proffered for terminating her were pretextual, then the jury may infer that Rose Casual intentionally discriminated against her. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir. 1996). [*14] Such evidence is clearly relevant and therefore discoverable. *See Miles v. The Boeing Co.*, 154 F.R.D. 117, 120 (E.D. Pa. 1994). Accordingly, Defendants must produce the requested MIT workbooks and GM Reports in their possession, custody, or control.

An appropriate order follows.

**ORDER**

AND NOW, this    day of January, 2004, upon consideration of the Equal Employment Opportunity Commission's and Danielle Rielli's Motion to Compel Answers to Interrogatories and Document Requests, and all papers filed in support thereof and opposition thereto, it is ORDERED that:

> 1. Defendants are ORDERED to produce any documents, including witness statements, relating to the investigation into Rielli's complaints conducted before Rielli was terminated;

> 2. Defendants are ORDERED to produce the requested MIT workbooks and GM Reports in their possession, custody, or control;

> 3. In all other respects, Plaintiffs' Motion to Compel is DENIED.

IT IS SO ORDERED.

BY THE COURT:

R. Barclay Surrick, Judge

  

LEXSEE 1992 U.S. DIST. LEXIS 4213

JOHN B. TERLESCKI v. E.I. DUPONT DE NEMOURS & CO.

Civ. No. 90–6854

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1992 U.S. Dist. LEXIS 4213

April 2, 1992, Decided
April 7, 1992, Filed

LexisNexis(R) Headnotes

COUNSEL: [*1]   FOR JOHN B. TERLESCKI, PLAINTIFF AND COUNTER–DEFENDANT, ALAN A. TURNER, INDEPENDENCE SQUARE WEST, STE. 750, THE CURTIS CENTER, PHILA, PA 19106, USA.

FOR E.I. DUPONT DE NEMOURS & COMPANY, INC., trading as DuPont Information Engineering Associates, DEFENDANT AND COUNTER–CLAIMANT, MICHAEL CLARKE, LEGAL DEPARTMENT, 1007 MARKET STREET, ROOM D–7070, WILMINGTON, DE 19898, USA.

JUDGES: POLLAK

OPINIONBY: LOUIS H. POLLAK

OPINION:

MEMORANDUM

In this diversity action, plaintiff John B. Terlescki alleges that he was wrongfully discharged by his employer, defendant E.I. DuPont de Nemours & Co., and that defendant breached its contract with him by failing to pay him approximately $75,000 in commissions, bonuses, and fringe benefits to which plaintiff claims he was entitled. Presently before the court is defendant's motion to compel plaintiff to produce documents.

The documents defendant seeks are plaintiff's income tax returns for 1988, 1989, and 1990, the years during which defendant employed plaintiff, as well as any returns or other documents that show plaintiff's earnings since his employment with defendant was terminated on February 8, 1990. n1 As a general matter, tax returns are confidential communications between [*2] the taxpayer and the government, and both public pol-icy and concern for the taxpayer's privacy interests counsel against their general discoverability. See DeMasi v. Weiss, 669 F.2d 114, 119–20 (3d Cir. 1982). It is widely recognized, however, that in appropriate circumstances tax returns are the proper subject of a discovery inquiry. In determining whether a tax return is properly discoverable in a given case, courts have applied a two–part test: the court must determine first, whether the returns are relevant to the subject matter of the litigation, and second, whether there is a compelling need for the returns because the information contained in the returns is not otherwise readily obtainable. See, e.g., American Health Systems v. Liberty Health System, Civ. No. 90–3112, 1991 U.S. Dist. LEXIS 14400 at *12 (E.D. Pa. July 22, 1991); First Fidelity Bank v. Nissenbaum, Civ. No. 89–2248, 1991 U.S. Dist. LEXIS 4064 at *5 (E.D. Pa. Mar. 28, 1991); Kravitz v. Jewelry Basics, Inc., Civ. No. 89–2657, 1991 U.S. Dist. LEXIS at *6 (E.D. Pa. April 12, 1990); United States v. Bonanno Organized Crime Family, 119 F.R.D. 625, 627 (E.D.N.Y. 1988). [*3]   The party seeking to obtain the returns bears the burden of demonstrating their relevance; once relevance has been established, the party resisting discovery bears the burden of proving that alternative sources would provide the required information. See Kravitz, 1991 U.S. Dist. LEXIS at *6; Bonanno, 119 F.R.D. at 127.

