EXHIBIT A

ProTEXT Transcript Condensing for Windows

SHEET 3   PAGE 9
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
9

1  salesman for Research Underwriters; is that correct?
2      A.  Yes.
3      Q.  Was that Mr. Steve Friedberg or his father or
4  both; do you know?
5      A.  I can't say which one specifically.
6      Q.  Did you have any position with Research
7  Underwriters other than as an insurance salesman?
8      A.  No.
9      Q.  As I think you know by now, we are here
10  because of a lawsuit Mr. Friedberg filed in Philadelphia
11  against various Mutual companies relating to some
12  accounts that are currently at Morgan Stanley in
13  Philadelphia.  Do you know anything about that lawsuit?
14      A.  No.
15      Q.  Have you discussed the lawsuit since 2002 with
16  Mr. Friedberg?
17      A.  No.
18      Q.  When was the last time you had any discussion
19  with Mr. Friedberg?
20      A.  It was prior to 2002.
21      Q.  Have you discussed the lawsuit with
22  Mr. Friedberg's lawyers?
23      A.  No.
24      Q.  Did you do anything at all to prepare for the
25  deposition?

PAGE 10
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
10

1      A.  Nothing.
2      Q.  Do you know Andy Lewis?
3      A.  I do.
4      Q.  When was the last time you had a discussion
5  with Andy Lewis?
6      A.  Five years ago.  Maybe more.
7      Q.  There are three accounts at issue in this
8  lawsuit.  One of them relates to U21, one of them
9  related to E11, and one of them relates to E14.  Do
10  those account names ring a bell or numbers ring a bell
11  to you?
12      A.  They ring a bell.  I don't know anything about
13  them currently, but I am familiar with the numbers.
14      Q.  Well, that's what we are here to try to
15  understand what you know and, of course, if you don't
16  know, if you don't remember, if that's the honest answer
17  to any of my questions, please feel free to say that.
18      A.  Sure.
19      Q.  Did you have -- strike that.
20          Do you still have the shareholder's agreements
21  you signed relating to U21, E14, and E11?
22      A.  I do not.
23      Q.  Did you leave those behind when you left
24  Research Underwriters?
25      A.  Not exactly left them, but they -- I was not

PAGE 11
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
11

1  released in a traditional fashion, so I was not able to
2  gather up any of my belongings.
3      Q.  So let me ask it this way:  Did you take any
4  copies of the shareholder's agreements --
5      A.  No.
6      Q.  -- or any documents relating to those
7  agreements?
8      A.  None.
9      Q.  Mr. Ouimette, let me ask you to refer to the
10  documents in front of you, Exhibits to Deposition of
11  Stephen Friedberg.  I would like to ask you about the
12  shareholder's agreements, and the first one I want to
13  ask you about is at Exhibit 16.
14      MR. REGA:  Doug, may I interrupt you to ask if
15  you have another copy of that set?
16      MR. CHRISTIAN:  I wish I did to help you out,
17  but I do not.
18      MS. SMITH:  Then we should probably take a
19  break so they can be duplicated.
20      MR. CHRISTIAN:  Let's go off the video record.
21      THE VIDEOGRAPHER:  Off the record at 10:09.
22      (Discussion off the record.)
23      MR. CHRISTIAN:  Back on the stenographic
24  record.
25          Counsel for Mr. Friedberg have indicated they

PAGE 12
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
12

1  did not bring previously marked exhibits with them.
2      MS. SMITH:  That's what I just said.
3      MR. CHRISTIAN:  But you didn't say it on the
4  record, which is why I am.
5      MS. SMITH:  I'm sorry.  I thought the
6  stenographic record was ongoing.  It was not?  Then the
7  record should be clear.  We did ask to take a break so
8  that documents that have been handed to the witness as
9  exhibits could be copied for our benefit.  Mr. Christian
10  has indicated he thinks that's unnecessary, given the
11  fact that all the documents were previously marked as
12  exhibits to Mr. Friedberg's deposition, and he has
13  refused to take a break in the deposition for the
14  purpose of providing copies of those to counsel for
15  Mr. Friedberg during the deposition.
16          We then asked if we could at least examine the
17  documents that have been handed to the witness before he
18  is questioned on them, and then Mr. Christian indicated
19  he would like to go back on the record.  I did indicate
20  in response to a question from Mr. Christian that we had
21  not brought with us documents that have been previously
22  marked to any of the other depositions in this matter,
23  so I should note that we were not advised as to which
24  exhibits, if any, were going to be made use of in this
25  deposition.  We would have had an opportunity then to

ProTEXT Transcript Condensing for Windows

SHEET 6  PAGE 21

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

21

1    A.   Yes.
2    Q.   And another one is E11?
3    A.   Yes.
4    Q.   Do you know what prompted this document that
5    established a 50 percent interest in each of those
6    accounts?
7    A.   No.  No, I don't.
8    Q.   Do you see after No. 4 it says, "We agree that
9    my share of the principal and interest in these accounts
10   is owed evenly between us"?  Do you see that?
11   A.   Yes.
12   Q.   So that was a side agreement between you and
13   Mr. Friedberg --
14        MR. REGA:  Objection.
15   Q.   (BY MR. CHRISTIAN)  -- with regard to who
16   owned your principal in interest -- your share of the
17   principal in interest in these accounts; is that
18   correct?
19        MR. REGA:  Objection.
20   Q.   (BY MR. CHRISTIAN)  You can answer it.
21   A.   You know, the letter -- I mean, I don't
22   recall.  The letter, I haven't seen this, but -- so I
23   can't say.
24   Q.   If you don't recall, that's fine.
25   A.   I can't say.

PAGE 23

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

23

1    joint request of you and Mr. Friedberg.  Is that a
2    concept you recall?
3    A.   Yes.
4    Q.   Sir, prior to this January 3, 1996 letter that
5    we marked as Exhibit 46, was there any paperwork that
6    indicated or established that Mr. Friedberg had any
7    interest in U21 or E11?
8    A.   I don't know.
9    Q.   Prior to this January 3, 1996 letter, did you
10   believe Mr. Friedberg had an interest in U21 and E11?
11   A.   I did.
12   Q.   Tell me about that, please.
13   A.   We both were responsible for producing the
14   business that generated the underwriting profits and we
15   both worked equally on the construction of the programs
16   and the work effort that went into it.
17   Q.   So is it your testimony that from the very
18   beginning you intended to give Mr. Friedberg some
19   interest in these accounts?
20   A.   Yes.
21   Q.   Was there any document setting forth the
22   transfer of any interest prior to January 3, 1996?
23   A.   I don't know.
24   Q.   And you have no recollection of what prompted
25   the January 3, 1996 letter?

PAGE 22

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

22

1    Q.   Mr. Ouimette, Exhibit 47 is a July 1, 1999
2    letter to Mr. Friedberg bearing Friedberg000080 Bates
3    number.
4        (Deposition Exhibit 47 was marked.)
5    Q.   Will you take a look at that please, sir.
6    Have you had a chance to look at that, sir?
7    A.   I have.
8    Q.   Do you know whether you have seen that before?
9    A.   No.
10   Q.   The last paragraph of the letter states,
11   quote, As a party to the Shareholder Agreements for the
12   above-referenced programs, Mutual Indemnity will
13   therefore only remit future profits at the joint written
14   request of both yourself" -- i.e. Mr. Friedberg -- "and
15   Mr. Mark Ouimette."  Do you see that?
16   A.   Yes.
17   Q.   Was it your understanding that as of this time
18   any distribution or emission of future profits would be
19   at the joint written request of you and Mr. Friedberg?
20   A.   I don't recall seeing -- I mean, this letter
21   is -- it's been quite some time, so I --
22   Q.   Whether you saw the letter or not, sir, I'm
23   asking that concept --
24   A.   Yes.
25   Q.   -- of moneys not being paid except at the

PAGE 24

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

24

1    A.   I don't.
2    Q.   Was it your contemplation that from the very
3    beginning of U21 whatever funds would be paid to you
4    would be split evenly with Mr. Friedberg?
5    A.   Yes.
6    Q.   To your knowledge, was that his understanding
7    as well?
8    A.   I can't speak for him, but I think so.
9    Q.   Well, let me ask it this way, Mr. Ouimette:
10   Did he ever lead you to believe that he was entitled to
11   more than 50 percent of the funds in U21?
12        MR. REGA:  Objection.
13   A.   No.
14   Q.   (BY MR. CHRISTIAN)  Did he ever say that he
15   was entitled to more than 50 percent of the funds in
16   U21?
17        MR. REGA:  Objection.
18   A.   No.
19   Q.   (BY MR. CHRISTIAN)  Pardon me?
20   A.   No, not that I'm aware of.
21   Q.   Did Mr. Friedberg ever lead you to believe in
22   any way that he thought he was entitled to all of the
23   funds relating to U21?
24        MR. REGA:  Objection.
25   A.   No.  At that time?

ProTEXT Transcript Condensing for Windows

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

25

1    Q.   (BY MR. CHRISTIAN)  Yes, sir.
2    A.   No.
3    Q.   What's the distinction you are drawing when
4  you say "at that time"?
5    A.   Well, he is entitled to all of them now.
6    Q.   As a result of your buyout?
7    A.   Correct.
8    Q.   But prior to your buyout, did he ever lead you
9  to believe that he was entitled to all of those funds?
10       MR. REGA:  Objection.
11   A.   No.
12   Q.   (BY MR. CHRISTIAN)  Answer again, please.
13   A.   I said no.
14   Q.   Thank you.  You were a shareholder at one time
15 of one or more of the Mutual companies; is that correct?
16   A.   Yes.
17   Q.   Do you recall signing any agreement with the
18 Mutual companies, other than the shareholder's agreement
19 or any amendment to the shareholder's agreement?
20   A.   I may have, but I don't recall.
21   Q.   Is it your understanding that the
22 shareholder's agreement governed the relationship
23 between you and the Mutual companies?
24   A.   Yes.
25   Q.   Is it your understanding that the moneys that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

26

1  would be paid to you by Mutual would be paid to you
2  pursuant to the terms of the shareholder's agreement?
3        MR. REGA:  Objection.
4    A.   Probably pursuant to the agreement, but also
5  based on the underwriting performance of the business
6  that was specific to that account.  So to the extent
7  that it would have performed in some way better than
8  what the agreement would have stated, it was probably my
9  assumption that it was a negotiable item.
10   Q.   (BY MR. CHRISTIAN)  But the shareholder's
11 agreement did speak to the money coming from Mutual and
12 going to you; is that correct?
13       MR. REGA:  Objection.
14   A.   Yes.
15   Q.   (BY MR. CHRISTIAN)  Are you aware of any oral
16 agreement between Mutual and you?
17   A.   No.
18   Q.   Are you aware of any oral agreement between
19 Mutual and Mr. Friedberg?
20   A.   No.
21   Q.   Did Mr. Friedberg ever tell you there was an
22 oral agreement between Mutual and Mr. Friedberg?
23   A.   No.
24   Q.   Did Mr. Friedberg ever tell you there was an
25 oral agreement of any nature relating to this situation?

