**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Stephen M. Friedberg, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | No. 02-CV-3193 |
| v. | : | (Judge Yohn) |
| | : | |
| Mutual Holdings Ltd., *et al.* | : | |
| | : | |
| Defendants. | : | |

## ORDER

AND NOW, on this _____ day of _____, 2005, it is hereby

ORDERED that the temporary restraining order issued by the Court on May 29, 2002, has

expired by operation of law.

It is FURTHER ORDERED that Plaintiff's complaint is dismissed with prejudice.

_____
Yohn, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Stephen M. Friedberg,                          :
                                               :
                              Plaintiff,   :   Civil Action
                                           :   No. 02-CV-3193
                         v.                :   (Judge Yohn)
                                               :
Mutual Holdings Ltd., *et al.*                 :
                                               :
                              Defendants.  :

## MUTUAL DEFENDANTS' PRE-HEARING BRIEF

Defendants Mutual Holdings Ltd., n/k/a IPC Mutual Holdings Ltd., Mutual

Holdings (Bermuda) Ltd., Mutual Indemnity Ltd., and Mutual Indemnity (Bermuda) Ltd. (the

"Mutual Defendants") submit this brief in advance of the evidentiary hearing before the Court on

October 27, 2005.  Pursuant to the Court's Order dated June 10, 2005, the Mutual Defendants,

within one week after the close of the hearing, also will submit their proposed findings of fact

and conclusions of law with reference to the motion to dissolve the temporary restraining order.

In this pre-hearing brief, the Mutual Defendants offer facts that they expect will be established at

the hearing based on depositions and documents.  They will provide fully-cited proposed

findings after the hearing.

## I.    INTRODUCTION

In his complaint, Plaintiff Stephen M. Friedberg ("Friedberg") generally alleges

that the Mutual Defendants have failed to transfer to Friedberg approximately $2.7 million

dollars that Friedberg claims was dividended to him pursuant to certain captive insurance

arrangements with the Mutual Defendants.  Specifically, Friedberg's complaint alleges that the

money was dividended to him pursuant to a formula set forth in three shareholder agreements

that govern the captive insurance arrangements and under which Friedberg is the sole remaining

shareholder. Although not set forth in his complaint, Friedberg also suggests that, pursuant to an

oral agreement, the Mutual Defendants agreed to retain the dividended money in the Mutual

Defendants' own accounts (currently with Morgan Stanley) for Friedberg's benefit and pay those

proceeds to Friedberg on his demand. The Mutual Defendants deny that any such oral agreement

existed and that the purported dividends ever were declared to Friedberg under the shareholder

agreements. Moreover, even if there were such an agreement, any disputes regarding it must be

decided in Bermuda.

On May 29, 2002, the Court issued a temporary restraining order ("TRO")

enjoining the Mutual Defendants from, inter alia, disposing of the funds held in the Mutual

Defendants' Morgan Stanley accounts. The TRO, however, expired by its own terms at the latest

on April 22, 2004. The Federal Rules of Civil Procedure state that a TRO will expire ten days

after its entry, unless a court for good cause shown extends the TRO for a maximum additional

ten days or unless the enjoined party agrees to an extension of the TRO's duration. Even if the

Mutual Defendants agreed to an extension of the TRO until the conclusion of settlement

negotiations between the parties, those negotiations ended on April 22, 2004. Therefore, at the

latest, the TRO expired by operation of law on April 22, 2004.

Moreover, Friedberg's claims are barred in their entirety by a forum-selection and

choice of law clause contained in the three shareholder agreements he attached to his complaint.

As stated in Friedberg's own complaint, the terms pursuant to which Friedberg would have

received dividends from the captive insurance arrangements are set forth in the shareholder

agreements themselves. Because the parties dispute whether the purported dividends were

declared to Friedberg under the shareholder agreements, and because the shareholder agreements

contain a forum-selection and choice of law clause requiring that all disputes be resolved in the

courts of Bermuda under Bermuda law, Friedberg is precluded from pursuing his claims in this jurisdiction (or any jurisdiction other than Bermuda).

In addition, the doctrine of collateral estoppel requires that the Court recognize that a dispute exists between the parties under the shareholder agreements as to whether the purported dividends ever were in fact declared or paid. In suits brought by Friedberg in Bermuda, the Bermuda Court of Appeals explicitly decided on March 19, 2004, that a "bona fide and substantial dispute" exists between Friedberg and the Mutual Defendants as to whether dividends were declared, and the dividend calculation asserted by Friedberg.

Furthermore, Friedberg is unable to meet the "clear and convincing" standard required to prove the existence of an alleged oral agreement. Even were he able to meet this heightened standard (which he cannot), and even if the TRO had not expired on April 22, 2004 (which it did), and even if the forum-selection clause did not apply to Friedberg's complaint (which it does), the Court still has no basis for awarding preliminary injunctive relief or hearing Friedberg's claims in this action. First, the parol evidence rule bars evidence of oral agreements, such as the one described by Friedberg, which address the same subject matter as a written agreement (here, the shareholder agreements). Second, under American Patriot Ins. Agency, Inc. v. Mutual Risk Management, Ltd., 248 F. Supp.2d 779 (N.D. Ill. 2003), aff'd, 364 F.3d 884 (7th Cir. 2004), the forum-selection and choice of law clause would apply equally to Friedberg's claims, as the alleged oral agreement also addressed the captive insurance arrangements that are the subject of the shareholder agreements. Finally, the oral agreement described by Friedberg, by his own admission, was intended for an illegal purpose -- to avoid payment of taxes on the

purported dividends. Under Pennsylvania law,[1] the oral agreement therefore is void and

unenforceable. For these additional reasons, Friedberg's complaint must be dismissed.

## II.    LEGAL ARGUMENT

### A.    The Temporary Restraining Order Issued By The Court On May 29, 2002 Expired By Operation Of Law At The Latest On April 22, 2004.

On May 29, 2002, the Court issued a TRO enjoining the Mutual Defendants from

"wasting, transferring, selling, concealing, disbursing, assigning, encumbering or otherwise

disposing of" the funds held in the Mutual Defendants' Morgan Stanley accounts. On March 5,

2003, the Court administratively dismissed this action pending the resolution of settlement

negotiations. The Mutual Defendants agreed to an extension of the TRO pending the conclusion

of settlement negotiations that took place between the parties. On April 22, 2004, counsel for the

Mutual Defendants notified the Court that settlement negotiations had concluded and were

unsuccessful and requested that the case be dismissed. At the hearing before the Court on the

Mutual Defendants' Motion to Dismiss on April 21, 2005, the Mutual Defendants requested that

the TRO be dissolved. On June 8, 2005, the Mutual Defendants also filed a formal Motion to

Dissolve the TRO. The Mutual Defendants' requests that the TRO be dissolved, however, were

unnecessary, as the TRO expired by operation of law at the latest upon conclusion of the parties'

settlement negotiations.

Rule 65 of the Federal Rules of Civil Procedure provides that a TRO "shall expire

by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within

---

[1]    The Mutual Defendants cite Pennsylvania law throughout this brief in the event the Court determines that law other than that of Bermuda applies. Of course, the Mutual Defendants submit that the Bermuda choice of law and forum clauses apply to the entire dispute.

the time so fixed the order, for good cause shown, is extended for a like period or unless the

party against whom the order is directed consents that it may be extended for a longer period."