> n1 Defendant's interrogatories numbers 28 and 29 request "the Federal and State Income Tax Returns, W–2 Forms, and all other documents which evidence, relate, or refer to the amount and source of income earned or received by Plaintiff" for the period at issue in this litigation.

Defendant argues that the tax returns are relevant to the issue of plaintiff's lost earnings. Plaintiff does not dispute the relevance of his earnings; it thus appears that defendant has carried its burden of establishing relevance with respect to plaintiff's earnings.

  

Defendant also urges that the tax returns are relevant to plaintiff's claims for reimbursement for expenses incurred in travel between plaintiff's [*4] home in Phoenixville, Pennsylvania, and his office in Wilmington, Delaware. On this latter issue, defendant argues that plaintiff has placed his tax returns in issue by stating in his deposition that he treated his home as an office for tax purposes. It is not apparent from the face of the complaint, however, that plaintiff in fact seeks to be reimbursed for travel expenses between his home and Wilmington. The complaint seeks to recover "lost salary, commissions, bonuses and fringe benefits." First Amended Complaint para. 35 at 7. Claims for travel expenses do not appear to fit into any of these categories. If it becomes evident that plaintiff is in fact seeking reimbursement for such expenses, and that no alternative sources of information would establish plaintiff's claimed use of his home as an office, then defendant may be entitled to redacted portions of plaintiff's tax returns. On the record before the court on the present motion, however, defendant has failed to carry the burden of showing that the tax returns are relevant for the purposes of this litigation for any purpose other than establishing plaintiff's earnings.

Plaintiff argues that although the tax returns are relevant [*5] to his earnings, and therefore relevant to the issue of damages, there is no substantial need for

production of the returns, because plaintiff has already produced his W–2 forms and pay stubs for the relevant periods. These would appear to suffice to show plaintiff's earned income. To the extent that the tax returns reflect unearned income during these periods, from interest, dividends, or other sources, that income is not relevant to plaintiff's claim and therefore does not form a basis for the production of the tax returns. Plaintiff having carried his burden of showing that alternative sources of information are available and indeed have been provided to defendant, it does not appear, on the present record, that there is a substantial need for the production of the tax returns.

Accordingly, defendant's motion will be denied. An appropriate order follows.

ORDER

Upon consideration of defendant's motion to compel plaintiff to produce documents, and plaintiff's response thereto, for the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that defendant's motion is DENIED.

APRIL 2, 1992

LOUIS H. POLLAK, J.

  

LEXSEE 1996 U.S. DIST. LEXIS 9781

United States of America v. David Ehrlich

CIVIL ACTION NO. 95-661

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1996 U.S. Dist. LEXIS 9781

July 10, 1996, Decided
July 11, 1996, FILED

**COUNSEL:** [*1] For UNITED STATES OF AMERICA, PLAINTIFF: BRIAN CARROLL, U.S. ATTORNEY'S OFFICE, PHILA, PA USA. DAVID L. DAIN, U.S. DEPT. OF JUSTICE, ENVIRONMENTAL ENFORCEMENT SECTION, WASHINGTON, DC USA. JAMES D'ALESSANDRO, U.S. ENVIRONMENTAL PROTECTION AGENCY, PHILA, PA USA.

For DAVID EHRLICH, DEFENDANT: ROBERT KRAMER, ROBERT M. KRAMER & ASSOCIATES, KING OF PRUSSIA, PA USA. RICHARD L. SCHEFF, ARLINE L. BAYO-SANTIAGO, TIMOTHY J. BERGERE, MONTGOMERY, MC CRACKEN, WALKER & RHOADS, PHILADELPHIA, PA USA.

**JUDGES:** Norma L. Shapiro, J.

**OPINIONBY:** Norma L. Shapiro

**OPINION:**

### MEMORANDUM AND ORDER

Norma L. Shapiro, J.