UNCERTIFIED ROUGH DRAFT TRANSCRI PT

27

1    A.   No.
2    Q.   Mr. Ouimette, I'm going to show you
3  Exhibit 48, which is a Partial Redemption and Release
4  Agreement relating to U21.
5        (Deposition Exhibit 48 was marked.)
6    Q.   I will ask you to take a look at that, please.
7  Sir, that's a document that you signed; is that right?
8    A.   Yes.
9    Q.   And you signed it on or about March 5, 2002?
10   A.   Yes.
11   Q.   It was also signed by Mutual Holdings and by
12 Mr. Friedberg; is that your understanding?
13   A.   Yes.
14   Q.   Sir, can you tell me what your recollection
15 is, even if generally, about the purpose of this
16 agreement?
17   A.   The purpose of the agreement was to allow my
18 ex-wife and I to complete our property settlement in our
19 divorce proceedings, which were long and difficult.  It
20 was a means to -- for us to divide up assets and move on
21 with our lives.
22   Q.   You received $500,000 pursuant to this
23 agreement; is that correct?
24   A.   I believe so.  That's what the document says.
25   Q.   That was in return for the redemption of your

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

28

1  share in U21; is that correct?
2    A.   Yes.
3    Q.   Mr. Friedberg then became the sole shareholder
4  of U21; is that correct?
5    A.   Yes.
6    Q.   And that was effective January 30, 2002; is
7  that correct?
8    A.   Yes.
9    Q.   And as of that time he had sole interest in
10 U21, correct?
11   A.   Correct.
12   Q.   Before that time he did not have sole interest
13 in U21, correct?
14   A.   I had minimal -- I had no interaction really
15 with any of this business on or about from 1999.
16   Q.   When I say "interest," I mean ownership.
17   A.   Yes.
18   Q.   So prior to January 30, 2002, he was not the
19 sole owner of U21, correct?
20   A.   Correct.
21       MR. CHRISTIAN:  Let's take a short break.
22       THE VIDEOGRAPHER:  Off the record at 10:43.
23       (Recess taken.)
24       THE VIDEOGRAPHER:  On the record at 10:51.
25   Q.   (BY MR. CHRISTIAN)  Mr. Ouimette, we were

ProTEXT Transcript Condensing for Windows

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

29

```
 1   talking about Exhibit 48 that was effective January 30,
 2   2002. That's the Partial Redemption and Release
 3   Agreement. Was your buyout that you talked about
 4   earlier by Mr. Friedberg something different than this?
 5       A.   No, not that I'm aware of.
 6       Q.   Did Mr. Friedberg pay you any money to buy out
 7   any of your interest?
 8       A.   No. I mean, other than what would be of
 9   record.
10       Q.   Meaning what?
11       A.   All the documents relating to money that I
12   received to buy out any and all interest I had in any
13   shares is of public record. It exists out there. The
14   documents exist.
15       Q.   Let me ask you this: Do you recall the
16   approximate amount you received from Mutual relating to
17   this buyout?
18       A.   Well, I don't think I received anything
19   directly from Mutual. I think I --
20       Q.   Who did you receive it from?
21       A.   I think I received it from Mr. Friedberg.
22       Q.   And what amount, approximately?
23       A.   For all shares, interest in all shares?
24       Q.   Yes, sir.
25       A.   $1.8 million.
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

30

```
 1       Q.   That was a negotiated amount; is that correct?
 2       A.   That is correct.
 3       Q.   Did Mr. Gary Gentile represent you in that
 4   negotiation?
 5       A.   He did.
 6       Q.   And did Mr. Pat Rega represent anyone in that
 7   negotiation?
 8       A.   My ex-wife.
 9       Q.   Did you understand at the time that he was
10   also counsel to Steve Friedberg?
11           MR. REGA: Objection; leading. Just so the
12   record is clear, I --
13           MR. CHRISTIAN: I will withdraw the question.
14       Q.   (BY MR. CHRISTIAN) Have you at any time known
15   whether Mr. Rega represented Mr. Friedberg?
16       A.   No.
17       Q.   Did you ever meet Mr. Rega prior to today?
18       A.   Yes.
19       Q.   When was that?
20       A.   I have known Pat as a friend and as a skiing
21   buddy for over ten years.
22       Q.   Have you ever had any business dealings with
23   Mr. Rega?
24       A.   No.
25       Q.   Have you ever met with him relating to any of
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

31

```
 1   the issues involved in this lawsuit?
 2       A.   No.
 3       Q.   When was the last time you had a conversation
 4   with Mr. Rega prior to the deposition beginning?
 5       A.   It would have to be back to 2002 sometime.
 6       Q.   Did that relate to any aspect of this case or
 7   any of these issues involved in the case?
 8       A.   No.
 9       Q.   Do you know whether any of the moneys in the
10   Legg Mason or Prudential -- strike that.
11           Do you know whether any of the moneys in the
12   Legg Mason or Prudential or other brokerage house
13   accounts that relate to U21 had been dividended by
14   Mutual?
15           MR. REGA: Objection; leading.
16       A.   I don't have any knowledge.
17       Q.   (BY MR. CHRISTIAN) Look at Exhibit 12 if you
18   will, please, sir. Is that a document you signed?
19       A.   Yes.
20       Q.   Is that a written request for dividends
21   relating to E14?
22       A.   It is.
23       Q.   Do you recall any written requests for
24   dividends relating to U21?
25       A.   No.
```

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

32

```
 1       Q.   Will you look, please, sir, at Exhibit 3.
 2   That's a May 12, 2000 letter to one of the Mutual
 3   companies from Mr. Rega. Do you see where it says
 4   "Attorney for Steven M. Friedberg and Robing F.
 5   Ouimette"?
 6       A.   Uh-huh.
 7       Q.   Is that a yes?
 8       A.   Yes.
 9       Q.   Then do you see Mr. Gary Gentile's name as
10   your attorney? Do you see that?
11       A.   Yes.
12       Q.   Is this a document that anyone forwarded to
13   you?
14       A.   No.
15       Q.   Was it standard practice for Mr. Gentile in
16   representing you to send copies of correspondence he
17   sent relating to the divorce proceedings?
18       A.   Yes.
19       Q.   Do you know for a fact that he did not send
20   this to you?
21       A.   No.
22       Q.   You just don't recall?
23       A.   Correct. It was a long, difficult divorce and
24   there is a lot of paperwork, so I, you know --
25       Q.   Sir, will you look, please, at Exhibit 6.
```

ProTEXT Transcript Condensing for Windows

SHEET 10   PAGE 37
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
37

```
1      A.   No.
2      Q.   Do you know what these notes refer to?
3      A.   I have no idea.
4      Q.   Let's go to the first page of Exhibit 40.
5  Before we do that, sir, let's go to 36.  Tell me when
6  you are ready to be questioned about 36, please.  Is
7  that a document you've seen before today?
8      A.   I have seen it.  I saw it about a week ago
9  when I was first made aware of this proceeding.
10     Q.   There is a reference in the second sentence
11 to, quote, Mr. Lewis's alleged $1,000,000 plus interest
12 (See U21), closed quote.  Do you see that?
13     A.   I do.
14     Q.   The author, Mr. Gentile, then says, quote, If
15 he intends to hold back his full amount, contrary to
16 what we discussed on the phone, then we may have a
17 problem.  As you will recall, it was our intention to
18 make him participate proportionally in the $1.8 million
19 claim of Mutual's.  I believe his number would be
20 something like 20 percent even without whatever
21 adjustment Mark and Steve deemed appropriate, closed
22 quote, and, of course, the letter continues.  Do you
23 recall any discussions regarding any interest or alleged
24 interest Mr. Lewis had or may have or wished to have in
25 U21?
```

PAGE 38
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
38

```
1           MR. REGA:  Objection.
2      A.   I don't.
3      Q.   (BY MR. CHRISTIAN)  Did you ever offer to give
4  Andy Lewis an interest in U21?
5           MR. REGA:  Objection.
6      A.   No.
7      Q.   (BY MR. CHRISTIAN)  Did you ever offer to give
8  Andy Lewis a $1 million plus interest in U21?
9           MR. REGA:  Objection.
10     A.   No.
11     Q.   (BY MR. CHRISTIAN)  Did you ever believe Andy
12 Lewis was in any way entitled to a one-third interest in
13 U21?
14          MR. REGA:  Objection.
15     A.   No.
16     Q.   (BY MR. CHRISTIAN)  Did you ever offer
17 Mr. Andy Lewis any interest in any of the accounts?
18          MR. REGA:  Objection.  This entire line of
19 questioning is leading.
20          MR. CHRISTIAN:  May I hear the question read
21 back, please.
22          (The last question was read back as follows:
23 "Did you ever offer Mr. Andy Lewis any interest in any
24 of the accounts?")
25     Q.   (BY MR. CHRISTIAN)  Mr. Ouimette, did you ever
```

PAGE 39
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
39

```
1  say anything to Mr. Lewis about any interest in U21, E11
2  or E14?
3           MR. REGA:  Objection.
4      A.   No.
5      Q.   (BY MR. CHRISTIAN)  What, if anything, did you
6  say to Mr. Lewis about any interest he might have or
7  claim to have or did have in U21, E11 or E14?
8      A.   Never had a conversation like that with
9  Mr. Lewis.
10     Q.   Did you ever have a conversation with
11 Mr. Friedberg in which the concept of giving Andy Lewis
12 an interest in any of these accounts was raised?
13          MR. REGA:  Objection; leading.
14     A.   No.
15          MR. CHRISTIAN:  May I hear the question again,
16 please.
17          (The last question was read back as follows:
18 "Did you ever have a conversation with Mr. Friedberg in
19 which the concept of giving Andy Lewis an interest in
20 any of these accounts was raised?")
21     Q.   (BY MR. CHRISTIAN)  Have you ever discussed
22 with Mr. Friedberg the concept of Mr. Lewis having an
23 interest in any of these accounts?
24          MR. REGA:  Objection.
25     A.   No.
```