Fed. R. Civ. P. 65(b). Thus, a TRO expires by operation of law, at the latest, twenty days after

the date of its entry (if the court extends its duration for good cause shown) or at the conclusion

of the extended period to which the parties agreed. See Sims v. Greene, 160 F.2d 512, 516-17

(3d Cir. 1947) (reversing TRO entered for a time period longer than the extension agreed to by

the parties). See also Prof'l Plan Examiners of New Jersey, Inc. v. Lefante, 750 F.2d 282, 288

(3d Cir. 1984) (vacating district court order granting TRO of indefinite duration due to court's

failure to issue findings of fact and conclusions of law). Accordingly, the TRO indisputably

expired by operation of law at the latest on April 22, 2004.

> **B.      A Dispute Exists Under The Shareholder Agreements As To Whether The Purported Dividends Ever Were Declared To Friedberg; Thus, The Forum-Selection Clause In The Shareholder Agreements Precludes Friedberg From Bringing His Claims In Any Jurisdiction Other Than Bermuda.**

Because the parties' dispute centers on whether a dividend ever actually was

declared to Friedberg under the shareholder agreements, see infra at II.B.2, and because each of

those shareholder agreements contains a forum-selection clause requiring that all disputes be

resolved in the courts of Bermuda, the Court has no subject matter jurisdiction over Friedberg's

complaint. Thus, Friedberg has no probability of success on his claims in this court. Friedberg

may, however, attempt to pursue his claims in the pending lawsuit he filed in Bermuda asserting

the same claims he asserted here.

1.    **The Forum Selection And Choice Of Law Clause Contained In The Shareholder Agreements Has Been Declared Enforceable By The Seventh Circuit Court of Appeals.**

The captive insurance arrangements at issue in Friedberg's Complaint are governed by certain shareholder agreements ("Shareholder Agreements"), which are generally referred to as the E11, U21 and E14 Agreements. Friedberg is a successor-in-interest to the original signatories to the Shareholder Agreements.

Each of the Shareholder Agreements states the following: "This Agreement has been made and executed in Bermuda and shall be exclusively governed by and construed in accordance with the laws of Bermuda and any dispute concerning this Agreement shall be resolved exclusively by the courts of Bermuda." (emphasis added).

The exact language of this forum selection and choice of law clause was declared enforceable by United States District Court for the Northern District of Illinois and by the Seventh Circuit Court of Appeals Judge Richard Posner in Amer. Patriot Ins. Agency, Inc. v. Mutual Risk Management, Ltd., 248 F. Supp.2d 779 (N.D. Ill. 2003), aff'd, 364 F.3d 884 (7th Cir. 2004). Moreover, courts in this jurisdiction routinely enforce forum-selection clauses entered into by parties exercising their freedom to contract. See, e.g., Instrumentation Associates, Inc. v. Madsen Electronics (Canada), Ltd., 859 F.2d 4, 6 (3d Cir. 1988); Hodes v. S.N.C. Achille Lauro, Nos. 88-5086, 88-5092, 1998 U.S. App. LEXIS 12802 (3d Cir. 1988); Jordan v. SEI Corp., No. 96-1616, 1996 U.S. Dist. LEXIS 7627 (E.D. Pa. June 4, 1996) (Yohn, J.)

Friedberg's complaint contains no allegations that the forum-selection clause was the result of fraud or over-reaching, nor has discovery revealed any such concerns. In fact,

Friedberg himself has acknowledged that the requirement that disputes be resolved in Bermuda was "clearly outlined." Moreover, enforcement of the forum-selection clause will not hinder Friedberg's ability to pursue his claims, as he already has a pending action relating to the Shareholder Agreements in Bermuda. As a result, because the parties entered into an enforceable forum-selection clause and because, for the reasons stated below, there exists a dispute between the parties under the Shareholder Agreements themselves, this Court has no subject matter jurisdiction over Friedberg's claims. Friedberg must pursue his claims only in the courts of Bermuda, as he and his predecessors agreed.

> **2.      The Parties Disagree As To Whether The Purported Dividends Ever Were Declared Under The Shareholder Agreements; Therefore, The Forum-Selection Clause Clearly Has Been Triggered.**

It is clear from both the face of the pleadings and deposition testimony gathered in the phase of discovery prescribed by the Court's June 10, 2005 Order that a dispute exists between the parties as to whether the $2.7 million in purported dividends ever actually were declared to Friedberg under the Shareholder Agreements. Friedberg's Complaint alleges that the money currently contained in Morgan Stanley accounts "was declared by [the Mutual Defendants] as dividends to Friedberg under the three Shareholder Agreements." Complaint at ¶ 13 (emphasis added). The Mutual Defendants deny that the money contained in the Morgan Stanley accounts was ever declared as dividends to Friedberg. Answer at ¶ 13. The Complaint further alleges that Friedberg made a choice not to redeem dividends under the E11 and E14 Shareholder Agreements so that the Mutual Defendants would hold the money Friedberg alleges was declared as dividends under those Shareholder Agreements for Friedberg's benefit. Complaint at ¶ 15. The Mutual Defendants deny these allegations as well. Answer at ¶ 15.

Friedberg admits that his alleged ownership of the funds at issue is based on the Shareholder Agreements. The Shareholder Agreements appear as exhibits to Friedberg's complaint, which includes roughly twenty references to those agreements. In fact, Friedberg also told Stephen Gitter, a Morgan Stanley broker, that there was a dispute involving the money contained in the Morgan Stanley accounts and as to who owned such money. Friedberg has not declared as income or paid income tax on any of the funds that went into or were earned by way of appreciation or equity dividends in the Morgan Stanley accounts or the predecessor accounts at Legg Mason and Prudential Securities.

Indeed, no evidence has surfaced showing that a dividend ever was declared relating to the funds at issue to Friedberg under the Shareholder Agreements in the first place. Therefore, regardless of whether the alleged oral agreement (purportedly addressing how, and how much of, the funds in the Morgan Stanley accounts ultimately would be released to Friedberg) existed, this dispute primarily concerns whether the money contained in the Morgan Stanley accounts ever was declared a dividend to Friedberg. Therefore, the forum-selection and choice of law clauses in the Shareholder Agreements preclude Friedberg from bringing his claims in this jurisdiction or any jurisdiction other than Bermuda.

> **3.      Furthermore, The Doctrine Of Collateral Estoppel Requires The Court To Honor The Bermuda Court Of Appeal's Ruling That A Dispute Exists Under the Shareholders Agreements.**

The doctrine of collateral estoppel prevents a party from re-litigating an issue "when a court of competent jurisdiction has already adjudicated the issue on its merits, and a final judgment has been entered as to those parties." Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1998) (affirming dismissal of claims based on collateral estoppel where issues previously adjudicated in arbitration). An "issue" for purposes of collateral estoppel includes issues of

evidentiary fact, issues of application of the law to facts, or issues of law.  Witkowski, 173 F.3d

at 199.  Courts consider the following four elements to determine whether collateral estoppel

bars re-litigation of an issue:

> 1) the issue decided in the prior adjudication must be identical to the one presented in the later action;
>
> 2) there must have been a final judgment on the merits;
>
> 3) the party against whom collateral estoppel is asserted must have been a party or in privity with the party to the prior adjudication; and
>
> 4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in the prior adjudication.