July 10, 1996

The United States of America ("the Government") filed this compliance action against defendant David Ehrlich ("Ehrlich") under Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e), based on his failure to provide information requested by the Environmental Protection Agency ("EPA") in its investigations into environmental contamination at the Strasburg Landfill Site. The court has permitted limited discovery in phases, and the parties dispute whether Ehrlich's tax returns must be produced to the Government. [*2] The court will order Ehrlich to submit the tax returns for in camera inspection.

### Factual and Procedural History

Prior to the initiation of the Government's action against him, Ehrlich, alleging that the EPA's requests for information violated the Due Process Clause of the Fifth Amendment of the United States Constitution and CERCLA, had filed suit against Janet Reno, Attorney General, et al., in this court. See David Ehrlich v. Janet Reno, Attorney General, et al., No. 93-5829 (E.D. Pa). The court dismissed Ehrlich's complaint for failure to state a claim on which relief could be based; on appeal, the Third Circuit Court of Appeals vacated the judgment and remanded the case, with instructions to consider Ehrlich's claim as an as-applied challenge to CERCLA, rather than a facial challenge to the statute. This court then consolidated Ehrlich's action with the action the Government filed against him.

Discovery disputes arose when Ehrlich claimed the Government was trying to use discovery to force disclosure of the very information his action was filed to protect. To minimize the disclosure of information claimed to be protected, the court bifurcated this action. [*3] In Phase I, after limited discovery, the court will hold a mini-trial in which the Government must establish a prima facie entitlement to the information it seeks from Ehrlich, because of his alleged relationship to the Strasburg Landfill Site, and his liability as a Potentially Responsible Party. If the Government succeeds in Phase I, Ehrlich must then establish why CERCLA is unconstitutional as applied to him to prevail.

Having established a framework for the litigation, the court ruled on many of the parties' discovery disputes. However, the court permitted the parties to brief whether Ehrlich's income tax returns should be protected from disclosure.

### Discussion

  

1996 U.S. Dist. LEXIS 9781, *3

Public policy favors maintaining confidentiality of tax returns, but returns are discoverable if they are an essential source of relevant information. See, e.g., Fort Washington Resources, Inc. v. Tannen, 153 F.R.D. 78, 80 (E.D. Pa. 1994); Terlescki v. E.I. Dupont Nemours & Co., 1992 U.S. Dist. LEXIS 4213, 1992 WL 75015, at *1 (E.D. Pa. 1992); In re Sunrise Securities Litigation, 130 F.R.D. 560, 578 (E.D. Pa. 1989), clarified on denial of motion for reconsideration, 109 Bankr. 658 (E.D. Pa. 1990). The court must [*4] apply a two-part test to determine whether Ehrlich's tax returns are discoverable.

> First, the party seeking discovery bears the burden of demonstrating relevance. If relevant, the tax returns will be discoverable unless the party resisting discovery meets its burden of proving there is no compelling need for the tax returns because the information available in the tax returns can be obtained from other sources.

Fort Washington Resources, 153 F.R.D. at 80 (citation omitted).

Title 26 U.S.C. section 6103 prohibits officers and employees of the United States from disclosing income tax return information obtained in connection with their employment. 26 U.S.C. § 6103 (West Supp. 1996). This statutory prohibition reflects the importance of maintaining confidentiality of tax return information, but it does not govern this dispute. § 6103 applies to disclosure by Internal Revenue Service employees (and other persons who have received return information under specially authorized conditions) to other government agencies and third parties; it does not prohibit the disclosure to the Government of tax returns by individual tax payers or third parties.

This discovery dispute [*5] focuses on the Government's Interrogatory No. 11 and the accompanying document requests. The Interrogatory reads:

> State whether you have provided any financial information, including but not limited to tax returns, financial statements or loan applications, to any governmental agency, financial or business institution or person other than your attorneys. If so, identify the information provided, to whom it was provided, when it was provided, and for what purpose it was provided.

In its brief, the Government concedes that if Ehrlich did not produce his income tax returns to any third party, the issue of production of the returns is moot. (Brief of United States Regarding Production of Income Tax Records, at 1 n.1)

The Government defends this interrogatory on the grounds that whether Ehrlich maintained confidentiality of such financial information is material to his constitutional challenge to the Government's investigation. The tax returns are among several sources of financial information requested by the Government, in Interrogatories 12–16 and accompanying document production requests, to determine Ehrlich's relationship to the Strasburg site and other landfilling [*6] operations and Ehrlich's ability to pay fines or fees levied on him. Ehrlich need not produce those requested documents until after the Phase I trial.