PAGE 40
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
40

```
1           MR. CHRISTIAN:  Nature of the objection?
2           MR. REGA:  Leading.  Every one of these
3  questions are leading, Doug.
4           MR. CHRISTIAN:  Not a single one is leading,
5  Pat.
6           MR. REGA:  They are all leading.
7           MR. CHRISTIAN:  Let's move on.
8           MR. REGA:  And the form of the questions are
9  improper and you know they are.
10          MR. CHRISTIAN:  They are absolutely not.
11 Can't be any more neutral in the asking of that question
12 than I was.
13          MR. REGA:  You can ask the witness what he
14 recalls about either documents that you provided to him
15 or a particular subject matter.
16          MR. CHRISTIAN:  Mr. Rega, I really do not want
17 a lecture from you on the record or off the record about
18 how to take a deposition.  May I move on?
19          MR. REGA:  My intention was not to give you a
20 lecture, and if it appeared that way, I apologize.  My
21 intention was to respond to your question as to why I'm
22 raising objections to the line of leading questions you
23 are asking.  You may continue.
24          MR. CHRISTIAN:  Thank you, sir.
25     Q.   (BY MR. CHRISTIAN)  Did Mr. Friedberg at any
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 11   PAGE 41
UNCERTIFIED ROUGH DRAFT TRANSCRIPT

41

1   time tell you that he offered an interest in any of
2   these accounts to Mr. Lewis?
3           MR. REGA: Objection.
4       A.   No.
5       Q.   (BY MR. CHRISTIAN) Have you seen any document
6   that leads you to believe that Mr. Lewis was ever
7   offered any interest -- strike that.
8           To your knowledge, did Mr. Lewis ever turn
9   down any offer of an interest in any of these accounts?
10          MR. REGA: Objection.
11      A.   I don't know.
12      Q.   (BY MR. CHRISTIAN) Mr. Gentile in Exhibit 36
13  references the concept of staying under the radar. Do
14  you see that?
15      A.   I do.
16      Q.   Do you have any idea what he was referring to
17  there?
18      A.   I don't.
19      Q.   Did you ever have occasion to consider whether
20  Mr. Lewis was adequately compensated?
21      A.   I'm sorry. Say that again.
22      Q.   Did you ever have occasion to consider whether
23  Mr. Lewis was adequately compensated?
24      A.   No.
25      Q.   That thought never occurred to you?

PAGE 42
UNCERTIFIED ROUGH DRAFT TRANSCRIPT

42

1       A.   No.
2       Q.   Did you ever have a discussion with
3   Mr. Friedberg about the tax treatment of any of the
4   funds relating to these accounts?
5       A.   I don't recall.
6       Q.   Exhibit 49 is a March 4, 1999 letter from
7   Cathryn Towlson at Mutual to you -- I'm sorry -- to
8   Mr. Gitter copied to you. Would you look at that,
9   please.
10          (Deposition Exhibit 49 was marked.)
11      Q.   Mr. Ouimette, is this a letter that was copied
12  to you at Research Underwriters?
13      A.   It would appear so, yes.
14      Q.   Do you see that it's a letter that confirms
15  guidelines for E11 and E14?
16      A.   Yes.
17      Q.   Did you ever have any conversations with
18  Mr. Gitter about any of these accounts?
19      A.   No.
20      Q.   Do you know whether either you or
21  Mr. Friedberg issued written guidelines -- well, strike
22  that.
23          Did you ever issue written guidelines with
24  regard to any of these accounts?
25      A.   No.

PAGE 43
UNCERTIFIED ROUGH DRAFT TRANSCRIPT

43

1       Q.   Do you know whether Mr. Friedberg did?
2       A.   I don't.
3       Q.   Exhibit 50 is a letter and some documents
4   relating to the opening of an account at Legg Mason Wood
5   Walker bearing Bates numbers Mutual 3136 to 3140.
6           (Deposition Exhibit 50 was marked.)
7       Q.   Mr. Ouimette, Exhibit 50, as I indicated, is a
8   January 16, 1995 letter from David Alexander, one of the
9   Mutual companies, to a person at the Legg Mason with
10  some additional documents included in the exhibit; is
11  that fair?
12      A.   Yes.
13      Q.   You were copied on that?
14      A.   Yes.
15      Q.   At least the letter?
16      A.   Yes.
17      Q.   If you see -- if you look on the second page
18  of the exhibit, Certificate of Foreign Status, under
19  "Name of owner Mutual Indemnity Limited," do you see
20  that?
21      A.   Yes.
22      Q.   Was Mutual Indemnity Limited the owner of that
23  account?
24          MR. REGA: Objection as to form and leading.
25      A.   It says Mutual Indemnity Series E11.

PAGE 44
UNCERTIFIED ROUGH DRAFT TRANSCRIPT

44

1       Q.   (BY MR. CHRISTIAN) Was it your understanding
2   that Mutual Indemnity, one of the Mutual companies, was
3   the owner of this account that was being opened?
4           MR. REGA: Objection; leading and as to form.
5           MR. CHRISTIAN: Okay. I will withdraw it.
6       Q.   (BY MR. CHRISTIAN) Look at 3139, Mutual 3139
7   in that exhibit. The Bates number I'm talking about.
8   The little number at the bottom.
9       A.   Okay.
10      Q.   Is this a document you have ever seen before?
11      A.   I don't know. I don't recall.
12      Q.   Would you agree with me, sir, that 3139 that
13  you are looking at is referenced in a letter that was
14  copied to you, i.e., the first page of this exhibit?
15          MR. REGA: Objection.
16      Q.   (BY MR. CHRISTIAN) Do you see the letter, it
17  refers to a Corporate Account Agreement (Cash)? Do you
18  see that. Item No. 3 in the letter.
19      A.   Yes.
20      Q.   Then Mutual 003139 is a Corporate Account
21  Agreement (Cash). Is that what it appears to be?
22      A.   Yes, that's what it appears to be.
23      Q.   Now, the authorized signatures or signatories
24  on this account were Mr. Watson, Mr. Alexander,
25  Mr. Kelly, and Mr. Mulderig; is that correct?

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 13  PAGE 49

UNCERTIFIED ROUGH DRAFT TRANSCRIPT
49

1  more of these -- strike that.
2           Were dividends ever declared relating to one
3  or more of these accounts?
4       MR. REGA:  Objection.
5       A.  Per this document, yes.
6       Q.  (BY MR. CHRISTIAN)  Is this document an
7  example of a dividend that was declared?
8       MR. REGA:  Objection; leading and as to form.
9       A.  I don't know what you mean by "example."
10      Q.  (BY MR. CHRISTIAN)  Does this document
11  indicate to you that a dividend was declared?
12      A.  Well, it indicates that --
13      MR. REGA:  Objection.
14      A.  It indicates that I received a dividend.
15      MR. REGA:  Objection; leading as to form.
16      Q.  (BY MR. CHRISTIAN)  You received other
17  dividends -- strike that.
18          Did you receive other dividends relating to
19  any of the three accounts at issue over the years?
20      A.  No.
21      Q.  Do you know whether dividends were declared in
22  your favor relating to any of these accounts over the
23  years other than with regard to the document we just
24  looked at?
25      MR. REGA:  Objection as to form.

PAGE 50

UNCERTIFIED ROUGH DRAFT TRANSCRIPT
50

1       A.  Not to my recollection.
2       Q.  (BY MR. CHRISTIAN)  Now, let's go back to
3  Exhibit 40, which is in the Andy Lewis set of exhibits.
4  Now, you may recall an earlier spreadsheet that
5  indicated a 50 percent split for U21.  Do you recall
6  looking at that a few minutes ago?
7       A.  Yes.
8       Q.  On this spreadsheet there is a 33 percent
9  split for U21.  Do you see that?
10      MR. REGA:  Objection as to form and leading.
11      Q.  (BY MR. CHRISTIAN)  Mr. Ouimette, do you see
12  the reference to U21?  Do you see the U21 column?
13      A.  Yes.
14      Q.  Do you see the "Split" line?
15      A.  I do.
16      Q.  What is the percentage set forth on the
17  "Split" line under the U21 column?
18      A.  It says 33 percent.
19      Q.  Was there ever -- strike that.
20          Did you ever discuss with Mr. Friedberg --
21  well, strike that as well.
22          Did anyone other than you and Mr. Friedberg
23  have an interest in U21?
24      A.  No.
25      Q.  Do you know, sir, why 33 percent is on the

PAGE 51

UNCERTIFIED ROUGH DRAFT TRANSCRIPT
51

1  "Split" line in the U21 column?
2       A.  I don't.
3       Q.  Do you know whether Mr. Rega ever indicated to
4  anyone that Mr. Lewis had an interest or an alleged
5  interest in U21?
6       MR. REGA:  Objection.
7       A.  I don't.
8       Q.  (BY MR. CHRISTIAN)  Did you have any
9  involvement in any of the lawsuits brought by
10  Mr. Friedberg in Bermuda relating to any of these
11  accounts?
12      A.  No.
13      Q.  Do you bear any ill will toward Mr. Friedberg?
14      A.  No.
15      Q.  Do you have any bias against Mr. Friedberg in
16  terms of your coming in and giving deposition testimony?
17      MR. REGA:  Objection.
18      A.  No.
19      MR. CHRISTIAN:  Mr. Ouimette, I thank you for
20  coming in and answering my questions.  I think Mr. Rega
21  has some questions for you.  I may have some follow-up
22  questions, but for now I'll pass the witness to
23  Mr. Rega.
24      MR. REGA:  If it's acceptable to you and
25  Mr. Christian, I would like to take a short break.  Not

PAGE 52

UNCERTIFIED ROUGH DRAFT TRANSCRIPT
52

1  to delay this, but maybe five or ten minutes.
2       MR. CHRISTIAN:  Sure.
3       THE VIDEOGRAPHER:  Off the record.  End of
4  tape 1 at 11:36.
5       (Recess taken.)
6       THE VIDEOGRAPHER:  On the record.  Start tape
7  2, September 8, 2005, Mark Ouimette at 11:41.
8       MR. REGA:  I have no questions for
9  Mr. Ouimette and would also like to thank him for taking
10  time out of his day to come and appear here this
11  morning.
12      MR. CHRISTIAN:  Let's go off the video record
13  then.
14      THE VIDEOGRAPHER:  Off the record at 11:42.
15      (Pause in proceedings.)
16      THE VIDEOGRAPHER:  On the record at 11:44.
17      Q.  (BY MR. CHRISTIAN)  Mr. Ouimette, did
18  Mr. Friedberg ever tell you that it was his belief that
19  he could have all of the funds in U21, E14 or E11 by
20  simply asking for the money from Mutual?
21      MR. REGA:  Objection as to form and leading.
22      A.  I'm not sure what you are --
23      Q.  (BY MR. CHRISTIAN)  Did Mr. Friedberg ever say
24  to you that it was his belief that he could have all of
25  the money in the accounts relating to U21, E14, and E11

EXHIBIT B

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN M. FRIEDBERG,
            Plaintiff

        V                           NO. 02-CV-3193

MUTUAL HOLDINGS, LTD., et al.,
            Defendants


            Oral deposition of ANDREW
A. LEWIS, taken at the law offices of
BALLARD SPAHR ANDREWS & INGERSOLL,
L.L.P., 1735 Market Street, 51st
Floor, Philadelphia, Pennsylvania, on
Wednesday, August 24, 2005,
commencing at approximately
9:34 a.m., before Barbara McKeon
Quinn, a Registered Merit Reporter,
pursuant to notice.

## James DeCrescenzo Reporting, LLC

INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

130

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1     Mr. Ouimette's share of the