Id.  Collateral estoppel operates to bar claims that have previously been litigated in either U.S. or

foreign courts.  See Pony Express Records, Inc. v. Springsteen, 163 F. Supp. 2d 465, 473-74

(D.N.J. 2001) (dismissing plaintiff's claims based on collateral estoppel where issues previously

adjudicated by High Court of Justice, Chancery Division, United Kingdom).

Friedberg has filed three actions in Bermuda courts relating to the Shareholder

Agreements.  Specifically, on May 27, 2002, four days after Friedberg filed this action,

Friedberg filed a writ of summons against the Mutual Defendants in the Supreme Court of

Bermuda (the "Bermuda Writ"), Civil Jurisdiction 2002:  No. 195.  See Bermuda Writ, attached

hereto as Exhibit A.  On August 12, 2002, Friedberg filed  petition against IPC Mutual Holdings

Ltd. ("IMH") in the Supreme Court of Bermuda (the "First Bermuda Petition"), Civil

Jurisdiction 2002:  No. 299.  Also on August 12, 2002, Friedberg filed a second petition against

Mutual Holdings (Bermuda) Ltd. ("MHL") with the Supreme Court of Bermuda (the "Second

Bermuda Petition"), Civil Jurisdiction 2002:  No. 300.

In the First Bermuda Petition, Friedberg claimed that he was owed $790,832 under a dividend formula set forth in the E14 Shareholder Agreement. In the Second Bermuda Petition, Friedberg and his co-plaintiffs claimed that they were owed $4,643,291 under the various Shareholder Agreements, and Friedberg claimed that, of that sum, he personally was owed $3,234,391 under the U21 Shareholder Agreement. In both the First and Second Bermuda Petitions, Friedberg argued that, despite the denials of IMH and MHL (collectively, the "Bermuda Mutual Defendants") that a dividend had been declared or that the Bermuda Mutual Defendants owed Friedberg any money, such denials were "inconsistent with the terms of the relevant shareholder agreements" and not "bona fide."

On June 12, 2003, the trial judge found in favor of Friedberg and his co-plaintiffs with respect to both the First and Second Bermuda Petitions (collectively, the "Bermuda Action"). However, on March 19, 2004, the Bermuda Court of Appeals reversed the trial court and entered judgment in favor of the Bermuda Mutual Defendants. Specifically, in a unanimous ruling, the appellate court (the "Bermuda Judgment") concluded that a "bona fide and substantial dispute" existed as to the amount of dividends to which Friedberg and his co-plaintiffs were entitled. See Bermuda Judgment, attached hereto as Exhibit B.

In rendering its decision, the appellate court referred to a series of detailed affidavits submitted by the parties and, in particular, to affidavits submitted by the Bermuda Mutual Defendants illustrating that the amount of dividends Friedberg alleged were owing was indeed contested. The appellate court reasoned that the relationship between Friedberg and the Bermuda Mutual Defendants was regulated by the shareholder agreements containing the dates on which the Bermuda Mutual Defendants agreed to cause a dividend to be declared. The appellate court determined that the terms of the Shareholder Agreements set forth the limits as to

the amounts and timing of payments made to insureds under the very captive insurance arrangements at issue in this case. Ultimately, the Bermuda Judgment stated: "We find and hold that the [Bermuda Mutual Defendants] have shown that they have a bona fide and substantial defen[s]e to the Petitioners' claims, whether made under the terms of the relevant Shareholders' Agreement or under an implied variation thereof (if such is alleged) by reason of an alleged course of dealing between the parties prior to March 2002. . . ."

As such, it is clear (1) that the Bermuda Judgment addressed the issue that is the subject of the October 27 hearing in this case, i.e., whether a dispute exists between Friedberg and the Mutual Defendants under the Shareholder Agreements; (2) that a final judgment on the merits as to this issue was reached pursuant to the Bermuda Judgment; (3) that Friedberg was a party to the Bermuda Action; and (4) that Friedberg had a full and fair opportunity through the Bermuda Action and the subsequent appeal to litigate whether a dispute existed under the Shareholder Agreements as to the amount of dividends to which Friedberg was entitled. For these reasons, all four elements of the doctrine of collateral estoppel have been met, Friedberg is barred from re-litigating issues addressed in his First and Second Bermuda Petitions, and the Court must honor the Bermuda Court of Appeals decision that a "bona fide" dispute exists under the Shareholder Agreements.[2]

---

[2]    Moreover, principles of international comity, whereby U.S. courts give effect to the rulings of foreign tribunals, also mandates that the Court honor the judgment entered by the Bermuda Court of Appeals. See General Elec. Co. v. Deutz, 270 F.3d 144, 160 (3d Cir. 2001). Comity works to promote international cooperation and encourage reciprocity and "should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971). Public policy encourages application of comity principles, as parties who have brought and argued their claims in a foreign tribunal should be bound by those

(continued...)

**C.    Friedberg Cannot Meet His Burden Of Establishing The Existence Of An Oral Agreement By Clear , Precise and Convincing Evidence.**

Friedberg cannot prove the existence of an oral agreement based solely on his own vague testimony, which is exactly what Friedberg attempts to do here.  Under Pennsylvania law, the plaintiff has the burden of establishing the existence of an oral contract by "clear, precise, and convincing evidence."  In re Labrum & Doak, LLP, 225 B.R. 93, 104 (E.D. Pa. 1998); Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998).

Discovery in this matter has not uncovered any evidence to support Friedberg's bald assertion that an oral agreement existed with the Mutual Defendants.  No deponent has in the slightest given any credence to Friedberg's claim of an alleged oral agreement.  Mark Ouimette, an original shareholder and signatory under all three Shareholder Agreements, was not aware of any oral agreement between him or Friedberg and the Mutual Defendants, nor did Friedberg tell Mr. Ouimette that any such oral agreement existed.  Friedberg, in his own deposition testimony, struggled to articulate the terms of the alleged oral agreement.  Friedberg was unclear as to the exact parties to the alleged oral agreement.  Friedberg could not answer whether the alleged oral agreement was formed pursuant to one or several conversations.  Moreover, Friedberg was unable even to pinpoint whether the oral agreement took place before or after execution of the Shareholder Agreements.

Friedberg simply cannot adduce evidence that the alleged oral agreement existed and, thus, cannot meet the "clear and convincing" standard required for a court to give effect to

---

(...continued)
decisions.  Id. (citing Baldwin v. Iowa State Traveling Men's Ass'n, 238 U.S. 522, 525-26 (1931)).

the terms of an oral agreement. Thus, Friedberg has no basis for arguing that this dispute arises under anything other than the Shareholder Agreements and cannot avoid invocation of the forum-selection clause in this case.