Ehrlich's tax returns appear to be relevant to the litigation, and he has not established that the information contained in those returns can be obtained from other sources. Because this action is proceeding in phases, disclosure of the tax returns to the Government would be premature. Ehrlich will be compelled now to answer Interrogatory 11 and to provide the information requested regarding any disclosures of his tax returns to third parties.

Following the Phase I trial, the court will determine whether the tax returns should be disclosed to the Government and in what form. Because it is likely that only certain portions of the tax returns are relevant and that full disclosure of the tax returns might unduly intrude on Ehrlich's privacy, if required to submit copies of the tax returns to the government, he may do so in redacted form. However, he must submit unredacted copies to the court for in camera inspection together with the proposed redacted copies.

An appropriate Order follows.

ORDER

AND NOW, this 10th [*7] day of July, 1996, it is ORDERED that:

1. David Ehrlich is compelled to answer Interrogatory 11 and provide information regarding disclosure of his tax returns to third parties on or before July 24, 1996.

2. Ehrlich shall submit proposed redacted copies and unredacted copies of his income tax returns for the years 1988 through the present to the court in camera on or before July 24, 1996.

Norma L. Shapiro, J.

  

LEXSEE 1997 U.S. DIST. LEXIS 6035

## RICHARD MORALES, Plaintiff, -v-THE UNITED STATES OF AMERICA, et al., Defendants. DANIEL ADAMI, Plaintiff, -v-THE UNITED STATES OF AMERICA, et al., Defendants.

### 94 Civ. 4865 (JSR), 94 Civ. 8773 (JSR)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### 1997 U.S. Dist. LEXIS 6035

### May 5, 1997, Decided
### May 5, 1997, FILED

**SUBSEQUENT HISTORY:** [*1]

Reconsideration Denied July 8, 1997, Reported at: 1997 U.S. Dist. LEXIS 10132.

**DISPOSITION:** Plaintiff Morales' motion to compel non-party witnesses Hall and Risorto to answer certain depositions questions denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For RICHARD MORALES, plaintiff (94-CV-4865): James I. Meyerson, New York, NY. For DANIEL ADAMI, plaintiff (94-CV-8773): Jonathan C. Moore. Craig Kaplan, Levinson & Kaplan, NY, NY.

For THE UNITED STATES OF AMERICA, ROBERT SMITH, individually, ROBERT STIA, individually, PAUL ORDUNA, defendants (94-CV-4865): Serene Keiko Nakano, Mary Jo White, U.S. Attorney-SDNY, New York, NY.

**JUDGES:** JED S. RAKOFF, U.S.D.J.

**OPINIONBY:** JED S. RAKOFF

**OPINION:**

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

By letter dated April 5, 1997, plaintiff Morales has resubmitted his motion to compel two non-party witnesses, Sergeant John Hall and Officer Keith Risorto, to answer questions about the substance of certain conversations they had with defendants' counsel, Assistant U.S. Attorney Serene K. Nakano, preparatory to the taking of their depositions. n1 See Hall Dep. at 35; Risorto Dep. at 38-39, 44. When these questions were first posed during Hall's and Risorto's depositions (on October 22, 1996 and November 18, 1996 respectively), counsel for defendants objected on the ground that such [*2] inquiries violated the attorney-work product doctrine, and the deponents thereupon declined to answer such questions. See Hall Dep. at 36; Risorto Dep. at 38, 45.

> n1 Plaintiff's motion was originally presented by letter dated October 31, 1996 to the Honorable Judge Barbara S. Jones, U.S.D.J., to whom this case was previously assigned. Defendants submitted a letter in opposition to the motion on November 4, 1996, to which plaintiff submitted that same day a further letter in response. See 4/5/97 Meyerson Letter Exhs. In response to plaintiff's newly resubmitted motion, defendants submitted a letter in opposition dated April 8, 1997, to which plaintiff responded by a further letter dated April 9, 1997.