2     allocation.

3          Q.    Used by whom?

4          A.    I don't think he said by

5     whom.

6          Q.    Did you have an

7     understanding of who used it?

8          A.    I had assumed it was

9     Mr. Friedberg.

10         Q.    What other conversation did

11    you have with Mr. Rega last night

12    about Mr. Gentile or the letter or

13    U-21 or our inquiry?

14         A.    He asked was this a

15    surprise and a common kind of

16    occurrence, and I said no, it was not

17    a surprise and no, it's not a common

18    occurrence.  Mark and Steve had,

19    within the U-21 structure, offered me

20    ownership in that, they had offered

21    me ownership in other things, and a

22    number of other clients had offered

23    me ownership as well.

24              My comment to Mr. Rega was



James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    that that was something that I had

2    routinely said no, thank you, but it

3    was also evidence of the job that I

4    did as a salesman for -- on their

5    programs and for MRM.

6         Q.    What else was discussed

7    last night with Mr. Rega or anyone

8    else involving Mr. Gentile or the

9    letter or U-21 or our inquiries

10   regarding the letter?

11             MS. SMITH:    Objection as to

12   form.

13             THE WITNESS:    What was that

14   last part of that question?

15   BY MR. CHRISTIAN:

16        Q.    Our inquiry regarding the

17   letter.

18        A.    There was nothing mentioned

19   on the inquiry.  I'm not sure I

20   understand that aspect of it.

21             With the U-21 program, and

22   the offer of the ownership, it was

23   believed by Mr. Friedberg and

24   Mr. Ouimette that during the course

James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905     FAX 215.751.0581

132

1    of our relationship that -- that they

2    had a disproportionate benefit of our

3    relationship; that I did a lot of

4    work and did not get compensated

5    fairly.

6           And my comment to them and

7    to Mr. Rega last night was that that

8    was just evidence of a good sales job

9    and that's how we were trained to do

10   it. So I told him that I had no

11   ownership; it was repeatedly offered;

12   I had been offered a number of things

13   from Mr. Friedberg and Mr. Ouimette

14   over the years, from vacations, from

15   a Ferrari, numerous other types of

16   gifts, vacations, wines.

17           I have not accepted

18   anything from Mr. Friedberg except

19   for a hundred dollar bill once in

20   Bermuda, which went to a bar tab, and

21   then a pair of I'll say Head skis

22   without bindings, which I gave to my

23   sister.

24           Q.    What other conversation did



1    of me, no.

2        Q.    Have you ever prepared such

3    a document?

4        A.    No.

5        Q.    Do you have any idea what

6    account statements Mr. Gentile is

7    referring to in the second line of

8    this letter?

9        A.    No.    It says See U-21.

10        Q.    Did you ever claim to have

11    an interest in the proceeds in U-21?

12        A.    No.

13        Q.    Did you ever tell anyone

14    you had an interest in any of the

15    proceeds, in any of the accounts at

16    issue in this lawsuit?

17        A.    No.

18        Q.    Do you believe you ever had

19    such an interest?

20        A.    No.

21        Q.    Did you ever have a

22    discussion with regard to your

23    responsibility or potential

24    responsibility for a portion of a

146

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    $1.8 million claim made by Mutual or

2    any of the Mutual companies?

3        A.    I'm sorry.  Can you repeat

4    that question?

5            MR. CHRISTIAN:  Would you

6    read the question back, please.

7                (The reporter read back the

8    following testimony:

9            "Q   Did you ever have a

10   discussion with regard to your

11   responsibility or potential

12   responsibility for a portion of a

13   $1.8 million claim made by Mutual or

14   any of the Mutual companies?")

15           THE WITNESS:  No.

16   BY MR. CHRISTIAN:

17       Q.    Have you ever discussed the

18   subject matter of this letter with

19   Mr. Friedberg?

20       A.    Mr. Friedberg repeatedly

21   offered me a participation in U-21.

22       Q.    Why?

23       A.    Because -- there's two

24   answers.  One, that is the type of



James DeCrescenzo Reporting, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

147

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    person he is.  He shares, he gives

2    the shirt off his back.  Two, he felt

3    I was undercompensated and that I was

4    due.  I said thank you, but no, thank

5    you.

6        Q.    How much of an interest did

7    he propose that you have?

8        A.    I'll say a third.

9        Q.    Did you ever have a

10   discussion with Mr. Ouimette about

11   any such proposed interest?

12       A.    Mr. Friedberg and

13   Mr. Ouimette both made the offer and

14   I said no to both.

15       Q.    And did you ever share your

16   compensation information with

17   Mr. Friedberg, how much money you

18   made?

19       A.    In total or relating to his

20   programs?

21       Q.    Either one.

22       A.    In total, no.

23       Q.    Relating to his programs?

24       A.    I told him how we got

James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Mr. Friedberg and/or his counsel in

2    the prosecution of the claim in

3    Bermuda; is that correct?

4         A.    That is correct.

5         Q.    Have you been paid for any

6    of that?

7         A.    For the very first time

8    last night I got a dinner, and that

9    is the extent to which I've been

10    paid.

11        Q.    You have flown to Bermuda

12    on Mr. Friedberg's behalf with regard

13    to this litigation; is that correct?

14        A.    I have flown to Bermuda and

15    met on behalf of Mr. Friedberg while

16    I was doing other business down

17    there.    I did not make a specific

18    trip for the sole purpose of that.

19        Q.    Well, did you make any

20    trips to Bermuda for the primary

21    purpose of helping Mr. Friedberg in

22    this matter?

23        A.    After what date?

24        Q.    After you started at

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

233

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    Keystone Risk.

2        A.    No.

3        Q.    How many trips did you make

4    to Bermuda for the purpose of

5    discussing this dispute or the

6    Bermuda dispute?

7            MS. SMITH:    Objection as to

8    form.

9    BY MR. CHRISTIAN:

10       Q.    How many times that you

11   traveled to Bermuda did you do

12   anything relating to either this

13   dispute or the Bermuda dispute?

14       A.    I will give you a

15   generalization.  I generally go to

16   Bermuda once a quarter.  While I'm in

17   Bermuda I generally meet with Mutual

18   Indemnity, and we almost always speak

19   at some point on this.  So I would

20   say probably seven; six, seven,

21   something like that.

22       Q.    Just to back up on the

23   collateral review, there was never an

24   automatic release of funds; correct?

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    The funds were only released pursuant

2    to a collateral review and approval

3    by someone in Bermuda; is that

4    correct?

5        A.    There were certain Mutual

6    Indemnity programs that had tax

7    liabilities that Mutual had to pay

8    tax and/or the customer had to pay

9    tax, and I believe those were

10   automatically generated.

11       Q.    Those were not these

12   accounts, though; correct?

13       A.    Those were not these

14   accounts.

15       Q.    All right.  With regard to

16   any of the expenses you have incurred

17   since you started at Keystone Risk

18   relating to this dispute or the

19   Bermuda dispute, or with regard to

20   any of the time you have spent

21   assisting Mr. Friedberg, have you

22   been paid or reimbursed?

23            MS. SMITH:   Objection as to

24   form.

James DeCrescenzo Reporting, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

235

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1          THE WITNESS:   No.

2    BY MR. CHRISTIAN:

3          Q.    Do you have an expectation

4    that you'll be paid or reimbursed?

5          A.    No.

6          Q.    Have you had any discussion

7    with Mr. Friedberg or any of his

8    lawyers with regard to whether you

9    would be paid or reimbursed?

10          A.    No.

11                Yes, actually.  There was

12    discussions and I said that I have

13    not been paid.  I do not intend to be

14    paid and I do this for all of my

15    existing customers, agents, brokers

16    as well as Legion and Mutual.

17          Q.    You're not assisting any of

18    the defendants in their defense of

19    this case, are you, sir?

20                MS. SMITH:  Objection as to

21    form.

22                THE WITNESS:  I made an

23    offer to them that I will help them

24    in any way, shape or form and they

236

ORAL DEPOSITION OF ANDREW A. LEWIS, 8/24/05

1    have elected to not take me up on

2    that offer.

3    BY MR. CHRISTIAN:

4        Q.    Who did you make that offer

5    to?

6        A.    To Mr. Pickering,

7    Mr. Alexander, Mr. Reardon.

8        Q.    I'm going to show you

9    Exhibit 18, previously marked. It's

10   a shareholders agreement, and I'm

11   going to refer you to Page 7. You

12   can look at the agreement if you

13   want, but I'm just going to ask you

14   about that last page.

15       A.    Okay.

16       Q.    There are some signatures

17   on that page.

18       A.    Yes.

19       Q.    Do you see where it says it

20   was signed in Hamilton, Bermuda?

21       A.    Yes.

22       Q.    Is it your recollection

23   that those gentlemen were in Bermuda

24   when that agreement was signed?

LEXSEE 2000 U.S. DIST. LEXIS 1409

**PEERLESS HEATER COMPANY and, PEERLESS INDUSTRIES, INC., Plaintiffs, VS. MESTEK, INC., JOHN E. REED, and R. BRUCE DEWEY, Defendants.**

**CIVIL ACTION NO. 98-6532**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2000 U.S. DIST. LEXIS 1409; 46 Fed. R. Serv. 3d (Callaghan) 553**

**February 7, 2000, Decided**
**February 7, 2000, Filed**

**DISPOSITION:** [*1] Court declined to grant plaintiffs' leave to depose Mr. Hittinger. Request DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For PEERLESS HEATER COMPANY, PEERLESS INDUSTRIES, INC., PLAINTIFFS: CARL W. HITTINGER, NEIL C. SCHUR, STEVENS AND LEE, P.C., PHILADELPHIA, PA USA.

For MESTEK, INC., JOHN E. REED, R. BRUCE DEWEY, DEFENDANTS: LARRY H. SPECTOR, MANN, UNGAR, SPECTOR, LABOVITZ, P.C., PHILA, PA USA.