> D.    **Even If Friedberg Somehow Meets The Clear And Convincing Standard Required To Prove The Existence Of An Oral Agreement, Friedberg's Claims Relating To Such Agreement Cannot Be Decided By This Court.**
>
>> 1.    **The Parol Evidence Rule Bars Consideration of the Alleged Oral Agreement.**

Under Pennsylvania law, the parol evidence rule operates to bar evidence of a subsidiary oral agreement addressing the same subject matter as a written agreement between the parties where the written and oral agreements "are so interrelated that both would be executed at the same time and in the same contract." Mellon Bank Corp. v. First Union, 951 F.2d 1399, 1405 (3d Cir. 1991) (applying parol evidence rule to bar evidence of oral agreement where parties would "naturally and normally" have included the terms of the oral agreement in the written agreement); Greenberg v. Tomlin, 816 F. Supp. 1039, 1053 (E.D. Pa. 1993) (declining to consider evidence of oral agreement as to timing of cash distributions to employees where employment agreement set forth process by which equity interest would be distributed). The written agreement need not contain an integration clause in order for the parol evidence rule to be applied. Mellon Bank, 951 F.2d at 1406 n. 6; Greenberg, 816 F. Supp. at 1053; see also Kehr Packages, Inc. v. Fidelity Bank, 710 A.2d 1169, 1173-74 (Pa. Super. 1998).

Both the Shareholder Agreements and the alleged oral agreement cover the same subject matter -- i.e., the process by which dividends would be declared and paid in connection with the captive insurance arrangements and Friedberg's entitlement to proceeds from the programs. Friedberg admits this. Indeed, Friedberg has testified that the alleged oral agreement

"tracked the process" by which money would be dividended, and he described the oral agreement as providing that "[a]n account evaluation would be done per the Shareholder Agreement." Similarly, the Shareholder Agreements set forth the terms pursuant to which Friedberg would have declared dividends from the captive insurance arrangements.

The parol evidence rule typically applies to oral agreements entered into prior to or contemporaneously with written agreements. See Greenberg, 816 F. Supp. at 1052. Friedberg does not recall whether the alleged oral agreement was made before or after he signed the Shareholder Agreements, although he does describe it as a "parallel" agreement to the Shareholder Agreement. Because no evidence shows that the alleged oral agreement was entered into subsequent to the written Shareholders Agreements, and Friedberg himself has suggested that both the oral and written agreements were entered into contemporaneously, the parol evidence rule applies. Accordingly, even were Friedberg able to meet the standard for proving the existence of an oral agreement (which he cannot), the parol evidence rule bars the Court from considering the terms of the oral agreement as evidence in this matter.

Furthermore, the Shareholder Agreements also contain the following clause: "This Agreement may not be modified, amended or changed in any manner except in writing signed by all the parties thereto." As a result, whether the alleged oral agreement was entered into prior or subsequent to the execution of the Shareholder Agreements, it cannot be deemed to impact the obligations set forth in the Shareholder Agreements.

2.    **The Forum-Selection And Choice Of Law Clause In The Shareholder Agreements Also Applies To The Alleged Oral Agreement.**

As stated above, Friedberg cannot meet the "clear and convincing" standard required to show that an oral agreement existed between Friedberg and the Mutual Defendants. Nevertheless, <u>even if</u> hearing testimony somehow unveils sufficient evidence to show that an oral agreement existed, and <u>even if</u> such oral agreement, and not the Shareholder Agreements, is deemed to be the contract forming the basis of the parties' dispute -- which it is not -- the Court still lacks jurisdiction over Friedberg's complaint, since the forum-selection clause in the Shareholder Agreements would apply equally to the alleged oral agreement.

Judge Posner's opinion in <u>American Patriot</u> emphasized that the exact forum-selection clause contained in the Shareholder Agreements at issue here would apply to other contracts between the plaintiff and defendants which related to the creation and administration of the insurance program that inspired execution of all of the agreements.  <u>American Patriot</u>, 364 F.3d at 889.  The plaintiff in <u>American Patriot</u> argued that its suit was based on "other contracts, which [were] part of the overall insurance program but do not contain forum-selection clauses, rather than the Shareholder Agreement."  <u>Id.</u>  Judge Posner rejected this argument, stating that "[t]he Shareholder Agreement happens to be the only site of the forum-selection clause, but no reason has been suggested for why the parties would have wanted disputes under that agreement to be litigated in Bermuda but not disputes under the other pieces of the jigsaw puzzle."  <u>Id.</u>

The same principle applies even more readily here.  Friedberg has stated that he and the Mutual Defendants entered into the "parallel" oral agreement in conjunction with the Shareholder Agreements and acknowledges that the Shareholder Agreements and alleged oral

agreement addressed the same subject matter. Friedberg even references the Shareholder Agreement into describing the alleged oral agreement.

Similarly, the Shareholder Agreements set forth how and when dividends could be declared. The alleged oral agreement purportedly addressed how, and how much of, the funds allegedly dividended to Friedberg and contained in the Morgan Stanley accounts ultimately would be released to Friedberg. Accordingly, both the Shareholder Agreements and the alleged oral agreement would have been pieces of the "jigsaw puzzle" laying out the process by which dividends would be declared and paid in connection with the captive insurance arrangements. As such, these written and oral agreements are interrelated, and under <u>American Patriot</u>, the parties' inclusion of a forum-selection and choice of law clause in the Shareholder Agreements can be presumed to represent the intent of the parties the purported oral agreement which Friedberg describes.[3] Friedberg should be required to honor his agreement to bring his claims only in the courts of Bermuda or, at the very least, the Court should recognize the parties' intent that Bermuda law apply to Friedberg's claims.

E.  **Friedberg States That The Alleged Oral Agreement Was Entered Into To Avoid Payment Of Taxes; Therefore, The Alleged Oral Agreement Is Illegal And, Thus, Unenforceable.**

Under Pennsylvania law, courts will not enforce contracts if formation of or performance under the contract would be criminal, tortious or otherwise opposed to public policy. <u>West Corp. v. Diversified Brokerage Agencies, Inc.</u>, 1986 U.S. Dist. LEXIS 17636, at *7-8 (E.D. Pa. 1986) (declaring illegal insurance contract void <u>ab initio</u>). More specifically,

---

[3] Friedberg did not testify that he intended some law other than Bermuda to apply to a dispute involving the oral contract.

contracts entered into for the purpose of evading payment of federal or state taxes have been found void and unenforceable. Alco Parking Corp. v. Pub. Parking Auth., 706 A.2d 343, 350 (Pa. Super. 1988); see also Homami v. Iranzadi, 211 Cal. App. 3d 1104, 1112 (Cal. Ct. App. 1989) (finding unenforceable contract where purpose was to avoid compliance with state and federal income tax regulations).

Friedberg says he received income but admits that he has not declared any of the money contained in the Morgan Stanley accounts or the predecessor accounts as income on his tax returns. The alleged oral agreement (had it occurred, which it did not), as described by Friedberg himself, was entered into for the illegal purpose of evading payment of federal and state income taxes on money that Friedberg claims was dividended to him. As such, even if the alleged oral agreement had occurred, the Court would not be permitted to give effect to its terms.

## III.    CONCLUSION

For the foregoing reasons, the Mutual Defendants respectfully request that the Court order that the temporary restraining order issued by the Court on May 29, 2002 has expired by operation of law and that Plaintiff's Complaint be dismissed prejudice.