Upon review of the parties' papers and the relevant deposition testimony, the Court hereby denies plaintiff's motion to compel, finding that there is a material possibility that "responses to [plaintiff's] deposition questions will reveal government counsel's legal strategy and thought processes" in contravention [*3] of the attorney work product doctrine. United States v. District Council of New York City, 1992 U.S. Dist. LEXIS 12307, No. 90 Civ. 5722, 1992 WL 208284, at *12 (Aug. 18, 1992 S.D.N.Y.); see also, e.g., Bercow v. Kidder Peabody & Co., 39 F.R.D. 357, 358 (S.D.N.Y. 1965) (deponent not required to answer questions on his preparation for deposition when it "represent[s] an indirect attempt to ascertain the manner in which an adversary is preparing for trial").





1997 U.S. Dist. LEXIS 6035, *3

Counsel for Morales has effectively conceded that one of the objectives of his putting the questions here at issue was to ascertain the Government's legal theories. See 4/9/97 Meyerson Letter. He does not attempt to show that some other goal overrides the work–product protection but rather argues that defendants have waived this protection to the extent that, by her conversations, Ms. Nakano revealed her legal theories and strategies to these non–party witnesses with whom she had no privity. But since the purpose of the work–product doctrine "is not to protect [such information] from disclosure to the outside world but rather to protect it only from knowledge of opposing counsel and his client," it follows that mere "disclosure of [such information] [*4] to third persons does not waive the work–product immunity" as to opposing counsel and parties. Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2024, at 367–69 (2d ed. 1994) (and cases cited therein).

Accordingly, plaintiff Morales' motion to compel non–party witnesses Hall and Risorto to answer certain depositions questions is hereby denied.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York

May 5, 1997

  

LEXSEE 1989 U.S. DIST. LEXIS 13906

**FOLGER ADAM CO., Plaintiff, v. PMI INDUSTRIES, et al., Defendants**

No. 87 Civ. 9272 (WK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1989 U.S. Dist. LEXIS 13906

November 21, 1989, Decided; November 22, 1989, Filed

LexisNexis(R) Headnotes

COUNSEL: [*1]

ROBERT A. COHEN, ESQ., New York, New York.

MARY ELIZABETH McGARRY, ESQ., Simpson Thacher & Bartlett, New York, New York.

ROBERT B. MAZUR, ESQ., Wachtell, Lipton, Rosen & Katz, New York, New York.

OPINIONBY:

KNAPP

OPINION:

MEMORANDUM & ORDER

*WHITMAN KNAPP*, UNITED STATES DISTRICT COURT JUDGE

Plaintiff The Folger Adam Company seeks reconsideration of two tentative rulings made at a discovery conference held on October 30, 1989. At that conference, we directed plaintiff to produce any drafts of the affidavit of Louis Maggs and to produce the affidavit of John Hartig. We conclude that drafts of the Maggs affidavit need not be produced at this time. We so rule without prejudice to an application from defendants at the close of the direct examination of Maggs or hartig for production of the drafts and therefore direct that, prior to trial, plaintiff undertake a thorough search for all such drafts. We adhere to our ruling requiring the production of the Hartig affidavit.

BACKGROUND

Plaintiff alleges that it bought two companies, Stewart–Decatur Security Systems, Inc. and The William Bayley Company ("the companies"), from defendants PMI Industries, Inc., Control Systems Corp.

and Wedge Group Inc. in reliance [*2] on fraudulently inflated statements regarding the companies' financial prospects. Among the material annexed to the complaint in support of this allegation is the affidavit of Louis Maggs, who at the time of the sale was the head of The William Bayley Company.

At deposition, Folger Adam's president, Eldon Nuss, testified that, sometime in 1988, Maggs telephoned him and told him of the circumstances surrounding the preparation of his affidavit. According to Nuss, Maggs said that he had been called to a meeting with John Hartig, Stewart–Decatur's Vice–President of Operations, and lawyers for plaintiff and asked to swear to a document that, among other things, accused Nuss of bribery in connection with the preparation of the companies' budgets. After Maggs refused, the lawyers instructed him to cross out whatever parts of the document to which he could not swear. Maggs complied, striking most of the document, and later executed an affidavit that did not include the material he had struck (Nuss dep. tr. at 732–733). Shortly after Maggs executed the revised affidavit, plaintiff fired him.