**JUDGES:** CHARLES B. SMITH, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** CHARLES B. SMITH

**OPINION:**

**MEMORANDUM AND ORDER**

**CHARLES B. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

At issue in the above-referenced action is a request by defendants Mestek, Inc. ("Mestek"), John E. Reed, and R. Bruce Dewey to depose Carl Hittinger, trial counsel for plaintiffs Peerless Heater Company and Peerless Industries, Inc. ("Peerless"). Plaintiffs vehemently oppose this request and accuse defendants of simply trying to disqualify their counsel. Upon review of the various submissions by the parties, the Court finds that (1) defendants can obtain the needed information in a less intrusive means and (2) the hardship exacted on plaintiffs by permitting the deposition of their counsel clearly outweighs any benefit to defendants. As such, the Court

will deny [*2] defendants' request for leave to depose Mr. Hittinger.

**I. FACTUAL BACKGROUND**

In October of 1992, Peerless Industries, Inc. and Mestek, Inc. entered into an Investment Agreement, which provided that the two companies would become co-owners of Eafco, Inc., previously a Peerless subsidiary operating a foundry in Boyertown, Pennsylvania. Mestek was to put capital into the foundry so that it could supply both companies with all of the cast iron sections they needed for their boilers.

A dispute arose between the parties, in March, 1998, over the interpretation of the Investment Agreement. Mestek subsequently sued Peerless, complaining that Peerless had breached the Agreement by buying castings from a foundry other than Eafco. In April, 1998, Peerless, acting through counsel Carl Hittinger responded by instituting two separate lawsuits against Mestek – one in equity and one in law. In an effort to glean the legal claims behind these lawsuits, Mestek, represented by Larry Spector, served Mr. Hittinger with praecipes for rules that complaints be filed on both the Summons in Law and the Summons in Equity. On May 14, 1998, Peerless filed a pleading only in its equity action asking the [*3] Court to declare that, under the terms of the Peerless/Mestek Investment Agreement, Peerless was not bound to purchase all of its cast iron products exclusively from Eafco. No complaint was ever filed for the Summons in Law.

During the course of these events, another problem simmered between the two companies. In May of 1995, prior to the filing of the lawsuits, Peerless received information that a Mestek representative was making some disparaging remarks as to Peerless' financial status. In response to this information, Peerless circulated a "To whom it may concern" memorandum to clients denying

 LexisNexis™     LexisNexis™     LexisNexis™

Case 2:02-cv-03193    Document 54-2    Filed 09/12/2005    Page 24 of 35

Page 2
2000 U.S. Dist. LEXIS 1409, *3; 46 Fed. R. Serv. 3d (Callaghan) 553

any rumors that Peerless was for sale or that its financial situation was precarious. Even after Peerless distributed this memo, however, it remained concerned that Mestek continued making negative statements about Peerless in the marketplace. As such, Robert Fish, the president of Peerless, asked his Vice President for Sales, Peter Morgan, to prepare a memo summarizing all the alleged remarks by Mestek that he had heard over the years. On May 12, 1998, Morgan sent Fish a fax describing for him "some specific examples of how our business and reputation has, in many cases, suffered these past [*4] five years with all of the false and erroneous comments made by those connected with the Smith and Mestek organization."

In June of 1998, Peerless chose not to pursue whatever claim was underlying the Summons in Law and, instead, entered into a stipulation for dismissal without prejudice. By October of 1998, the parties agreed to an effective "divorce." Pursuant to a settlement agreement containing mutual releases, Mestek was to purchase Peerless' interest in the foundry n1 and Peerless agreed to buy its castings from the foundry. Independent of the contractual releases, Peerless also consented to dismiss with prejudice the litigation previously instituted by the Summons in Law.

> n1 At the January 31, 2000 oral argument in this matter, Mestek's counsel represented that Mestek paid Peerless an amount in the vicinity of $9 million.

Six weeks later, Peerless filed this litigation based on the same "bad mouthing" allegations which had been the subject of its 1995 "To whom it may concern" memo, as well as many of [*5] the statements summarized in Pete Morgan's May 12, 1998 memo. Defendants promptly argued that the April 1998 Summons in Law, separate from the equity action which sought declaratory relief, stemmed from the same alleged defamatory statements challenged in the instant complaint. As such, those claims were now barred by *res judicata*, due to the October 1998 dismissal with prejudice. Plaintiffs responded that the Summons in Law had nothing to do with the claims set forth in the complaint currently at bar.

Defendants now seek to depose Mr. Carl Hittinger, as counsel for plaintiffs at the time the Summonses were filed, to determine the underlying basis of the Summons in Law.

## II DISCUSSION

Under Federal Rule of Civil Procedure 26(b)(1),

"parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . ." Although the attorney–client privilege and/or the work–product doctrine may provide grounds for refusal to answer some or all of the questions, "the fact that the proposed deponent is an attorney, or even an attorney for a party to the suit, is not an absolute bar to taking his or her deposition." 8A CHARLES [*6] A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2102 (West 1994). n2 No special privilege or immunity shields an attorney of record. Walker v. United Parcel Services, 87 F.R.D. 360, 361 (E.D. Pa. 1980). Indeed, "if the attorney possesses relevant, non-privileged information, that information ought to be discoverable just as it would be if possessed by a party or a non-party." Arias v. Philadelphia, 1998 U.S. Dist. LEXIS 10066, Civ. A. No. 97–6641, 1998 WL 398252, *1 (E.D. Pa. June 23, 1998).

> n2 Plaintiffs argue that because Mr. Hittinger will have no non–privileged information about which to testify, the Court should preclude his deposition. Specifically, they contend that defendants seek to depose Mr. Hittinger about his client communications regarding the reasons for filing the Summons in Law in 1998 and his own legal strategy at that time. Such subjects are protected under both the work product doctrine and the attorney–client privilege.

It is true that "since questions to an attorney may give rise to objections based on work product doctrine and the attorney–client privilege, a request to depose opposing counsel is generally viewed with disfavor . . ." Moore's Federal Practice, § 30.03 (Matthew Bender & Co., Inc. 1999). However, questions of attorney–client privilege and work–product privilege should be resolved at a deposition rather than in the abstract in advance. Jamison v. Miracle Mile Rambler, Inc., 536 F.2d 560, 565–66 (3d Cir. 1976); Musko v. McCandless, 1995 U.S. Dist. LEXIS 14477, Civ. A. No. 94–3938, 1995 WL 580275, *1 (E.D. Pa. Sept. 29, 1995) but see Walker v. United Parcel Services, 87 F.R.D. 360, 362 (E.D. Pa. 1980)(short of prohibiting plaintiffs' deposition of defense counsel, there is no way to protect the attorney's mental impressions, opinion, legal theories or litigation strategy). The sheer fact that Mr. Hittinger's answers to the deposition questions may be privileged does not, in and of itself, prohibit the deposition.

  

2000 U.S. Dist. LEXIS 1409, *7; 46 Fed. R. Serv. 3d (Callaghan) 553

[*7]

However, "such a deposition provides a unique opportunity for harassment, it disrupts the opposing attorney's preparation for trial, and could ultimately lead to disqualification of opposing counsel if the attorney is called as a trial witness." Slater v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 275, Civ. A. No. 98-1711, 1999 WL 46580, *1 (E.D. Pa. Jan. 14, 1999) (quoting Marco Island Partners v. Oak Development Corp., 117 F.R.D. 418, 420 (N.D. Ill. 1987); see also Musko v. McCandless, 1995 U.S. Dist. LEXIS 14477, 1995 WL 580275, *1 (E.D. Pa. Sept. 29, 1995) ("deposition of an attorney can often be burdensome and disruptive, and is not to be entered into unadvisedly or lightly."). Therefore, it is fairly well-established in this district that a party should not be permitted to take the deposition of the opposing party's attorney "unless he can show that the information sought is relevant, non-privileged and critical to the preparation of the case and that there is no other way to obtain the information." Slater, 1999 WL 46580 at *1; see also Lebovic v. Nigro, 1997 U.S. Dist. LEXIS 1897, Civ. A. No. 96-319, 1997 WL 83735, *1 (E.D. Pa. Feb. 26, 1997) (deposition of opposing counsel [*8] is "typically only permitted where a clear need is shown").

To determine whether an attorney of record may be deposed, the courts in the Eastern District of Pennsylvania have adopted three factors to guide their decisions: "(1) The extent to which the proposed deposition promises to focus on central factual issues, rather than peripheral concerns; (2) the availability of the information from other sources, viewed with an eye toward avoiding cumulative or duplicative discovery; and (3) the harm to the party's representational rights resulting from the attorney's deposition." Frazier v. Southeastern Pennsylvania Transportation Authority, 161 F.R.D. 309, 313 (E.D. Pa. 1995); Arias, 1998 WL 398252, at *2. Analyzing the case at bar under these three factors, this Court finds that defendants should not be permitted to depose Carl Hittinger.

A. The Extent to which the Proposed Deposition Promises to Focus on Central Factual Issues, Rather than Peripheral Concerns.

Turning to the first factor, plaintiffs argue that the proposed deposition of Mr. Hittinger would focus on peripheral concerns rather than central factual issues. The instant complaint states [*9] claims for violations of the Sherman Act, the Clayton Act and the Lanham Act, as well as claim for defamation, tortious interference, trade libel and violation of the Massachusetts Unfair Sales Act. Because Mr. Hittinger allegedly knows no facts relevant to such claims, plaintiffs contend that his deposition is outside the scope of this litigation and, as such, impermissible.

Quite to the contrary, however, Defendants' claim of res judicata is more than just a boilerplate defense. Indeed, it goes to the very heart of this case and queries whether the allegations that were to be the subject of litigation instituted through the filing of the Summons in Law, later dismissed with prejudice following a substantial payment by Mestek to Peerless, were the same as those underlying four of the six counts of this lawsuit. If the evidence yields an affirmative answer to that question, then defendants may persuasively argue for dismissal of those counts. As the issue is far from peripheral to this lawsuit's central concerns and since Mr. Hittinger, as counsel for Peerless during the filing of the Summons in Law, would have information on this crucial issue, the first factor tilts the scales [*10] in favor of defendants' position.