DATED: October 26, 2005                    Respectfully submitted,


                                           s/Brooke J. Hertzer
                                           Douglas Y. Christian (ID No. 41934)
                                           Joshua A. Mooney (ID No. 85945)
                                           Brooke J. Hertzer (ID No. 91999)
                                           BALLARD SPAHR ANDREWS & INGERSOLL, LLP
                                           1735 Market Street, 51st Floor
                                           Philadelphia, PA 19103-7599
                                           (215) 665-8500

                                           Attorneys for Defendants

# EXHIBIT A

IN THE SUPREME COURT OF BERMUDA
CIVIL JURISDICTION
2002 · No. 195

BETWEEN:

STEPHEN FRIEDBERG

Plaintiff

-v-



MUTUAL INDEMNITY LIMITED

First Defendant

-and-

IPC MUTUAL HOLDINGS LTD.

Second Defendant

-and-

MUTUAL INDEMNITY (BERMUDA) LTD.

Third Defendant

ELIZABETH II, by the Grace of God of the United
Kingdom of Great Britain and Northern Ireland and
of our other Realms and Territories Queen, Head of
the Commonwealth, Defender of the Faith

TO: Mutual Indemnity Ltd. , IPC Mutual Holdings Ltd.
and Mutual Indemnity (Bermuda) Ltd
Clarendon House
Church Street
Hamilton HM11

---

### GENERALLY INDORSED WRIT OF SUMMONS

---

WE COMMAND YOU that within fourteen days after the service of this Writ on you, inclusive of
the day of such service, you do cause an appearance to be entered for you in an action at the suit
of Steven Friedberg and take notice that in default of your so doing the Plaintiff may proceed
therein, and judgment may be given in your absence

WITNESS the Honourable L. Austin Ward Q.C. Chief Justice of our said Court,
the 27 day of May in the year of our Lord two thousand one hundred and
two 2002.

NOTE - This Writ is to be served within twelve calendar months from the date thereof, or if
renewed, within six calendar months from the date of the last renewal including the day of such
date, and not afterwards

DIRECTIONS FOR ENTERING APPEARANCE

The Defendant may enter an appearance in person or by an attorney either (1) by handing in the appropriate form, duly completed, at the Registry of the Supreme Court in Hamilton, Bermuda, or (2) by sending them to the Registry by post.

INDORSEMENT OF CLAIM

The Plaintiff's claim is for:

1       A declaration that the First , Second and/or Third Defendant hold all monies accounted for by them as monies held in  shareholder accounts and representing dividends declared in the Plaintiff's favour pursuant to certain shareholder agreements between the Plaintiff and the Second and/or Third Defendant, being a minimum admitted amount of US$4,700,613 according to the Defendants' financial statements for the period ending 31st March, 2002, as constructive trustees for the Plaintiff.

2.      A declaration that the First and or Third Defendant holds all monies held by it  pursuant to the Plaintiff's directions in portfolio investment accounts #616-019708-215-2, 616-019497-215-2, 616-019707-215-2 at Morgan Stanley Gitter Group's Philadelphia, Pennsylvania, U.S.A branch,  being dividends declared in the Plaintiff's favour and payable pursuant to, inter alia, certain shareholder and/or redemption agreements between the Plaintiffs and the Second and/or Third Defendant, as constructive trustee for  the Plaintiff.

3.  An account of the profits made by the First, Second  and/or Third Defendant from such  property as aforesaid.

4.  An Order that the First, Second and/or Third Defendant do transfer to the  Plaintiff such  property as aforesaid and do pay to them the profit found to be made by them as aforesaid on the taking of the account.

5.  An injunction restraining the First, Second and/or Third Defendant from transferring to any  other person or otherwise dealing with the property described in paragraphs 1-2 hereof.

6.  Costs.

7  Further and other relief

Dated this  27th day of  May  2002

MILLiGAN-WHYTE & SMiTH
Attorneys for the Plaintiff

INDORSEMENT AS TO ATTORNEY AND ADDRESS

This writ was issued by Milligan-Whyte & Smith, of Mayflower Place  2 - Floor  5 Parla Mill Road  Hamilton  HM08  Bermuda  Attorneys for the said Plaintiff whose address  is  c/o Research Underwriters 4240 Greensburg Place Pittsburgh  PA  15221-4236 USA  and  whose

address for service is c/o Milligan-Whyte & Smith, Mintflower Place, 8 Par-la-Ville Road, Hamilton

HM 08.

<u>INDORSEMENT AS TO SERVICE</u>

This Writ was served by me at                                              on

-day, the        of              . 2002 at           o'clock in the       -noon.

              Indorsed the           day of              . 2002.

Name        _____    Signed _____

Address        _____

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

2002: No. 195

BETWEEN:

STEPHEN FRIEDBERG

Plaintiff

– v –

MUTUAL INDEMNITY LTD.

First Defendant

-and-

IPC MUTUAL HOLDINGS LTD.

Second Defendant

---

### GENERALLY INDORSED WRIT OF SUMMONS

---



MILLIGAN-WHYTE & SMITH
Barristers & Attorneys
Mintflower Place, 2nd Floor
8 Par-la-Ville Road
Hamilton HM 08
Bermuda

Attorneys for the Plaintiff



EXHIBIT B



# IN THE COURT OF APPEAL FOR BERMUDA

## CIVIL APPEAL NO.   17 OF 2003

IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES ACT 1981

### IPC MUTUAL HOLDINGS LTD.
Plaintiff (Intending Appellant)

and

### STEPHEN FRIEDBERG
Defendant (Intending Respondent)

## CIVIL APPEAL NO.   18 OF 2003

IN THE MATTER OF THE PETITION OF STEPHEN FRIEDBERG
AND IN THE MATTER OF THE COMPANIES ACT 1981

### MUTUAL HOLDINGS (BERMUDA) LIMITED
Plaintiff (Intending Appellant)

and

### STEPHEN FRIEDBERG
1st  Defendant (1st Intending Respondent)

### DALE KRAPF
2ND   Defendant (2nd Intending Respondent)

### DALLAS KRAPF
3rd Defendant (3rd Intending Respondent)

---

Before:    Zacca, P.
           Evans, J.A.
           Clough, J.A.

Date of Hearing:       15th March 2004
Date of Judgement:     19th March 2004

## JUDGMENT

Evans, J.A.:

1.    This is an application for leave to appeal against judgments given by
      Mr. Justice Warner on 12th June 2003.  By order of the Court of Appeal
      dated 20th November, 2003, the applications have been heard inter

partes and the hearing is to be treated as the hearing of the appeal if
leave is granted.

2.   We will refer to the appellants as "the Companies", or to "IPC" and
     "Mutual" when it is necessary to distinguish between them. Similarly,
     we will refer to "the Petitioners" jointly, except when it is necessary to
     refer to them individually and by name.

3.   On 12th August 2002, the Petitioners issued winding-up Petitions
     against both companies. They did so claiming to be both
     contributories (Preferred Shareholders) and creditors of the
     Companies. The order they sought was in the following terms:-

     "(1)      That this Petition be adjourned *sine die.*

     (2)  That, at such time as this Petition is relisted for hearing, if so
          moved by the Petitioners, the Company be wound up by the Court
          under the provisions of the Companies Act, 1981.

     (3)  That a Provisional Liquidator of the Company be appointed with
          the power to appoint agents and attorneys and to pay for same out
          of the assets of the Company at the normal hourly rates charged by
          such agents and attorneys.

     (4)  That the costs occasioned by this Petition be paid out of the assets
          of the Company.

     (5)  That such other Order may be made in the premises as may to this
          Honorourable Court seem just."