In response to questions defense counsel posed at deposition, Hartig, who is still employed by plaintiff, [*3] testified that he had read a draft of the Maggs affidavit and that, so far as he remembered, it did not differ in any way from the affidavit that Maggs ultimately executed (Hartig dep. tr. at 572–73). Hartig further testified that he had executed an affidavit of his own fixing his recollection of the events concerning the sale of the companies.

Plaintiff objects, based on the work–product privilege, to our rulings directing the production of any drafts of the Maggs affidavit and to the production of the Hartig affidavit.

DISCUSSION

 LexisNexis™
 LexisNexis™
 LexisNexis™

Embodied in the rules governing the application of the work–product privilege is a tension between two principles: (1) Under the adversary system, "[p]roper preparation of a client's case demands that [counsel] assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." Hickman v. Taylor (1947) 329 U.S. 495, 511; and (2) Our liberal system of pre-trial discovery places great value on full disclosure of the facts. Thus, Fed. R. Civ. P. 26(b)(3) provides, in pertinent part:

[A] party may obtain discovery of documents and tangible things [*4] . . . prepared in anticipation of litigation or for trial by or for another party or by that other party's representative (including the other party's attorney . . .) only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case and that the party is unable without substantial hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of any attorney or other representative of a party concerning the litigation.

Hickman v. Taylor, supra, and the quoted rule, which, as it had been amended in 1970, codified the holding of Hickman, create "qualified or conditional privilege— one that would ordinarily bar discovery but which would yield if the need for discovery were shown to be great enough." James & Hazard, Civil Procedure, 252 et seq. (1985). See also Diversified Industries, Inc. v. Meredith (8th Cir. 1977) 572 F.2d 569, 603.

First, we consider the draft of the Maggs affidavit. [*5] n1 Nuss' testimony indicates that the Maggs affidavit, as is quite usually the case, was originally drafted by counsel and then submitted to the witness for signature. After reviewing the draft, the witness revised it to bring it into accordance with a version of events he was willing to adopt. Thus, any language the witness deleted necessarily reflected counsel's views and is protected by the work–product privilige.

n1 Plaintiff has submitted the only draft it has been able to locate to chambers for in camera inspection.

Hartig's testimony at deposition did not waive that privilege. His responses to questions posed by defense counsel did not, contrary to defendants' assertion, "dis-

close information pertaining to the contents" of any draft, but rather merely indicated that his recollection that the particular draft he had read did not differ from the affidavit ultimately executed. Cf. Malco Manufacturing Co. v. Eleco. Corp. (E.D. Penn. 1969) 307 F. Supp. 1177, 1178.

Defendants suggest the privilege can be overcome because drafts may somehow reveal Maggs' "recollection of the true facts [sic]." In view of the fact that defendants have access to the transcripts of eight [*6] days of Maggs' deposition testimony they utterly fail to make the requisite showing of "substantial need" and inability "without substantial hardship to obtain the substantial equivalent of the materials by other means." We therefore conclude that such drafts need not be produced at this time. We so rule without prejudice to an application from defendants at the close of the direct examination of Maggs or Hartig for production of any drafts, if defendants believe that either such direct examination has provided a basis for overriding the privilege. We therefore direct that, prior to trial, plaintiff undertake a thorough search for all such drafts. We indicate, however, no view as to what our ruling would be should such application be made.

We now turn to the Hartig affidavit. An affidavit is a witness' sworn recollection and does not, by definition, include an attorney's "mental impressions, conclusions, opinions, or legal theories." Unlike, for example, the above discussed draft of an affidavit prepared by an attorney or an attorney's notes of an interview with a potential witness, materials which might reflect the attorney's view of the case, an affidavit is designed to fix and record [*7] under oath a witness' independent recollection of events. Obtaining affidavits from witnesses is not a usual part of the fact–gathering and strategy-development processes that Hickman sought to protect from an adversary's prying eyes. Nor has there been any suggestion that defendants seek the affidavit as a substitute for their own efforts to gather, through other means of discovery, information necessary to prepare for trial. We therefore adhere to our decision directing plaintiff to produce the Hartig affidavit.

CONCLUSION

Plaintiff need not produce drafts of the Maggs affidavit, but must produce the Hartig affidavit.

SO ORDERED.

New York, New York
November 21, 1989