B. The Availability of the Information from Other Sources, Viewed with an Eye Toward Avoiding Cumulative or Duplicative Discovery.

Defendants' argument falters, however, when, under the second factor, they claim that Mr. Hittinger is the sole source of knowledge available on the reasons underlying the filing of the Summons in Law. Defendants allege that neither Robert Fish, who authorized the filing of the Summons in Law, or Gene Fish, the President of Peerless Industries, could clearly testify as to why the Summons in Law was filed. Moreover, defendants contend that plaintiffs have refused to produce the bills from Ballard Spahr, Mr. Hittinger's law firm at the time the Summons in Law was filed, thereby precluding defendants from taking a closer look into the reasons behind that filing. These facts, according to defendants, leave Mr. Hittinger as the only individual with knowledge of the reason for filing of the Summons in Law and what the claims underlying that action were.

Such an argument, however, mischaracterizes the record to some extent. A thorough review of the deposition testimony provided by the parties reveals not only that defendants [*11] already have substantial information regarding the reasons behind the Writ of Summons in Law, but also that they have several other means of obtaining additional information on the subject.

1. The Already-Existing Evidence

As noted above, both plaintiffs and defendants deposed Robert Fish and Eugene Fish. In turn, both men testified extensively as to this very issue, repeatedly explaining, without qualification, the reasons for filing the Writ of Summons in Law:

  

(a) Deposition Testimony of Robert Fish

Q. [by Mr. Hittinger] Now, at the time that you had your attorneys file these Writ of Summons in Law and Writ of Summons in Equity, what legal dispute were you contemplating be resolved by those filings, what issue?

[by Mr. Spector] I'm going to object. I don't think it's — I don't think the witness made it clear, but I think it's clear from the documents that these are two separate lawsuits. And I think that questioning should — I object to the form of the question.

\* \* \*

A. I wanted to have the right to get my iron made where we felt it was best for Peerless Heater Company. Mestek clearly didn't have that position. We needed to make a determination [*12] as soon as we could, and our attorney's advice was that in filing this, it might be a faster path to having a trial or some decision where we could find the outcome.

\* \* \*

Q. Now, at the time that either of the Writs of Summons were filed or the Complaint was filed that I've just shown you, had you made any determination as to whether or not at that time you were going to, you being the president of Peerless Heater Company, were going to sue Mestek for any antitrust violations?

A. Absolutely not.

Q. Did the Writs that we looked at before which were brought on behalf of both Peerless Heater and Peerless Industries contemplate in any way that Peerless Heater was thinking about filing an antitrust action against the individuals named in the Berks County Common Pleas Court?

A. No. That was all about a foundry, plain and simple.

Deposition of Robert Fish, at pp. 21–29.

—

Q. [by Mr. Hittinger] Okay. Now, your recall at the time that that was resolved there were certain pending lawsuits that were dismissed as part of that settlement? Do you remember that?

A. Right.

\* \* \*

Q. Were — did you contemplate or intend that by signing that you were [*13] releasing your rights against Mestek and its officers for any antitrust violations that they had committed?

A. No. Neither side was releasing anything other than the foundry issues. It was a very specific document.

Deposition of Robert Fish, at pp. 38–40.

—

Q. [by Mr. Spector] Is it fair to say that it was only after Mestek had sued Peerless and you and your father, that under those circumstances, Peerless first considering — first considered suing Mestek for the badmouthing that had gone — allegedly gone on?

A. Absolutely not. Absolutely not. Mestek in my opinion was threatening my ability to get iron. If I didn't have that, I was out of business. And that was the whole purpose of writing it. Nothing to do with anything else. That's what it says. That's what it was. That's a scary thing when that's what you sell.

Q. When did you first consider suing Mestek for defamation?

A. For defamation?  None of the other things?  I don't think we — I would know what was even suable until we talked with Carl [Hittinger] in June of '98 I think it was.

\* \* \*

Q. Did you discuss with anyone the need for Peerless to take some action by filing some legal [*14] document to protect its right for statute of limitations purposes to sue Mestek for defamation?

  

Case 2:02-cv-03193    Document 54-2    Filed 09/12/2005    Page 27 of 35

Page 5

2000 U.S. Dist. LEXIS 1409, *14; 46 Fed. R. Serv. 3d (Callaghan) 553

A. Never.

Deposition of Robert Fish, at pp. 336–338.

—

Q. [by Mr. Spector] My question to you is, what was the purpose of the filing of [the Writ of Summons in law]?

* * *

A. I don't know all the fancy lawyer stuff. All I know is that I was worried about being able to buy iron. And I wanted the right to go to other people if Mestek shut me off, and I wanted that right away, as fast as possible.

* * *

Q. Do you believe — do you have any knowledge as to why the Summons in Law, RF-3, was filed?

[by Mr. Hittinger] He just answered that. How many time do you want to hear the answer? Give it to him again.

A. It's the same thing. All I know, I'm not a lawyer, I saw the Mestek suit, I said, oh, my God, I have to be able to get iron.

Q. And weren't you angry then about all the bad–mouthing or all the derogatory statements that you recalled having been made about Peerless by Mestek?

A. I was far too busy trying to settle everything else. No. It wasn't really on my mind.

* * *

Q. The question is, in April of '98, did you discuss [*15] with [Mr. Hittinger] the possibility of Peerless filing a defamation action?

A. We didn't discuss anything with [Mr. Hittinger] until June [of 1998] at my father's house when this crap didn't stop and everything just kept going on and on and on. And, you know, you talk to the people that run the company. If they don't do anything,

what are you supposed to do?

Deposition of Robert Fish, at pp. 349–353.

—

Q. [by Mr. Spector] Had you had any discussions with Mr. Hittinger or anyone at the Ballard firm about the allegedly defamatory statements that had been made by Mestek about Peerless at any time before the filing of the Summons in Law on April 6th, 1998?

[by Mr. Hittinger] I'll let you answer that question.

* * *

A. Not that I recall.

Deposition of Robert Fish, at pp. 364–365.

—

Q. [by Mr. Spector] Now, when — when you — you signed a settlement agreement that we've marked D–8 in late October 1998, correct? Now, at that time you intended to bring a lawsuit against Mestek for defamation, correct?

* * *

A. No. No. You're saying intended. I'm saying we started thinking about it in June. I decided to file the lawsuit [*16] after all that was done and the rumors kept continuing. I think earlier I testified as to two specific instances after we signed where this behavior continued.

Q. Okay. And those were, one, an instance in Chicago that took place actually after you filed the Complaint, correct?

A. Yes.

Q. And the other was with regard to Emco in Nova Scotia?

A. Yes.

Q. And when did that situation take place?

A. They were both after we signed that agreement. The specifics Pete Morgan





Case 2:02-cv-03193    Document 54-2    Filed 09/12/2005    Page 28 of 35

Page 6

2000 U.S. Dist. LEXIS 1409, *16; 46 Fed. R. Serv. 3d (Callaghan) 553

would have.

Q. That is between late October and the time this litigation was filed, which I believe was December 16th?

A. All I know is it happened after we signed.

Deposition of Robert Fish, at pp. 378–379.

—

Q. [by Mr. Spector] Take out RF-8 please. RF-8 appears to be a memo from Peter Morgan to you and it's dated May 12th, 1998. What were the circumstances that led to Mr. Morgan giving you this memo?

A. You'd have to ask him.

Q. Did you ask for it?

A. My recollection is that he would mention something, you know, one of the instances of trouble, and at some point I said, you known, write down a memo to me, and I think that's how it happened. But [*17] I don't have a real clear recollection.

Q. Well, why did you ask him to write it down to you?

A. Because he kept calling me with little pieces of information or somebody said this. And I said, look, make up a summary and, you know, let's look at the whole thing.

Q. And why did you want to have him make up a summary? What was the point?

A. I often ask for summaries of things because I don't have time to read all the lines of everything.

Q. Well, isn't it true you wanted a summary so that you could consider bringing litigation — or strike that. Wasn't it true that you wanted a summary so that you could flesh out the Summons in Law, RF-3, into a full-blown Complaint for defamation against Peerless.

A. Absolutely not. Defamation never came up.

Q. How about using allegedly derogatory remarks made by Mestek about Peerless as the basis for an antitrust suit, had that come up at any time before April 6th, 1998.

A. No, it did not.

Deposition of Robert Fish, at pp. 366–368.

(b) Deposition Testimony of Eugene Fish

Q. [by Mr. Hittinger] An let me show what has been marked previously as RF-3 and RF-4. RF-3 is a Summons in Law filed [*18] by Peerless Industries, Peerless Heater, Eugene Fish, Robert Fish against Mestek and various individuals in Berks County. It was filed April 6, '98. And also a document, RF-4, which is a Summons in Equity, filed the same date, against the same people. Have you seen these two documents before?

A. Yes, I have.

Q. Did you authorize them to be filed on behalf of yourself and Peerless Industries?

A. Yes, I did.

Q. And can you tell use why you asked your attorneys to file them?

A. I was so angry when I received the original Complaint that I didn't read it. But eventually I read portions of it. I consulted with some of my friends in the Berks County area, and I was told that the judge that was assigned to this particular case took his good old time to decide cases and if we wanted any action, we better file our own case, and that's what we did.

Q. Okay. Now let me show you what's been marked as RF-5. And this is a Complaint filed by Peerless Industries against Mestek, and it was filed May, 14th, 1998. Have you seen that document before.

A. Yes, I have.

Q. And is that an action that you authorized

  

2000 U.S. Dist. LEXIS 1409, *18; 46 Fed. R. Serv. 3d (Callaghan) 553

be filed on behalf of Peerless?

A. Yes, I did.

*  [*19]  * * [long description by Eugene Fish as to why it was filed]