4.   On 19th August 2002 the Companies issued Summonses seeking
     Orders that the Petitions "be struck out as an abuse of the process of
     this Honourable Court."

5.   The Companies' Summonses were heard (together with a third
     Summons, which is not relevant to these Appeals) before Warner J. on
     11th /13th December 2002. He gave his Ruling on 12th June 2003,
     holding that the Companies' applications were dismissed.

6.   On 1st July, 2003, the learned Judge refused the Companies'
     applications for leave to appeal, on the ground that the applications
     had "no realistic chance of success."

     The Parties

7.   Although there is a complex contractual relationship between the
     Petitioners and the Companies, and other parties, the essential
     relationship for the purposes of this appeal is that each of the
     Petitioners is a Preference Shareholder in one, or both, of the
     Companies. This aspect of the relationship is regulated by a
     Shareholder Agreement which provides that "on the dates shown in
     Appendix 1 (hereinafter referred to as the 'Dividend Date') [the
     Company] agrees to cause a dividend to be declared to the owner of

record on such date (1) of the PREFERRED SHARE in an amount equal to" the sum of a formula which followed in the clause.

8. The full contractual relationship establishes what are described as Rent-a-captive insurance programmes run by the MRM Group of Companies to which the Companies belong. These programmes were designed to make the economic advantages of a captive reinsurer available to customers who are potential insureds, but who do not own or operate captive insurance companies of their own.

9. The object of the scheme,was to enable the insureds to share in the profits (or losses) of the insurance and reinsurance programme. So the insurance was placed with an insurance company which was an affiliate of the Companies (in the example we were given, Legion Insurance Company) which then reinsured part of the risk with a reinsurer wholly-owned by one of the Companies. The reinsurers were Mutual Indemnity Ltd. and Mutual Indemnity (Bermuda) Ltd., known as "MIL" and "MIB" respectively. To safeguard the reinsurers against losses, the insureds provided them with collateral security in the form of a letter of credit, or cash substitute.

10. Profits made by the reinsurers became available to the Companies, as the owners of the reinsurers, in form of dividends paid in respect of the Companies' shareholdings. The Companies themselves were not insurers, or reinsurers, and they did not carry on business as such.

11. By constituting the insureds as Preferential Shareholders in the Companies, they became entitled to share in any profits made by the Companies from their insurance programmes. Again, the profit-sharing mechanism involved the payment of dividends by the Companies to the insureds as Preference Shareholders, hence the obligation placed on the Companies to declare dividends under Clause 2 of the Shareholders' Agreement, quoted in Paragraph 7 above.

12. In outline, the amount of the dividends to be declared under Clause 2 took account of investment income received by the Companies and the reinsurers, less an administration fee, "plus or minus the amount of indemnity gain or loss realized" by the reinsurers, calculated as stated in the clause.

13. There were doubtless valid commercial reasons why the insured's participation in the underwriting gains was agreed to be paid by means of dividends declared by the Companies. These reasons may have been fiscal, or regulatory, or perhaps others, but whatever they were, the terms and effect of the Shareholders' Agreement are clear. They do not provide for any other payment to be made by the Companies to the insureds.

14.   A feature of the arrangements is that separate agreements were
      entered into and separate accounts were prepared for each insurance
      programme. These appeals relate to six different programmes. We
      were told that these were all that have been entered into by the
      present Respondents, but in total the Companies' business extends
      over several hundred programmes placed by other insureds. Each of
      these, presumably, is also a Preferred Shareholder.

15.   Against this background, it is sufficient to state that the following
      programmes are relevant to this appeal:

      Petition No. 299

      Petitioner –        Stephen Friedberg
      Programme -         Series E14
      Company –           IPC Mutual Holdings Ltd. ("IPC")

      Petition No. 300

      Petitioners –       Stephen Friedberg, Dale Krapf and Dallas Krapf
      Programmes –        Series LU21 (Friedberg)
                          Series M23 (Dale Krapf and Dallas Krapf)
                          Series N23 (all); also
                          Series C39 (all)
      Company -           Mutual Holdings (Bermuda) Ltd. ("Mutual")

16.   The Shareholders' Agreement for Series U21 provided for a dividend
      to be declared annually on 31st May and for the amount to be
      calculated for "the period ending March 31 immediately preceding."
      Under the other relevant Shareholders' Agreements, the Dividend Date
      is 28th February (annually) in respect of the previous calendar year
      ("period ending 31st December immediately preceding").

      The Petitions

17.   The Petitioners claimed as Creditors and Contributories of the
      Companies in which they are preferred shareholders. As creditors,
      they allege –
      "The Petitioner(s) is (are) owed $790,832 (Petition 299) [$4,643,291
      (Petition 300)] according to the Company's own accounts for the
      period ending 31st March, 2002 under a dividend formula set out in
      their respective preference shareholder's agreement"

18.   The Petitioners also alleged –
      (1) that the Companies were insolvent;
      (2) that there was a need for independent management of the
          Companies affairs (their business being in run-off); and
      (3) that it was just and equitable for the Petitioners as Contributories
          that the Companies should be wound up; however, "as it is not
          inevitable that the Company be wound-off (sic) in any event after
          the run-off of the relevant insurance programmes is complete, the
          winding-up petition can be adjourned to the first return date and a

provisional liquidator appointed specifically to supervise the run-off process".

19.  The passage quoted in Paragraph 18(3) (above) was the Petitioners' explanation for the unusual form of the Relief which they sought. It is not otherwise apparent why a winding-up petition should ask, first, for the petition to be adjourned and for no winding-up order to be made in the first instance.

The Companies' Response

20.  The Companies issued summonses dated 19th August 2002 asking for orders that the Petitions be struck out "as an abuse of process of this Honourable Court". The grounds, as stated in affidavits sworn by J. Patrick Reardon (in-house counsel to the MRM Group) dated 20th August, 2002) and David Alexander (President of Mutual) dated 11th July 2002, can be summarized as follows:

(1) no dividends had been declared by the Companies in favour of the Petitioners as Preference Shareholders, and the Companies were not indebted to them;

(2) the state of accounts between the Companies and the Petitioners was disputed, as the Petitioners well know;

(3) the Petitioners had previously (25th June 2002) issued a Statutory Demand for payment of the sums in question, and their lawyers had given an undertaking not to present winding-up Petitions based on the Demand;

(4) Stephen Friedberg, on his own behalf and on behalf of the co-petitioners, had agreed orally on 30th January, 2002 that the Company (Mutual) could "cross-collateralize" (exercise rights of set-off) between programmes M23, N23 and C39;

(5) Sephen Friedberg had already commenced proceedings both in Bermuda (Civil Jurisdiction 2002 No. 195) and in Pennsylvania in respect of substantially the same claims as those in the Petition; and

(6) The Petitioners had acted in bad faith in that they were using the petitions for an improper purpose, namely, to bring pressure to bear on the Companies to meet their claims for dividends, which had not been declared.