Q. And the purpose of the suit, then, was to have the court declare the rights of the parties as to whether castings had to be — have to be purchased from Eafco or not?

A. Absolutely.

Q. Now, did this Complaint, or these writs that I showed you, have anything to do with an anti-trust action against Mestek or its officers?

* * *

A. Absolutely not.

Deposition of Eugene Fish at pp. 9–13.

—

Q. [by Mr. Hittinger] Now, the action that was filed in Berks County, the writs that were filed in April of '98, at that time those were filed, were you contemplating filing an anti-trust action, possibly, against Mestek or any of its individuals?

[by Mr. Spector] Objection.

A. Absolutely not.

Q. Did you authorize your lawyers at that time, in April of '98, to do any research or investigation as to whether or not Mestek and its officers had violated the anti-trust laws or the Lanham Act or engaged in defamation in any way?

A. I did not. We didn't have enough information at that time. At least I didn't have enough information at that time.

Q. So what was your purpose in [*20] telling your lawyers to file these Writs of Summons in Berks County, what rights were you trying to protect on behalf of Peerless Industries?

* * *

A. That was for the purpose of permitting Peerless to continue to do business, both to have a place to buy their castings and to sell them.

Q. Okay. Now, what Mr. Spector did not ask you was why, in these Writs of Summons that were filed, you not only named Mestek at a potential defendant but named various individuals as defendants. My question is, why did you authorize your lawyers to name those individuals in these writs that were filed in April of '98; what were you thinking?

A. Well, I would say we did it for two reasons. First, we didn't know exactly who was responsible there. And secondly, we wanted to make sure everybody that might have — possibly have anything to do with it was being sued.

Q. When you say responsible and have something to do with it, what are you referring to, what's the issue you're referring to?

A. Well, as far as the agreement was concerned, we — I don't want to get involved with each one of the individuals.

Q. You mean him, right.

A. But somebody there obviously was [*21] trying to say that we couldn't buy boilers somewhere else. And as I pointed out before, they had done it, they had bought boilers from Burnham, that was all right. But when we had talked about the possibility of getting boilers on the outside they objected to it.

Deposition of Eugene Fish, at pp. 123–126. n3

n3 Defendants cite to the following exchange as proof that Eugene Fish was not able to address the issue:

Q. [by Mr. Spector] Now, there was — let's refer back to RF-3. This separate action. It started through the filing of this document called Summons





2000 U.S. Dist. LEXIS 1409, *21; 46 Fed. R. Serv. 3d (Callaghan) 553

in Law. Now, did you have an under-
standing as to what that action was
about?

A. I had no — when I turned this over
to the attorneys, that's their job not
mine.

   * * *

Q. Is it fair to say that if anyone would
know the answer to the question as to
why the Summons in Law was filed,
it would be your attorney?

A. I can't answer that. I don't know
the answer to that.

   * * *

Q. Other than yourself, who else was
involved in authorizing your attor-
neys to take any action on behalf of
Peerless Industries or Peerless Heater
Company against Mestek?

A. I think Bob, my son Bob was in-
volved in that.

Deposition of Eugene Fish, at pp. 91–95. Standing
alone, this testimony may have been persuasive.
Viewed, however, in conjunction with the other
extensive testimony by Eugene and Robert Fish,
the Court finds that this one exchange does not
meet defendants' burden of proving that it has not
already received a satisfactory answer to its ques-
tions.

[*22]

In light of this extensive, indeed repetitive, testi-
mony discussing the reasons behind plaintiffs' Summons
in Law, the purpose of the May 12, 1998 Peter Morgan
memorandum and plaintiffs' first consideration of a
defamation-type action against Mestek, defendants are
hard-pressed to argue that no witness, other than Mr.
Hittinger, can testify on this subject. The simple fact that
defendants have not yet received the answer they seek
does not give them unfettered access to Mr. Hittinger
in order to attempt to force from him more favorable
testimony.

2. Alternative Means of Obtaining the Needed
Information.

Beyond this substantial testimony already given by
the chief decision-makers at Peerless, defendants pos-

sess other, less-intrusive means of continuing their dis-
covery on the issue. First, Mr. Hittinger agreed to rep-
resent, on the record, whether or not any research was
done by anybody at the Ballard firm on what the statute
of limitations was for any potential antitrust or defama-
tion claims that Peerless might want to bring against
Mestek, so long as Mr. Spector agreed to not seek Mr.
Hittinger's disqualification. Mr. Spector declined the of-
fer. See Deposition of Robert Fish [*23] at pp. 355–360.

Second, Mr. Hittinger proposed that Mr. Spector
file interrogatories to plaintiffs asking, in plain fashion,
what the purpose underlying the Summons in Law was.
Again, Mr. Spector refused. See Deposition of Eugene
Fish at pp. 101–102.

Third, Mr. Hittinger suggested that Mr. Spector
could question Mr. Eugene Fish about all privileged dis-
cussions with his attorneys, so long as the privilege was
not waived. Mr. Spector would not agree unless Mr.
Hittinger produced time sheets and bills n4 from his
former law firm showing what work was done on the
case. See Deposition of Eugene Fish at pp. 103–105.
Mr. Hittinger declined to produce the bills under work-
product privilege.

> n4 These bills and timesheets were produced
> for an *in camera* review by this Court. Having
> thoroughly read these documents in search of
> something that would indicate that the Writ of
> Summons in Law was filed to preserve plaintiffs'
> defamation, antitrust or Lanham Act claims, this
> Court finds nothing that would, in any way, sup-
> port defendants' *res judicata* defense.

[*24]

Fourth, Mr. Hittinger actually agreed to produce the
Ballard, Spahr bills if Mr. Spector agreed that no priv-
ilege was waived and that no attempt would be made
to depose Mr. Hittinger. Mr Spector would not agree
to forego Mr. Hittinger's deposition. See Deposition of
Eugene Fish, at pp. 98–100.

Finally, defendants could have obtained the deposi-
tion of Joel Nied, Esq., the attorney who actually re-
searched, drafted and filed the writs at issue and com-
municated with the clients about the filing, but who no
longer represents plaintiffs in this litigation. They have
failed to do so during the entire course of the discovery
period.

In sum, despite at least five different, less-intrusive
options, defendants have refused to accept anything less
than Mr. Hittinger's deposition. The record, however,
reveals that Mr. Hittinger's deposition would be duplica-

  

2000 U.S. Dist. LEXIS 1409, *24; 46 Fed. R. Serv. 3d (Callaghan) 553

tive, not only of the significant amount of testimony on the subject that defendants' already have, but also of the additional evidence it can otherwise obtain. To require plaintiffs' trial counsel of record to appear for a deposition and face imminent disqualification from this case, despite defendants' minimal need for the information [*25] he could provide, would not only disrupt the course of this litigation, but would contravene the very discovery principles underlying the Federal Rules of Civil Procedure.

C. The Harm to the Party's Representational Rights Resulting from the Attorney's Deposition.

As a final consideration, plaintiffs clearly face the most severe harm to their representational rights if defendants are permitted to depose Mr. Hittinger. Mr. Spector, defendants' counsel, has repeatedly noted that, if allowed to take Mr. Hittinger's deposition, he will seek to put him on as a witness at trial, thereby necessitating his withdrawal as trial counsel under Pennsylvania Rule of Professional Conduct 3.7. In fact, defendants have made clear that, regardless of Mr. Hittinger's testimony, they will demand his disqualification:

> Mr. Hittinger must be deposed on whether the allegations that were to be subject of the litigation instituted through the filing of the Summon in Law, later dismissed with prejudice, were the same as those underlying four of the six counts of this lawsuit. If upon being deposed, he said that they were or were not, then he must be disqualified either because he will be an adverse [*26] witness to his client or because his credibility will be an issue. Rule Prof. Conduct 3.7(a).

Defendants' Letter Brief, dated January 14, 2000, at p. 5. By virtue of this statement, defendants concede that allowing the deposition will directly result in the incapacitation plaintiffs' counsel on the eve of trial. The

Court cannot condone defendants' effort, be it intentional or unintentional, to so undermine plaintiffs' case.

III. CONCLUSION

Considering the three factors in conjunction, it remains clear that, while defendants may have a cognizable defense, they have not shown either that the information is not available from less intrusive sources or that the benefit of the deposition outweighs the significant hardship that would be exacted on plaintiffs. While this ruling does not, in any way, imply that defendants' *res judicata* defense is meritless or that defendants cannot attempt to prove it at trial, it does recognize that defendants cannot disrupt the entire litigation in pursuit of some favorable testimony by plaintiffs' counsel. This Court, therefore, declines to grant plaintiffs' leave to depose Mr. Hittinger. n5

> n5 This litigation has been plagued by countless discovery fights and non-stop bickering between counsel over minute issues. I would remind them that "it is the end that crowns, not the fight" Robert Herrick, The End, Ch. 1, p. 27 (1698).

[*27]

An appropriate order follows.

**ORDER** – ENTERED: 2-8-00

AND NOW, to wit, this 7TH day of *February*, 2000, upon consideration of the letter briefs submitted by the parties in support of defendants' request for leave to take the deposition of Mr. Carl Hittinger, it is hereby ORDERED, that the request is DENIED.

It is so ORDERED.

BY THE COURT:

CHARLES B. SMITH

UNITED STATES MAGISTRATE JUDGE

  

LEXSEE 1999 U.S. DIST. LEXIS 275

ERIC SLATER v. LIBERTY MUTUAL INSURANCE CO.

CIVIL ACTION NO. 98–1711

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1999 U.S. Dist. LEXIS 275

January 13, 1999, Decided
January 14, 1999, Filed

DISPOSITION: [*1] Motions to Compel DENIED and Motions for Protective Orders GRANTED.

**LexisNexis(R) Headnotes**

COUNSEL: For ERIC SLATER, PLAINTIFF: BRUCE L. NEFF, NEFF AND ASSOCIATES, PHILA, PA USA.

For LIBERTY MUTUAL INSURANCE COMPANY, DEFENDANT: WILLIAM C. FOSTER, KELLY, MC LAUGHLIN & FOSTER, PHILADELPHIA, PA USA.

JUDGES: JAY C. WALDMAN, J.

OPINIONBY: JAY C. WALDMAN

OPINION:

### MEMORANDUM ORDER

This is an insurance bad–faith action pursuant to 42 Pa. C.S.A. § 8371. Each party has moved to compel a deposition of the other's attorney, and each has moved for a protective order to prevent such a deposition.

The Federal Rules of Civil Procedure do not expressly prohibit a deposition by a party of another party's attorney. See Fed. R. Civ. P. 30(a)(1) (a party may take by deposition "the testimony of any person"). A court, however, for good cause may enter a protective order to prevent a deposition from being conducted. See Fed. R. Civ. P. 26(c).

Many courts have found that it is appropriate to grant such an order to prevent the deposition of a party's attorney by an adversary unless he can show that the information sought is relevant, non–privileged and critical to the preparation of the case and that there is no other [*2] way to obtain the information. See Boughton v. Cotter Corp., 65 F.3d 823, 830 n.10 (10th Cir. 1995); Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986); Dunkin' Donuts, Inc. v. Mandorico, 181 F.R.D. 208, 210 (D.P.R. 1998); Jones v. Bd. of Police Commissioners, 176 F.R.D. 625, 626 (W.D. Mo. 1997); Caterpillar Inc. v. Friedmann, 164 F.R.D. 76, 78 (D. Or. 1995); EEOC v. HBE Corp., 157 F.R.D. 465, 466 (E.D. Mo. 1994). See also Lebovic v. Nigro, 1997 U.S. Dist. LEXIS 1897, 1997 WL 83735, at *1 (E.D. Pa. Feb. 26, 1997) (deposition of opposing counsel is "typically only permitted where a clear need is shown"); Kelling v. Bridgestone/Firestone, Inc., 153 F.R.D. 170, 171 (D. Kan. 1994) ("absent an attorney's advice being made an issue in the case, courts should exercise great care before permitting the deposition of an [opposing] attorney"). This is because a deposition of one's attorney by an opposing party is inherently annoying, oppressive, disruptive and burdensome. "Such a deposition provides a unique opportunity for harassment, it disrupts the opposing attorney's preparation for trial, and could ultimately lead to disqualification of opposing counsel if the attorney is [*3] called as a trial witness." Marco Island Partners v. Oak Development corp., 117 F.R.D. 418, 420 (N.D. Ill. 1987).

Defendant states that plaintiff's attorney communicated with a number of defendant's employees in connection with his handling of the underlying underinsured motorist claim. Defendant contends it is "entitled to know whether [plaintiff's attorney] intends to contradict any statement given by any representative of Liberty Mutual or whether he is in possession of any additional information which relates to the case."

Defendant obviously has other means of discovering what its employees may have said to plaintiff's attorney. Plaintiff's attorney cannot meaningfully "contradict" a statement made by an employee of defendant unless he testifies as a witness at trial. There is absolutely no indication that plaintiff's attorney proposes to present himself as a witness and to do so would almost certainly re-

 LexisNexis™     LexisNexis™     LexisNexis™

1999 U.S. Dist. LEXIS 275, *3

quire his disqualification. See Pa. Rules of Professional Conduct 3.7.

That a party wishes to ask another party's attorney whether he has "any additional information which relates to the case" does not remotely justify the deposition of the attorney. If it did, adversaries [*4] in virtually every case could compel the depositions of each other's attorney. Moreover, any relevant information which is known to a participating attorney in a pending case and is not protected by the attorney–client privilege or work–product doctrine can be discovered by other means such as interrogatories and requests for admission or production directed to the party.

Plaintiff seeks to depose defendant's counsel about his conduct of discovery in this action which plaintiff contends further evinces defendant's bad faith conduct towards plaintiff. Plaintiff asserts that defense counsel unilaterally canceled depositions and has not conducted discovery in an appropriate manner. According to a letter from plaintiff's attorney to defense counsel, the authenticity of which is not challenged, plaintiff also seeks to depose defense counsel to "maintain a level playing field" since defense counsel seeks to depose him.

Plaintiff has attempted to notice the deposition of defense counsel. As the court noted in its order of September 24, 1998, notice is insufficient to compel the attendance of a deponent who is not a party or an officer, director or managing agent of a party. Moreover,

the [*5] arguments of plaintiff in support of a protective order to prevent his attorney from being subject to deposition are well–taken. Even assuming that some particular act of defense counsel in the conduct of discovery may be relevant, there has been no showing that plaintiff cannot ascertain and present evidence of such an act without making a witness of defendant's attorney.

Discovery in this case has been quite contentious. The parties have filed an array of discovery motions on matters which ordinarily would not require court involvement. Counsel are admonished that whatever acrimony may exist between their clients, counsel are expected to ensure that discovery is conducted in a diligent, reasonable and professional manner and that any true dispute is resolved in a practical manner without the need for court intervention except as a last resort.

**ACCORDINGLY**, this 13th day of January, 1999, upon consideration of plaintiff's Motion for Protective Order (Doc. # 24), defendant's Motion for Protective Order (Doc. # 22), plaintiff's Motion to Compel Deposition of William C. Foster, Esq. (Doc # 27) and defendant's Motion to Compel Deposition of Plaintiff's Counsel (Doc. # 25), [*6] IT IS HEREBY ORDERED that the Motions to Compel are **DENIED** and the Motions for Protective Orders are **GRANTED**.

**BY THE COURT:**

**JAY C. WALDMAN, J.**

  

LEXSEE 1996 U.S. DIST. LEXIS 10341

## DANIELLE ORLANDO V. OPERA COMPANY OF PHILADELPHIA "OCP"

### 95-CV-3860

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 1996 U.S. Dist. LEXIS 10341; 71 Fair Empl. Prac. Cas. (BNA) 639; 68 Empl. Prac. Dec. (CCH) P442,247

**July 23, 1996, Decided**
**July 24, 1996, FILED, ENTERED**

**DISPOSITION:** [*1] Defendant's motion of April 25, 1996 for a protective order precluding the taking of defense counsel's deposition GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DANIELLE ORLANDO, PLAINTIFF: CHARLES HARDY, PETER KONOLIGE, SPRAGUE AND SPRAGUE, PHILA, PA USA. CAROL L. HARTZ, FOX, ROTHSCHILD, O'BRIEN AND FRANKEL, PHILA, PA USA.

For OPERA COMPANY OF PHILADELPHIA, DEFENDANT: WILLIAM A. WHITESIDE, ALLISON E. ACCURSO, ANNE C. BANCROFT, FOX, ROTHSCHILD, O'BRIEN & FRANKEL, PHILA, PA USA. For ROBERT DRIVER, JACK R. BERSHAD, G. THOMPSON PEW, JR., LAREN PITCAIRN, LAURIE WAGMAN, WALTER SPIRO, KARL H. SPAETH, ALBERT E. PISCOPO, DONALD MYKYTIUK, JOHN P. MULRONEY, ROBERT J. MILLSTONE, SANDE HOLLIN, MRS., JOSEPH J. HILL, JAMES A. GRIGSBY, PAUL JAY FINK, RICHARD A. DORAN, C. CHRISTOPHER CANNON, DEFENDANTS: ANNE C. BANCROFT, FOX, ROTHSCHILD, O'BRIEN & FRANKEL, PHILA, PA USA.

For RUDAS THEATRICAL ORGANIZATION OF NEVADA, INC., RESPONDENT: CARL GRUMER, MANATT, PHELPS AND PHILLIPS, LOS ANGELES, CA USA.

**JUDGES:** JUDGE RAYMOND J. BRODERICK

**OPINIONBY:** RAYMOND J. BRODERICK

**OPINION:**

MEMORANDUM

Broderick, J.

July 23, 1996

Presently before the Court is the Defendant's motion of April 25, 1996 for a protective order pursuant to Fed.R.Civ.P. [*2] 26(c) to preclude Plaintiff's counsel from taking the deposition in this Title VII sex discrimination action of counsel for Defendant Opera Company of Philadelphia. On April 23, 1995 Plaintiff's counsel noticed the deposition of defense counsel who prior to commencement of this action conducted an internal investigation, as counsel to OCP, of Plaintiff's internal complaints that she was being discriminated against by her supervisor. Defense counsel's investigation resulted in an "Investigation Report" dated March 30, 1994 and an "Executive Summary" of that report dated April 21, 1994, copies of which defense counsel has provided Plaintiff. Defense counsel has informed the court that she does not intend to introduce either report at trial.

It is well-settled that opposing counsel does not enjoy absolute immunity from being deposed. However, as set forth in the following comment in 8A Wright & Miller, Federal Practice and Procedure § 2102 (1994), the practice of taking the deposition of opposing counsel should not be encouraged:

> The fact that the proposed deponent is an attorney, or even an attorney for a party to the suit, is not an absolute bar to taking his or her deposition, [*3] although it may be that the attorney-client privilege will provide a ground for refusal to answer some or all questions. But the opportunity to take the deposition of opposing counsel may invite abuse. As the Eighth Circuit observed:

  

Page 2

1996 U.S. Dist. LEXIS 10341, *3; 71 Fair Empl. Prac. Cas. (BNA) 639;
68 Empl. Prac. Dec. (CCH) P442,247

In recent years, the boundaries of discovery have steadily expanded, and it appears that the practice of taking the deposition of opposing counsel has become an increasingly popular vehicle of discovery. To be sure, the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition. See Fed.R.Civ.P. 30(a) (a party may take the deposition of "any person"). We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances. [Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986)].

Accordingly, the court indicated that a court should permit the taking of counsel's deposition only where it is shown that no other means exist to obtain the information, and that the information sought is crucial to preparation of the case. Other courts have cast a similarly jaundiced [*4] eye on taking the deposition of opposing counsel and imposed similar limitations.

The Plaintiff has advised the court that it seeks to depose defense counsel to ascertain the following: (1) defense counsel's qualifications to conduct the investigation at OCP regarding Plaintiff's internal allegations of discrimination, (2) defense counsel's instructions from the Defendant concerning how to conduct the investigation, (3) the bases of defense counsel's statements in the Investigation Report, and (4) how defense counsel reached her decision as to whom to interview during the investigation. In view of defense counsel's statement that she does not intend to introduce either of the two reports at trial, the reasons set forth by the Plaintiff for deposing defense counsel are not necessary nor relevant to Plaintiff's preparation for the trial in this case.

Accordingly, the Court will grant Defendant's motion for a protective order precluding the taking of defense counsel's deposition.

**ORDER**

AND NOW, this 23rd day of July 1996, for the reasons stated in this court's order of July 23, 1996;

IT IS ORDERED: Defendant's motion of April 25, 1996 for a protective order precluding [*5] the taking of defense counsel's deposition is GRANTED.

RAYMOND J. BRODERICK, J.