21.  Stephen Friedberg responded in his second Affidavit dated 11th September 2002. He contended that

"3.1    moneys are owing by way of dividend so, I am advised and I verily believe, it is quite proper (to) bring pressure to bear to obtain payment of monies indisputably due;

3.2    It is irrelevant that the Petitions herein are based in part on statutory demands the petitioners undertook not to base petitions on;

3.3    the proceedings [civil claims in Bermuda and Pennsylvania] are proprietary claims not inconsistent with the present proceedings and designed to establish the Petitioners are standing as secured creditors in the events of the Respondents going into liquidation;

3.4    the Petitions herein are presented in the Petitioners' dual capacities as creditors and contributories of the Respondent companies. No averments are made supporting or capable of supporting an order to strike out the Petition presented by the Petitioners _qua_ contributories."

22.    He further contended that (1) "applying the mechanism [of Clause 2 of the Shareholder's Agreement] to the relevant programmes, dividends have been declared by operation of law and are payable, thus giving rise to debts due to the Petitioners", and (2) "it is clear that the Petitioners are creditors of the Respondent to some extent" (emphasis supplied) (Paragraph 11). He also dealt with the various reductions which Mr. Alexander claimed that the Companies were entitled to make, and with the claim to exercise "cross-collateralization" with Series C39. He did not dispute Mr. Alexander's assertion that he made an oral agreement on 20th January, 2002; he denied that this was legally binding, and he produced a letter from Mutual dated 22nd March, 2002 requesting the Petitioners' written agreement to the cross-collateralization proposal, which they had not signed. Writing was necessary, he contended, to modify or vary the Shareholder's Agreements, each of which was opened "in a discrete way" from inception (Paragraph 8.b).

23.    A second Affidavit was sworn by Mr. Alexander, dated 9th December, 2002.

The Companies' Summonses

24.    These were heard before the Hon. Justice Warner on Wednesday 11th December and Friday 13th December 2003. Counsel for both parties made wide-ranging submissions, in the course of which Mr. Kawaley said on behalf of the Petitioners "we accept that there is a dispute about the exact amounts that are owing ... The question is really is any money due at all to the Petitioner." He said later, "There is no bona fide or substantial dispute over the fact that the Petitioners are creditors to Resp. Co. to some extent," and "we say there is such a dispute about the existence of those debts."

Judgment

25.    Regrettably, the learned judge's ruling was delayed until 12th June 2003. The relevant part is brief and can be quoted in full:-

"With regard to Petition 2002 No. 299 [this was in error for No. 300] based on the evidence, I find that dividends have been declared by the Respondent company for the relevant period. There is no bona fide or substantial dispute over whether or not moneys are presently owed to the Petitioner. I find that this Petitioner is owed US$4,643,291.00 by the Respondent. I find that there is no dispute based on bona fide or substantial grounds.

Further based on the Respondent's admissions and assertions, I find that the respondent is unable to pay its debts.

In the circumstances, I would refuse the Respondent's application to strike out the Petitioner's Petition.

Similarly with regard to Petition 2002 No. 300 (in error for No. 299) on the evidence I find that this Respondent owes US$ 790,832 based on declared dividends for the relevant period. I find that there is no dispute based bona fide on substantial grounds. As with Petition 2002 No. 299, I find that the Respondent is unable to pay its debts.

In the circumstances, I refuse the Respondent's application to strike out the Petitioner's petition."

<u>The Judge's failure to State Reasons</u>

26.    It is a separate ground of appeal that the learned judge failed to state any, or sufficient, reasons for the conclusions that he reached. Mr. Hargun, for the Companies as Appellants, referred us to the recent judgment of the Court of Appeal (England) in <u>Flannery v Halifax Estate Agencies Ltd</u>: [2000] 1 WLR 377 (Henry L.J.). Mr. Duncan for the Respondents (Petitioners) did not address us on this issue.

27.    If an appeal were allowed on this ground, and the judgment set aside, it would be necessary in most cases for this Court to order a re-hearing of the Summonses or a retrial. That is not necessary in the present case, because we have reached a clear conclusion on other grounds of appeal that the appeal should be allowed. We, therefore need to say no more about this ground.

<u>The Appeal</u>

28.    We are indebted to Mr. Hargun for his concise statement of the issues raised by the appeal and for his submissions on behalf of the Companies (Appellants). Mr. Duncan realistically responded by accepting that he would no longer pursue the Petitioners' contention that they were entitled to present the Petitions as contributories, and we need say no more about that aspect of the case. With regard to their claims as creditors, Mr. Duncan explained to us that this is based on the course of dealing which was adopted by both parties under the

IPC Appeal                                              7

Shareholders' Agreement, rather than on the terms of the Agreements themselves. He accepted, moreover, that there is limited evidence of what this course of dealing was, though he submitted that it is made sufficiently clear from the small number of documents before the Court. He also recognized that it was difficult for him to avoid falling into what he called the "trap" of acknowledging that the sums claimed by the Petitioners were, and are, disputed by the Companies on bona fide and substantial grounds.

29. We are also indebted to Mr. Duncan for his realistic and responsible conduct of the case for the Respondent on this appeal.

The Course of Dealing

30. Mr. Duncan accepts that no dividend was declared, by either of the Companies, in respect of the accounting period which ended on 31st December, 2001 (the year before the Petitions were presented alleging that debts were due) or, in the case of Series U21, for the year ending 31st March 2002.

31. He also accepts that the Companies' accounts for the year ending 31st December 2001, for the relevant programmes other than Series U21, are not in evidence before the Court.

32. He contends that a course of dealing became established in the years before 2002 whereby the Companies prepared quarterly accounts and then paid to or to order of the Petitioners any sums which the accounts showed were due to them from the Companies. The requirement of Clause 2 of the Shareholder Agreements that dividends should be declared annually was not, in fact, observed. There is no documentary evidence to support this contention before 31st March 2002, but he submits that the course of dealing is confirmed by documents which have been produced. Thus, -

(1) the Petitioners in their Statutory Demand dated 25th June, 2002 claimed that the sums which they were entitled to be paid by way of dividend "according to the Company's own calculations as at 31st March, 2002", were:

| | |
|---|---|
| Series E11 (redeemed) | $1,261,788.00 |
| Series E14 (Friedberg) | $790,832.00 |
| Series U21 (Friedberg) | $3,234,391.00 |
| Series M23 (Friedberg/Krapf) | $149,015.00 |
| Series N23 (Friedberg/Krapf) | $1,259,895.00 |
| | $6,695,921.00 |
| Less paid | $2,000,000.00 |
| Total Due | $4,495,921.00 ; and |

(2) these figures were confirmed by the Companies' "Dividend Calculation" which was enclosed with their attorneys' letter dated 23rd May, 2002. This showed the same figures as "Potential Surplus per Collateral Review as at 31st March 2002" and it

recorded redemption payments totaling US$2,000,000 allocated to Programmes E11 ($1,250,000) E14 ($250,000) and U21 ($500,000). It acknowledged that there was a potential surplus of $90,253 over the five programmes, after "Adjustments" which included (a) claims made for increased reserves and payment to insurers (under a letter of credit issued under Programme U21); (b) "cross-collateralization" of US$1,259,895 with Programme C39; and (c) a claim for $1,800,000 made by the MRM Group against Stephen Friedberg.

33.    Each of the "Adjustments" is challenged by the Petitioners, but their primary contention is that, even on the Company's own figures, there was a surplus of $90,253 which they submit, by virtue of the course of dealing, was contractually due to them from the Companies.

34.    The next question is whether there is a "bona fide and substantial dispute" that the total amount is due by reason of the "Adjustments" which the Companies claimed. The relevant evidence briefly is as follows:

    (a) the direct insurer under Programme U21, Credit General, is in liquidation, and the liquidator has drawn down US$1,500,000 under a letter of credit provided by Mutual under these programme arrangements, as evidenced by the reference to letter of credit expenses in Clause 2C. The Companies therefore gave credit for the sum of US$709,973 previously claimed as loss reserves, but they debited a further US$744,364 as a "reserve for potential increase in Credit General liability". The Companies' evidence is that the amounts for reserves are fixed on the basis of independent, professional advice;

    (b) regarding "cross-collateralization" of Programme 39, the Companies rely on the oral agreement described by Mr. Alexander and not challenged by Mr. Friedberg. He asserted in his second Affidavit that Clause 7 of the Agreements required any modification or amendment to be in writing, but the Agreement does not contain any express term that each programme is discrete or that no set-off is allowed.

35.    On these figures, therefore, the Companies acknowledged that the "potential surplus" would increase from $90,253 to $1,890,253 if the ""MRM Group claim" item was left out of account.

36.    Mr. Alexander produced a further account showing the "potential surplus as at 30th September, 2002". This showed a surplus totaling US$2,041,492 on Programmes E11, E14, U21, M23 and N23, offset by

a debt of US$2,856,523 on Programme C39. Thus, this account shows a balance in the Petitioners' favour if the Companies are not entitled to cross-collateralization of the Programme C39 debt.

Submissions

37.    Mr. Hargun denied that there was a course of dealing having any contractual effect, and his primary submission for the Companies is that a winding-up Petition should be struck out as an abuse of process if it is based on a debt which is disputed by the Company, on bona fide and substantial grounds. A recent re-statement of the law is as follows:-

"A winding-up petition is not a legitimate means of seeking to enforce payment of a debt which is a bona fide disputed: Stonegate Securities Ltd. v. Gregory [1980] 1 All E.R. 241 at Page 243. It is an abuse of the process of the Court to present a winding-up petition against a company based on the non-payment of a debt which is bona fide disputed on substantial grounds, even if the company is otherwise shown to be insolvent: Mann v. Goldstein [1968] 2 All E.R. 769; Re a Company (No. 0012209 of 1991) [1992] 2 All E.R. 797. It is also sometimes said that where the debt is disputed, the alleged creditor has no locus standi to present a petition: Mann v. Goldstein [1968] 2 All E.R. 769 at 774-775, approved in Stonegate Securities Ltd. v. Gregory [1980] 1 All E.R. 241 at 244, Re Bayoil SA [1999] 1 BCLC 62 AT 65-66. But this is a rule of practice only, which may have to give way to circumstances which make it desirable for the petition to proceed: Re Claybridge Shipping Co. SA [1997] 1 BCLC 572; Alipour v Ary [ 1997] 1 BCLC 557".

(Re MIC World Com Ltd. [2003] 1 BCLC 330, per Lawrence Collins, J.)

38.    This submission was not challenged by Mr. Duncan, but he also referred us to Re UOC Corp. (Court of Appeal, England: Unreported: cited in the first Supplement to O'Neill and Woloniecki on the Law of Rinsurance at Paragraph 17-11) where Peter Gibson L.J. said that a creditor's petition "will not be dismissed if the petitioning creditor has a good arguable case that he is a creditor and the effect of dismissal would be to deprive the petitioner of a remedy or otherwise injustice would result or for some other sufficient reason the petition should proceed." In a case before the Supreme Court of Bermuda, In the Matter of Caliban Holdings Ltd., Belvedere Insurance Co. Ltd. (in Liquidation) v. Caliban Holdings Ltd. Companies (Winding-up) No. 80 of 199, Mitchell J. held that in the "most unusual" circumstances of that case the existence or otherwise of the debts should be litigated with the winding-up proceedings. In Re London & Gobal Ltd. (11th June 1998, Court of Appeal, England) Peter Gibson L.J. drew the analogy

with applications for summary judgment, where judges may determine, even on conflicting evidence, that the defendant has no real or bona fide defence.

39.    Mr. Duncan submitted that the present case is one where the amount owing should be "litigated with the winding-up proceedings", not least because $90,523 was as he submits, admitted to be due. Mr. Hargun contends that no special circumstances exist, which should justify a departure from the rule of practice that the winding-up petition is struck out when the company has a bona fide and substantial defense to the claim.

40.    With regard to the cross-collateralization issue, Mr. Duncan made a further submission, that the alleged oral agreement made on 30th January, 2002 was not valid as a set-off against claims made by the Petitioners Dale Kopf and Dallas Krapf who were third parties to the alleged oral agreement made on 30th January, 2002. However, Mr. Alexander states that Mr. Friedberg made the agreement on their behalf, as well as his own, and Mr. Duncan acknowledged that there were grounds on which an allegation of ostensible, if not actual authority might be based.

Conclusions

41.    We find and hold that the Companies have shown that they have a bona fide and substantial defence to the Petitioners' claims, whether made under the terms of the relevant Shareholders' Agreement or under an implied variation thereof (if such is alleged) by reason of an alleged course of dealing between the parties prior to March 2002 (see Paragraphs 30, 31 and 37 above).

42.    We further find and hold that the following "Adjustments" made by the Companies in their accounts for 31st March, 2002 are bona fide and substantial defences to the Petitioners' claims for sums allegedly otherwise due, namely:

(a) Reserves and other claims in respect of Programme U21(see Paragraph 34(a) above); and

(b) Cross-collateralization of losses incurred under Programme C39 (see Paragraphs 34(b) and 40 above).

43.    We hold that no circumstances exist in the present case which would justify departing from the "rule of practice" that a winding-up petition based on a debt which the company disputes on bona fide and substantial grounds is an abuse of process and should be struck out.

44.    We, therefore, grant leave to appeal in both cases, and the Companies' appeals are allowed. We order that:-

(1) leave to appeal is granted in both cases;

(2) the appeals are allowed;

(3) the judge's ruling dated 12th June, 2003 is set aside;

(4) the Winding-up Petitions Nos. 299 and 300 of 2002 are struck out as an abuse of process of the Court; and

(5) the Petitioners shall pay to the Companies their costs of the appeals and their costs of the Petitions and of the Summonses, to be taxed if not agreed.


_____
Evans, J.A.


_____
Zacca, P.


_____
Clough, J.A.


IPC Appeal

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October 2005, a true and correct copy of

the foregoing Mutual Defendants' Pre-Hearing Brief was served on the following as noted:

> Han Nguyen, Esquire
> SCHNADER HARRISON SEGAL & LEWIS LLP
> Suite 36,00, 1600 Market Street
> Philadelphia, PA  19103
> *(via hand delivery)*

> Patrick J. Rega, Esq.
> Hergenroeder Rega & Sommer LLC
> Centre City Tower, Suite 1700
> 650 Smithfield Street
> Pittsburgh, PA  15222
> *(via facsimile)*

A courtesy copy of the Mutual Defendants' Pre-Hearing Brief was sent via hand

delivery to:

> The Honorable William H. Yohn, Jr.
> United States District Court for the Eastern District of Pennsylvania
> United States Courthouse
> Room 14613
> 601 Market Street
> Philadelphia, PA 19106

> s/Brooke J. Hertzer
> Brooke J. Hertzer